**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELEVATOR CONSTRUCTORS UNION LOCAL NO. 1 ANNUITY & 401(K) FUND on Behalf of Itself and All Others Similarly Situated,<br><br>                     Plaintiff,<br><br>   v.<br><br>RECKITT BENCKISER GROUP PLC, LAXMAN NARASIMHAN, NICANDRO DURANTE, KRISTOFFER LOE LICHT, PATRICK SLY, and JEFFERY CARR,<br><br>                    Defendants. | Civil Action No. 1:25-cv-4708<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

**COMPLAINT FOR VIOLATIONS OF THE**
**FEDERAL SECURITIES LAWS**

Elevator Constructors Union Local No. 1 Annuity & 401(K) Fund ("Plaintiff"), individually and on behalf of all others similarly situated, by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Reckitt Benckiser Group PLC ("Reckitt" or the "Company"), with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Reckitt; and (c) review of other publicly available information concerning Reckitt.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of all persons and entities that purchased or otherwise acquired Reckitt American Depositary Shares ("ADSs") between January 13, 2021, and July 28, 2024, inclusive (the "Class Period"), against Reckitt and certain of its officers and executives, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Reckitt, a United Kingdom ("U.K.")-based global consumer goods company, reports three operating segments: (1) Hygiene, (2) Health, and (3) Nutrition. In 2017, Reckitt acquired Mead Johnson Nutrition ("Mead Johnson") for $19.7 billion, which effectively provided the Company with its current Nutrition segment. Reckitt's Nutrition segment includes, among others, its infant and child nutrition businesses, its adult nutrition, and its range of vitamins, minerals, and supplements. Brands under Reckitt's Nutrition segment include infant and baby formulas such as Enfamil.

3.      Enfamil is a cow's milk-based formula designed for premature infants. While cow's milk-based formula was good for bulking up these babies quickly, science and research have advanced in recent years confirming strong links between cow-based products and Necrotizing Enterocolitis ("NEC") causing and/or substantially contributing to death in preterm and severely preterm, low-weight infants, along with many other health complications and long-term risks to these babies. Throughout the Class Period, Defendants touted the purportedly conclusive science on which Enfamil is based to assure investors and consumers of Enfamil's safety.

4.      Unbeknownst to investors, Reckitt failed to warn investors and consumers (1) that preterm infants were at an increased risk of developing NEC by consuming Reckitt's cow's milk-based formula, Enfamil, and (2) of the attendant impact on Reckitt's sales of Enfamil and Reckitt's exposure to legal claims.

5.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADSs, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

8.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in

substantial part in this Judicial District.  In addition, the Deposit Agreement that governs Reckitt's ADSs contains a binding forum-selection clause specifying jurisdiction in a state or federal court in New York, New York.

9.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone and wire communications, and the facilities of a national securities exchange.

## **PARTIES**

10.      Plaintiff Elevator Constructors Union Local No. 1 Annuity & 401(K) Fund, as set forth in the accompanying certification, incorporated by reference herein, purchased or otherwise acquired Reckitt ADSs during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

11.      Defendant Reckitt is a U.K.-based consumer goods and health conglomerate.  The Company maintains substantial operations in the United States, including its principal U.S. corporate offices, which are located in Parsippany, New Jersey.  Reckitt's ordinary shares trade on the London Stock Exchange under the ticker symbol "RB," while its sponsored ADSs trade on the U.S. over-the-counter ("OTC") market under the ticker symbol "RBGLY."  Five ADSs represent one ordinary share.

12.      Defendant Laxman Narasimhan ("Narasimhan") served as the Company's the Chief Executive Officer ("CEO") from September 2019 until his abrupt resignation in September 2022.

13.      Defendant Nicandro Durante ("Durante") served as the Company's CEO from September 2022 to October 2023.

14. Defendant Kristoffer Loe Licht ("Licht") has served as the Company's CEO Designate ("CEO Designate") since May 2023 and Executive Director of the Company's Board of Director (the "Board") since June 2023, respectively. Licht also served as President of the Company's Health segment and as Chief Customer Officer ("CCO") from July 2020 until his appointment as CEO Designate in May 2023.

15. Defendant Patrick Sly ("Sly") has served as President of the Company's Health segment since July 2023. Sly originally joined the Company as part of its acquisition of Mead Johnson and served as the Company's President of Global Nutrition from 2021 until his appointment as President of the Company's Health segment in 2023.

16. Defendant Jeffrey Carr ("Carr") served as the Company's CFO and Executive Director of the Board from 2020 until his retirement in March 2024.

17. Defendants Narasimhan, Durante, Licht, Sly, and Carr (together, the "Individual Defendants" and together with the Company, "Defendants") because of their positions with Reckitt, possessed the power and authority to control the contents of, among other things, Reckitt quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of Reckitt's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and

misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

18.     According to the World Health Organization (the "WHO"), babies born prematurely, or "preterm," are defined as being born alive before 37 weeks of pregnancy are completed.  The WHO estimates that approximately 15 million babies are born preterm every year and that this number is rising.

19.     Historically, there are three types of nutrition for preterm babies: parenteral nutrition for feed intolerance such as a feeding tube, human milk whether it is the mother's own milk or donor milk, and cow's milk-based formulas and fortifiers.  Cow's milk-based products were believed to be good for the growth of premature, low birth weight babies.  While the cow's milk-based products were good for bulking up these babies quickly, science and research have advanced in recent years confirming strong links between cow-based products and NEC causing and/or substantially contributing to death in preterm and severely preterm, low-weight infants, along with many other health complications and long-term risks to these babies.  Additionally, advances in science have created alternative fortifiers that are derived from human milk and non-bovine based products.  Despite knowledge of a causal connection between cow's milk-based products and NEC, the manufacturers of the cow's milk-based products, including Defendants, did nothing to change their product, packaging, guidelines, instructions, and/or warnings and continue to promote and sell the cow's milk-based products versions.

20.     NEC is a deadly intestinal disease characterized by inflammation and injury of the gut wall barrier that may advance to necrosis and perforation of the gut.  The classic signs and symptoms of NEC experienced by vulnerable preterm babies after ingesting the cow's milk-based

products include, but are not limited to: irritability, crying, pain, abdominal distention, hyperthermia, and tachycardia.

21.    Throughout the Class Period, Defendants touted the purportedly conclusive science on which Enfamil is based to assure investors and consumers of Enfamil's safety.

## FALSE AND MISLEADING STATEMENTS

22.    On January 13, 2021, the Company presented at the 39th Annual JPMorgan Virtual Healthcare Conference.  During the question and answer portion of the call, Narasimhan touted the benefits of the Mead Johnson acquisition and highlighted that it had enhanced Reckitt's science-based approaches to the Nutrition segment:

> [A]s I said last year, last February, the acquisition of the infant nutrition business brought 3 things for us.  First, it brought scale in some emerging markets where we were subscale and we weren't that strong, it came in and added to our portfolio. The second thing it did is it brought some strength in R&D., some of which have actually strengthened our science platforms pretty much across the portfolio, and given us the platform, particularly in areas like senior nutrition, where the science of Mead Johnson is beginning to find its [] play, but also where there's some tailwind.  And third, it brought some terrific scales in digital and e-commerce, and particularly in China.  And that has been actually scaled up pretty much around the world.  As we've looked across our entire business. I mean it's one level, this is a great example of the CRM business.  I mean of a continuous business where you're building relationships with consumers for certain periods of time, then, of course, you leave the category and come back.  So that's been a skill set that's been developed over time, and it's actually been very helpful across our entire portfolio.

23.    On February 24, 2021, the Company hosted an earnings call with securities analysts to discuss the Company's financial results for fiscal year 2021.  During the earnings call, Narasimhan touted the Company's "five-fold" investment into its science platforms, specifically focusing on expanding its research and development ("R&D") of the microbiome, which directly impacts infant formulas, such as Enfamil.  Specifically, Narasimhan stated, in relevant part:

> Let's start with R&D and innovation.  Last year, I signaled that returning to our innovation-led growth heritage was strategically important for the rejuvenation of sustainable growth at RB.  We have increased our focus here.  And in 2021, we will invest around 35% more than we did in 2019.

Key to our success will be the investments we are making in science platforms. Here, we are making a fivefold increase in investment, which is funding the hiring of high-caliber scientists, engineers and technical professionals as well as enabling technologies.

These science platforms, the 8 areas detailed at the bottom of the slide, will deepen our capabilities in areas like the microbiome, polymer science, digestive health and surface chemistry. They will span all the GBUs and work across a number of consumer needs like immunity, digestive health and pain relief, just a few examples that are shown here.

24.     During the question and answer portion of the call, Narasimhan responded to a security analyst's question about the Company's Nutrition business in China by touting the benefits of the Mead Johnson acquisition on the Nutrition segment as a whole:

On Nutrition business, ex Greater China, as I said earlier, is growing mid-single digits. We have a great presence in the U.S. The Americas business overall has gained share. We have opportunities in Latin America to improve but also to bring in Adult Nutrition into that area.

But what we are doing is taking the science of Mead Johnson and bringing it into the technology platforms that we have in R&D. And it's clearly been very helpful, particularly as you look at the microbiome technology platform that we had, some of the work in digestive health. You see the linkages across the overall spectrum, we're bringing that in together.

And so those are just a couple of examples, also in allergy and the work in allergy and the work -- how we're bringing that into the technology platform, it provides a base for us to get to scale across not just what you see in the Nutrition business, but also in the Health business. So that's the other add I'll give you in terms of what it does for us in terms of the potential.

We've also learned a lot, by the way, from Mead Johnson on e-commerce. It's a terrific e-commerce operation. We've scaled that in North America and Canada. And now we're scaling it up to other countries too.

25.     On July 27, 2021, the Company issued a press release reporting its second quarter 2021 financial results. Therein, the Company reported a positive trend in revenues from the Nutrition segment positively that impacted net revenues. Specifically, the press release stated, in relevant part:

**Performance in H1 2021**

- Excluding IFCN China, H1 LFL net revenue was up 3.7%, and the two-year stacked LFL [like-for-like] net revenue growth vs H1 2019 was 17.6%. Including IFCN China the two-year stacked LFL net revenue growth vs H1 2019 was 13.4%.
- Q2 2021 LFL net revenue (ex IFCN China) was up 2.2%, as slower growth in Hygiene was partly offset by improving trends in Nutrition and our OTC brands.

26.     During the associated pre-recorded earnings call published the same day, Narasimhan stated that the allergy segment of Specialty Infant Nutrition, is grounded in science that has improved the Nutrition segment's growth. Specifically, Narasimhan stated, in relevant part:

> Turning to Specialty Infant Nutrition. This is our highest margin business, and it is a business that has taken a while for us to fully put the building blocks in place. The allergy segment is large and growing at 7% historically, as a result of increased prevalence with very supportive consumer trends grounded in science.

27.     On September 23, 2021, the Company hosted its first Investor Seminar. During the call, Narasimhan touted the growth of the Company's Specialty Infant Nutrition segment and attributed the growth to the Company's investment in science. Specifically, Narasimhan stated, in relevant part:

> Our specialty infant business is currently largely a North American business, where our brands Nutramigen and PurAmino, they play in allergy with a very strong science backbone and have achieved strong market positions, in fact, market leadership recently in North America. The opportunity set for our specialty infant business is global, and we are rapidly expanding it. Together, we expect that our core Enfa business and our specialty infant nutrition business is a low single digits growth business, growing in the region of 1% to 4%.
>
> Additionally, we expect our Adult Nutrition business to contribute 100 basis points on average to our growth each year. This is a large total addressable market. We have the science, and we're one brand launched and others in the works and an exciting brand like Sustagen in the developing markets.
>
> Finally, we expect our vitamins, minerals and supplements business to deliver 4% to 6% growth, in line with what we are seeing as we expand and extend on new brands. Together, that combines to drive 3% to 5% growth in the medium term.

We have focused strongly on refining the model that underpins our nutrition business. Specifically, the incremental investment in science, innovation, expert recommendation and executional excellence, coupled with our continuous relationship marketing or what we call care model, which maximizes consumer lifetime value and provides the basis for a broader Reckitt relationship with a household at a time in the life of a consumer when behaviors change the most.

Our core Enfa business growth relies on science and differentiated claims to support premiumization, offsetting the declines in birth rates. Our science is very strong across cognition, digestion and immunity. And the business has a strong pipeline of products and claims.

28. On October 26, 2021, the Company issued a press release reporting its third quarter 2021 financial results. Therein, the Company reported an increase in net revenue from its Nutrition segment, which the Company attributed to price/mix improvements and was driven by infant formula. Specifically, the press release stated, in relevant part:

Nutrition net revenue grew on a LFL basis by 3.8% in the quarter to £640m. This reflected volume decline of 2.5% and price/mix improvements of 6.3% due to pricing growth in IFCN North America and VMS. Reported net revenue declined 20.6% primarily reflecting the decline in IFCN China revenue.

IFCN net revenue grew 5% on a LFL basis. The US business, which represents around half of IFCN revenue, grew high-single digits. This has been driven primarily by Nutramigen – our Specialty brand – and good share gains in the base Enfa business, along with an increase in birth rates in recent months. Our business in ASEAN returned to growth following the increased focus placed on the business in recent months, whilst in Latam, trading continues to be positive

29. On April 29, 2022, the Company hosted an earnings call to discuss its first quarter 2022 financial results. During the call, Narasimhan assured investors that the Company's "most important measure" is quality, and that the Company would only supply products into the market if it is comfortable with their quality. Specifically, Narasimhan stated, in relevant part:

The primary focus of manufacturing and the supply chain in our Infant Formula business is quality. We want to be sure that what we are producing is something that we feel comfortable with, that we feel good about supplying into the market. So the most important measure in anything that we think of is quality.

30.     On March 1, 2023, the Company hosted an earnings call to discuss its Fiscal Year 2022 financial results.  During the call, Sly touted the Company's market share and Enfamil's strong reputation among health care professionals, which has helped it reach its strong market share.  Specifically, Sly stated, in relevant part:

> In North America, we are now the #1 infant formula manufacturer in both the United States as well as Canada.  Enfamil is now the #1 most trusted brand, both by parents and health care professionals . . . In the United States, our market share of non-WIC, i.e., the formula which parents choose and pay for themselves, is just under 50%, up from around 38% at the beginning of 2022.

> In developing markets, we strengthened our reputation with health care professionals, or HCPs, during the year.  Having the trust of HCPs is critical as it is the HCPs who interact with parents and help them make the choice of the right formula for their babies.  This improvement in our go-to-market capability is delivering results with market share gains in Mexico and Thailand and a significant turnaround in our Philippines business throughout the year.  We have more work to do here, but I'm very encouraged by the progress that we are making.

> *    *    *

> It is difficult to know exactly how much of this increased share we will retain.  I think it will be relatively sticky in the short term, as parents don't tend to switch brands when they're happy with their baby's formula.  However, there's no doubt the market will become more competitive in 2023.  But I can assure you that with our leading brands and stronger reputation with health care professionals, including being the #1 recommended brand by pediatricians in the U.S., we will be fighting hard for every new parent who enters the category in 2023 and beyond.

31.     On April 26, 2023, the Company hosted an earnings call to discuss its first quarter 2023 financial results.  During the call, Carr touted the Company's market share for infant formula and stated that the Company benefitted from mothers "sticking with Enfamil," which bolstered his confidence the Company would maintain its market share.  Specifically, Carr stated, in relevant part:

> In the U.S., we maintained our market-leading share position in the non-WIC markets, showing that mothers already in the category are sticking with Enfamil, and we are seeing good signs of new mothers entering the category also sticking with Enfamil.

In addition, the quarter was helped by some retailer restocking due to the supply shortages that we had in the end of last year and during the whole of 2022, in fact. We know maintaining share will be difficult as we progress through the year when the competitive environment heats up, but we remain confident in our ability to maintain a sustainable upside in market share versus our position prior to the supply issues.

32.    During the question and answer portion of the call, Durante told investors he was confident in the market share of the Nutrition segment and attributed its strength to the pediatricians' recommendation for Enfamil and the future innovations the Company has planned. Specifically, Durante stated, in relevant part:

As I said in the full year's results, our brands Enfamil is the preferred brand by -- the #1 preferred brand by the pediatricians in the United States, it has not changed. So we have a strong portfolio. I'm very optimistic that we'll retain some or most of the share during the year because we are in a good momentum. The competition is fully backed and we are retaining our share . . . .

So if you look at quarter 1, it was better than quarter 4 next year. And with the innovations working and the early results are really great, I expect market share in Nutrition to improve in the coming quarters. So I'm not worried about that. I'm very optimistic that things are going to move into the right direction. The pipeline of innovations that we have just launched, the first results are really good.

33.    On July 26, 2023, the Company hosted an earnings call to discuss its first half fiscal year 2023 financial results. During the call, Licht touted the Company's market share of hospital contracts, which he attributed to pediatricians' trust in Enfamil. Specifically, Licht stated, in relevant part:

In the U.S., we've maintained an absolute non-WIC market share just below 50%. Enfamil remains the #1 recommended infant formula by pediatricians and the #1 trusted brand by consumers in the U.S. And Nutramigen remains the #1 allergy brand. We also have a circa 40% share of hospital contracts, which we've managed to increase over the last 18 months. This is an excellent performance by our U.S. team who did an outstanding job, along with our supply and R&D colleagues who all worked very hard to supply significantly more safe formula to mothers and babies during a national crisis. In addition, the quarter was helped by some retailer restocking due to the supply shortages that we had in the end of last year and during the whole of 2022, in fact.

34.     On February 22, 2024, Reckitt presented at the 2024 Consumer Analyst Group of New York Conference.   During the call, Licht discussed supply disruptions and touted the Company's close coordination with the US government to provide formulas that were 40% safer than those previously distributed.   Specifically, Licht stated, in relevant part:

> More recently, the U.S. infant nutrition market saw some significant supply disruption. Our teams from the U.S. and internationally worked 24/7 in conjunction with the U.S. government and close coordination with our retail partners to provide 40% more safe, high-quality formula to help the U.S. address these shortages.

35.     Licht also touted the science behind the Company's premature infant formula, Enfamil NeuroPro, which benefits infants' health.   Specifically, Licht stated, in relevant part:

> Now I want to give you an example of how we're premiumizing nutrition with superior science.   Enfamil NeuroPro contains critical ingredients to drive brain superiority and immunity including MFGM.   This superior proposition is enabling us to both premiumize the value per infant nutrition basket for our retailers and the category, while driving better health and cognitive outcomes for consumers.

36.     During the question and answer portion of the call, a securities analyst asked Licht about long-term growth opportunities for Reckitt's infant formula business.   In response, Licht stated the long-term growth is based on the fact the formulas are "anchored" on the science. Specifically, Licht stated, in relevant part:

> There's also no question that the real way to grow this business and what's attractive about this business is actually the runway for significant premiumization.   And that's why I anchored on the science that underpins our innovation and our formula in the benefits that we can deliver when we bring new propositions to market that are clinically supported, where we have strong science to back that and claims that we can make that are very relevant for consumers.
>
> So in terms of health outcomes, for babies, et cetera, there's a long runway for growth to actually improve formula, deliver new benefits that are scientifically proven and premiumize the business as a result.

37.     On February 28, 2024, the Company issued a press release reporting the Company's full year 2023 financial results. Therein, the Company trumpeted Enfamil's position as the "number one recommended infant formula by paediatricians in the US."

38.    On the same day, the Company also published its 2023 Annual Report and Accounts. Therein, the Company attributed Enfamil's position as the "number one recommended infant formula" to its foundation in science. Specifically, the 2023 Annual Report and Accounts stated, in relevant part:

> Our products are differentiated by our clinical, science-based approach to innovation and an expanding focus on specialised nutrition.
>
> Our leading scientists and Key Opinion Leader partnerships enable us to deliver solutions that are trusted and respected by parents and healthcare professionals (HCPs) alike. This is reflected in Enfa's position as the leading premium infant nutrition brand across markets and the number one paediatrician recommended product in core markets such as the US and Malaysia, where infants are able to benefit from the cognitive and digestive benefits of our science-backed formula.

39.    During the earnings call on the same day, Licht again touted its share of hospital contracts and the trust pediatricians have in Enfamil. Specifically, Licht stated, in relevant part:

> Turning to Nutrition. While our North America business continues to rebase, we exited the year as market leader. And Enfamil remains the #1 brand recommended by pediatricians. We also have a circa 45% share of hospital contracts.
>
> We drive growth in this business through both premiumization, from science-led innovation and focus on the faster-growing and higher gross margin segment of specialty formula. We are operating in an evolving regulatory environment. We are working closely with regulators and other stakeholders to continually improve standards. Families and health care providers rely on our products, and we take that responsibility very seriously.

40.    On April 24, 2024, the Company hosted an earnings to discuss the Company's first quarter 2024 financial results. During the call, Licht commented on the pending NEC litigation and expressly denied any scientific causal connection between Enfamil and NEC. Specifically, Licht stated, in relevant part:

> Enfamil premature products are safe and provide life-saving nutrition for premature babies under the guidance of medical professionals who administer and specify our products. We strongly reject any assertion that any of our products cause necrotizing enterocolitis and that there was any failure to warn users of risk. The science does not support a causal connection between any Mead Johnson product and NEC. We have no plans to stop providing the product, as that would be

detrimental to the care of preterm babies and their families. Safety is and will remain our #1 priority across our entire product portfolio. And we are not seeing any wider impact on the equity of our nutrition brands from this litigation.

41. The above statements set forth above in ¶¶22-40 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading. Specifically, Defendants failed to warn investors and consumers: (1) that preterm infants were at an increased risk of developing NEC by consuming Reckitt's cow's milk-based formula, Enfamil; (2) of the attendant impact on Reckitt's sales of Enfamil and Reckitt's exposure to legal claims; and (3) as a result of the above, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

42. On March 15, 2024, in the case captioned *Watson vs. Mead Johnson Co*., Docket No. 21-L-1032 (Ill. Cir. Ct. Oct. 28, 2021), a jury in St. Clair County, Illinois, returned a $60 million verdict in the first NEC lawsuit to be tried to a verdict. The jury found that Mead Johnson was negligent and failed to warn the decedent's mother of the increased risk her preterm infant could develop NEC by consuming cow's milk-based formula.

43. On this news, the price of the Company's ADSs fell $1.87, or nearly 14%, from a closing price of $13.31 per share on March 14, 2024, to a closing price of $11.44 per share on March 15, 2024.

44. On July 29, 2024, in the case captioned *Gill v. Abbot Laboratories, Inc.*, Docket No. 2322-CC1251 (Mo. Circ. Ct. Jun. 23, 2023), a jury in St. Louis, Missouri concluded that Abbott's specialized formula for premature babies led to a baby develop NEC and awarded the plaintiff $495 million.

45.    On this news, the price of the Company's ADSs fell $1.02, or nearly 9%, from a closing price of $11.66 per share on July 28, 2024, to a closing price of $10.64 per share on July 29, 2024.

<u>**CLASS ACTION ALLEGATIONS**</u>

46.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Reckitt ADSs between January 13, 2021, and July 28, 2024, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

47.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, millions of Reckitt's sponsored ADSs traded on the OTC market. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Reckitt or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

48.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

49.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' actions as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Reckitt; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

51.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

52.     The market for Reckitt's ADSs was open, well-developed, and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Reckitt's ADSs traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class, relying upon the integrity of the market price of the Company's ADSs and market information relating to Reckitt, purchased or otherwise acquired Reckitt's ADSs and have been damaged thereby.

53.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Reckitt's ADSs, by publicly issuing false and/or misleading statements and/or

omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Reckitt's business, operations, and prospects as alleged herein.

54.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Reckitt's financial well-being and prospects. These material misstatements and/or omissions had the effect of creating, in the market, an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's ADSs to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's ADSs at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## **LOSS CAUSATION**

55.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

56.     During the Class Period, Plaintiff and the Class purchased Reckitt's ADSs at artificially inflated prices and were damaged thereby. The price of the Company's ADSs significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

57.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Reckitt, their control over, and/or receipt and/or modification of Reckitt's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Reckitt, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

58.     The market for Reckitt's ADSs was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Reckitt's ADSs traded at artificially inflated prices during the Class Period. On April 21, 2021, the Company's share price closed at a Class Period-high of $19.26 per ADS. Plaintiff and other members of the Class purchased or otherwise acquired the Company's ADSs relying upon the integrity of the market price of Reckitt's ADSs and market information relating to Reckitt, and have been damaged thereby.

59.     During the Class Period, the artificial inflation of Reckitt's ADSs was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading

statements about Reckitt's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Reckitt and its business, operations, and prospects, thus causing the price of the Company's ADSs to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's ADSs. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's ADSs at such artificially inflated prices, and each of them has been damaged as a result.

60.    At all relevant times, the market for Reckitt's ADSs was an efficient market for the following reasons, among others:

(a)    Reckitt's ADSs met the requirements for listing, and was listed and actively traded on the OTC market, a highly efficient and automated market.

(b)    As a regulated issuer, Reckitt filed periodic public reports with the SEC.

(c)    Reckitt regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Reckitt was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports were publicly available and entered the public marketplace.

61.    As a result of the foregoing, the market for Reckitt's ADSs promptly digested current information regarding Reckitt from all publicly available sources and reflected such information in Reckitt's ADSs price. Under these circumstances, all purchasers of Reckitt's ADSs

during the Class Period suffered similar injury through their purchase of Reckitt's ADSs at artificially inflated prices and a presumption of reliance applies.

62.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

63.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading,

and/or the forward-looking statement was authorized or approved by an executive officer of Reckitt who knew that the statement was false when made.

## FIRST CLAIM

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
<u>Against All Defendants</u>**

64.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

65.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Reckitt's ADSs at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each defendant, took the actions set forth herein.

66.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADSs in an effort to maintain artificially high market prices for Reckitt's ADSs in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein, or as controlling persons as alleged below.

67.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails and wires, engaged and participated in a continuous course of conduct to conceal adverse material information about Reckitt's financial well-being and prospects, as specified herein.

68.    Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Reckitt's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Reckitt and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADSs during the Class Period.

69.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

70.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Reckitt's financial well-being and prospects from the investing public and supporting the artificially inflated price of its ADSs. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

71.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Reckitt's ADSs was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's ADSs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the ADSs trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Reckitt's ADSs during the Class Period at artificially high prices and were damaged thereby.

72.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Reckitt was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Reckitt ADSs, or, if

they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

73.      By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74.      As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's ADSs during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

75.      Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

76.      Individual Defendants acted as controlling persons of Reckitt within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

78.     As set forth above, Reckitt and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's ADSs during the Class Period.

<strong><u>PRAYER FOR RELIEF</u></strong>

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

<strong><u>JURY TRIAL DEMANDED</u></strong>

Plaintiff hereby demands a trial by jury.

DATED:  June 5, 2025                              **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                                                 */s/ Thomas L. Laughlin, IV*

Thomas L. Laughlin, IV (TL-4471975)
Donald A. Broggi (DB-4784195)
Kassandra A. Nelson (KN-5861059)
Jonathan Zimmerman (*pro hac vice* forthcoming)
Nicholas S. Bruno (NB-5953245)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
tlaughlin@scott-scott.com
dbroggi@scott-scott.com
knelson@scott-scott.com
jzimmerman@scott-scott.com
nbruno@scott-scott.com

*Counsel for Plaintiff Elevator Constructors Union
Local No. 1 Annuity & 401(K) Fund*

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Leonard Legotte, on behalf of Elevator Constructors Union Local No. 1 Annuity & 401(K) Fund (the "Fund"), herby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am the Co-Chair for the Board of Trustees of the Fund.  I am authorized to make legal decisions on behalf of the Fund.

2.    I have reviewed the Class Action Complaint filed against Reckitt Benckiser Group PLC and certain of its officers (the "Complaint"), and authorize the filing of this Certification and the Complaint on behalf of the Fund.

3.    The Fund is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4.    During the Class Period (as defined in the Complaint), the Fund purchased and/or sold the security that is the subject of the Complaint as set forth on the attached Schedule A.

5.    The Fund did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.    During the three-year period preceding the date on which this Certification is signed, the Fund has either served or sought to serve as a representative party on behalf of a class in the following private actions arising under the Securities Act or the Exchange Act:

- *Pembroke Pines Firefighters & Police Officers Pensions Fund v. Integra LifeSciences Holdings Corp.*, No. 3:23-cv-20321 (D. N.J.)

7.    The Fund will not accept any payment for serving as a representative party on behalf of the Class beyond its *pro rata* share of any recovery, except for such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _____ day of

May 2025.

                                        **ELEVATOR CONSTRUCTORS UNION LOCAL
                                        NO. 1 ANNUITY & 401(K) FUND**

                                        _____

                                        Leonard Legotte
                                        Co-Chair for the Board of Trustees

# Schedule A

**RECKITT BENCKISER-SPON ADR**                                          Ticker:     **RBGLY**     Cusip:     **756255204**

Class Period: 01/13/2021 to 07/28/2024

**ELEVATOR CONSTRUCTORS UNION LOCAL NO. 1 ANNUITY & 401(K) FUND**

| | DATE | SHARES | PRICE |
|---|---|---|---|
| Purchases: | 7/7/2021 | 20,129 | $18.29 |
| | 7/8/2021 | 5,801 | $18.21 |
| | 6/1/2022 | 24,152 | $15.66 |
| | 6/2/2022 | 1,013 | $15.83 |
| | 10/6/2022 | 1,664 | $13.31 |
| | 10/26/2022 | 1,142 | $13.28 |
| | 11/8/2022 | 13,314 | $13.15 |
| | 12/7/2022 | 1,090 | $14.64 |
| | 12/22/2022 | 1,761 | $13.86 |
| | 1/19/2023 | 1,000 | $14.58 |
| | 1/20/2023 | 1,066 | $14.67 |
| | 2/9/2023 | 1,300 | $14.03 |
| | 2/10/2023 | 1,331 | $13.93 |
| | 6/13/2023 | 689 | $15.15 |
| | 6/30/2023 | 1,008 | $15.20 |
| | 7/3/2023 | 992 | $15.19 |
| | 8/15/2023 | 2,781 | $14.50 |
| | 11/6/2023 | 2,424 | $13.56 |
| | 11/21/2023 | 1,700 | $13.47 |
| | 3/4/2024 | 2,815 | $13.03 |
| | 3/5/2024 | 1,642 | $12.98 |
| | 3/6/2024 | 1,173 | $12.77 |
| | 3/28/2024 | 2,662 | $11.37 |
| | 4/11/2024 | 1,254 | $10.53 |

|        |            |        |         |
|--------|------------|--------|---------|
|        | 7/5/2024   | 948    | $10.97  |
|        | 7/9/2024   | 1,942  | $10.95  |
|        | 7/26/2024  | 1,199  | $11.57  |
| **Sales:** | 1/14/2022 | 7,197 | $17.13  |
|        | 4/5/2022   | 47,464 | $15.68  |
|        | 6/23/2022  | 600    | $15.25  |
|        | 6/24/2022  | 599    | $15.52  |
|        | 3/16/2023  | 1,089  | $14.41  |
|        | 3/17/2023  | 1,089  | $14.31  |
|        | 3/20/2023  | 2,536  | $14.41  |
|        | 5/18/2023  | 1,220  | $16.27  |