UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— x
                                              :
In re RECKITT BENCKISER GROUP PLC      :     Civil Action No. 1:25-cv-04708-JPC-SDA
SECURITIES LITIGATION                         :
                                              :     <u>CLASS ACTION</u>
—————————————————— x

## AMENDED COMPLAINT FOR VIOLATIONS OF THE
## FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

**Page**

NATURE OF THE ACTION AND OVERVIEW ........................................................................1

JURISDICTION AND VENUE ...............................................................................................4

PARTIES ...............................................................................................................................6

SUBSTANTIVE ALLEGATIONS ..........................................................................................8

    I.     Reckitt's Infant-Formula Business and That Business's Dependence on
           NICUs .................................................................................................................8

    II.    The Devastating Disease Necrotizing Enterocolitis ...............................................10

    III.   Scientific Evidence Demonstrates that Feeding Premature Babies Cow's-
           Milk-Based Infant Formula Greatly Increases the Risk of NEC ...........................11

    IV.   Reckitt Was Aware of the Scientific Evidence Linking Cow's-Milk-Based
           Formula with an Increased Risk of NEC in Premature Babies Before and
           During the Class Period .......................................................................................16

    V.    Reckitt Concealed the Increased Risk of NEC in Premature Babies During
           the Class Period ..................................................................................................20

    VI.   Many Neonatologists Were Not Fully Informed During the Class Period
           About the Increased Risk of NEC in Preterm Babies Who Were Fed
           Bovine Formula ..................................................................................................27

FALSE AND MISLEADING STATEMENTS.........................................................................28

    A.    Defendants Misrepresented and Concealed the Severe Risks of
           Reckitt's Formulas for Preterm Infants.......................................................28

    B.    Defendants Misrepresented the Scientific Basis and Safety of
           Reckitt's Infant Formulas While Omitting Known NEC Risk .................33

    C.    Defendants Misrepresented Pediatrician and Hospital
           Endorsements.............................................................................................39

    D.    Reckitt Falsely Represented to Investors that It Monitored Adverse
           Event Reports.............................................................................................42

    E.    Defendants Misrepresented the Drivers and Sustainability of the
           Nutrition Segment's Growth.......................................................................43

- i -

Page

F.   Defendants Characterized Product-Safety Risks as Merely Hypothetical When They Knew that Reckitt's Infant Formula Posed an Unreasonable Risk of Serious Illness or Death for Premature Babies ........................................................................47

G.   Defendants Downplayed and Misrepresented the Materiality of NEC Litigation ...........................................................................48

THE TRUTH EMERGES.............................................................................51

ADDITIONAL ALLEGATIONS OF SCIENTER.......................................54

POST CLASS PERIOD EVENTS ...............................................................61

CLASS ACTION ALLEGATIONS .............................................................62

LOSS CAUSATION.....................................................................................63

APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)...........................................................................................64

NO SAFE HARBOR ....................................................................................65

COUNT I ......................................................................................................66

Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ......................................66

COUNT II .....................................................................................................69

Violation of Section 20(a) of the Exchange Act Against the Individual Defendants..........................................................................................69

COUNT III....................................................................................................70

For Violations of Section 90A of the Financial Services and Markets Act of the United Kingdom Against Reckitt ...........................................70

PRAYER FOR RELIEF ...............................................................................71

JURY TRIAL DEMANDED ........................................................................72

Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund and Plaintiffs New York State Teamsters Conference Pension and Retirement Fund and New York State Teamsters Council Health and Hospital Fund (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, among other things, the investigation of their counsel, which includes, without limitation: (a) review and analysis of regulatory filings made by Reckitt Benckiser Group plc ("Reckitt" or the "Company") with Companies House, the official registrar of United Kingdom ("U.K.") companies, and the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by or concerning Reckitt; (c) review of pleadings and trial transcripts in the action styled *Watson v. Mead Johnson Co.*, Docket No. 21-L-1032-PF (Ill. Cir. Ct. St. Clair Cnty. Oct. 28, 2021); and (d) review of other publicly available information concerning Reckitt.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a securities class action on behalf of a class consisting of all persons, other than the defendants ("Defendants," as defined in ¶23) and those affiliated with Defendants, (i) who purchased or otherwise acquired Reckitt American Depositary Shares ("ADSs") on the Over-the-Counter ("OTC") market in the United States, or incurred irrevocable liability for the ADSs in the United States, or to whom title to the ADSs passed in the United States, from January 13, 2021 to July 26, 2024, inclusive (the "Class Period"), and were damaged thereby, against Reckitt and certain of its officers and directors, seeking remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated under the Exchange Act (collectively, the "Exchange Act claims"); or (ii) who purchased or otherwise acquired Reckitt ordinary shares on the London Stock Exchange during the same period, and were damaged thereby,

against Reckitt, seeking remedies under Section 90A and Schedule 10A of the U.K. Financial Services and Markets Act 2000 ("FSMA") (the "English Law claims") (the "Class," as defined further in ¶190).[1]

2.      Reckitt is a U.K.-based consumer-goods and health conglomerate that operates three segments: Nutrition, Health, and Hygiene.  Its Nutrition segment, built through Reckitt's $19.7 billion acquisition of Mead Johnson Nutrition Company ("Mead Johnson") in 2017, markets the Enfamil brand of infant formulas under the Mead Johnson name.  During the Class Period, Reckitt repeatedly assured investors that its formulas were safe and effective for premature and low-birth-weight infants (generally those born after less than 37 weeks of pregnancy).

3.      Premature and low-birth-weight babies are particularly vulnerable to disease, including gastrointestinal disease, and Reckitt marketed multiple varieties of its formulas as being nutritious and safe specifically for those babies in marketing and informational materials whose contents were available to investors, securities analysts, and the general public.  For example, Reckitt's website for its Enfamil infant formulas said during the Class Period that its preemie formulas were "easy on the tummy":

> Whether you're already home with your sweet pea or are preparing to make that exciting milestone transitioning from the NICU [neonatal intensive care unit], Enfamil preemie formulas are designed to support your baby's special nutritional needs. . . .  Enfamil preemie formula is specially designed to promote their continued catch-up growth and development throughout their first nine months.  Our options support the distinct nutritional needs of premature and low-birth-weight infants. . . . **And because your little one's belly is still developing, our preemie baby formula is easy on the tummy**. . . .  The newest love of your life is ready to hit their next milestone.  Nurture their growth and development with Enfamil preemie formulas.  From Enfamil NeuroPro® EnfaCare®, clinically shown to promote catch-up growth

---

[1]      Reckitt ADSs and ordinary shares are collectively referred to in this Complaint as "Reckitt Securities."

similar to full-term breastfed infants, to our other premature formula options, Enfamil has formulas to support the special nutritional needs of your perfect baby.[2]

4.     Defendants also emphasized Enfamil's reputation for safety and pediatricians' endorsement of Enfamil formulas to investors as a key driver of Reckitt's premium infant-formula pricing and growth strategy.

5.     Those statements were materially false and misleading.  As confirmed by internal Company documents and sworn trial testimony in *Watson v. Mead Johnson Co.* ("*Watson v. Mead Johnson*" or "*Watson*"), Reckitt and its Mead Johnson subsidiary long possessed, and internally acknowledged, scientific evidence showing that cow's-milk-based (or "bovine") formulas, including Enfamil NeuroPro EnfaCare and other Enfamil formula varieties that are marketed specifically for preterm infants, carry a substantially increased risk of necrotizing enterocolitis ("NEC") in preterm infants.  NEC is a devastating gastrointestinal disease in which the baby's intestinal tissue dies, preventing it from absorbing nutrition and exposing it to serious infections and inflammation.  NEC often requires surgery, in which doctors remove dead intestinal tissue and resew the remaining parts of the intestine in an attempt to repair the damage caused by the disease.  NEC causes severe pain and suffering for the infants and is often fatal.  Despite their knowledge that Enfamil's formula for premature babies greatly increased the risk of NEC, Reckitt failed to disclose the risk to investors, doctors, or consumers, continued marketing Enfamil as an appropriate formula for preterm infants, and affirmatively represented that the Company's "science" supported those claims.

6.     Throughout the Class Period, Defendants also concealed both the true scope and magnitude of Reckitt's exposure to product-liability claims brought by families whose preterm babies suffered NEC after being fed Enfamil, and the NEC litigation's financial and reputational impact on Reckitt.  Defendants repeatedly assured investors that the NEC litigation reported in its

---

[2]     All emphasis in quotations in this Complaint is added, except as otherwise noted.

filings was baseless and that the science did not support any causal connection between Enfamil and NEC. Internally, however, Reckitt executives and medical-affairs personnel received adverse-event reports about babies who experienced serious NEC after being fed Enfamil, monitored the scientific literature that provided ever-growing support for a causal link between cow's-milk-based formula and NEC, and recognized that the risk of NEC was significantly higher for babies fed cow's-milk-based formula than for those fed human milk.

7.     Investors learned the truth about Enfamil's link to NEC and the extent of Reckitt's undisclosed product-safety and litigation risks only when juries in *Watson v. Mead Johnson* and another case involving bovine formula manufactured by Reckitt's competitor Abbott Laboratories ("Abbott") – which presented substantially the same factual and legal issues – ultimately found that Mead Johnson's and Abbott's cow's-milk-based products caused NEC that killed babies, and the juries awarded substantial verdicts.

8.     Following those developments, Reckitt Securities' prices fell sharply, erasing billions in market capitalization. Defendants' misrepresentations and omissions artificially inflated and maintained the prices of Reckitt Securities, deprived investors of material information necessary to evaluate the Company's business operations, results, and risks, and directly caused Plaintiffs' and the Class's losses when the truth emerged.

## JURISDICTION AND VENUE

9.     This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated under the Exchange Act by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11.     With respect to the English Law claims, this Court has diversity jurisdiction under 28 U.S.C. §1332.  Plaintiffs New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund, New York State Teamsters Conference Pension and Retirement Fund, and New York State Teamsters Council Health and Hospital Fund are citizens of the United States. Defendants Reckitt and Jeffrey Carr ("Carr") are citizens of the United Kingdom; Defendant Nicandro Durante ("Durante") is a citizen of Brazil; and Defendants Laxman Narasimhan ("Narasimhan"), Kristoffer Loe Licht ("Licht"), and Patrick Sly ("Sly") are citizens of the United States.  The amount in controversy under the English Law claims exceeds $5 million.  On information and belief, Reckitt Securities are not "covered securities" within the meaning of 28 U.S.C. §1332(d)(9)(A).

12.     The English Law claims are so related to the Exchange Act claims that they form part of the same case or controversy.  Jurisdiction over the English Law claims is therefore also conferred by 28 U.S.C. §1367.

13.     Venue is proper in this Judicial District under 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts alleged in this Complaint, including the dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  In addition, the Deposit Agreement that governs Reckitt's sponsored ADSs contains a binding forum-selection clause specifying jurisdiction in a state or federal court in New York, New York.

14.     In connection with the acts, transactions, and conduct alleged in this Complaint, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail and interstate telephone and wire communications.

## PARTIES

15.    Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund, as set forth in the certification accompanying its motion for appointment as Lead Plaintiff (ECF No. 22-2), incorporated by reference in this paragraph, purchased or otherwise acquired Reckitt ADSs during the Class Period and suffered damages as a result of the federal securities law violations and false and misleading statements and material omissions alleged in this Complaint.

16.    Plaintiffs New York State Teamsters Conference Pension and Retirement Fund and New York State Teamsters Council Health and Hospital Fund (together, "New York State Teamsters Funds") purchased or otherwise acquired Reckitt ordinary shares on the London Stock Exchange during the Class Period and suffered damages as a result of the English law violations and false and misleading statements and material omissions alleged in this Complaint, as set forth in their accompanying certification, which is incorporated by reference in this paragraph.

17.    Defendant Reckitt is a U.K.-based consumer-goods and health conglomerate.  The Company maintains substantial operations in the United States, including its principal U.S. corporate offices, which are located in Parsippany, New Jersey.  Reckitt's ordinary shares trade on the London Stock Exchange under the ticker symbol "RKT," while its sponsored ADSs trade on the U.S. OTC market under the ticker symbol "RBGLY."  Five ADSs represent one ordinary share.

18.    Defendant Narasimhan served as the Company's Chief Executive Officer ("CEO") from September 2019 until his resignation on September 30, 2022.

19.    Defendant Durante joined Reckitt's Board as a Non-Executive Director in 2013, became the Senior Independent Director in 2019, became the Company's CEO on October 1, 2022, and served as CEO until September 30, 2023.

20.     Defendant Licht has served as the Company's CEO since October 1, 2023, and Executive Director of the Company's Board of Directors (the "Board") since June 1, 2023. Before his appointment as CEO, Defendant Licht served as the Company's CEO Designate from May 1, 2023, and President of the Company's Health segment and Chief Customer Officer from July 2020 until his appointment as CEO Designate on May 1, 2023.

21.     Defendant Sly has served as President of the Company's Health segment since July 1, 2023. Sly originally joined the Company as part of its acquisition of Mead Johnson in 2017 and served as the Company's Chief Operating Officer of Global Nutrition from July 2021 until his appointment as President of the Company's Health segment on July 1, 2023.

22.     Defendant Carr served as the Company's CFO and Executive Director of the Board from 2020 until his retirement on March 31, 2024.

23.     Defendants Narasimhan, Durante, Licht, Sly, and Carr (together, the "Individual Defendants" and together with the Company, "Defendants"), because of their positions with Reckitt, possessed the power and authority to control the contents of Reckitt's annual reports, press releases, website, and presentations to securities analysts, money and portfolio managers, and institutional and retail investors, i.e., the market. The Individual Defendants were provided with copies of Reckitt's reports, press releases, website, and presentations alleged in this Complaint to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material nonpublic information available to them but not to the public, the Individual Defendants knew that the adverse facts specified in this Complaint had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and

misleading.  The Individual Defendants are liable for the false and misleading statements pleaded in this Complaint.

## SUBSTANTIVE ALLEGATIONS

**I.    Reckitt's Infant-Formula Business and That Business's Dependence on NICUs**

24.    Infant formulas marketed specifically for premature babies are a major part of Reckitt's business.

25.    Reckitt manufactures and sells several varieties of cow's-milk-based formula specifically for premature infants, including: Enfamil Neuropro EnfaCare, Enfamil 20 Cal/fl oz, Enfamil Premature 24 Cal/fl oz, Enfamil Premature 24 Cal/fl oz HP [high protein], and Enfamil Premature 30 Cal/fl oz.  The labels for these formula varieties and Mead Johnson's website[3] specify that these formula varieties are intended for premature and low-birth-weight infants.  The first of these varieties is marketed directly to parents for use when a premature baby is transitioning from a NICU to home; the others are marketed primarily to doctors and hospitals for feeding premature babies who are being treated in NICUs.

26.    Reckitt generated hundreds of millions of dollars of revenue in the United States each year during the Class Period, and most of this revenue – and a large percentage of Reckitt's total global revenue – came from the Nutrition segment's infant formulas.  The Company's 2021 annual report stated:

> The Nutrition GBU [Global Business Unit] represents 20% of Group net revenue, with 60% from developed markets – primarily North America.  Approximately 81% of revenue is from our IFCN [infant and children nutrition, *i.e.*, formula] business.  The US is our largest market, generating about half of IFCN revenue.  This business has performed consistently well since being acquired as part of Mead Johnson in

---

[3]    *Reckitt-Mead Johnson Infant Products*, MEAD JOHNSON & COMPANY, LLC, https://hcp.meadjohnson.com/s/products/category/a4K4J000001uk2OUAQ/premature (last visited Oct. 19, 2025).

2017.  Since 2018, it has averaged nearly 5% growth as a result of continued strong execution and innovation.

Thus, U.S. formula sales represented at least 8% of Reckitt's total global revenue in 2021.  Another section of the 2021 annual report explained that "the US IFCN business . . . now accounts for half of the GBU's revenue," which would put U.S. formula sales at 10% of Reckitt's total revenue. Reckitt's full-year net revenue in 2021 was £13,234 million, so U.S. formula revenue was approximately £1,059-£1,323 million.  The Company's annual report for 2022 reported 5.4% growth in Nutrition net revenue (not including 17.5% sales growth to address a severe supply shortage caused by the closure of a contaminated Abbott formula factory).  In 2023, the Nutrition segment's net revenue declined 4% as the exceptional 2022 bump caused by the Abbott-related shortage ended. But assuming that U.S. formula sales continued to represent 8-10% of Reckitt's total global revenue, which was £14,607 million in 2023, those sales were still over £1,000 million.

27.    The Company's infant-formula revenue in the United States comes primarily from "retail" sales to parents buying formula after bringing their babies home from the hospital. However, the critical way that Reckitt's Mead Johnson subsidiary and its competitors (primarily Abbott, which is its only formula competitor in hospitals) gain retail sales is by having hospitals provide their formulas to parents of newborn babies.  Once doctors, nurses, and nutritionists in the hospital recommend a particular formula, the parents will commonly continue to buy that particular formula after taking the baby home.

28.    Mead Johnson generally provides its infant formulas to hospitals as free samples. Thus, it does not earn significant revenue by providing formulas to hospitals.  As described above, however, having the formulas in hospitals where the professional medical staff recommend them to parents of newborns is critical for later retail sales of the formulas to parents.

29.    Within hospitals, the neonatologists working in the NICUs are critical to determining which companies' formulas the hospital will use.  Since many mothers of premature babies cannot produce enough milk for their babies, the NICU doctors need to be able to provide donor milk, human-milk-based formula, or cow's-milk-based formula to many of the premature babies who are treated in the NICU during the first weeks of their lives.  And the NICU doctors' decision about which supplier's products are appropriate for feeding premature babies in the NICU is the primary driver of the hospital's choice of supplier for an entire portfolio of formulas for all infants.  An internal Mead Johnson document presented at the *Watson* trial states that 75% of hospital contracts for infant formula are determined by the NICU's choice of supplier, and Rakesh Kapoor, who was Reckitt's CEO from 2011 to 2019, testified that this was correct.

30.    Thus, Mead Johnson needed to convince NICU doctors to use Mead Johnson formulas for premature babies in order to drive its entire formula portfolio's sales.  And because Mead Johnson did not have a human-milk-based formula during the Class Period and still does not have one, it aggressively marketed its cow's-milk-based formulas for the premature babies who are treated in NICUs, despite the Company's awareness (as alleged in ¶¶52-64) of the significantly greater risk of NEC for premature babies who are fed cow's-milk-based formulas.

## II.    The Devastating Disease Necrotizing Enterocolitis

31.    NEC is one of the most frequent causes of serious illness and death in premature babies.

32.    In a Mead Johnson document presented at the *Watson* trial, the Company describes NEC as "a devastating disease that affects the intestine of premature infants and can destroy the wall of the bowel, causing life-threatening infection."  The document further states that approximately 13% of very low birth weight (less than 2,000 grams) infants suffer from NEC; about 35% of those

infants require surgery; and about 35% of the infants who suffer from NEC die each year. Thus, about 4% of preterm very low birth weight babies die from NEC each year.

33.    Dr. Jonathan Swanson, a neonatologist and NEC expert who testified at the *Watson* trial (*see* ¶47), explained that "the only ways to treat [NEC] are to treat the infection, if there is one," and hope the bowel will heal itself; if it doesn't, as it often can't, then surgery is necessary to remove the dead portion of the intestine, which can cause further complications for the baby, and the baby often requires intubation, a ventilator, and pain control. He agreed that NEC is "one of the most horrible diseases that infects some of our most fragile patients."

## III.    Scientific Evidence Demonstrates that Feeding Premature Babies Cow's-Milk-Based Infant Formula Greatly Increases the Risk of NEC

34.    Reckitt's bovine infant formulas greatly increase the risk of NEC in premature babies.

35.    Babies are considered carried to term if they are born after 37 weeks' pregnancy. Babies born earlier than that are considered premature and are often much smaller than term babies, including having low birth weight, and are more vulnerable to serious illnesses. Therefore, premature babies are commonly cared for in NICUs in hospitals.

36.    Mothers cannot always produce enough of their own breast milk to feed their babies, and this is particularly the case for mothers of premature babies. As a result, it is often necessary to feed these babies a substitute or supplement for the mother's milk. There are three primary substitutes or supplements for the mother's own milk: pasteurized donor milk, which is available to hospitals from a nationwide network of donor milk banks; commercial human-milk-based formulas; and commercial cow's-milk-based formulas. There is a medical consensus that mother's own milk is the most advantageous nourishment for premature babies, when it is available, followed by pasteurized donor milk or human-milk-based formula, followed last by bovine formula.

37.     Premature infants have less developed gastrointestinal systems than babies carried to term.  As a result, premature infants are less able to digest formulas based on cow's milk, which contains different carbohydrates, proteins, and other nutrients than human milk, and those formulas significantly increase the risk of premature infants developing NEC.  The greatly increased risk of NEC in premature babies who are fed bovine formulas has been reported in scientific research studies since 1990 (but as alleged in ¶¶82-84, many doctors and even neonatologists were not aware of this research during the Class Period).

38.     A 1990 study by A. Lucas, et al., in the medical journal *The Lancet*, titled "Breast milk and neonatal necrotising enterocolitis," found that in one group, only 1% of the babies who received human donors' milk developed NEC, while 5% of the babies who received cow's-milk-based formula developed the disease – *i.e.*, the risk of NEC was five times greater with formulas like Mead Johnson's than with donor milk.  In a second group, 1.2% of the babies who received donors' milk developed NEC, while 3.6% of babies who received cow's-milk-based formula developed the disease – *i.e.*, the risk of NEC was three times greater with formulas like Mead Johnson's than with donor milk.

39.     A 2005 study by Richard Schanler, et al., in *Pediatrics*, titled "Randomized Trial of Donor Human Milk Versus Preterm Formula as Substitutes for Mother's Own Milk," found that babies who were fed formula had an 11% incidence of NEC compared to a 6% incidence for babies fed donor milk – almost a two times difference.

40.     A 2009 study by J. Meinzen-Derr, et al., titled "Role of Human Milk in Extremely Low Birth Weight Infants' Risk of NEC or Death," published in the *Journal of Perinatology*, found that the percentage of human milk in the total nourishment fed to a baby correlated with the risk of NEC, demonstrating that human milk reduces the incidence of NEC compared to bovine formula.

41.    In a 2013 study by Elizabeth A. Cristofalo, et al., titled "Randomized Trial of Exclusive Human Milk versus Preterm Formula Diets in Extremely Premature Infants," published in the *Journal of Pediatrics*, the incidence of NEC in babies receiving bovine formula was 21%, compared with 3% in babies receiving human donor milk or human-milk-based formula – seven times greater risk.

42.    In a 2014 study in *Breastfeeding Medicine* by Steven A. Abrams, et al., titled "Greater Mortality and Morbidity in Extremely Preterm Infants Fed a Diet Containing Cow Milk Protein Products," an exclusively human milk diet was found to reduce both NEC and mortality. The rate of NEC for cow's-milk-based formula was 17%, including 12% surgical NEC, and for human milk was 5%, including 1% surgical NEC.

43.    In a 2016 study by M. Assad, et al., titled "Decreased Cost and Improved Feeding Tolerance in VLBW [Very Low Birth Weight] Infants Fed an Exclusive Human Milk Diet," published in the *Journal of Perinatology*, the babies fed bovine formula or a mix of formula and human milk had a 10% NEC rate, while the babies fed only human milk had a little over 1% NEC rate.

44.    In a 2016 study by Deborah L. O'Connor, et al., titled "Effect of Supplemental Donor Human Milk Compared With Preterm Formula on Neurodevelopment of Very Low-Birth-Weight Infants at 18 Months," published in the *Journal of the American Medical Association*, the incidence of all stages of NEC was 3.9% for babies receiving donor milk and 11% for babies receiving bovine formula – 2.8 times the risk.  For more serious, advanced stages of NEC, the incidence was 1.7% in the donor milk group and 6.6% in the bovine formula group – 3.9 times the risk.

45.    In a January 2024 article by Tarah T. Colaizy, et al., titled "Neurodevelopmental Outcomes of Extremely Preterm Infants Fed Donor Milk or Preterm Infant Formula," published in

the *Journal of the American Medical Association*, the incidence of NEC in a double-blind, randomized clinical trial was found to be 4.2% for the donor milk group and 9.0% for the bovine formula group – a 2.1 times greater risk. A double-blind, randomized study is considered the gold standard of medical research because it removes the researchers' potential bias.

46.     Dr. Brian Sims, a practicing neonatologist and medical professor at the University of Alabama, Birmingham, testified at the *Watson* trial as an expert in neonatology, including NEC. Dr. Sims testified within a reasonable degree of medical certainty, based on his experience and knowledge of the scientific literature, that bovine formula presents a three-to-ten times greater risk of NEC than donor milk or human-milk-based formula. Dr. Sims also studied the medical records of the baby who died in the *Watson* case and testified that he could eliminate all risk factors for NEC other than prematurity and cow's-milk-based formula as causes of the baby's sickness and death, and therefore opined that Reckitt's formula caused or contributed to the baby's sickness and death. He also opined that it is true both that mother's milk is more protective against NEC than formula (as the Company says), and that Mead Johnson's formula has harmful risks (as the Company denies): "It's both. The answer is it's protective effects of breast milk, and there's also data that supports there are things that causes stress to the baby that's in . . . premature formula."

47.     Dr. Jonathan Swanson, a practicing neonatologist and professor of pediatrics, medical director of the NICU, and chief quality officer for children's services at the University of Virginia, testified as an expert in neonatology, including NEC, at the *Watson* trial. Dr. Swanson testified within a reasonable degree of medical certainty, based on his experience and knowledge of the scientific literature, that "cow's milk-based formula causes or contributes to cause NEC" in premature infants, particularly those born at less than 34 weeks, and that the risk of NEC is two to five times greater with bovine formula than donor milk. Dr. Swanson's professional "passion" is

NEC and nutrition for newborns, which is the biggest part of his research, and he has written many scientific articles about NEC. Based on his professional experience and knowledge of the scientific literature, he and his colleagues at the University of Virginia NICU introduced an exclusive human milk diet for very low birth weight infants (under 1,500 grams). They also adopted a diet of either mother's milk or donor milk for all babies under 34 weeks; they use cow's-milk-based formula only for babies born at 34 weeks or more. As a result, "there's definitely been a decrease in NEC" and "a significant decrease in NEC that requires surgery, . . . the most severe form of NEC."

48.    Dr. Swanson testified at the *Watson* trial that the risk of NEC is highest for babies born at 34 weeks or less, and that "the risk of using formula at that age far outweighs any benefit," whereas "the risk of utilizing pasteurized donor milk is far less than the benefit. . . ."

49.    An article coauthored by Dr. Swanson in *Pathophysiology* in 2014, titled "Necrotizing enterocolitis is one disease with many origins and potential means of prevention," states that "cow's milk intolerance" is one of the "risk factors" for NEC. Similarly, a 2022 article coauthored by Dr. Swanson in *Practical Gastroenterology*, titled "Nutritional Management of Infants with Necrotizing Enterocolitis," stated that "cow's milk protein exposure in very low birth weight infants or cow's milk allergy" was a risk factor for NEC.

50.    An article coauthored by Dr. Swanson in *BMC Pediatrics* in 2023, titled "Implementing an exclusive human milk diet for preterm infants: real-world experience in diverse NICUs," reported that seven NICUs that implemented exclusive human milk diets for preterm infants all demonstrated a significant decrease in the most severe cases of NEC, those that require surgery, and the vast majority of the NICUs also demonstrated a decrease in total NEC cases.

51.     Thus, the weight of scientific evidence supports the conclusion that Reckitt's bovine infant formulas cause or contribute to cause sickness and death from NEC in premature infants and create a significantly increased risk of NEC for these infants.

## IV.    Reckitt Was Aware of the Scientific Evidence Linking Cow's-Milk-Based Formula with an Increased Risk of NEC in Premature Babies Before and During the Class Period

52.     Evidence from the *Watson* trial demonstrates that Reckitt was aware of the significantly increased risk of NEC from feeding its bovine formulas to premature infants before and during the Class Period.

53.     Dr. Christina Valentine, who worked at Mead Johnson as Medical Director of North America from 2014 to August 2021, returned in May 2022 as Chief Medical Officer, and left again in October 2023, said in a 2010 presentation before she joined the Company: "Because of the known risk reduction in NEC and infection, [doctors] must have informed choice (informed consent) from mother – offer donor milk if mother's own milk unavailable." Dr. Valentine's knowledge in 2010 that bovine formula posed a greater risk of NEC than donor milk is attributable to Mead Johnson not only because she joined the Company in 2014 but also because an internal Company email in 2010 referred to Dr. Valentine having stated that "Enteral [i.e., tube] feeding containing at least fifty percent human milk in the first 14 days of life was associated with a six-fold decrease in the odds of NEC. . . .  If the consumption of human milk and the incidence of NEC are inversely proportional, then it is clear why NICUs are seeking human milk alternatives."

54.     In addition, Dr. Valentine co-wrote a chapter in a book in 2012 before joining Mead Johnson in 2014.  In her chapter, she wrote: "Human milk feeding is the only known practice to reduce the likelihood of necrotizing enterocolitis."  Her chapter also cited a 2010 study by Sandra Sullivan, et al., in *The Journal of Pediatrics*, titled "An exclusively human milk-based diet is associated with a lower rate of necrotizing enterocolitis than a diet of human milk and bovine milk-

based products."  Dr. Valentine's co-written chapter stated that the Sullivan study "included pasteurized donor human milk and human milk-based fortifier to ensure exclusive human milk feeding of preterm infants" and "reported that both medical and surgical NEC were dramatically reduced."  And the chapter stated: "Meta-analysis of randomized control trials indicate that human milk feeding of preterm infants provides significant protection against NEC.  It suggests that donor human milk use may reduce NEC by 79 percent."  The chapter also stated: "The commercial donor milk product available through industry known as Prolacta has a demonstrated reduction in NEC if used in place of formula in bovine milk-based fortifier to augment human milk," citing the Sullivan study.  The chapter also cited her own experience as a practicing neonatologist whose large NICU system had "demonstrated a decrease in rates of NEC from 12 percent to 4 percent since instituting our donor milk program."

55.    An internal Mead Johnson review of scientific literature from the early 2020s showed that the risk of NEC with donor milk was 6% and with bovine formula was 11% – a 1.8 times greater risk.

56.    An internal Mead Johnson document from 2012 admitted that human milk is "important" because it "addresses the key risks of tolerance and infection when treating preterms. . . . Tolerance – infants this small do not tolerate bovine protein well, making feeding a challenge. . . . Infection – sick children don't eat and premature infants are highly susceptible to infection." Thus, this internal document admitted that human milk was safer for premature babies than bovine formula.

57.    Reckitt considered buying a series of human-milk-based formula companies, including Prolacta in 2008, Neolac in 2009–2010, Medolac in 2017, and Lactalogics in 2021. However, none of these deals occurred because Reckitt was unwilling to pay an adequate price to

persuade any of these companies to be acquired by it.  Yet internal Reckitt documents presented at the *Watson* trial about its consideration of these potential deals demonstrate its awareness of human milk products' superior risk profile compared with bovine products.

58.     For example, in 2010, while Reckitt was considering acquiring Neolac, an internal Company document presented to the Mead Johnson management committee stated: "hard clinical outcomes reducing the incidence of NEC and sepsis. . . .  Market need.  NEC, proven decrease if only human milk is given."  In a version of this document for external distribution, however, that statement was changed to read: "Human milk is being studied to understand the benefit that might be derived during sepsis and NEC," concealing the Company's internal knowledge that there was a causal relationship between bovine formula and NEC that explained why human milk had lower NEC rates.  In 2019, when Reckitt was considering acquiring Medolac, an internal Mead Johnson presentation stated:  "The US team believes the Medolac portfolio will transform our ability to win in hospitals.  Human milk is the gold standard for NICU feeding.  Mounting evidence on improved clinical outcomes (fewer complications including NEC and reduced mortality rates)."

59.     In an internal presentation in March 2021, when Reckitt was considering acquiring Lactalogics or developing its own in-house human-milk-based product, the Company wrote: "Reduces NEC by 80 percent."

60.     Robert Cleveland, who was Reckitt's Global Category Director – Nutrition from 2020 to September 2021 and its Senior Vice President for North America Nutrition from September 2021 to the present, testified at the *Watson* trial that the Company pursued these potential acquisitions because mother's milk has "immunoprotective properties" that Mead Johnson's bovine formulas lack.

61.     Mr. Kapoor, Reckitt's CEO from 2011 to 2019, testified at the *Watson* trial that he was informed by 2017 that NICUs increasingly wanted human-milk fortifier (*i.e.*, a substance added to human milk or formula to provide additional nutrients) rather than bovine fortifier; that demand for human-milk-based products was driven by the fact that they provided protective gut health, including the avoidance of NEC; and that there was a medical need for donor milk because it reduced the likelihood of NEC.

62.     Additional evidence at the *Watson* trial demonstrated that Mead Johnson knew about the greater risk of NEC associated with its bovine formula but chose not to develop a safer alternative because it did not think doing so would increase sales.   In 2018, Mead Johnson commissioned a study comparing the incidence of NEC in piglets that were fed lactose, the sugar in human milk, versus corn syrup solids and maltodextrin, the sugars in Mead Johnson's formulas. Upon learning that the study showed a 3.1 times greater risk for corn syrup solids and maltodextrin versus lactose, Mead Johnson scientific and business personnel discussed internally whether to develop a formula with lactose, but Susan Sholtis, who was then Reckitt's Head of Global Marketing – Consumer Health and later became the Company's President of Nutrition in July 2023, responded that "it will be difficult to say we are going to sell that much more."   So the Company did not develop a lactose product, despite knowing about the greater risk of its existing product, because developing a safer product was not expected to increase sales.

63.     An internal slide from Mead Johnson from 2021 that was presented at the *Watson* trial discussing the possibility of developing a human-milk-based product – which the Company has not done to this day – states that human milk (including the mother's own milk and donor milk) reduces the risk of NEC compared with cow's-milk-based formula by 80%.  In other words, the risk

of NEC is five times greater for premature infants who are fed cow's-milk-based formula compared with those who are fed human milk.

64.     By December 2021, Reckitt and its executives were also aware that Mead Johnson had become a defendant in dozens of product-liability actions brought by parents alleging that its cow's-milk-based preterm formulas caused NEC in premature infants who died after being fed Enfamil formulas.  The claims included state-court proceedings in Illinois (e.g., *Watson v. Mead Johnson Nutrition Co.*, No. 21-L-1032 (Ill. Cir. Ct. St. Clair Cnty.) and the federal multidistrict litigation, *In re Abbott Laboratories, et al., Preterm Infant Nutrition Products Liability Litigation*, MDL No. 3026 (N.D. Ill.), which consolidated federal NEC cases against both Mead Johnson and Abbott.  Thus, Defendants were aware by December 2021 that the Company was exposed to enormous financial liability and reputational harm because of its marketing of cow's-milk-based formulas for preterm infants while misrepresenting the greatly increased risk of NEC for preterm infants who were fed those formulas instead of mother's milk, donor milk, or human-milk-based formula.

## V.     Reckitt Concealed the Increased Risk of NEC in Premature Babies During the Class Period

65.     As a result of the centrality of having hospitals provide Mead Johnson formulas to premature babies in NICUs to the Nutrition segment's entire infant formula business (*see* ¶¶27-30), Defendants were strongly motivated to conceal and misrepresent the significantly increased risk of NEC for premature babies who are fed the Company's formulas in order to avoid deterring doctors and hospitals from recommending Reckitt's formulas for premature babies.

66.     The labels for the versions of Reckitt's formula that are marketed for premature babies and the Company's websites for its infant formulas did not include any warning during the Class Period that these formulas are associated with a significantly greater risk of NEC.

67.    Similarly, a Mead Johnson pamphlet that was distributed to parents in NICUs during the Class Period noted that NEC was "a severe problem with the intestines" but said "the cause is not very well understood," without informing parents that numerous scientific studies showed an increased risk of NEC for babies who were fed bovine formula versus donor milk or human-milk-based formula.

68.    Reckitt, like other manufacturers of products that are provided to doctors and hospitals to be given to patients, routinely sends "dear doctor" letters to doctors and hospitals to advise them of scientific studies that identify risks associated with the products.  Despite being aware of the significantly greater risk of NEC associated with its infant formulas for premature babies, Reckitt never advised doctors and hospitals of this risk during the Class Period.

69.    Reckitt also maintains a sales force of representatives who visit doctors and hospitals to give or sell Reckitt products to them.  Dr. Valentine testified in the *Watson* case that "sales reps are often [neonatologists'] avenue for education.  And so [the reps] give [the neonatologists] educational handouts, papers, statistics[.]  And [the doctors] get it from all the companies and then they make an educated decision is what usually happens."

70.    Despite being aware of the significantly greater risk of NEC associated with its infant formulas for premature babies, Reckitt trained its sales representatives during the Class Period not to mention this risk to the doctors and hospitals they spoke with.  In case the question was brought up by the doctors, Reckitt trained its sales representatives with talking points about purported flaws in scientific studies that said there was an increased risk of NEC for babies who were fed bovine formula.  For example, shortly after publication of the 2016 O'Connor study discussed in ¶44, which showed NEC incidences of 1.7% of infants on donor milk and 6.6% of infants on formula, Dr. Valentine, Mead Johnson's chief medical officer, wrote in an internal email about how to

respond to the study that there was "no difference in NEC," which was untrue.  In an early 2020 training video for nutritionists who would speak about Mead Johnson products outside the Company, Dr. Valentine said that the O'Connor study "found that there was no difference" with respect to cognitive development "in those two groups" that received either donor milk or Mead Johnson formula, but she did not mention that there was a difference in NEC cases.

71.    Reckitt's internal editing of presentations it issued to be shown to doctors during the Class Period also demonstrates that Reckitt knew its bovine formulas increased the risk of NEC in premature babies but deliberately obfuscated that risk by concealing the causal relationship.  For example, in a presentation titled "Nutrition to support adequate growth" by Dr. Valentine, an internal draft stated that "human milk significantly reduces risk of NEC or death in extremely low birth weight infants in a dose-dependent manner."  However, the final version that was presented to doctors stated instead that "human milk is associated with lower risk," obscuring the causal relationship.  Similarly, the internal draft stated: "Human milk has a dose-dependent beneficial effect on risk of NEC or death in extremely low birth weight infants."  However, the final version that was presented to doctors stated instead that "human milk intake is associated with a dose-related reduction."  And the initial draft stated: "Human milk consumed by preterm infants within the first 14 days offers a great degree of protection in reducing NEC-associated mortality in a dose-dependent manner"; but the final version instead stated that "the study suggests that human milk consumed by preterm infants within the first 14 days is associated with a dose-related reduction in NEC incidence."

72.    In another instance of misleading presentations to doctors, Mead Johnson edited a prior version of a slide deck for such presentations to remove any indication of causation of NEC. The prior version stated: "Human milk significantly reduces risk of necrotizing enterocolitis."  The

revised version instead stated: "Human milk is associated with lower risk of necrotizing enterocolitis." Similarly, the prior version stated: "Human milk consumed by preterm infants within the first 14 days offers a great degree of protection in reducing NEC associated mortality in a dose-dependent manner." The revised version instead stated: "This study suggests that human milk consumed by preterm infants within the first 14 days is associated with a dose-related reduction in NEC." The study cited in the slide deck was from 2009, indicating that these edits were not a good-faith "update" based on new information but rather an effort to conceal the truth about causation of NEC by bovine formula.

73. Mead Johnson also funded and publicized unreliable study results to obfuscate its formulas' greater risk of NEC, and Reckitt continued to publicly rely on that unreliable research after acquiring Mead Johnson. The primary study Reckitt cited during the Class Period to deny that its formulas present a significantly greater risk of NEC than human milk is a 2016 study by Willemijn E. Corpeleijn, et al., that was funded by Mead Johnson. However, this study, titled "Effect of Donor Milk on Severe Infections and Mortality in Very Low Birth Weight Infants: The Early Nutrition Study Randomized Clinical Trial," published in *JAMA Pediatrics*, did not compare donor milk with cow's-milk-based formula; instead, it compared groups who both received more than 80% of their own mothers' milk, with the remainder being either donor milk or bovine formula – essentially comparing mother's milk to mother's milk. Thus, the study's finding of no significant difference in NEC risk between the groups does not outweigh the numerous other studies showing significantly higher risk levels with bovine formula than with human-milk-based formula or donor's milk. The study also considered only the first ten days of each baby's feeding and did not record what they were fed after that, but more than 40% of the study groups' NEC events happened after the first ten days, when it was unknown what they were being fed, rendering the study unreliable.

- 23 -

The Company provided this study to speakers for presentations about its products to external audiences to say there was no difference in NEC rates but did not point out the study's flaws to the speakers. Mead Johnson's funding and promotion of this poorly designed study was part of the Company's misrepresentation and concealment of the truth about its formulas' significantly higher NEC risk.

74.    While funding and promoting flawed research purporting to disprove the increased NEC risk to babies who are fed bovine formula, Reckitt has conspicuously failed ever to conduct or fund a randomized clinical trial comparing formula to mother's milk or donor milk to provide the level of scientific certainty about the *causal relationship* between formula and NEC that the Company claims the numerous existing studies showing an *association* between formula and NEC fail to provide. In 2015, Dr. Tim Cooper, a Senior Medical Affairs executive at Mead Johnson, acknowledged internally that many studies showed human milk was "obviously superior" and that the Company faced difficulty convincing neonatologists otherwise, and he suggested Mead Johnson might need to fund a large, expensive trial to try to prove there was no donor milk advantage, even for NEC. But no such study was ever forthcoming. Thus, Reckitt has avoided putting its bovine formulas to the test it claims publicly would be necessary to prove whether its formulas cause NEC.

75.    Reckitt also concealed "adverse event reports" that it received from hospitals and complaints from parents concerning premature babies who became ill or died after being fed the Company's bovine formulas during the Class Period. The Company never reported a single one of these adverse event reports or complaints to the FDA. Instead, the Company stated internally and in any external response to the person who made the adverse event report or complaint that there was no causal relationship between Mead Johnson's bovine formulas and NEC. Rather than treating adverse event reports as indications that the Company should take the scientific literature supporting

a causal relationship between bovine formula and NEC seriously, Reckitt treated the reports as if they concerned potential manufacturing defects in particular batches of products and limited its investigations of the reports to checking batch records to see if there were such defects.

76.    Unlike pharmaceutical manufacturers, which are subject to more rigorous adverse-event-reporting requirements than baby food makers, Mead Johnson was not legally required to report every adverse event report about its formulas to the FDA – only those for which the Company, in its sole discretion, determined that a causal relationship between its product and the adverse event was reasonably possible.  And Dr. Valentine, who was responsible for the Company's decisions about how to handle adverse event reports, adhered throughout the Class Period to the Company's official line that no causal relationship between its formulas and NEC had been proved, despite the scientific literature demonstrating higher rates of NEC for babies fed bovine formula than those fed human milk.  Consistent with that Company line, Dr. Valentine determined in every instance – often within a few minutes of receiving an adverse event report or complaint – that there was no need to report it to the FDA.

77.    Moreover, despite a purported policy that sales representatives should report adverse events they were told about to the Company, this policy was not enforced or consistently followed.  And despite the existence of a system for tracking the adverse event reports that the Company received, such reports were not consistently entered into that system.

78.    In 2017, Dr. Valentine also edited a script for Company employees receiving calls about adverse events to remove the implication that the Company's bovine formula caused NEC.  A prior version of the script instructed call recipients to ask: "Are there other medical problems or potential causes of NEC that are being considered?"  Dr. Valentine edited this to read: "What other medical problems is the infant diagnosed to have?"  Similarly, the prior version of the script

instructed call recipients to ask: "Does the infant have a history of feeding intolerance?"  Dr. Valentine edited this to read: "Do you have a standard feeding protocol?"  At the *Watson* trial, Dr. Valentine admitted that she made these changes to avoid having the script imply causation of NEC. In her 2017 edits, she also deleted the statement that "Human milk and careful advancement of feedings are known to be effective in prevention."  Thus, during the Class Period, the Company avoided indicating in its responses to callers reporting adverse events that its products could cause NEC, despite knowing of the scientific literature indicating that they did.

79.     Internal Company materials for communicating with hospitals further show that Mead Johnson tracked hospital-level discussions about donor-milk programs and sought to counteract other parties' promotion of donor milk.  An internal 2018 presentation directed staff to "disrupt" competing donor-milk narratives by reframing data from studies such as Schanler, which had reported lower NEC incidence among infants fed human milk (*see* ¶39).  Cleveland, who testified about this document, explained that the Company used the term "disrupt" to counter communications by competitors that were influencing physicians' views of donor-milk benefits.

80.     Even after the *Watson* verdict, Reckitt has continued to try to mislead parents, doctors, and investors by insisting that its cow's-milk-based formula does not increase the risk of NEC; rather, insists Reckitt, human milk reduces the risk.  However, as Dr. Swanson explained at the *Watson* trial, this is a misleading assertion by Reckitt: "there is no middle ground where there's a baseline and only formula increases the risk and breast milk doesn't protect.  Or vice versa, that there's only breast milk is protective and formula doesn't increase the risk.  Our only options are human milk and formula, and so it's both."

81.     Despite Reckitt's efforts to muddy the scientific waters, Dr. Swanson testified at the *Watson* trial that in light of "the entire data, the literature that's out there . . . the science isn't

mixed. . . . [P]asteurized donor human milk is superior in reducing the rates of NEC compared to formula."

## VI.    Many Neonatologists Were Not Fully Informed During the Class Period About the Increased Risk of NEC in Preterm Babies Who Were Fed Bovine Formula

82.    Defendants' misrepresentation and concealment of the NEC risk associated with Mead Johnson's formulas for premature babies succeeded in concealing this risk from doctors during the Class Period.  At the *Watson* trial, testimony was presented that the treating doctors for the baby in that case who died after being fed Mead Johnson formula believed that there was only "a slight risk increase," "a slight risk," or "a potential higher incidence" of NEC in feeding a premature baby the Company's formula rather than donor milk or a human-milk-based formula.  This testimony demonstrates that many neonatologists did not fully understand the risk of NEC associated with formula during the Class Period.

83.    Amy Gates, Ph.D., who later joined Mead Johnson as Medical Scientific Liaison in September 2020 and Associate Medical Director in January 2023, confirmed at a conference in 2018 that NICU doctors are not consistently up to date about scientific research relevant to their practice: "One of the Mead Johnson's weaker points is that you're making a lot of assumptions about the knowledge base of the NICUs and their ability, not just their nutrition knowledge, but their ability and their willingness and their time to critically review journal articles."

84.    Dr. Swanson testified at the *Watson* trial that he agreed that "neonatologists are generally not fully aware of the magnitude of the risk and severity of NEC in premature infants. . . ." In an article he published based on a survey, Dr. Swanson reported that only about half of neonatologists recognized that human milk had a major impact in reducing NEC. Testifying at the *Watson* trial in March 2024, Dr. Swanson agreed that "there's an underestimation of NEC risks with regard to cow's milk-based formula" and that, in light of the publication just weeks earlier of

Colaizy's 2024 article, "we're learning more about the risks of NEC and formula every day or every month[.]"

85.    Reckitt advertised that it adhered to the relevant science and medical recommendations in its production and marketing of infant formula, including for preterm infants. However, Reckitt violated its own internal guidelines about marketing formula.  In particular, Reckitt's internal documents presented at the *Watson* trial state that Reckitt has the responsibility to implement and monitor its own marketing practices according to the principles and aim of the applicable World Health Organization code for breast-milk substitutes – *i.e.*, to support and promote breastfeeding – even though portions of that code are not legally required in the United States.

86.    Defendants' concealment of NEC risk not only misled doctors and parents but also perpetuated investors' reasonable belief that the Company's scientific representations were accurate. Because the medical community itself relied on Reckitt's claims of safety and clinical validation, analysts and investors had no basis to suspect that Reckitt's narrative that its products were trusted by doctors and parents concealed material product-safety, litigation, and financial risk.  Thus, the same omissions that kept neonatologists and other doctors uninformed also maintained the market's false perception of Reckitt's scientific integrity.  Indeed, securities analysts' reports about Reckitt before the *Watson* verdict did not discuss the Company's NEC litigation exposure, demonstrating that analysts were fooled by the Company's deception, which extended to its statements directly to investors, as alleged below.

## FALSE AND MISLEADING STATEMENTS

### A.    Defendants Misrepresented and Concealed the Severe Risks of Reckitt's Formulas for Preterm Infants

87.    Throughout the Class Period, Reckitt told parents and the general public, including investors, that the Company's formulas that were marketed for premature infants were safe and

nutritious, while concealing that those formulas actually posed a serious risk of severe illness and even death from NEC, relative to human milk and human-milk-based products.

88.     Reckitt's website for its Enfamil infant formulas said throughout the Class Period that its preemie formulas were "easy on the tummy":

> Whether you're already home with your sweet pea or are preparing to make that exciting milestone transitioning from the NICU, Enfamil preemie formulas are designed to support your baby's special nutritional needs.  Enfamil preemie formula is specially designed to promote their continued catch-up growth and development throughout their first nine months.  Our options support the distinct nutritional needs of premature and low-birth-weight infants. . . . **And because your little one's belly is still developing, our preemie baby formula is easy on the tummy.**  The newest love of your life is ready to hit their next milestone.  Nurture their growth and development with Enfamil preemie formulas.  From Enfamil NeuroPro® EnfaCare®, clinically shown to promote catch-up growth similar to full-term breastfed infants, to our other premature formula options, Enfamil has formulas to support the special nutritional needs of your perfect baby.

This statement appeared on the Company's website at least as early as September 28, 2021, and remained on the website throughout the Class Period.

89.     On November 18, 2021, Mead Johnson posted a video advertisement for "Enfamil NeuroPro EnfaCare for preterm infants transitioning to home" on YouTube, in which it touted Reckitt's formula for preterm infants as "patterned after early breast milk":

> Today we are going to talk about Enfamil NeuroPro EnfaCare, enriched nutrition, specially tailored to support growth during premature babies' first year of life. . . . Enfamil NeuroPro EnfaCare is patterned after early breast milk, with an 80-20 whey-to-casein ratio that is easy to digest.  Enfamil NeuroPro EnfaCare has demonstrated to help promote catch-up growth similar to full-term, breast fed infants when offered in a program of Enfamil formulas fed through 12 months corrected age.

90.     Reckitt even advertised its preemie formulas to the Super Bowl audience.  On January 18, 2022, the Company's website announced the launch of a digital ad aimed at the Super Bowl audience in a statement titled "Raising Awareness of the 380,000 Premature Births a Year, Enfamil Launches the First Premature Advertising Campaign of Football's Biggest Game – Because Every Kickoff Should Be Great, Even an Early One."  The ad said: "With more than 100 years of

nutrition experience and industry leading science to create products for parents and babies, Enfamil continues its mission to support baby's development – especially those who need a bit of extra help." In the statement on January 18, 2022, announcing its Super Bowl ad, Reckitt said: "In those important first few weeks, Enfamil is there for them in NICUs with everything premature babies need to get the best start in life."

91. Defendants touted Reckitt's preemie formulas not only in Super Bowl advertising but also in less global forums focused more narrowly on investors. During the question and answer portion of an earnings call on February 24, 2021, Defendant Narasimhan touted the benefits of the Mead Johnson acquisition for the Nutrition segment's science concerning the microbiome and digestive health, which underlay its claims about the safety and effectiveness of Enfamil, including specifically the NeuroPro formula marketed for premature babies:

> But what we are doing is taking the science of Mead Johnson and bringing it into the technology platforms that we have in R&D. And it's clearly been very helpful, particularly as you look at the microbiome technology platform that we had, some of the work in digestive health. You see the linkages across the overall spectrum, we're bringing that in together.

92. In the Company's 2020 annual report, issued on June 13, 2021, Reckitt said:

> In Infant Formula, Enfa defended an already strong position in the WENR ("WIC [Women, Infants and Children] Exempt, Non-Rebated") market growing over 5%. This was led in large part by strong insight-led innovation with NeuroPro – an Omega3-DHA-led product. The innovation was allied to strong consumer and healthcare professional marketing execution.

93. The statements quoted in ¶¶88-92 were materially false and misleading when made for all the reasons alleged in this Complaint, including without limitation that Defendants were aware that numerous scientific studies demonstrated that bovine formulas presented a significantly greater risk of NEC than human milk, as discussed in ¶¶38-51; that internal Reckitt documents acknowledged that risk, as discussed in ¶¶52-63; that Reckitt received multiple adverse event reports linking its infant formulas to NEC but chose to report none of those reports to the FDA, as discussed

- 30 -

in ¶¶75-76; and that Reckitt deliberately altered its presentations to doctors to conceal that risk, as discussed in ¶¶71-72.

94.    On July 27, 2022, during the Company's second-quarter 2022 earnings call, Defendant Narasimhan told investors: "On our core Enfa range, we launched . . . our latest NeuroPro product, which now contains a blend of human milk oligosaccharides that provide additional immune support.  In specialty, we have Enfamil A+, the only formula aligned to global expert guidelines for macro and micronutrients to support growth, weight and neurodevelopment of preterm infants."  This assertion conveyed that NeuroPro's immune support was equivalent to human milk's and that Enfamil A+ was clinically endorsed as the standard of care for preterm infants.

95.    The statement quoted in ¶94 was materially false and misleading when made for all the reasons alleged in this Complaint, including without limitation that Defendants were aware that numerous scientific studies demonstrated that bovine formulas presented a significantly greater risk of NEC than human milk, as discussed in ¶¶38-51; that internal Reckitt documents acknowledged that risk, as discussed in ¶¶52-63; that Reckitt received multiple adverse event reports linking its infant formulas to NEC but chose to report none of those reports to the FDA, as discussed in ¶¶75-76; and that Reckitt deliberately altered its presentations to doctors to conceal that risk, as discussed in ¶¶71-72.  Moreover, no major expert body, including the American Academy of Pediatrics ("AAP") or the European Society for Paediatric Gastroenterology, Hepatology and Nutrition endorsed bovine-based formulas for very low-birth-weight infants.

96.    On February 22, 2024, Defendant Licht addressed investors at the Consumer Analyst Group of New York conference.  In discussing the Company's U.S. supply expansion in response to a baby-formula shortage caused by problems at one of competitor Abbott's factories, Licht stated: "Now I want to give you an example of how we're premiumizing nutrition with superior science.

Enfamil NeuroPro" – a formula variety marketed specifically for preterm babies – "**contains critical ingredients to drive brain superiority and immunity including MFGM.** This superior proposition is enabling us to both premiumize . . . while driving better health and cognitive outcomes for consumers."

97.     The statement quoted in ¶96 was materially false and misleading when made for the reasons discussed in ¶93.

98.     On March 15, 2024, following the $60 million verdict in *Watson v. Mead Johnson* two days earlier, Reckitt issued a "Statement re NEC Litigation" in which it flatly denied that its infant formula caused NEC and said it would seek to have the verdict overturned:

> **Statement is in response to a verdict received in Illinois state court on 13 March in one case concerning Necrotising enterocolotis (NEC)**
>
> Reckitt/Mead Johnson stands by the safety of our products.  We strongly reject any assertion that any of our products cause NEC, a serious gastrointestinal problem that mostly affects premature infants.
>
> While we continue to offer our deepest condolences to Ms. Watson, we strongly disagree with the jury's decision to fault Mead Johnson and award damages.  We continue to believe that the allegations from the plaintiff's lawyers in this case were not supported by the science or experts in the medical community.  This was underscored during the trial by a dozen neonatologists.
>
> It is important to note that this is a single verdict in a single case and should not be extrapolated.
>
> This case, and others like it, exclusively involve products used under the strict supervision of neonatologists in neonatal intensive care units and provide lifesaving nutrition options for vulnerable premature infants.
>
> We are of course, surprised and deeply disappointed with the verdict and will pursue all options to have it overturned.

99.     On April 24, 2024, Reckitt held an earnings call during which Defendant Licht repeated the Company's denial that its infant formulas cause NEC:

> To reiterate what we have previously said.  Enfamil premature products are safe and provide life-saving nutrition for premature babies under the guidance of medical

professionals who administer and specify our products. We strongly reject any assertion that any of our products cause necrotizing enterocolitis and that there was any failure to warn users of risk. The science does not support a causal connection between any Mead Johnson product and NEC. We have no plans to stop providing the product, as that would be detrimental to the care of preterm babies and their families. Safety is and will remain our #1 priority across our entire product portfolio.

100.    Defendants' categorical denials that Enfamil premature products caused NEC and reaffirmation of the products' safety quoted in ¶¶98-99 were materially false and misleading for all the reasons alleged in this Complaint. Among other things, Defendants not only were aware at the time of these statements of the numerous scientific studies demonstrating that bovine formulas presented a significantly greater risk of NEC than human milk, as discussed in ¶¶38-51, many of which were presented at the *Watson* trial, but were also aware that internal Reckitt documents acknowledged that risk, as discussed in ¶¶52-63; that Reckitt received multiple adverse event reports linking its infant formulas to NEC but chose to report none of those reports to the FDA, as discussed in ¶¶75-76; and that Reckitt deliberately altered its presentations to doctors to conceal that risk, as discussed in ¶¶71-72. By denying any causal link, asserting that "the science does not support" such a connection, and stating that "[t]his was underscored during the trial by a dozen neonatologists," Defendants both seriously misrepresented the scientific testimony at the trial, including without limitation the testimony of Dr. Sims and Dr. Swanson, and omitted material facts necessary to make the statements not misleading in light of their contemporaneous knowledge.

**B.    Defendants Misrepresented the Scientific Basis and Safety of Reckitt's Infant Formulas While Omitting Known NEC Risk**

101.    Throughout the Class Period, Reckitt and its executives touted the Company's infant formulas as grounded in "science" and "safe," while internally acknowledging mounting evidence that cow's-milk-based formulas significantly increased the risk of NEC in premature infants. Rather than disclosing these risks, Defendants repeatedly reaffirmed that Reckitt's infant formulas were based on "science" to preserve market share and pricing power in the Nutrition segment.

102.    On January 13, 2021, the Company presented at the 39th Annual JPMorgan Virtual Healthcare Conference.  During the question and answer portion of the call, Defendant Narasimhan touted the benefits of the Mead Johnson acquisition and highlighted that it had enhanced Reckitt's science-based approach to the Nutrition segment:

> [A]s I said last year, last February, the acquisition of the infant nutrition business brought . . . some strength in R&D., some of which have actually strengthened our science platforms pretty much across the portfolio, and given us the platform, particularly in areas like senior nutrition, where the science of Mead Johnson is beginning to find its . . . play, but also where there's some tailwind.

103.    On the Company's February 24, 2021 earnings call with securities analysts, Defendant Narasimhan touted the Company's "five[-]fold" investment in its science platforms, specifically focusing on expanding its research and development ("R&D") of the microbiome, which is part of the science purportedly supporting the safety and effectiveness of Enfamil:

> Let's start with R&D and innovation.  Last year, I signaled that returning to our innovation-led growth heritage was strategically important for the rejuvenation of sustainable growth at RB.  We have increased our focus here.  And in 2021, we will invest around 35% more than we did in 2019.

> Key to our success will be the investments we are making in science platforms. Here, we are making a fivefold increase in investment, which is funding the hiring of high-caliber scientists, engineers and technical professionals as well as enabling technologies.

> These science platforms, the 8 areas detailed at the bottom of the slide, will deepen our capabilities in areas like the microbiome, polymer science, digestive health and surface chemistry.  They will span all the GBUs and work across a number of consumer needs like immunity, digestive health and pain relief, just a few examples that are shown here.

104.    In Reckitt's 2020 annual report, issued on June 13, 2021, the Company again emphasized the scientific basis of its infant formulas:

> The Nutrition business includes our leading infant and child nutrition, adult nutrition and our range of vitamins, minerals and supplements. Brands include Airborne, Mead Johnson, Move Free and Schiff.  The strength of this business is its focus on science-led innovations which underpin products catering to consumers from infant through to the elderly.

- 34 -

105.    After the market closed on July 27, 2021, Reckitt held an earnings call to discuss its Nutrition segment.  During prepared remarks, Defendant Narasimhan stated about Reckitt's infant-formula business:  "We've recently become market leaders in the U.S. . . . and believe we can grow this portion of the business in the near-double-digit range."

106.    On September 23, 2021, during an investor seminar, Defendant Narasimhan further stated about Reckitt's infant-formula business: "Our science is very strong across cognition, digestion and immunity."

107.    On June 8, 2022, Reckitt issued its 2021 annual report, in which it again boasted about the scientific basis of its infant formulas:

> The Nutrition business includes our leading infant and child nutrition, our adult nutrition and our range of vitamins, minerals and supplements (VMS).  Brands include Enfa, Nutramigen, Airborne, Move Free and Neuriva.  The strength of this business is its focus on science-led innovations which underpin products catering to consumers from infants through to the elderly.
>
> *    *    *
>
> HOW DO WE PROVIDE ENHANCED NUTRITION FOR INFANTS AND FOR THE INCREASING NUMBER OF SENIORS IN SOCIETY?
>
> *    *    *
>
> Our response: Through the strength of our brands, consumer insight and science understanding, we are well placed to be a winner in the nutrition market.  With our infant brands such as the Enfa range and Nutramigen, and adult brands such as Provital, Move Free, Airborne and Neuriva, we seek to address the most important needs in nutrition.  Our product innovation teams leverage the capabilities within our science platforms of digestive health and allergy and immunity to deliver natural solutions that address the specific nutritional needs of these groups, whether infants or adults.

108.    The statements quoted in ¶¶102-107 were materially misleading when made for all the reasons alleged in this Complaint, including without limitation because they represented that the Company's preterm and specialty products were grounded in "science" without disclosing that Defendants were aware that numerous scientific studies demonstrated that bovine formulas presented

a significantly greater risk of NEC than human milk, as discussed in ¶¶38-51; that internal Reckitt documents acknowledged that risk, as discussed in ¶¶52-63; and that Reckitt deliberately altered its presentations to doctors to conceal that risk, as discussed in ¶¶71-72.

109.    On the February 22, 2024 call—when the *Watson* trial was underway and the witnesses who were neonatologists had already been deposed—an analyst asked about the Company's infant-nutrition business, specifically referencing Reckitt's description of an "attractive earnings model, enduring competitive advantage, [and] long-term runway for growth." Defendant Licht responded:

> [E]ven in very developed markets like here in the U.S., we can grow fast. And we have conviction that we can do that. In nutrition . . . we are still in a situation of normalizing after our business became much larger . . . due to the supply crisis. . . . [T]here's also no question that the real way to grow this business . . . is the runway for significant premiumization. And that's why I anchored on the science that underpins our innovation and our formula in the benefits that we can deliver when we bring new propositions to market that are clinically supported, where we have strong science to back that and claims that we can make that are very relevant for consumers. So in terms of health outcomes for babies . . . there's a long runway for growth to actually improve formula, deliver new benefits that are scientifically proven and premiumize the business as a result. . . . There's no question that there are fewer babies being born . . . but there's also no question that the real way to grow this business . . . is actually the runway for significant premiumization.[4]

110.    The statements quoted in ¶109 were materially misleading when made for all the reasons alleged in this Complaint, including without limitation because they represented that the Company's infant formula had "scientifically proven" benefits without disclosing that Defendants were aware that numerous scientific studies demonstrated that bovine formulas presented a significantly greater risk of NEC than human milk, as discussed in ¶¶38-51; that internal Reckitt documents acknowledged that risk, as discussed in ¶¶52-63; that Reckitt deliberately altered its

---

[4]    "Premiumization" means seeking to shift a company's sales toward "fancier, and often pricier, versions of everything . . . ." Jason Karaian and Jeanna Smialek, *Is the Entire Economy Gentrifying*, THE NEW YORK TIMES (Mar. 4, 2023), https://www.nytimes.com/2023/03/04/business/economy/premium-prices-inflation.html.

presentations to doctors to conceal that risk, as discussed in ¶¶71-72; and that prominent neonatology experts had opined in the *Watson* action that bovine formula causes or contributes to cause NEC.

111.    On May 16, 2024, two months after the *Watson* verdict, Reckitt issued its 2023 annual report, in which it brazenly doubled down on prior annual reports' boasts about the scientific basis for its infant formula and the trust pediatricians and consumers accordingly placed in it:

> Many of our brands have number one or two market share positions globally or in their markets.  From Dettol, Lysol, Durex, Finish, Harpic and Vanish to Enfamil, Mucinex, Nurofen, Strepsils, Nutramigen and Air Wick, consumers love and rely on our brands to care for their families[.]
>
> *       *       *
>
> With its strong science-backed reputation for supporting brain health, the Enfamil family of brands offers a range of routine and specialty infant formulas, as well as toddler nutritional drinks.  It is the leading premium infant nutrition brand across markets and the number one paediatrician recommended product in core markets such as the US.
>
> *       *       *
>
> "Our products are differentiated by our clinical, science-based approach to innovation and an expanding focus on specialised nutrition."  [Quoting Susan Sholtis, President of Nutrition.]
>
> *       *       *
>
> Our infant formula and toddler products lead their categories and earn trust through an immutable commitment to quality that is deeply rooted in our Purpose.  We bring that Purpose to life through a strong innovation and clinical research pipeline that delivers the latest in scientific advances to our consumers.
>
> Our Nutrition business comprises some of the world's leading brands in infant and toddler formula alongside a growing brand presence in adult nutrition.  Our products are differentiated by our clinical, science-based approach to innovation and an expanding focus on specialised nutrition.
>
> Our leading scientists and Key Opinion Leader partnerships enable us to deliver solutions that are trusted and respected by parents and healthcare professionals (HCPs) alike.  This is reflected in Enfa's position as the leading premium infant nutrition brand across markets and the number one paediatrician recommended

product in core markets such as the US and Malaysia, where infants are able to benefit from the cognitive and digestive benefits of our science-backed formula.

*    *    *

Our credible science has meant we have established high levels of consumer trust and paediatric recommendation.  This is a position we never take for granted.  We recognise trust needs to be earned every day and we work relentlessly to meet changing nutritional needs through a no-compromise commitment to product quality and food safety.

*    *    *

Within Nutrition, HCPs play an integral role in educating parents on child nutrition and recommending the solutions for their needs.  As channel mediators, HCPs are therefore critical to our market success, which means building their awareness and trust alongside that of consumers.  We review the latest clinical research continually to help improve understanding of how our products may be used to meet the specialised nutritional needs of infants and toddlers.  We provide a variety of resources to HCPs, including medical education, roundtables and the workshops we facilitate with world-renowned experts.  Our goal throughout is to foster a collaborative support environment that is second to none.  The investment we have made in educating HCPs on the scientific credibility of our products has resulted in our status as the number one trusted infant formula in the US; a testament to the trust we have established throughout this important stakeholder community.

112.    Defendants' statements quoted in ¶111 were materially misleading when made for all the reasons alleged in this Complaint, including without limitation because they represented that the Company's infant formula was "science-based" and "trusted" by pediatricians without disclosing that numerous scientific studies demonstrated that bovine formulas presented a significantly greater risk of NEC than human milk, as discussed in ¶¶38-51; that internal Reckitt documents acknowledged that risk, as discussed in ¶¶52-63; that Reckitt deliberately altered its presentations to doctors to conceal that risk, as discussed in ¶¶71-72; and that prominent neonatology experts had opined in the *Watson* action that bovine formula causes or contributes to cause NEC.

113.    Defendants' statements about Mead Johnson infant formulas' scientific basis and safety were material to investors, as Defendants acknowledged in Reckitt's 2021 annual report.  The

report cited the "Key Findings" of a "2021 Materiality Matrix" based on surveys of investors and other stakeholders:

> Non-negotiable ESG issues like Product quality & safety and Ethical business conduct continue to be among our most material issues. Stakeholders referenced previous product recalls, and the volatile nature of public perception of consumer goods companies. Some also believed that our repositioning as a health company means that we will face more intense scrutiny.

As discussed in ¶178, Reckitt's annual reports defined "ESG" to include "[p]roduct quality & safety and Ethical business conduct."

114.    The 2021 annual report further specified that ESG was material not only to "stakeholders," whom the annual report defined as including investors, but also specifically to investors: "ESG is an increasingly material topic for investors, with ESG ratings incorporated into investment decision-making."

## C.    Defendants Misrepresented Pediatrician and Hospital Endorsements

115.    Throughout the Class Period, Defendants repeatedly assured investors that Reckitt's infant-formula business was underpinned by strong professional endorsements from pediatricians and hospitals. In addition to the statements quoted above in which Defendants linked Enfamil's purported strong scientific basis to pediatricians' trust in it, there were many other earnings calls, investor presentations, and marketing materials in which Defendants highlighted that "Enfamil is the #1 pediatrician-recommended brand." These assurances implied that qualified medical experts had validated the clinical safety of Reckitt's preterm formulas and that no material controversy existed regarding their use in NICUs.

116.    The 2021 annual report issued on June 8, 2022, boasted about how the Company's scientifically based infant formulas had the trust of doctors and consumers:

> Reckitt is home to some of the best loved, most recognisable and most trusted consumer brands in the US, including Airborne, Air Wick, Enfamil, Finish, KY,

Lysol and Mucinex. . . . Our infant follow-on nutrition, Enfamil, is the number one brand recommended by paediatricians.

117.    During the March 1, 2023 earnings call, Defendant Sly told investors that:

In North America, we are now the #1 infant formula manufacturer in both the United States as well as Canada. Enfamil is now the #1 most trusted brand, both by parents and health care professionals. . . . In the United States, our market share of non-WIC, i.e., the formula which parents choose and pay for themselves, is just under 50%, up from around 38% at the beginning of 2022. . . . Having the trust of HCPs [i.e., health care providers – doctors, nurses, and nutritionists in hospitals] is critical . . . . It is difficult to know exactly how much of this increased share we will retain. I think it will be relatively sticky in the short term . . . with our leading brands and stronger reputation with health care professionals, including being the #1 recommended brand by pediatricians in the U.S., we will be fighting hard for every new parent. . . .

118.    Likewise, on an April 26, 2023 investor call, Defendant Durante said that "Enfamil is, as I said several times, is the preferred brand recommended by pediatricians."

119.    On May 15, 2023, the Company issued its 2022 annual report, in which it again touted the trust doctors and consumers placed in Enfamil:

Our Nutrition Global Business Unit (GBU) provides the highest-quality nutrition through various stages of life. The strength of this business is the leading position we occupy in infant nutrition across our key markets and the immense trust placed in us, especially by healthcare professionals and parents.

*    *    *

Our Enfamil brand is currently the Number One Recommended Infant Formula by Paediatricians and the Number One Trusted by Consumers in the US.

120.    On July 26, 2023, during Reckitt's earnings call, Defendant Licht stated:

In the U.S., we've maintained an absolute non-WIC market share just below 50%. Enfamil remains the #1 recommended infant formula by pediatricians and the #1 trusted brand by consumers in the U.S. . . . We also have a circa 40% share of hospital contracts, which we've managed to increase over the last 18 months.

121.    Defendants' statements quoted in ¶¶116-120 were materially misleading when made for all the reasons alleged in this Complaint, including without limitation because they represented that the Company's infant formula was "trusted" by pediatricians without disclosing that numerous

- 40 -

scientific studies demonstrated that bovine formulas presented a significantly greater risk of NEC

than human milk, as discussed in ¶¶38-51; that internal Reckitt documents acknowledged that risk,

as discussed in ¶¶52-63; and that Reckitt deliberately altered its presentations to doctors to conceal

that risk, as discussed in ¶¶71-72.

122.    On February 28, 2024, on Reckitt's earnings call held during the *Watson* trial,

Defendant Licht told investors:

> Turning to Nutrition.  While our North America business continues to rebase, we
> exited the year as market leader.  And Enfamil remains the #1 brand recommended
> by pediatricians.  We also have a circa 45% share of hospital contracts.  We drive
> growth in this business through both premiumization, from science-led innovation
> and focus on the faster-growing and higher gross margin segment of specialty
> formula. . . .  Families and health care providers rely on our products, and we take
> that responsibility very seriously.

123.    In its 2023 annual report issued on June 8, 2024, after the *Watson* verdict, Reckitt

further represented:  "Enfamil is the #1 infant formula brand recommended by pediatricians and

trusted by consumers in the US.  In 2023, our share in the Core Enfa family of products increased by

c.60bps, supported by innovation and healthcare professional activation."  The same report

reiterated:  "Our products are differentiated by our clinical, science-based approach . . . solutions that

are trusted and respected by parents and healthcare professionals . . . reflected in Enfa's position as

the . . . number one pediatrician recommended product. . . ."

124.    The representations quoted in ¶¶122-123 were materially false and misleading for all

the reasons alleged in this Complaint, including without limitation that by the time these statements

were made, Reckitt was aware of the extensive expert testimony in the *Watson* case supporting a

causal relationship between its bovine infant formulas and NEC in premature babies.  Thus, there

was no reasonable basis for Defendants to continue to tout families' and health care providers'

"reliance" on Reckitt's formulas in the face of the strong evidence that those formulas contributed to

or caused NEC.

125.    By 2018-2019, Mead Johnson's Medical Affairs and Quality teams were receiving and investigating hospital reports describing NEC cases among premature infants who were fed Enfamil products, including Enfamil Human Milk Fortifier and Enfamil Premature 24 Calorie. Internal e-mails presented at the *Watson* trial show that such reports were circulated among Mead Johnson personnel in Medical Affairs, Quality, and Commercial functions, and that Dr. Valentine routinely reviewed and buried the resulting adverse-event files.    *See* ¶¶75-76.    These communications demonstrate that, before the Class Period, Reckitt was aware that hospitals had reported NEC cases involving its preterm products, but Reckitt effectively ignored those reports.

126.    Accordingly, Defendants' statements concerning professional endorsements were materially false and misleading when made.  They omitted the material fact that Reckitt's purported "#1 pediatrician recommendation" and hospital relationships did not reflect medical validation of product safety but rather historical brand recognition and marketing relationships.  By continuing to tout these claims amid mounting clinical and legal scrutiny, Defendants created a false impression of sustained medical trust and scientific consensus that did not exist.

**D.    Reckitt Falsely Represented to Investors that It Monitored Adverse Event Reports**

127.    Reckitt's 2021 annual report assured investors that the Company monitored the quality of its products and reported adverse events:

Product safety policy

The purpose of this policy is to assure our stakeholders of the safety of our products by describing our approach to Safety Assurance for products of Reckitt.  We have a responsibility to develop products that are as safe and nourishing as they can be; to monitor their in-use safety and listen to feedback from users, and if things change, to react quickly and effectively to mitigate harm.

*            *            *

A robust quality management system is underpinned by clear policies and supporting systems, which are subjected to comprehensive and independent regular audit

review.  Consumer safety and vigilance teams within the GSA [Global Safety Assurance] function conduct pre- and post-market safety reviews and monitor and report on adverse events.

128.    Similarly, the Company's 2022 annual report stated that the Company managed "product safety" risk in part by "Adverse and critical events procedure and dedicated vigilance group to monitor and report adverse events."

129.    The statements quoted in ¶¶127-128 were false and misleading when made for all the reasons alleged in this Complaint, including without limitation because, as alleged in ¶¶75-77, Reckitt did not enforce its purported policy that its employees should report adverse events involving its infant formulas to the Company, and when the Company received reports from parents or hospitals about adverse events involving Enfamil, even deaths, it always responded that its formulas were not the cause of the adverse events, and it never reported the adverse events to the FDA.

## E.    Defendants Misrepresented the Drivers and Sustainability of the Nutrition Segment's Growth

130.    On July 27, 2021, Reckitt held an earnings call to discuss its second-quarter results. During prepared remarks, Defendant Narasimhan stated:

> Turning to specialty infant nutrition.  This is our highest margin business, and it is a business that has taken a while for us to fully put the building blocks in place. . . . We've recently become market leaders in the U.S. We see a global scaling opportunity for this business with our current offering and believe we can grow this portion of the business in the near double digit range.

131.    On the same call, Defendant Narasimhan further emphasized Reckitt's share growth in the U.S. infant-formula market: "On market share, U.S. IFCN [*i.e.*, infant and children nutrition] grew share by 100 basis points on the non-WIC . . . segment of the market.  This continues to be driven by the strength in NeuroPro, where we have built marketing campaigns around its Omega 3-DHA claims."

132.    The statements quoted in ¶¶130-131 were materially false and misleading when made for all the reasons alleged in this Complaint, including without limitation because they portrayed Reckitt's specialty infant nutrition business as a high-margin, market-leading segment with scalable global growth potential, while omitting material information that rendered those claims misleading. At the time, Reckitt had received hospital reports of NEC among premature infants fed Enfamil preterm products, and had summarily concluded in each instance that no significant investigation or regulatory reporting was required because of Reckitt's corporate policy that the increased incidence of NEC in premature infants who were fed Reckitt formulas was not proof of causation. Reckitt also knew that no randomized clinical trial had tested whether bovine-based preterm formulas caused NEC, and that leading professional bodies, including the American Academy of Pediatrics and the European Society for Paediatric Gastroenterology, Hepatology and Nutrition, identified human donor milk, not cow's-milk-based formula, as the recommended nutrition for very-low-birth-weight infants. By highlighting "scaling opportunity" in its specialty infant business without revealing these facts, Defendants misled investors about the durability and risk profile of that growth.

133.    Two months later, at a September 23, 2021 Investor Seminar, Defendant Narasimhan again attributed Reckitt's performance to scientific differentiation and premiumization: "Our specialty infant business is currently largely a North American business. . . .  Our core Enfa business growth relies on science and differentiated claims to support premiumization, offsetting the declines in birth rates. Our science is very strong across cognition, digestion and immunity."  He also said: "The opportunity set for our specialty infant business is global, and we are rapidly expanding it. Together, we expect that our core Enfa business and our specialty infant nutrition business is a low single digits growth business, growing in the region of 1% to 4%."

134.     The statements quoted in ¶133 were materially false and misleading for all the reasons alleged in this Complaint, including without limitation because they attributed Enfamil's growth and "premiumization" to "science and differentiated claims" while omitting material facts that contradicted that narrative.  At the time, Reckitt's Medical Affairs personnel were aware of published studies and professional guidelines identifying an elevated risk of NEC in premature infants who were fed cow's-milk-based formula compared with those who were fed human donor milk, and no randomized clinical trials had demonstrated that Enfamil reduced or eliminated that risk.  Senior Mead Johnson personnel also acknowledged in internal discussions that NICUs were increasingly adopting human-milk-based feeding protocols in response to those risks.  By citing strong science as the driver of growth while concealing these facts, Defendants misled investors to believe that Enfamil's premium positioning rested on validated clinical evidence rather than continued promotion of products facing undisclosed safety concerns.

135.     On October 26, 2021, Reckitt's Q3 press release reported:

Nutrition net revenue grew on a LFL [like-for-like] basis by 3.8% in the quarter to £640m.  This reflected volume decline of 2.5% and price/mix improvements of 6.3% due to pricing growth in IFCN North America and VMS. . . .  IFCN net revenue grew 5% on a LFL basis.  The US business, which represents around half of IFCN revenue, grew high-single digits.  This has been driven primarily by Nutramigen – our Specialty brand – and good share gains in the base Enfa business.

136.     On June 8, 2022, Reckitt issued its 2021 annual report stating: "We have approximately a one-third share of the IFCN market in the US, excluding sales related to the WIC. . . .  [S]hare here grew c.50bps in 2021 as a result of strong innovation, with the new Enfamil NeuroPro launched in June. . . ."

137.     On July 27, 2022, Reckitt again reported quarterly results, stating that "Nutrition delivered mid-single-digit growth, led by the success of our preterm and specialty products, particularly Enfamil A+ and NeuroPro."

138.    The following year, Reckitt's 2022 Annual Report issued on March 28, 2023, stated: "US net revenue grew around +40% on a LFL basis in the year, with strong growth across both our core Infant Formula and Specialty segments. . . .  We exit 2022 in the US with a larger, stronger business, and as the market leader in Infant Formula."

139.    On an April 26, 2023 earnings call, Defendant Carr told analysts: "In the U.S., we maintained our market-leading share position in the non-WIC markets, showing that mothers . . . are sticking with Enfamil. . . .  [W]e remain confident in our ability to maintain a sustainable upside in market share. . . ."

140.    The statements quoted in ¶¶135-139 were materially false and misleading when made for all the reasons alleged in this Complaint, including without limitation because Reckitt described its preterm portfolio as a "success" without disclosing that Defendants were aware of numerous scientific studies demonstrating that bovine formulas presented a significantly greater risk of NEC than human milk, as discussed in ¶¶38-51; internal Reckitt documents acknowledged that risk, as discussed in ¶¶52-63; and Reckitt deliberately altered its presentations to doctors to conceal that risk, as discussed in ¶¶71-72.  The omission of these facts rendered Defendants' description of Reckitt's preterm and specialty products' growth as a "success" materially misleading.

141.    The foregoing statements from 2021 through 2024 quoted in ¶¶130-131, 133, and 135-139 were also materially false and misleading when made because Defendants failed to disclose that: (a) the Nutrition segment's growth was driven in substantial part by continued sales of bovine-based preterm formulas despite internal acknowledgment of those formulas' greatly increased NEC risk; (b) claims of "strong" or "superior science" lacked any support from controlled clinical data; and (c) Reckitt and its executives were contemporaneously aware of pending NEC litigation,

- 46 -

hospital feedback, and scientific evidence that undermined the Company's public narrative of sustained, science-driven growth.

142.    By attributing Reckitt's Nutrition growth to "strong science" and "premiumization," while omitting the adverse facts described above, Defendants created a false and misleading impression that the segment's growth was structural and sustainable.  In truth, Reckitt's gains increasingly depended on continued promotion of products that carried known safety risks and exposure to rapidly escalating litigation.

F.    **Defendants Characterized Product-Safety Risks as Merely Hypothetical When They Knew that Reckitt's Infant Formula Posed an Unreasonable Risk of Serious Illness or Death for Premature Babies**

143.    In Reckitt's annual reports, the Company falsely and misleadingly described the admittedly serious harms the Company could suffer from product safety problems as merely hypothetical when, as alleged above, Defendants were aware of the serious NEC danger that Mead Johnson's infant formulas posed to premature babies.

144.    The Company's 2020 and 2021 annual reports both discussed its "Principal risks," including "Product safety."  The "Risk Management" sections of the annual reports elaborated on this risk's "Potential impact":

> Product safety issues lead to reputational damage with consumers, customers or regulators.  Significant financial losses could arise from supply disruption, product recalls, delayed launches, penalties and a loss of consumer trust, as well as possible criminal liability for senior management.  Any gaps in the completion of our safety assessments or a lack of anticipation of new safety concerns could exacerbate any potential impact.

145.    The Company's 2020 and 2021 annual reports also discussed "adherence to product quality standards" as one of the Company's "Principal risks" and described this risk's "Potential impact": "Impacts are wide-ranging and may include a consumer safety incident, regulatory failures,

loss of sales (including product recall) and adverse reputational impact, a supply disruption or factory closure, or potential civil/criminal actions against individuals."

146.    Similarly, the Company's 2021 annual report discussed "Product Regulations" as a "Principal risk" concerning not only "regulations" but also "internal standards" and described this risk's "Potential impact": "Non-compliance with a product-related regulation may result in supply disruption, increased regulatory scrutiny, financial impact including product recall, damage to company reputation and potential civil/criminal liability."

147.    The statements quoted in ¶¶144-146 were materially false and misleading when made for all the reasons alleged in this Complaint, including without limitation because they described the risk of harm to the Company from product safety defects, product quality defects, and violations of external or internal regulations or standards concerning product safety and product quality as merely hypothetical, when Defendants were aware of numerous scientific studies (*see* ¶¶38-51) and internal documents (*see* ¶¶52-63) indicating that Mead Johnson's bovine formulas presented an unreasonable risk of serious illness or death for premature infants.

### G.    Defendants Downplayed and Misrepresented the Materiality of NEC Litigation

148.    By about December 2021, Mead Johnson was a defendant in ten federal lawsuits and forty-three state lawsuits brought by parents of babies who became seriously ill or died from NEC after being fed Mead Johnson's bovine formulas.  By March 2024, over 400 cases were pending against Mead Johnson (and Abbott) nationwide raising substantially identical allegations that bovine-based formulas such as Enfamil NeuroPro and EnfaCare increased the risk of NEC and that Mead Johnson (and Abbott) failed to provide adequate warnings.  Despite this widespread litigation exposure, Reckitt and its executives repeatedly assured investors that ongoing product-liability actions alleging that the Company's preterm formulas caused NEC posed no material financial or

reputational risk to the Nutrition segment or the Company.  In public filings and earnings calls, Defendants minimized the litigation as baseless, while continuing to promote Enfamil and related preterm products as "safe" and supported by "science."

149.    On March 8, 2023, Reckitt issued its 2022 Annual Report, in which Reckitt first acknowledged the NEC cases in a single paragraph under "Contingent Liabilities," stating that "any potential costs relating to these actions are not considered probable and cannot be reliably estimated."  The Company emphasized that it "denied the material allegations" and that its products "provide critical tools to expert neonatologists for the nutritional management of preterm infants."

150.    The statements quoted in ¶149 were materially false and misleading when made for all the reasons alleged in this Complaint, including without limitation that Defendants were aware that the weight of the scientific literature supported a causal link between bovine formula and NEC (*see* ¶¶38-51); that Mead Johnson had altered its presentations to doctors to conceal that causal link (*see* ¶¶71-72); and that Mead Johnson had received multiple adverse event reports about NEC cases among babies who had been fed Mead Johnson formulas but had summarily dismissed these reports and had not reported them to the FDA, based on the Company's self-serving dogma that there was no causal link (*see* ¶¶75-76).

151.    On March 14, 2024, Reckitt issued its 2023 Annual Report and again downplayed the litigation, stating that although "an adverse legal ruling [in *Watson v. Mead Johnson*] awarded one plaintiff $60 million," no provisions were recorded and "no related net cash outflows have been included."  The Company told investors that "the allegations . . . [are] not supported by the science or the experts," and that "an economic outflow is not considered probable."

152.    On April 24, 2024, during an earnings call, Defendant Licht reiterated: "We strongly reject any assertion that any of our products cause necrotizing enterocolitis. . . .  Safety is and will

remain our #1 priority across our entire product portfolio."  He also added that the NEC litigation "does not change our overall outlook, and we remain confident in our position," emphasizing that Reckitt was "not seeing any wider impact on the equity of our nutrition brands."

153.    Defendants' statements quoted in ¶¶151-152 were materially misleading when made for all the reasons alleged in this Complaint, including without limitation because they falsely and misleadingly minimized the significance of the *Watson* verdict without disclosing that numerous scientific studies demonstrated that bovine formulas presented a significantly greater risk of NEC than human milk, as discussed in ¶¶38-51; that internal Reckitt documents acknowledged that risk, as discussed in ¶¶52-63; that Reckitt deliberately altered its presentations to doctors to conceal that risk, as discussed in ¶¶71-72; and that prominent neonatology experts had opined in the *Watson* action that bovine formula causes or contributes to cause NEC.  Moreover, by characterizing the *Watson* verdict as a "single adverse ruling," Defendants downplayed the significance of a major liability event and failed to disclose the likelihood of increasing claim volume and legal, financial, and reputational harm to the Company.

154.    On July 24, 2024, during another earnings call, Defendant Licht further attempted to reassure investors, stating:  "Some of these individual trials will not drive the outcome of this litigation. . . . [T]he *Watson* case is not going to be a driver of the ultimate outcome. . . .  We are not seeing any wider impact on the equity of our nutrition brands."

155.    The statements quoted in ¶154 were materially misleading for the same reasons discussed in ¶153.  Reckitt's executives were aware that the *Watson* verdict had already catalyzed a surge of new filings.  By suggesting that individual verdicts were inconsequential and that the litigation did not threaten the Company's financial position, Defendants concealed the growing risk to Reckitt and misled investors about the scope and seriousness of the claims.

156.    By repeatedly minimizing the NEC litigation and affirming that no material risk existed, Defendants created the false impression that Reckitt was insulated from significant legal or financial exposure related to its Nutrition segment.  In truth, Reckitt faced escalating product-liability claims involving a core revenue driver and substantial likely future costs and reputational harm.  Defendants' false reassurances deprived investors of material information necessary to assess the true risks facing the Company.

### THE TRUTH EMERGES

157.    On March 13, 2024, in the *Watson* action, a jury in St. Clair County, Illinois, returned a $60 million verdict in the first NEC lawsuit to be tried to a verdict.  The jury found that Mead Johnson's formula caused or contributed to cause NEC and that the Company failed to warn the decedent's mother of the increased risk her preterm infant could develop NEC by consuming cow's-milk-based formula.

158.    On this news, the price of the Company's ADSs fell $1.97, or 14.7%, from a closing price of $13.41 per share on March 13, 2024, to a closing price of $11.44 on March 15, 2024. Simultaneously, the price of the Company's ordinary shares fell £7.80, or 14.8%, from a closing price of £52.66 on March 13, 2024, to a closing price of £44.86 per share on March 15, 2024.

159.    The *Watson* verdict contradicted Reckitt's public assurances that "the science does not support a causal connection between any Mead Johnson product and NEC."  The jury's findings, that cow's-milk-based formula caused or contributed to cause a premature infant's NEC and that the Company failed to warn of that risk, partly revealed the falsity of Defendants' statements touting Enfamil's "strong science," "safety," and "alignment with global expert guidelines."

160.    Securities analysts began to question their prior acceptance of the Company's false reassurances that it faced no significant liability in the NEC litigation.  For example, J.P. Morgan wrote in a March 15, 2024 analyst report that "[w]e see the share price movement reflecting market

concerns on the potential financial liability (for which the company has not provisioned) . . . ."  On March 17, 2024, Jefferies wrote in an analyst report that the "liability risk is zero to £8bn+.  Our base case assumes a £5.5bn, taking our PT [price target] from £46 to £40. . . ."  On March 18, 2024, BNP Paribas acknowledged for the first time in an analyst report that "[t]here appears to be a body of scientific evidence linking dairy based formula with NEC.  Having reviewed the bellwether cases it appears that there is a body of scientific evidence to support the case that use of cows' milk-based preterm formula is linked to an increased incidence of necrotising enterocolitis (NEC)."

161.  However, the *Watson* verdict did not reveal the entire truth, and Defendants prevented the market from recognizing the verdict's full implications by falsely reassuring investors that Reckitt's bovine formula did not cause NEC and that it expected to prevail in the ongoing NEC litigation, including an appeal of the verdict in *Watson*.  *See* ¶98.

162.  The market accepted Defendants' false reassurances that the *Watson* verdict did not undermine Reckitt's litigation strategy or position regarding NEC.

163.  For example, J.P. Morgan wrote in a March 18, 2024 report:

At this stage the company still believes that no liability should rise (no provision taken in FY23 accounts) as no causal link have been established between NEC and its pre-term feeding product, but rather that formula fed babies are at higher risk of developing NEC (vs breast fed).  All in all, we found that that context was helpful and reassuring even though the timeline (at the earliest H125) means the question of liability will linger for now.  Near term, the shares could some see some relief on the positive outcome of an appeal against the verdict in the trial court (over the next months).

164.  Similarly, RBC wrote in a March 18, 2024 analyst report, "we are reassured by management's confidence. . . ."

165.  On April 24, 2024, the Company reported the *Watson* verdict in its 2023 annual report and stated that it had unquantified "contingent liabilities" related to the case purely as an

accounting matter, but Reckitt did not book any reserve and continued to insist that it did not expect to ultimately pay any money to Ms. Watson or any of the other NEC plaintiffs:

> Necrotizing Enterocolitis (NEC) Product liability actions relating to NEC have been filed against certain Group subsidiary companies, or against certain Group subsidiary companies and Abbott Laboratories, in state and federal courts in the United States. The actions allege injuries relating to NEC in preterm infants. Plaintiffs contend that human milk fortifiers (HMF) and preterm formulas containing bovine-derived ingredients cause NEC, and that preterm infants should receive a diet of exclusive breast milk. **The Company has denied the material allegations of the claims. It contends that its products provide critical tools to expert neonatologists for the nutritional management of preterm infants for whom human milk, by itself, is not available or nutritionally sufficient. The products are used under the supervision of medical doctors. Any potential costs relating to the product liability actions are not considered probable[.]** Given the uncertainty on the number of cases and range of possible results and/or outcomes on each case, the possible economic outflow cannot be reliably estimated, but may be significant. . . .

> \*      \*      \*

> On 13 March 2024, a state court jury in Belleville, Illinois awarded $60 million to a mother of a child who was born prematurely and died 25 days later from Necrotizing Enterocolitis (NEC). Reckitt believe the allegations from the plaintiff's lawyers in this case were not supported by the science or the experts in the medical community. Reckitt are appealing the verdict, and at this time, an economic outflow is not considered probable. There is a possible outcome that may be unfavourable. . . .

166.    The Company's reassurances following the *Watson* verdict turned out to be false. On July 29, 2024, in the case captioned *Gill v. Abbott Laboratories, Inc.*, Docket No. 2322-CC01251 (Mo. Cir. Ct. June 23, 2023), a jury in St. Louis, Missouri concluded that Abbott's specialized formula for premature babies led a baby to develop NEC and awarded the plaintiff $495 million. The scientific issues concerning causation of NEC by Abbott's bovine formula for premature babies were substantially identical to the issues concerning causation of NEC by Reckitt's formula. The *Gill v. Abbott* verdict therefore directly contradicted Defendants' prior statements that the NEC litigation was baseless, and it alerted investors that Reckitt faced even greater liability exposure than the *Watson* verdict had suggested.

- 53 -

167.    Accordingly, the market reasonably understood the *Gill v. Abbott* verdict as additional material news contradicting Reckitt's false reassurances both about what the science supposedly said about bovine formula and NEC, and about the supposed strength of Reckitt's arguments in the *Watson* appeal and its defenses in the hundreds of NEC cases still pending against Mead Johnson. For example, HSBC wrote in a July 25, 2024 report about Reckitt that "all eyes will be on the Abbott trial (Gill), already under way for two weeks, in St Louis, Missouri," and that "the result of the Abbott trial remains likely to be important for sentiment surrounding the litigation," although HSBC also noted that "[m]anagement still does not see either of these trials [*Watson* or *Gill*] as critical in the bigger scheme of things . . . ."  After the *Gill* verdict, J.P. Morgan wrote in a July 29, 2024 analyst report: "Although this case did not involve Mead Johnson, the verdict is a second verdict on NEC (after the $60m Watson case) and, with the scale of the damages awarded, a negative read on potential liability is weighing on Reckitt shares today."

## ADDITIONAL ALLEGATIONS OF SCIENTER

168.    Reckitt and the Individual Defendants were motivated to misrepresent and conceal the truth about the science demonstrating that Mead Johnson's bovine formulas cause NEC in premature infants because the Company's ability to provide formulas to NICUs to feed premature infants was critical to its ability to win contracts with hospitals to supply them with its whole portfolio of formulas, and the ability to supply the whole portfolio to hospitals was critical to gaining customers among parents – not only of premature babies but also of term babies – who would buy Mead Johnson formulas at retail after bringing their babies home from the hospital.  Thus, Reckitt's entire infant formula business in the United States depended on its success in persuading neonatologists to use its formulas with premature babies in NICUs, which the neonatologists would not have done if they had been fully informed about the NEC risks that Reckitt misrepresented and concealed.  *See* ¶¶27-30.

- 54 -

169.    Reckitt's U.S. infant formula business was one of its critical sources of revenue. During the Class Period, Reckitt received hundreds of millions of pounds (and probably over one billion pounds) in revenue from this business every year, representing 8-10% of its total global net revenue. *See* ¶26. Thus, Defendants were motivated to misrepresent and conceal the linkage between Mead Johnson's bovine formulas and NEC in premature infants in order to protect this vital revenue stream.

170.    Because of its awareness of the greater risk of NEC for premature babies who were fed bovine formula instead of human milk, Reckitt tried to acquire a human-milk-product manufacturer several times from 2008 to 2021. *See* ¶¶57-60. Thus, there is a strong inference that the Individual Defendants were all informed of that greater NEC risk, and of the legal, financial, and reputational harms the Company was exposed to as a result, when the Company's senior executives and Board were considering the proposed acquisition of a human-milk-product manufacturer in 2021.

171.    By about December 2021, Reckitt was aware that it was a defendant in ten federal lawsuits and forty-three state lawsuits brought by parents of babies who became seriously ill or died from NEC after being fed Mead Johnson's bovine formulas. Mead Johnson sought a federal MDL consolidation of its federal NEC cases in February 2022. The number of NEC cases against Mead Johnson increased throughout the Class Period. Thus, there is a strong inference that the Individual Defendants were all informed of the greater risk of NEC for babies who are fed bovine formula instead of human milk, and the resulting legal, financial, and reputational harms to which the Company was exposed, when the Company's senior executives and Board were considering the Company's defenses in those cases.

172.    The Individual Defendants' scienter is further demonstrated by their positions in senior executive roles in which they had responsibility for product safety, product quality, and compliance with internal and external standards, including specifically with respect to the marketing of breast milk substitutes ("BMS") such as the Company's bovine formulas.

173.    The "Risk Management" section of Reckitt's 2021 annual report states, with respect to "Oversight accountability" for "adherence to product quality standards," that "Executive ownership resides directly with the CEO, Global Business Unit Presidents and Chief Supply Officer, who drive activity through each of the Global Business Unit executive leadership teams."  Thus, Defendants Narasimhan, Durante, and Licht were personally responsible for "adherence to product quality standards" during their respective terms as CEO and either knew or were reckless in disregarding the undisclosed facts about the serious NEC danger posed by the Company's infant formula to premature babies and the resulting legal, financial, and reputational harms to which the Company was exposed.

174.    These three Individual Defendants' scienter during their respective terms as CEO is further demonstrated by the Company's Policy and Procedures on the Marketing of Breast-Milk Substitutes ("BMS Marketing Policy"), which was adopted in 2018 and remained in effect throughout the Class Period.  The BMS Marketing Policy pledged that the Company would comply with the World Health Organization's International Code of Marketing of Breast-Milk Substitutes of 1981 ("WHO Code"), "as implemented by local governments worldwide."  The WHO Code calls for exclusive breastfeeding during the first six months.  The BMS Marketing Policy specified that the CEO was responsible for ensuring compliance with the policy: "The Chief Executive Officer (CEO) of RB [Reckitt] is ultimately accountable for the BMS Marketing Policy and ensuring compliance herewith.  All reporting on compliance with the BMS Marketing Policy, is submitted to the CEO for

final review and approval." Reckitt's marketing of bovine formula for newborn premature infants was contrary to the WHO Code, and each of the Company's three CEOs during the Class Period knew or was at least reckless in not knowing that the Company was violating that code for which he was "ultimately accountable."

175.    According to the Company's 2023 annual report, "Ownership and accountability of principal risks resides with the GEC [Group Executive Committee]." The "principal risks" included "product quality" and "product safety," which were combined in 2023 as "product safety." The Group Executive Committee included Defendants Narasimhan, Carr, Licht, and Sly in 2021; Durante, Carr, and Licht in 2022; and Licht and Carr in 2023. Thus, all of the Individual Defendants were personally responsible for product quality and product safety during the Class Period and either knew or were reckless in not knowing the undisclosed facts about the serious NEC dangers posed by the Company's infant formula to premature babies and the resulting legal, financial, and reputational risks to which the Company was exposed.

176.    Reckitt's Corporate Responsibility, Sustainability, Ethics and Compliance ("CRSEC") Committee is another forum in which Defendants Narasimhan, Durante, Licht, and Carr either learned or were reckless in not learning about the bovine formula-NEC linkage and the resulting legal, financial, and reputational risks to the Company.

177.    Reckitt's 2021 annual report states that "Board oversight [of adherence to product quality standards] is provided by the CRSEC Committee." The 2021 annual report further states:

> Our Board is responsible for overseeing, considering and reviewing the Group's environmental, social and governance (ESG) strategy, as outlined in its Schedule of Matters Reserved for the Board. The Board delegates regular oversight of sustainability to the Corporate Responsibility, Sustainability, Ethics and Compliance (CRSEC) Committee.

178.    The 2021 annual report also states that "[p]roduct quality & safety and Ethical business conduct" were among the "Non-negotiable ESG issues" that "continue to be among our

- 57 -

most material issues." Thus, the Board and CRSEC Committee's responsibility for ESG included responsibility for product quality and safety, as well as compliance.

179.    The 2021 annual report's "Risk Management" section states with respect to "Oversight accountability" for "product safety" that "Executive ownership resides with the Chief R&D Officer, who drives activity through each of the Global Business Unit executive leadership teams. Board oversight is provided by the CRSEC Committee." The 2021 annual report makes substantially the same statement with respect to the Chief R&D Officer and CRSEC Committee's "Oversight accountability" for compliance with external and internal "product regulations" and standards.

180.    The CRSEC Committee included Defendant Durante in 2021 and 2022 until he became CEO. The CEO and CFO "regularly attend[ed] meetings," according to the 2021 annual report. Thus, Defendants Narasimhan, Durante, and Licht attended the committee's meetings during their respective tenures as CEO, and Defendant Carr attended the committee's meetings throughout the Class Period until his retirement as CFO in March 2024.

181.    Specific matters considered by the CRSEC Committee during 2021 included "Product safety evaluation," "product integrity review," and "IFCN update - breast-milk substitute call to action." The "Product integrity review" was a "Completion of a 4.5-year programme to review the safety and compliance of Reckitt's portfolio in response to the Humidifier Sanitiser (HS) tragedy. At peak a workforce of 90 dedicated cross-functional scientists reviewed over 21,000 stock-keeping units (SKUs) across 173 markets." The "HS tragedy" was a catastrophic product safety violation in South Korea which led to numerous serious illnesses and deaths among consumers and to legal, financial, and reputational harms to the Company, alerting Defendants to the serious harms to the Company that a serious product safety violation causes.

182.    The CRSEC Committee also specifically addressed the Company's infant formula marketing practices in 2021:

> As part of our governance mandate and ensuring that we monitor the proper implementation of Reckitt's policy and procedures on the marketing of breast-milk substitutes (BMS), we are apprised on progress and developments in the marketing of our BMS products.  We employ a number of monitoring activities, and have summarised below the key items from 2021:
>
> - We completed our reporting on the responsible marketing of BMS: summarising alleged non-compliances of our BMS marketing practices versus the BMS Marketing Policy and/or local legislation for 2020.

183.    Reckitt's 2022 annual report stated that the CRSEC Committee continued to monitor the Company's infant formula marketing practices in 2022: "As part of our governance mandate and ensuring that we monitor the proper implementation of Reckitt's policy and procedures on the marketing of breast-milk substitutes (BMS Policy), at each Committee meeting, we are apprised on progress and developments in the marketing of our BMS products."  The Committee also that year considered "product safety evaluation," "regulatory matters," and "quality performance and risks."

184.    The 2022 annual report also stated that the CRSEC Committee's priorities in 2023 would include monitoring "product safety" and "compliance matters (including regulatory and quality risk assurance . . .)."

185.    The CRSEC Committee reviewed "Product Safety and Quality" at all of its meetings during 2023, according to the 2023 annual report.

186.    Thus, all of the Individual Defendants were responsible for and informed of the Company's product safety issues through their participation in the CRSEC and either knew or were reckless in not knowing the undisclosed facts concerning the serious NEC dangers posed by Reckitt's infant formulas to premature babies and the resulting legal, financial, and reputational harms to which Reckitt was exposed.

187.    In addition to the allegations in ¶¶173-183 concerning Defendant Durante's scienter, he was thoroughly familiar with Reckitt's business, including the issues of product safety, product quality, and compliance with internal and external guidelines, from before the start of the Class Period until his departure from the Company.  He served on Reckitt's Board for nine years before serving as the Company's CEO from October 1, 2022 to September 30, 2023.  The Company's 2022 annual report called him "deeply familiar with the business and its leadership function and . . . well positioned to lead the execution of the company's strategy and transformation."

188.    Defendants' scienter is also demonstrated by the active concealment of the truth about the links between the Company's infant formula and NEC by Dr. Valentine, who was Mead Johnson's Medical Director of North America from before the start of the Class Period until August 2021 and its Chief Medical Officer from May 2022 to October 2023.  As alleged in detail above, Dr. Valentine acknowledged in her writings before joining the Company that human milk posed a significantly lower risk of NEC than bovine formula (*see* ¶¶53-54), but after joining Mead Johnson, she edited presentations to be shown to doctors to conceal the causal link between bovine formula and NEC (*see* ¶71); failed to notify the FDA of adverse event reports concerning NEC cases among premature babies who were fed Mead Johnson's bovine formulas (*see* ¶¶75-76); and edited a script for Company employees receiving calls about NEC cases among premature babies who were fed Mead Johnson's bovine formulas to conceal the causal link between bovine formula and NEC (*see* ¶77).  Dr. Valentine also received an internal email in October 2015 reporting that Dr. Jae Kim, who at that time worked at the University of California, San Diego, had "virtually said it's not ethical to use bovine in the NICU."  In light of her senior positions at Mead Johnson, there is a strong inference that the Individual Defendants were either aware, or reckless in not being aware, of Dr.

Valentine's knowledge and concealment of the undisclosed or misrepresented facts concerning the link between bovine formula and NEC.

## POST CLASS PERIOD EVENTS

189.    The NEC litigation against Mead Johnson has continued actively since the end of the Class Period.  Among other things, Mead Johnson and Abbott Laboratories initially won a jury verdict in October 2024 in *K.W. ex rel. Whitfield v. Mead Johnson & Co., et al.*, No. 2222-CC06214 (Mo. Cir. Ct.), an NEC case in which both formula manufacturers were defendants.  But the judge in that case granted a new trial in March 2025, finding that defendants' lawyers had engaged in misconduct at trial that made the verdict "against the weight of the evidence."  The judge held that defendants' lawyers intentionally and repeatedly violated court rulings when presenting evidence to the jury; "flooded the zone" with improper objections; presented evidence the judge had previously excluded; falsely argued that the FDA had approved the relevant formulas' ingredients; confused the jury by attacking "straw man" arguments; and improperly argued that if plaintiff prevailed, babies would "starve to death" because the companies' bovine infant formulas would have to be pulled from the market, contrary to evidence that the formulas would not have to be removed from the market and that there are alternative feeding options for premature babies.  During the trial, the court sanctioned one defense lawyer – a lawyer for Abbott – for his misconduct, but the court held in its subsequent order granting a new trial that "Mead exacerbated Abbott's errors and misconduct by mirroring the same language throughout their presentation of evidence and arguments."[5]  Thus, the NEC litigation since the *Watson* and *Gill* verdicts continues to favor plaintiffs who maintain that bovine formula causes NEC.

---

[5]    Counsel who represented Mead Johnson (and counsel who represented Abbott) in the *K.W.* case are not the same counsel who represent Reckitt in this action.

## CLASS ACTION ALLEGATIONS

190.    Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, as defined in ¶1.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

191.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.  During the Class Period, Reckitt had approximately 700 million ordinary shares outstanding.  Record owners and other members of the Class may be identified from records maintained by Reckitt or its transfer agent, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

192.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws or U.K. law that is alleged in this Complaint.

193.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

194.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws and U.K. law were violated by Defendants' actions as alleged in this Complaint;

(b)      whether statements made by Defendants to the investing public during the Class Period omitted or misrepresented material facts about the business, operations, and prospects of Reckitt; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

195.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

196.    As alleged in ¶¶157-158, the *Watson* verdict revealed new and corrective information, and in response the price of the Company's ADSs fell $1.97, or 14.7%, from a closing price of $13.41 per share on March 13, 2024, to a closing price of $11.44 per share on March 15, 2024. Simultaneously, the price of the Company's ordinary shares fell £7.80, or 14.8%, from a closing price of £52.66 on March 13, 2024, to a closing price of £44.86 per share on March 15, 2024.

197.    As alleged in ¶¶166-167,  the *Gill* verdict, which was reported after the market closed on Friday, July 26, 2024,[6] revealed new and corrective information.  In response, the price of the Company's ADSs fell $1.02, or nearly 9%, from a closing price of $11.66 per share on July 26, 2024, to a closing price of $10.64 per share on Monday, July 29, 2024.  Simultaneously, the price of

---

[6]      Robert Burnson and Jef Feeley, *Abbott Loses $500 Million Infant Formula Verdict, Lawyers Say*, BLOOMBERG (July 26, 2024), https://www.bloomberg.com/news/articles/2024-07-27/abbott-loses-500-million-infant-formula-verdict-lawyers-say.

the Company's ordinary shares fell £3.93, or 8.8%, from a closing price of £44.86 per share on July 26, 2024, to a closing price of £40.93 per share on July 29, 2024.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

198. At all relevant times, the market for Reckitt's ADSs and ordinary shares was efficient for the following reasons, among others:

199. Reckitt's ordinary shares met the requirements for listing and were listed and actively traded during the Class Period on the London Stock Exchange, a highly efficient market;

200. Reckitt's ADSs traded in large volumes on the OTC market, were exchangeable for ordinary shares, and were closely linked with the prices of the Ordinary Shares on the London Stock Exchange through trading by arbitrageurs;

201. Reckitt communicated with public investors via established market communication mechanisms, including dissemination of press releases through major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

202. Reckitt was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and customers of their respective brokerage firms during the Class Period and were publicly available and entered the public marketplace; and

203. Unexpected material news about Reckitt was reflected in and incorporated into the Company's ordinary share and ADS prices during the Class Period.

204. As a result of the foregoing, the market for Reckitt's ordinary shares and ADSs promptly digested current information regarding the Company from all publicly available sources and reflected that information in Reckitt Securities' prices. Under these circumstances, all

purchasers of Reckitt Securities during the Class Period suffered similar injury through their purchases of Reckitt Securities at artificially inflated and maintained prices, and a presumption of reliance applies.

205.    Alternatively, reliance need not be proven in this action because the action involves omissions.  Positive proof of reliance is not a prerequisite to recovery for securities-fraud claims based on omissions under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  All that is necessary is that, as is the case here, the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## NO SAFE HARBOR

206.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading in this Complaint all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized by Defendants as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is alleged by Defendants to apply to any forward-looking statements pleaded in this Complaint, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false and misleading, or the forward-looking statement was authorized or approved by an executive officer of Reckitt who knew that the statement was materially false and misleading when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

207.    Lead Plaintiff repeats and realleges every allegation contained above as if fully stated in this Count.

208.    Lead Plaintiff asserts this Count against all Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated under the Exchange Act by the SEC.

209.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they intentionally or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  This scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members; (ii) artificially inflate and maintain the market prices of Reckitt Securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Reckitt Securities at artificially inflated and maintained prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions alleged in this Complaint.

210.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and issuance of the annual reports, filings, website, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Reckitt Securities.  These reports, filings, website, press releases, and statements were materially

false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

211.    By virtue of their positions at the Company, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged in this Complaint and intended to deceive Lead Plaintiff and other members of the Class, or, in the alternative, these Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose facts that would reveal the materially false and misleading nature of the statements made, although those facts were readily available to these Defendants.  These acts and omissions of these Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Individual Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

212.    Information showing that the Individual Defendants acted intentionally or with reckless disregard for the truth is peculiarly within these Defendants' knowledge and control.  As the senior managers or directors of the Company, the Individual Defendants had knowledge of the details of Reckitt's internal affairs.

213.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of in this Complaint.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the Company's statements.  As officers or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information about Reckitt's business, operations, and financial results.  As a result of the dissemination of the false and misleading reports, filings, website, releases, and public statements alleged above, the market price of Reckitt Securities was artificially inflated and maintained throughout the Class Period.  In ignorance of the adverse facts

concerning the Company that were concealed by Defendants, Lead Plaintiff and other members of the Class purchased or otherwise acquired Reckitt Securities at artificially inflated and maintained prices and relied upon the price of the securities, the integrity of the market for the securities, or the false and misleading statements and omissions by Defendants, and were damaged thereby.

214.    During the Class Period, Reckitt Securities were traded on an active and efficient market.  Lead Plaintiff and other members of the Class, relying on the materially false and misleading statements and omissions described in this Complaint, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Reckitt Securities at prices artificially inflated and maintained by Defendants' wrongful conduct.  Had Lead Plaintiff and other members of the Class known the truth, they would not have purchased or otherwise acquired Reckitt Securities, or would not have purchased or otherwise acquired the securities at the inflated prices that they paid.  At the time of the purchases and other acquisitions by Lead Plaintiff and other Class members, the true value of Reckitt Securities was substantially lower than the prices paid by Lead Plaintiff and other members of the Class.  The market prices of Reckitt Securities declined sharply upon public disclosure of the facts alleged in this Complaint, to the injury of Lead Plaintiff and other Class members.

215.    By reason of the conduct alleged in this Complaint, Defendants intentionally or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated under the Exchange Act.

216.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases and acquisitions of Reckitt Securities during the Class Period, upon the disclosure of the previously materially misrepresented or omitted facts alleged in this Complaint.

**COUNT II**

**Violation of Section 20(a) of the Exchange Act
Against the Individual Defendants**

217.    Lead Plaintiff repeats and realleges every allegation contained in the foregoing paragraphs as if fully stated in this Count.

218.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.   Because of their senior positions, they knew the adverse nonpublic information about Mead Johnson bovine products' link to NEC and the related legal, financial, and reputational risks to the Company.

219.    As officers or directors of a publicly traded company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct or update promptly any public statements issued by Reckitt that had become materially false or misleading.

220.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the reports, press releases, website, and public filings which Reckitt disseminated in the marketplace during the Class Period containing the misrepresentations and omissions.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Reckitt to engage in the wrongful acts complained of in this Complaint.   The Individual Defendants therefore were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged, which artificially inflated and maintained the market prices of Reckitt Securities.

221.    Each Individual Defendant, therefore, acted as a controlling person of the Company. By reason of their senior management positions or being directors of the Company, each of the

- 69 -

Individual Defendants had the power to direct Reckitt's actions and exercised that power to cause Reckitt to engage in the unlawful acts and conduct complained of in this Complaint. Each Individual Defendant exercised control over the general operations of the Company and possessed the power to control the specific activities constituting the primary violations set out in this Complaint.

222.    By reason of the above conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act for the violations committed by the Company.

### COUNT III

### For Violations of Section 90A
### of the Financial Services and Markets Act of the United Kingdom
### Against Reckitt

223.    Plaintiffs New York State Teamsters Funds repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully stated in this Count.

224.    This Count is brought under Section 90A of the FSMA, as amended by the Companies Act of 2006 and the FSMA 2000 (Liability of Issuers) Regulations 2010 (2010/1192), and Schedule 10A of the FSMA against Reckitt seeking damages in relation to New York State Teamsters Funds' and the Class's acquisition and/or retention of Reckitt ordinary shares during the Class Period.

225.    Reckitt, as an issuer of securities to which Schedule 10A applies, dishonestly delayed the publication of information (within the meaning of paragraph 5 of Schedule 10A), including in reports and statements published in response to provisions implementing Articles 4, 5, and 6 of Directive 2004/109/EC of the Transparency Obligations Directive of December 31, 2004, in its preliminary statements pertaining thereto, and as further alleged in this Complaint.

226.    Reckitt had an obligation under English law to publish and not to dishonestly delay publication of the truth about the matters concerning its infant formula for premature infants, NEC,

and the legal, financial, and reputational risks to the Company arising from the link between its formula and NEC that it misrepresented or concealed, as alleged in this Complaint.

227.    One or more of the Individual Defendants, in discharging their managerial responsibilities on behalf of Reckitt, acted dishonestly in delaying the publication of information regarding the substantially increased risk of NEC and death to preterm infants taking Reckitt's cow's-milk-based formulas and the attendant legal, financial, and reputational risks facing Reckitt.

228.    This delay in publishing information was regarded as dishonest by people who regularly trade on the securities market in question.

229.    One or more of the Individual Defendants, as alleged in this Complaint, were aware (or must be taken to have been aware) that such a delay was regarded as dishonest.

230.    New York State Teamsters Funds and the Class made a decision to acquire shares in the market at the inflated price at which they were in fact acquired.  Had New York State Teamsters Funds and the other members of the Class known the truth, they would not have purchased or otherwise acquired those shares, or would not have purchased or otherwise acquired them at the inflated prices that were paid.

231.    New York State Teamsters Funds and the Class have suffered losses with regard to their purchase and retention of Reckitt ordinary shares as a result of the dishonest delay in publishing truthful information.

232.    By reason of the foregoing, Reckitt is liable to New York State Teamsters Funds and the Class for compensation as provided by Section 90A of the FSMA 2000, as amended.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  October 20, 2025                  ROBBINS GELLER RUDMAN
                                                        & DOWD LLP
                                                   CHAD JOHNSON
                                                   NOAM MANDEL
                                                   DESIREE CUMMINGS
                                                   JONATHAN ZWEIG
                                                   JAI CHANDRASEKHAR


                                                   _____
                                                             */s/ Noam Mandel*
                                                        NOAM MANDEL

                                                   420 Lexington Avenue, Suite 1832
                                                   New York, NY  10170
                                                   Telephone:  212/432-5100
                                                   chadj@rgrdlaw.com
                                                   noam@rgrdlaw.com
                                                   dcummings@rgrdlaw.com
                                                   jzweig@rgrdlaw.com
                                                   jaic@rgrdlaw.com

                                                   *Lead Counsel for Plaintiffs*

                                                   PITTA LLP
                                                   VINCENT F. PITTA
                                                   120 Broadway, 28th Floor
                                                   New York, NY  10271
                                                   Telephone:  212/652-3890
                                                   vpitta@pittalaw.com

                                                   *Additional Counsel for Plaintiffs*

- 72 -