**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re RECKITT BENCKISER GROUP PLC SECURITIES LITIGATION | No. 1:25-cv-04708-JPC-SDA <br><br> <u>CLASS ACTION</u> <br><br> **ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
<u>**MOTION TO DISMISS THE AMENDED COMPLAINT**</u>

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

I.    Reckitt Defendants.....................................................................................................3

II.   Preterm Formula and NEC.........................................................................................3

III.  Ongoing NEC Litigation............................................................................................5

IV.  Reckitt's Full and Fair Disclosure .............................................................................6

V.   This Lawsuit..............................................................................................................6

ARGUMENT.........................................................................................................................7

I.    The Complaint Fails to State a Section 10(b) Claim (Count I)............................................7

      A.     Plaintiffs Fail to Allege an Actionable Misstatement..............................................7

            1.    Statements Regarding the Cause of NEC...........................................................8

            2.    Statements Regarding Risks Associated with NEC Litigation ......................11

            3.    Statements Concerning Business Outcomes, Product Safety Policies, and Preterm Formula...............................................................................................13

      B.     Plaintiffs Fail to Allege a "Strong Inference" of Scienter ....................................17

      C.     Plaintiffs Fail to Allege Loss Causation ..............................................................20

      D.     The Amended Complaint Fails to State a Section 20(a) Claim (Count II)............22

II.   The Complaint Should Be Dismissed for *Forum Non Conveniens* or, Alternatively, the FSMA Claim Should be Dismissed for Failure to State a Claim (Count III)....................22

      A.     English Courts Are a More Suitable Forum ........................................................22

      B.     The Complaint Fails to State a FSMA Claim .......................................................25

CONCLUSION......................................................................................................................27

i

## TABLE OF AUTHORITIES

**Cases**

*380544 Canada, Inc. v. Aspen Tech., Inc.*,
  544 F. Supp. 2d 199 (S.D.N.Y. 2008)........................................................................18

*Aenergy, S.A. v. Republic of Angola*,
  2021 WL 1998725 (S.D.N.Y. May 19, 2021), *aff'd*, 31 F.4th 119 (2d Cir.
  2022) ............................................................................................................................23

*Alfadda v. Fenn*,
  966 F. Supp. 1317 (S.D.N.Y. 1997), *aff'd,* 159 F.3d 41 (2d Cir. 1998) ...........................25

*Allstate Life Ins. v. Linter Group Ltd.*,
  994 F.2d 996 (2d Cir. 1993)........................................................................................25

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).....................................................................................3, 17

*Axar Master Fund, Ltd. v. Bedford*,
  308 F. Supp. 3d 743 (S.D.N.Y. 2018)........................................................................12

*Bettis v. Aixtron SE*,
  2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016) .............................................................11

*Boca Raton Firefighters and Police Pension Fund v. Bahash*,
  506 Fed. Appx. 32 (2d Cir. 2012)...............................................................................16

*Bondali v. Yum! Brands, Inc.*,
  620 F. App'x 483 (6th Cir. 2015) ...............................................................................12

*Buhrke Family Revocable Trust v. U.S. Bancorp*,
  726 F. Supp. 3d 315 (S.D.N.Y. 2024)........................................................................16

*Burr v. Florida*,
  474 U.S. 879 (1985)....................................................................................................21

*Byrd v. City of N.Y.*,
  2005 WL 1349876 (2d Cir. June 8, 2005) .....................................................................3

*City of Ouro Preto v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  751 F. Supp. 3d 356 (S.D.N.Y. 2024)..............................................................22, 23, 24

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)..........................................................................................7

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)..................................................................................................20

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).................................................................................15, 17

*Fort Worth Emp'rs Ret. Fund v. Biovail Corp.*,
    615 F. Supp. 2d 218 (S.D.N.Y. 2009)......................................................................22

*Gilstrap v. Radianz Ltd.*,
    443 F. Supp.2d 474 (S.D.N.Y. 2006)........................................................................23

*Gregory v. ProNAi Therapeutics Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y. 2018).......................................................................16

*Guzman v. Bldg. Serv. 32BJ Pension Fund*,
    2023 WL 2526093 (S.D.N.Y. Mar. 15, 2023) ..........................................................10

*Hemming v. Alfin Fragrances*,
    690 F. Supp. 239 (S.D.N.Y. 1988) ...........................................................................16

*Hunt v. Bloom Energy Corp.*,
    2021 WL 4461171 (N.D. Cal. Sept. 29, 2021) .........................................................13

*In re Aratana Therapeutics Inc. Sec. Litig.*,
    315 F. Supp. 3d 737 (S.D.N.Y. 2018).................................................................9, 13, 14

*In re Arbitration Between Monegasque De Reassurances S.A.M. v. Nak Naftogaz*
    *of Ukraine*, 311 F.3d 488 (2d Cir. 2002) ...............................................................23

*In re EHang Holdings Ltd. Sec. Litig.*,
    646 F. Supp. 3d 443 (S.D.N.Y. 2022).......................................................................17, 18

*In re FBR Inc. Sec. Litig.*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008).......................................................................12

*In re Lottery.com, Inc. Sec. Litig.*,
    715 F. Supp. 3d 506 (S.D.N.Y. 2024).......................................................................13

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003).......................................................................11

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010).....................................................................................20, 21

*In re Philip Morris Int'l Inc. Sec. Litig.*,
    89 F.4th 408 (2d Cir. 2023) .....................................................................................16

iii

*In re Sanofi Sec. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016)............................................................................15, 17

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015).....................................................................................14

*In re SeaChange Int'l, Inc.*,
    2004 WL 240317 (D. Mass. Feb. 6, 2004) ..........................................................................12

*In re UiPath, Inc. Sec. Litig.*,
    2025 WL 2065093 (S.D.N.Y. July 23, 2025) ............................................................ *passim*

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
    146 F.3d 66 (2d Cir. 1998).....................................................................................................3

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..................................................................................................17

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)......................................................................................20, 21, 22

*Lurenz v. Coca-Cola Co.*,
    2025 WL 2773188 (S.D.N.Y. Sept. 29, 2025)........................................................................3

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
    518 F. Supp. 3d 772 (S.D.N.Y. 2021)..................................................................................18

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)..................................................................................................11

*Nadoff v. Duane Reade, Inc.*,
    107 F. App'x 250 (2d Cir. 2004) ................................................................12, 14, 15, 16

*O'Neil v. Standard Homeopathic Co.*,
    346 F. Supp. 3d 511 (S.D.N.Y. 2018)....................................................................................3

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)......................................................................................................9, 10, 14

*Owens v. Turkiye Halk Bankasi A.S.*,
    2023 WL 3184617 (2d Cir. May 2, 2023) ............................................................................24

*Pitman v. Immunovant, Inc.*,
    2024 WL 1342737 (E.D.N.Y. Mar. 29, 2024)........................................................................8

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
    329 F.3d 64 (2d Cir. 2003)....................................................................................................23

*Porrazza v. Bumble Bee Foods, LLC*,
    822 F. Supp. 2d 406 (S.D.N.Y. 2011)...............................................................................3

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012).............................................................................11

*Salim v. Mobile Telesystems PJSC*,
    2021 WL 796088 (E.D.N.Y. Mar. 1, 2021) .....................................................................13

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019).........................................................................................7, 15

*Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*,
    421 F. Supp. 2d 741 (S.D.N.Y. 2006)............................................................................24

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital*,
    531 F.3d 190 (2d Cir. 2008)..........................................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................................7

*Zagami v. Cellceutix Corp.*,
    2016 WL 3199531 (S.D.N.Y. June 8, 2016) ...................................................................8

**Statutes**

15 U.S.C. § 78a ..........................................................................................................................6

15 U.S.C. § 78u-4(b)(2)(A)........................................................................................................17

Financial Services and Markets Act 2000 (UK) .....................................................................6, 22

Reckitt Benckiser Group plc ("Reckitt"), Laxman Narasimhan, Nicandro Durante,[1] Kristoffer Loe Licht, Patrick Sly, and Jeffrey Carr (collectively "Individual Defendants" and with Reckitt, "Defendants") submit this memorandum of law in support of their motion to dismiss the Amended Complaint, Dkt. No. 44 ("Complaint"), along with the Declarations of Professor Paul Davies, KC (Hon.) ("Davies Decl.") and Timothy J. Perla.

## INTRODUCTION

This case involves issues of science and medicine, not securities fraud. Hundreds of thousands of babies are born prematurely each year. Mothers of preterm babies often do not produce enough milk, and donor milk is scarce and not always nutritiously sufficient. Two companies (including a Reckitt subsidiary) fill the gap by manufacturing cows' milk-based preterm formula—an integral part of the standard of care in hospitals. Yet, Plaintiffs now theorize that Defendants, rather than saving lives, defrauded investors by failing to confess publicly that preterm formula causes a serious condition known as necrotizing enterocolitis ("NEC").

Plaintiffs' theory is fundamentally at odds with the prevailing medical and scientific view that preterm formula does not cause NEC. The Food and Drug Administration ("FDA"), Centers for Disease Control and Prevention ("CDC"), and National Institutes of Health ("NIH") jointly issued a "Consensus Statement" in October 2024 stating that "*[t]here is no conclusive evidence that preterm infant formula causes NEC.*" Ex. 15. The Consensus Statement recognizes that while there is "strong evidence that human milk is protective against NEC," the cause of NEC is not well-understood. *Id.* A working group within the Department of Health and Human

---

[1] Mr. Durante is concurrently moving to dismiss for lack of service and lack of personal jurisdiction. He joins this motion to the extent that the Court denies relief under Rules 12(b)(2) and 12(b)(5).

Services ("HHS") focused on NEC reached a similar conclusion.  Ex. 17 at 15 ("Available evidence supports the hypothesis that it is the absence of human milk – rather than the exposure to formula – that is associated with an increase in the risk of NEC.").  The American Academy of Pediatrics ("AAP")—a "major expert body" and the largest professional association of pediatricians—also agrees.  *See* ¶ 95; Ex. 18 (AAP Amicus Br.).[2]

Given this consensus, it is unsurprising that the Complaint fails to establish that Reckitt committed securities fraud by adopting the same view.  *First*, Plaintiffs do not plausibly allege a false or misleading statement.  The challenged statements are consistent with scientific consensus and largely constitute inactionable opinions; and besides, the studies concerning NEC that Plaintiffs cite were public knowledge.  *Second*, Plaintiffs fail to plead a "strong" inference of scienter.  Plaintiffs cobble together generic allegations of "motive" with "must have known" allegations about the Individual Defendants.  Yet courts routinely reject this formula for pleading scienter where, as here, Plaintiffs do not allege with specificity that the Individual Defendants had information contrary to their public statements or motive to commit fraud.  *Third*, loss causation is lacking because the two adverse jury verdicts from products liability suits the Complaint cites—which Plaintiffs cherry-picked from among hundreds of cases with varying outcomes—are not corrective disclosures.

Plaintiffs' English law claim for "dishonest delay" fails to plead the required elements for similar reasons and, alternatively, should be dismissed under *forum non conveniens*.

---

[2] "¶ _" refers to the Complaint.  "Ex. []" refers to exhibits to the Perla Declaration.

## BACKGROUND

### I.    Reckitt Defendants

Reckitt is a UK-based company that operates three business segments: Health, Hygiene, and Nutrition.  ¶ 2.[3]  Ordinary shares trade on the London Stock Exchange.  ¶ 16.  American Depositary Receipts ("ADRs") trade over-the-counter.  ¶¶ 16-17.  The Individual Defendants are current or former Reckitt officers.  ¶¶ 18-22.

### II.    Preterm Formula and NEC

In 2017, Reckitt acquired Mead Johnson Nutrition Company ("Mead Johnson"), which makes Enfamil-branded infant formulas.  ¶¶ 2, 26.  The Enfamil brand includes cow's-milk based formulas and fortifiers.  ¶¶ 25, 125.

These products are important because hundreds of thousands of babies are born prematurely in the United States each year.  ¶ 35; Ex. 16 (CDC FastStats).[4]  Ensuring they are sufficiently fed is critical.  *See* Ex. 7 (Corpelejin Article) at 658; Ex. 8 (Assad Article) at 219.[5] Physicians recognize three food sources: mother's milk, donated human milk, and formula.  ¶¶ 29, 36.  Mothers to premature babies often cannot produce sufficient milk and the nutritional content may be insufficient.  *Id.*; Ex. 9 (Abrams Article) at 281.  Donated human milk is scarce. Ex. 10 (Swanson Article) at 2.  Formula therefore is necessary to feed preterm infants, as are

---

[3] This Motion relies on the Complaint, documents incorporated by reference, and matters of public record. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998).

[4] The Court may take judicial notice of CDC statistics available on CDC's official website. *See Byrd v. City of N.Y.*, 2005 WL 1349876, at *1 (2d Cir. June 8, 2005) (matters of public record may be considered on motion to dismiss); *see also Porrazza v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 411-12 (S.D.N.Y. 2011) (judicial notice of documents on agency websites); *Lurenz v. Coca-Cola Co.*, 2025 WL 2773188, at *3 (S.D.N.Y. Sept. 29, 2025) (judicial notice of FAQs and studies on agency websites); *O'Neil v. Standard Homeopathic Co.*, 346 F. Supp. 3d 511, 519 n.1 (S.D.N.Y. 2018) (judicial notice of press release on agency website).

[5] Exhibits 7-14 are cited or quoted in the Complaint and thus properly considered as materials incorporated by reference. *See* ¶¶ 38, 40, 42-43, 49, 50, 54, 73; *ATSI*, 493 F.3d at 98.

fortifiers that ensure that even infants predominantly fed human milk receive sufficient nutrition. *See, e.g.*, *id.*; Ex. 9 (Abrams Article) at 281.

Preterm infants are more vulnerable to serious illnesses like NEC. ¶ 35. As the literature the Complaint cites confirms, scientists do not know what causes NEC. *See, e.g.*, Ex. 8 (Assad Article) at 216 (cause of NEC is "multifactorial"); Ex. 11 (Gordon Article) at 15 ("Preterm NEC is a multifactorial disease"); Ex. 12 (Lucas Article) at 1519 ("[N]o single organism has proved to be the cause [of NEC]"). The primary risk factor for NEC is preterm birth. *See* Ex. 12 (Lucas Article) at 1519. Both infants who are formula-fed and those who are fed human milk can develop NEC. *Id.*

Since the 1990s, scientific literature has observed a lower incidence of NEC in preterm infants fed exclusively human milk versus exclusively formula. *See, e.g.*, Ex. 12 (Lucas Article). The conclusion these studies reach is not that formula causes NEC but rather that human milk, particularly mother's milk, protects against NEC. *Id.* at 1522 ("breast milk may protect against [NEC]"); Ex. 13 (Meinzen-Derr Article) at 5 ("We also found a protective effect of [human milk] against NEC"); Ex. 14 (Sullivan Article) at 566 ("data suggest that exclusive human milk diets may exert protective … effects" against NEC). Despite over thirty years of scientific studies, there has been <u>no</u> conclusive evidence that formula <u>causes</u> NEC. Ex. 18 (AAP Amicus Brief) at 3; Ex. 15 (Consensus Statement) at 1; Ex. 17 (Working Group Report) at 15.[6] Indeed, on October 3, 2024, the CDC, NIH, and FDA issued a consensus statement confirming their collective view that "1) [t]here is no conclusive evidence that preterm infant formula causes

---

[6] The Court may take judicial notice of the Consensus Statement and the Working Group Report because they are available on the HHS or NIH websites. *See supra* n.4.

-4-

NEC; and 2) there is strong evidence that human milk is protective against NEC." Ex. 15 (Consensus Statement) at 1.

### III.   Ongoing NEC Litigation

By December 2021, enterprising lawyers had filed a string of products liability lawsuits against Mead Johnson and Abbott Laboratories (the other principal formula manufacturer). ¶ 148.  By March 2024, over 400 such cases were pending ("NEC Litigation").  *Id.*  The litigation is nowhere close to over.

There have been three jury trials in state court.  ¶¶ 157, 166, 189.  One jury awarded a plaintiff $60 million in *Watson v. Mead Johnson*, No. 21-L-1032-PF (Ill. Cir. Ct. St. Clair Cnty. Mar. 13, 2024) and another awarded a plaintiff $495 million against a competitor company in *Gill v. Abbott Labs.*, No. 2322-CC01251 (Mo. Cir. Ct. July 26, 2024).  ¶¶ 157, 166.  Then, a jury found for defendants in *Whitfield v. Mead Johnson*, No. 2222-CC06214 (Mo. Cir. Ct. Oct. 31, 2024).  *Watson* and *Gill* are on appeal, and a new trial has been ordered in *Whitfield*.  ¶ 189; *see Watson*, No. 5-24-0936 (Ill. App. Ct. 5th Dist.); *Gill*, No. ED113162 (Mo. Ct. App. E.D.).

There is also a federal multi-district litigation where defendants have in bellwether cases won summary judgment on key issues like causation.  *See, e.g.*, Mem. & Order, *Brown v. Abbott Labs.*, No. 1:22-cv-2001 (N.D. Ill. Oct. 23, 2025), Dkt. No. 100 at 10 (noting "concerns about Plaintiffs' causation theory"); Mem. & Order, *Diggs v. Abbott Labs.*, No. 1:22-cv-05356 (N.D. Ill. Aug. 14, 2025), Dkt. No. 114 at 14 (noting "issues relating to cause-in-fact have recurred in this MDL…").  Four bellwether trials are scheduled for 2026 and 2027.  *See* Order, *In re Abbott Labs.*, Master Docket No. 1:22-cv-00071 (N.D. Ill. Oct. 25, 2023), Dkt. No. 416; Case Management Order No. 15 at 1, *In re Abbott Labs.*, Master Dkt. No. 1:22-cv-00071 (N.D. Ill. Oct. 28, 2025), Dkt. No. 724.

## IV.   Reckitt's Full and Fair Disclosure

Consistent with the view of the FDA, CDC, NIH, and AAP, Reckitt does not believe that preterm formula causes NEC, although mother's milk does lower risk.  While Reckitt has been clear about this view, it also has continually warned investors of safety and financial risks.  For instance, Reckitt cited "product safety" as a top three risk in its 2020 and 2021 Annual Reports. *See* Ex. 1 (2020 Report) at 82, 84; Ex. 2 (2021 Report) at 90, 92.  Beginning with its 2022 Annual Report, Reckitt also cautioned investors about the NEC Litigation.  *See* Ex. 3 (2022 Report) at 209.  Reckitt "denied the material allegations of the claims" in the NEC Litigation and advised that while "[a]ny potential costs relating to [the NEC Litigation] are not considered probable," such costs "cannot be reliably estimated at the current time."  *Id.* at 209, 225.  The 2023 Annual Report further warned that "[g]iven the uncertainty on the number of cases, their validity and range of possible outcomes on each valid case, the possible economic outflow cannot be reliably estimated, but may be significant."  Ex. 4 (2023 Report) at 190.  Reckitt supplemented these disclosures with a March 15, 2024, statement in response to the *Watson* verdict that "strongly reject[ed] any assertion that any of [its] products cause NEC."  ¶ 98.  On an April 24, 2024, earnings call, Mr. Licht reiterated that "[t]he science does not support a causal connection between any Mead Johnson product and NEC."  ¶ 99.

## V.   This Lawsuit

The Complaint asserts: (i) claims under the Securities Exchange Act of 1934 ("Exchange Act") on behalf of ADRs purchasers and (ii) English law claims under Section 90A and Schedule 10A of the Financial Services and Markets Act 2000 of the UK ("FSMA") on behalf of ordinary share purchasers.  Plaintiffs challenge over forty statements made between January 13, 2021 and July 26, 2024.  The crux is that preterm formula allegedly causes NEC and that Defendants denied this linkage and downplayed financial risks.  Plaintiffs challenge: (1) statements

regarding the cause of NEC, which Plaintiffs allege were misleading because the statements did

not disclose studies and other information purportedly demonstrating that preterm formula

"presented a significantly greater risk of NEC" than human milk (¶¶ 98, 99, 152); (2) statements

regarding risks associated with the NEC Litigation, which Plaintiffs allege misleadingly

downplayed its materiality (¶¶ 144-46, 149, 151-52, 154); and (3) statements reporting on

business outcomes and growth, referencing product safety policies, or describing preterm

formula or its development, which Plaintiffs allege misleadingly omitted information linking

formula to higher NEC risk (¶¶ 88-89, 90-92, 94, 96, 98-99, 102-07, 109, 111, 120, 122-23, 127-

28, 130, 133, 135-39).

## ARGUMENT

## I.    The Complaint Fails to State a Section 10(b) Claim (Count I)

To state a Section 10(b) claim, "a complaint must plausibly allege: (1) a material

misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with

the purchase or sale of a security; (4) reliance …; (5) economic loss; and (6) loss causation."

*Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) (quotations omitted).  Plaintiffs must

further satisfy heightened pleading requirements and allege facts that give rise to a strong

inference of scienter "with particularity."  *See id.*; *City of Pontiac Policemen's & Firemen's Ret.*

*Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).  An inference of scienter is "strong" if "a

reasonable person would deem the inference of scienter cogent and at least as compelling as any

opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 324 (2007).  The Complaint does not adequately allege a materially

false or misleading statement, scienter, or loss causation.

### A.    Plaintiffs Fail to Allege an Actionable Misstatement

Plaintiffs' central assertion is that Defendants' statements were materially misleading

because they failed to disclose studies and other information that *Plaintiffs* believe demonstrate that preterm formula causes NEC.  *See, e.g.*, ¶¶ 100, 153.  This assertion fails.

### 1.    Statements Regarding the Cause of NEC

Plaintiffs challenge a statement Reckitt issued on March 15, 2024 following the *Watson* verdict in which it emphasized that Mead Johnson formula products were "safe," "reject[ed] any assertion that any of our products cause NEC," and noted it "believe[d]" that the *Watson* allegations "were not supported by the science or experts in the medical community," as "underscored during the trial by a dozen neonatologists."  ¶ 98.  Plaintiffs also dispute Mr. Licht's statements on an April 24, 2024 earnings call noting that Reckitt prioritized "safety" and that "[t]he science does not support a causal connection between any Mead Johnson product and NEC."  ¶¶ 98-99, 152.  These statements are inactionable.

A scientific disagreement cannot support a securities fraud claim where defendants' interpretation of the evidence is reasonable.  *See Kleinman v. Elan Corp., plc*, 706 F.3d 145, 154 (2d Cir. 2013) ("where a defendant's competing analysis or interpretation of data is itself reasonable, there is no false statement"); *Pitman v. Immunovant, Inc.*, 2024 WL 1342737, at *7 (E.D.N.Y. Mar. 29, 2024) (similar); *Zagami v. Cellceutix Corp.*, 2016 WL 3199531, at *13 (S.D.N.Y. June 8, 2016) (similar).  There can be no serious debate about whether Reckitt's view about NEC causation had a basis—it matches the view of the FDA, CDC, NIH, and AAP.  Even the studies the Complaint cites acknowledge the many potential causes of NEC and that the science is not well understood.  *See, e.g.*, Ex. 11 (Gordon Article) at 15; Ex. 12 (Lucas Article) at 1519.[7]

---

[7] Mr. Licht's statement that "[s]afety is and will remain our #1 priority" is puffery.  *See* ¶ 152; *In re AstraZeneca plc Sec. Litig.*, 2022 WL 4133258, at *8 (S.D.N.Y. Sept. 12, 2022).

More broadly, "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). Statements opining about the lack of causal connection between preterm formula and NEC and, relatedly, characterizing formula products as safe, are inactionable opinions because Reckitt and Mr. Licht "actually held the belief professed, did not supply an untrue supporting fact, and did not omit information rendering the statement misleading." *See In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018) (*citing Omnicare*, 575 U.S. at 183-86).

*First*, regarding Mr. Licht, Plaintiffs do not allege that he secretly believed that preterm formula causes NEC. Regarding Reckitt, Plaintiffs contend that "Reckitt knew" formula "increased the risk of NEC in premature babies" because "Reckitt" edited internal drafts of presentations to doctors to "conceal[] the causal relationship" between formula and NEC. *See* ¶¶ 71-72, 100. However, Plaintiffs conflate the notion that human milk <u>protects</u> against NEC with the notion that formula <u>causes</u> NEC. There is no necessary connection between the former, which the scientific community accepts, and the latter, which it rejects. The alleged edits, accordingly, are benign and irrelevant. *See, e.g.*, ¶¶ 71-72 (alleging that "human milk significantly reduces the risk of NEC" was edited to "human milk is associated with lower risk").

*Second*, Plaintiffs do not sufficiently allege that Reckitt or Mr. Licht provided an untrue supporting fact. Plaintiffs allege in a conclusory fashion that Reckitt misrepresented "the scientific testimony" from the *Watson* trial, including the testimony of plaintiff experts Drs. Sims and Swanson, by stating that testimony from a "dozen neonatologists" underscored its belief that the *Watson* allegations were not supported by science. ¶ 100. As a threshold matter, the trial evidence was available for investors to see in real time. Plaintiffs do not dispute that substantial

-9-

testimony supported Reckitt's position, and in any event, Drs. Sims and Swanson conceded that they could not explain how formula causes NEC. *See* Ex. 20 (Sims Tr.) at 149:20-150:9 (Q. "[Y]ou couldn't point me or the jury today to a specific component in cow's milk-based formula and say that's the component that caused [plaintiff's] NEC, right? A. No."); Ex. 21 (Swanson Tr.) at 212:19-213:6 ("Q. You agree that the jury is still out on the exact pathogenesis by which NEC develops, correct? A. I agree that we're still trying to figure out the pathways.…"). Dr. Sims was unable to identify <u>any</u> scientific literature stating that formula causes NEC, and Dr. Swanson acknowledged that his was "just one person's … opinion." *See* Ex. 20 (Sims Tr.) at 253:1-10; Ex. 21 (Swanson Tr.) at 339:17-18.[8]

*Third*, Plaintiffs fail to allege plausibly that any omitted facts rendered the opinions misleading. Plaintiffs allege that Reckitt and Mr. Licht failed to disclose scientific studies "demonstrating" the "greater risk of NEC" formula allegedly presents, "internal Reckitt documents" "acknowledg[ing]" the same, and adverse event reports documenting negative outcomes to infants fed formula. *See* ¶ 100. But, critically, they never said that formula was not associated with a greater incidence of NEC; they said that there is no scientific evidence that formula <u>causes</u> NEC. The supposedly omitted documents support the same conclusions Reckitt, the CDC, the FDA, NIH, and the AAP reached—that there is no conclusive scientific evidence that formula causes NEC. And even if the allegedly omitted documents did lend any credence to Plaintiffs' theories, an opinion is not misleading "when an issuer knows, but fails to disclose, some fact cutting the other way" because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts." *See Omnicare*, 575 U.S. at 189-90.

---

[8] The Complaint quotes and summarizes these transcripts and therefore incorporates them by reference. *See Guzman v. Bldg. Serv. 32BJ Pension Fund*, 2023 WL 2526093, at *6 (S.D.N.Y. Mar. 15, 2023).

Therefore, Plaintiffs have failed to allege that their omission rendered the challenged statements "so incomplete as to mislead." *See Richman v. Goldman Sachs Grp., Inc*., 868 F. Supp. 2d 261, 273-74 (S.D.N.Y. 2012) ("[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject").

Finally, Plaintiffs' position—that Reckitt in any statement about the causes of NEC had to list out studies that Plaintiffs assert support a contrary conclusion—is both practically unworkable and not the law.  The studies Plaintiffs cite are all published in medical journals and have been publicly available and readily accessible for up to thirty years.  *See Bettis v. Aixtron SE*, 2016 WL 7468194, at *12-13 (S.D.N.Y. Dec. 20, 2016) (no duty to disclose information in publications); *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 249, 261 (S.D.N.Y. 2003) (defendants could not be held liable for not disclosing public information). Reckitt and Mr. Licht also had no duty to disclose the adverse event reports Reckitt received, which Plaintiffs speculate without basis must have shown a causal relationship between formula and NEC despite the Company's denials.  *See* ¶ 75; *Meyer v. Jinkosolar Holdings Co*., 761 F.3d 245, 250 (2d Cir. 2014) ("[T]here is no duty to disclose a fact … merely because a reasonable investor would very much like to know that fact.").

2.    Statements Regarding Risks Associated with NEC Litigation

Plaintiffs next allege that Reckitt failed to caution investors sufficiently concerning the risks of the NEC Litigation and later misleadingly portrayed it as immaterial.  *See* ¶¶ 144-46, 149, 151-52, 154.  Both claims fail.

The risk disclosures in Reckitt's Annual Reports for 2020 and 2021 included cautionary language about product safety risks.[9]  Plaintiffs allege that these cautions characterized these

---

[9] *See, e.g.*, ¶¶ 144-45 (disclosing "product safety" and "adherence to product quality standards" as "principal risk[s]"; warning of impact to Reckitt from "[p]roduct safety issues" and "potential civil … actions"), 146

-11-

risks "as merely hypothetical" when Defendants allegedly were aware of studies and "internal documents" demonstrating the risks from formula. *See* ¶ 147. As an initial matter, several courts have found risk disclosures inactionable because they "are inherently prospective in nature" and would not be considered material by an investor.[10] Even assuming risk disclosures are actionable, the challenged statements are not false or misleading because the studies did not put Defendants on notice that preterm formula causes NEC. Again, the scientific evidence suggests that "[t]here is no conclusive evidence that preterm infant formula causes NEC." *See* Ex. 15 (Consensus Statement); *supra* §I.A.1 (describing studies).[11]

The disclosures in Reckitt's Annual Reports for 2022 and 2023 supplemented the above cautions with warnings that costs related to the NEC Litigation were "not considered probable," could not be "reliably estimated," but, as of the 2023 Report, "may be significant." ¶¶ 149, 151; Ex. 4 (2023 Report) at 190.[12] On earnings calls on April 24, 2024 and July 24, 2024, Mr. Licht opined that the NEC Litigation "[did] not change [Reckitt's] overall outlook" and that "the *Watson* case is not going to be a driver of the ultimate outcome." ¶¶ 152, 154.[13] The challenged

---

(disclosing "Product Regulations" as "principal risk"; warning of "potential civil … liability").

[10] *See, e.g.*, *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) (risk disclosures "warn an investor of what harms may come to their investment" but "are not meant to educate investors on what harms are currently affecting the company"); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) ("boilerplate description of [defendant's] regulatory risks could not have been misleading" where it "said nothing company-specific").

[11] The same argument applies to disclosures from the 2022 and 2023 Annual Reports. *See* ¶¶ 149, 151.

[12] In the 2022 Annual Report, Reckitt also "denied the material allegations" from *Watson* and noted that formula "provide[s] critical tools to expert neonatologists for the nutritional management of preterm infants." ¶ 149. Reckitt's denial of the *Watson* allegations is an inactionable opinion as explained *supra*. *See supra* §I.A.1; *see also Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 756-57 (S.D.N.Y. 2018) (litigation disclosures non-actionable opinions); *In re SeaChange Int'l, Inc.*, 2004 WL 240317, at *8-9 (D. Mass. Feb. 6, 2004) (prospectus that disclosed company was contesting claims and outcome of litigation was uncertain was not materially misleading given no verdict had been returned and "well understood vagaries of litigation"). The statement characterizing formula as a tool for neonatologists is accurate. *See Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004) (accurate statements not actionable under securities laws).

[13] Plaintiffs also challenge Mr. Licht's statements from April 24 and July 24, 2024 earnings calls that Reckitt was "not seeing any wider impact on the equity of our nutrition brands." ¶¶ 152, 154. Plaintiffs do not plausibly

statements are inactionable opinions that reflect business judgment. *See Hunt v. Bloom Energy Corp.*, 2021 WL 4461171, at *5 (N.D. Cal. Sept. 29, 2021) (noting that application of accounting standards "require the exercise of judgment" and concluding that company's "statements about its contingent liabilities are opinion statements"); *Salim v. Mobile Telesystems PJSC*, 2021 WL 796088, at *8-9 (E.D.N.Y. Mar. 1, 2021) (statements concerning potential liability are "necessarily" opinions until losses are reasonably estimable). Plaintiffs do not allege any facts showing that a contingent loss could be reliably estimated. They also fail to allege plausibly that Reckitt or Mr. Licht did not believe their stated opinions, that either supplied an untrue supporting fact, or that either had a duty to disclose studies or other information that allegedly rendered the statements misleading by omission. *See Aratana*, 315 F. Supp. 3d at 758; *supra* §I.A.1.

Finally, the challenged statements are also protected under the bespeaks caution doctrine because they are forward-looking and Reckitt's Annual Reports included specific, meaningful cautions, including that any economic outflow from the NEC Litigation "may be significant," that the result of the *Watson* litigation "may be unfavourable," and that the "Product Safety" and "Legal and Compliance" risks facing the Company could have a "significant impact." *See* Ex. 4 (2023 Report) at 56, 190, 200; *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 537-40 (S.D.N.Y. 2024) (applying bespeaks caution doctrine).

3.      Statements Concerning Business Outcomes, Product Safety Policies, and Preterm Formula

Plaintiffs also scour the public record for any statement between 2021-24 bearing on Enfamil—including, for instance, product advertising (¶¶ 89-90)—and declare them to be false

_____

allege this observation was inaccurate, and it did not impose a duty to disclose public studies. *See supra* §I.A.1.

because Defendants allegedly knew that preterm formula causes NEC and omitted to disclose studies and internal documents to that effect. These claims fail.

**Statements Concerning Business Outcomes and Growth.** Plaintiffs assert that statements of business outcomes and statements conveying growth prospects misleadingly portrayed preterm formula as successful without disclosing scientific studies or "internal Reckitt documents" allegedly acknowledging that preterm formula "greatly increased NEC risk." *See* ¶¶ 92, 105, 130-31, 133, 135-39. The anodyne reports of business outcomes are "[a]ccurate statements about past performance" that "are self-evidently not actionable."[14] *See Nadoff*, 107 F. App'x at 252. The forecasts of potential growth are inactionable opinions.[15] *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015) (expressions of future expectations are opinions). Plaintiffs do not allege that Messrs. Narasimhan or Carr did not believe that the infant formula business would grow. *See Aratana*, 315 F. Supp. 3d at 758. And Plaintiffs fail to meet the remaining prongs of *Omnicare* for the reasons set out above. *See supra* §I.A.1.

**Statements Concerning Product Safety Policies.** Plaintiffs allege that statements from certain Annual Reports referencing monitoring of adverse event reports were false because Reckitt allegedly did not enforce the policies and did not report adverse events to the FDA. *See* ¶¶ 127 ("teams … monitor and report on adverse events"), 128 ("dedicated vigilance group to monitor and report adverse events"), 129. These statements were accurate and inactionable

---

[14] *See* ¶¶ 92 ("strong position" and Enfamil growth of 5%), 130 ("market leaders" for "specialty infant nutrition"), 105 (similar), 131 (U.S. market share grew by 100 basis points), 135 ("good share gains in the base Enfa[mil] business"), 136 ("one-third share of the [infant and child nutrition] market in the US" and share growth of "c. 50 bps in 2021"), 137 (nutrition business "delivered mid-single digit growth"), 138 ("strong growth" and "market leader in Infant Formula"), 139 ("market-leading share position"), 120 ("[specified] market share just below 50%" maintained, "40% share of hospital contracts").

[15] *See* ¶¶ 105 (belief that specialty infant nutrition business "can grow … in the near double digit range"), 130 (same), 133 (expectation that Enfamil and specialty infant nutrition business together are "a low single digits growth business"), 139 ("confiden[ce] in [company's] ability to maintain a sustainable upside in market share").

because, as the Complaint concedes, Reckitt was monitoring adverse event reports, did have a procedure in place to report when appropriate, and was not required to report all adverse events to the FDA. *See* ¶¶ 75 (describing investigation), 76 (reporting of adverse events required only when company found that "causal relationship" between product and adverse event "was reasonably possible"); *Nadoff*, 107 F. App'x at 252 (accurate statements not actionable). And Plaintiffs only speculate that the reports showed a causal relationship between formula and NEC. Moreover, courts routinely reject generic compliance statements like these as too vague to be actionable. *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co*., 553 F.3d 187, 205-06 (2d Cir. 2009) (statements concerning bank's "disciplined" "risk management processes" were inactionable generalizations); *Singh*, 918 F.3d at 63-64 (generic assertions about "policies and procedures" were too vague to be actionable); *In re Sanofi Sec. Litig*., 155 F. Supp. 3d 386, 401 (S.D.N.Y. 2016) (description of "compliance program" inactionable).

  ***Statements Describing Infant Formula and Its Development.*** Plaintiffs challenge statements (often consisting of product advertisements) that describe the benefits of formula,[16] reference using "science" to develop formula,[17] or describe the Enfamil retail brand (not the preterm formula products) as the "#1 recommended brand by pediatricians"[18] *See, e.g.,* ¶¶ 88

---

[16] *See, e.g.*, ¶¶ 88 (selling formula as "easy on the tummy"), 89 (advertising Enfamil NeuroPro EnfaCare as "patterned after early breast milk"), 90 (marketing Enfamil as containing "everything premature babies need to get the best start in life"), 94 (describing Enfamil NeuroPro as containing "a blend of human milk oligosaccharides" and Enfamil A+ as "aligned to global expert guidelines … to support growth"), 96 (describing Enfamil NeuroPro as "contain[ing] critical ingredients to drive brain superiority and immunity"), 109 (referring to "benefits" and "premiumization"), 111 (referring to "cognitive and digestive benefits"), 131 (referring to "Omega 3-DHA claims").

[17] *See* ¶¶ 90 (touting Reckitt's "industry leading science"), 91 ("the science of Mead Johnson"), 92 ("strong insight-led innovation with NeuroPro"), 96 ("premiumizing nutrition with superior science"), 102 (Mead Johnson acquisition "strengthened our science platforms"), 103 (investing in "science platforms"), 104 ("focus on science-led innovations"), 107 (similar), 106 ("Our science is very strong"), 109 (referring to "science that underpins our innovation" and "scientifically proven benefits"), 111 (referring to "science-backed reputation," "science-based approach," "credible science," and "science-backed formula"), 122 ("science-led innovation"), 123 ("clinical, science-based approach"), 133 ("Our core Enfa[mil] business growth relies on science and differentiated claims").

[18] *See* ¶ 116 ("number one brand recommended by paediatricians"), 122 (similar), 117 ("#1 infant formula manufacturer"), ("#1 most trusted brand"), 119 (similar), 118 (similar), 120 (similar), 111 (similar), 123 (similar).

(company website), 89 (video advertisement), 90 ("digital ad aimed at the Super Bowl audience"). Advertisements are not plausibly statements to investors. *See Hemming v. Alfin Fragrances*, 690 F. Supp. 239, 244-45 (S.D.N.Y. 1988) (magazine advertisement not actionable). Moreover, many of the challenged statements are also immaterial puffery because they are not a "determinate, verifiable statement, that can be tested against an objective, black-and-white standard." *In re UiPath, Inc. Sec. Litig.*, 2025 WL 2065093, at *10 (S.D.N.Y. July 23, 2025). Here, the challenged statements are vague ("insight-led innovation," "premiumizing nutrition with superior science"), promotional ("#1 most trusted brand," "preferred brand"), and not readily subject to verification.[19] The remaining statements are product descriptions ("patterned after early breast milk," "contains critical ingredients") or accurate marketing statements ("#1 recommended brand by pediatricians in the US"). *See, e.g.*, ¶¶ 89, 90, 92, 94, 96, 109, 111, 116-17, 119-20, 122-23, 131; *Nadoff*, 107 F. App'x. at 252. Plaintiffs do not dispute that Reckitt accurately described Mead Johnson products or had support for "#1" marketing claims.[20] Plaintiffs allege the statements were nevertheless misleading because they failed to disclose information that Plaintiffs believe demonstrate that formula causes NEC. *See, e.g.*, ¶¶ 93, 95, 97, 108, 110, 112, 121, 134. Describing a product or touting that professionals "recommend" it neither says nor implies anything about the cause of NEC and therefore imparts no duty to

---

[19] *See, e.g.*, ¶¶ 90-92, 96, 102-04, 106-07, 109, 111, 117-20, 122-23, 133; *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417-18 (2d Cir. 2023) (describing studies as "best science" was puffery); *Boca Raton Firefighters and Police Pension Fund v. Bahash*, 506 Fed. Appx. 32, 34-37 (2d Cir. 2012) (describing how credit-rating services utilized "market leading software" that contributed to "reliability" and "credibility" was puffery); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398-99 (S.D.N.Y. 2018) (statements promoting competitive advantage from "scientific resources" and cancer therapies that "deliver therapeutic outcomes that dramatically changed patients' lives" were puffery); *Buhrke Family Revocable Trust v. U.S. Bancorp*, 726 F. Supp. 3d 315, 335-38 (S.D.N.Y. 2024) (emphasizing customers' trust of bank and importance of trust to bank's brand was puffery).

[20] Plaintiffs assert that Reckitt had "no reasonable basis" to tout consumers or health care providers' reliance on preterm formula after *Watson*. *See* ¶ 124. Their reasoning is flawed because the *Watson* evidence did not alter Reckitt's position on causation, or the position of the FDA, CDC, NIH. *See* ¶ 98 (noting that *Watson* claims were unsupported by science or medical experts); Ex. 15 (Consensus Statement).

-16-

disclose public studies (which, in any event, do not support Plaintiffs' causation theory, see *supra*). *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d at 403 (disclosure required only if information is "sufficiently connected to defendants' existing disclosures to make those public statements misleading"); *see supra* §I.A.1.

### B.      Plaintiffs Fail to Allege a "Strong Inference" of Scienter

Plaintiffs' failure to allege particularized facts giving rise to a "strong inference" of scienter also supports dismissal. *See* 15 U.S.C. §78u-4(b)(2)(A). Plaintiffs must allege either "facts (1) showing the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Plaintiffs do neither.

The Complaint is devoid of any allegations that the Individual Defendants "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198. Plaintiffs identify no stock sales and merely allege that Defendants were motivated to conceal that preterm formula causes NEC to protect a "vital revenue stream." ¶¶ 168-69. However, generalized interest in supporting revenue is insufficient for motive. *See ECA*, 553 F.3d at 198 ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable … do[es] not constitute 'motive' for purposes of [the scienter] inquiry."); *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (similar).

Absent plausible allegations of motive, the strength of circumstantial allegations of scienter based on recklessness must be correspondingly greater. *See UiPath*, 2025 WL 2065093, at *12; *Kalnit*, 264 F.3d at 142. Yet here the Complaint alleges only that the Individual Defendants must have had access to information contrary to their public statements through their "positions in senior executive roles" and through Mead Johnson employee Dr. Christina Valentine. *See* ¶¶ 170-88. These are insufficient. *See In re EHang Holdings Ltd. Sec. Litig.*,

-17-

646 F. Supp. 3d 443, 463-644 (S.D.N.Y. 2022) (rejecting "must have known" allegations and dismissing complaint). Indeed, there is no allegation that Reckitt secretly conducted any causation study that yielded information about NEC not already available in the published literature.

Most of the scienter allegations impermissibly plead scienter based on status. *See* ¶¶ 172-87 (alleging that Individual Defendants sat on committee accountable for "principal risks," alleging that all Individual Defendants but Mr. Sly sat on committee with oversight of "product safety" and related issues, and alleging that Messrs. Narasimhan, Durante, and Licht were "accountable" for adherence to product quality standards); *380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 222 (S.D.N.Y. 2008) (allegations concerning defendant's "managerial status" insufficient to support strong inference); *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) (allegations concerning close involvement of "executive defendants" in running business did not demonstrate "access to contrary information"). Plaintiff must, but do not, "specifically identify the reports or statements containing [the allegedly contradictory] information" that undermined the challenged statements. *See UiPath*, 2025 WL 2065093, at *14; *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *28 (S.D.N.Y. Apr. 2, 2020).

Similarly unavailing are assertions that the Individual Defendants must have known that formula causes NEC and that Reckitt faced legal, financial, and reputational harm as a result merely because Reckitt considered, but never moved forward with, an acquisition of a human-milk product manufacturer and "[was] considering the Company's defenses" in products liability cases. *See* ¶¶ 170-71. These allegations are speculative and say nothing about Reckitt's reasons for considering or deciding against a potential transaction, who was involved, or what they knew

or believed. *See UiPath*, 2025 WL 2065093, at *14; *Adient*, 2020 WL 1644018, at *28. At best, one can infer that Reckitt employees concluded that the human-milk manufacturer was not a good investment and were aware that human milk was protective against NEC, not that formula caused NEC—consistent with prevailing science and the consensus of the CDC, FDA, NIH, and AAP. *See, e.g.*, ¶ 61 (former CEO testified that demand for human-milk products was driven in part because it "provided protective gut health, including the avoidance of NEC"). And again, Reckitt never denied that human milk was protective—this is a red herring.

Another red herring is the allegation that Messrs. Narasimhan, Durante, and Licht were responsible as CEO for compliance with Reckitt's Policy and Procedures on the Marketing of Breast-Milk Substitutes (Ex. 6) in which Reckitt committed to complying with the World Health Organization's International Code of Marketing of Breast-Milk Substitutes of 1981 ("WHO Code") "as implemented by local governments worldwide." *See* ¶ 174. Plaintiffs assert that Reckitt violated the WHO Code, which calls for exclusive breastfeeding from 0 to 6 months, by marketing preterm formula. *Id.* Reckitt's policy clearly excludes "formulas for prematurely born infants," and, in any event, nothing in the WHO Code states that formula causes NEC and noncompliance is not fraud. Ex. 6 at 4.

Plaintiffs' allegation that the Individual Defendants must have known that Dr. Valentine knew of, but concealed, the link between infant formula and NEC because of Dr. Valentine's senior position at Mead Johnson is another dead end. *See* ¶ 188. This allegation not only piles status allegations upon status allegations but assumes that Dr. Valentine knew that formula caused NEC—which is not plausibly alleged in the Complaint or the documents on which the Complaint relies that focus instead on the protective benefits of human milk. *See, e.g.*, Ex. 19 (Valentine 2010 Presentation) at 66 ("Human milk immune biology is vital for protection against

-19-

NEC"); ¶ 54 ("Human milk feeding is the only known practice to reduce the likelihood of [NEC]."); *supra* §I.A.1. Moreover, the Complaint does not allege <u>any</u> interactions between the Individual Defendants and Dr. Valentine. *See* ¶¶ 53-54, 71-72, 75-76, 78, 188. In fact, many of the documents on which the Complaint relies to demonstrate Dr. Valentine's alleged knowledge are from 2012 or earlier, which predates Reckitt's acquisition of Mead Johnson and the Individual Defendants' tenure at Reckitt.

Finally, Plaintiffs cannot avail themselves of the "core operations" theory or rely on an inference of "corporate scienter." Merely asserting that Reckitt's U.S. infant formula business— which is broader than preterm formula products—represented "8-10%" of Reckitt's global net revenue is insufficient to allege a "core operation," and in any event, such allegations "cannot fill the gap" where other allegations fall short. *See* ¶ 169; *UiPath*, 2025 WL 2065093, at *17. Similarly, where the Complaint lacks specific allegations showing knowledge or recklessness of the Individual Defendants, the Second Circuit strongly disfavors relying on generalized "corporate scienter." *See Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital*, 531 F.3d 190, 195-96 (2d Cir. 2008) (inference of "corporate scienter" may be appropriate in extreme cases where speaker obviously knew statement was false, such as car manufacturer reporting sales of one million cars when accurate figure is zero).

## C.    Plaintiffs Fail to Allege Loss Causation

Loss causation requires a causal connection between the challenged statements and Plaintiffs' losses. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Securities class action plaintiffs establish loss causation by showing that the stock price fell upon the revelation of <u>new</u> information that corrects a prior misstatement. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (distinguishing bad news from corrective news); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511-13 (2d Cir. 2010); *UiPath*, 2025 WL 2065093, at *18.

Here, Plaintiffs allege that the *Watson* verdict revealed that Reckitt's assurances that "the science does not support a causal connection between any Mead Johnson product and NEC" were false and that the *Gill* verdict against Abbott revealed that Reckitt's characterizations of the NEC Litigation were incorrect. *See* ¶¶ 159, 166, 196-97. Neither assertion survives scrutiny.

The notion that the *Watson* verdict—cherry-picked by Plaintiffs from among over 400 NEC cases—revealed a scientific "truth" about NEC causation is illogical. The Complaint does not allege exactly what the jury found or why it would be reasonable to infer any conclusion about causation from the verdict. More fundamentally, Plaintiffs' position makes no sense and would make "truth" a moving target. They posit that the *Watson* verdict revealed the truth, but that case is on appeal; if the defense ultimately prevails, will the truth suddenly flip? Or consider that the defense has won other cases at summary judgment for lack of causation—do those undermine Plaintiffs' causation theory? Further, suppose that a year from now there are more defense verdicts—what becomes the "truth" then? The point is simple: the *Watson* verdict did not supply new information about NEC causation. Rather, it merely disclosed how one jury weighed the evidence presented. *Cf. Burr v. Florida*, 474 U.S. 879, 881 (1985) ("[A] jury's verdict and truth are not unerringly synonymous.").

Moreover, if the Court accepts the Complaint's allegations as true, the *Watson* verdict <u>cannot</u> have supplied new information about NEC causation. The Complaint is self-defeating because it asserts that the scientific community concluded that formula causes NEC long before *Watson*. *See* ¶¶ 38-45 (alleging scientific studies on NEC 1990-2024), ¶ 51 (alleging "weight of scientific evidence" showed formula causes NEC). If that were true (which Defendants deny) then the *Watson* verdict could not have disclosed that information anew and thus is not a corrective disclosure. *See Lentell*, 396 F.3d at 173; *Omnicom*, 597 F.3d at 511-13; *UiPath*, 2025

WL 2065093, at *18.  The same is true of the later *Gill* verdict, which is not alleged to have disclosed anything about NEC causation beyond what was previously disclosed in scientific studies or allegedly disclosed by *Watson*.  *See* ¶ 166 (causation issues in *Gill* are "substantially identical" to *Watson*).

The *Gill* verdict was at best a materialization of a disclosed risk of adverse litigation results.  *See Lentell*, 396 F.3d at 173; *Fort Worth Emp'rs Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009) (where underlying trial data had been disclosed, "decline in the price of [company's] stock following the … announcement that the FDA had not approved [drug] application … was caused by the agency's failure to approve the drug—not by any 'corrective' disclosure of some prior untruth").  Beginning in March 2023, Reckitt disclosed the NEC Litigation, "denied the material allegations of the claims," and opined that costs relating to the NEC Litigation were "not considered probable," could not be reliably estimated, but as of April 2024, "may be significant."  *See* Ex. 3 (2022 Report) at 209, 225; Ex. 4 (2023 Report) at 190.

### D.      The Amended Complaint Fails to State a Section 20(a) Claim (Count II)

The Court should dismiss Plaintiffs' Section 20(a) claim because Plaintiffs fail to plead a primary violation under Section 10(b).  *See UiPath*, 2025 WL 2065093, at *21.

## II.     The Complaint Should Be Dismissed for *Forum Non Conveniens* or, Alternatively, the FSMA Claim Should be Dismissed for Failure to State a Claim (Count III)

### A.      English Courts Are a More Suitable Forum

The English law claim alleging "dishonest delay" under Section 90A and Schedule 10A of FSMA should be dismissed pursuant to *forum non conveniens* because English courts have jurisdiction to hear the case and the chosen forum is inappropriate.  *City of Ouro Preto v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 751 F. Supp. 3d 356, 365 (S.D.N.Y. 2024).  The Exchange

-22-

Act claims also may be dismissed pursuant to *forum non conveniens* because of the inefficiencies and potential inconsistent judgments that would result from bifurcating the claims from the English law claim premised on the same factual allegations.

In deciding whether to dismiss a claim under *forum non conveniens*, the Court must first determine the degree of deference afforded to Plaintiffs' choice of forum, then consider whether an adequate alternative forum exists, and, if so, balance public and private interest factors. *Id.* at 365-66.  Here, these factors favor dismissal.

*First*, Plaintiffs' chosen forum receives minimal deference.  A representative plaintiff's choice of forum is afforded less deference.  *See Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 479 (S.D.N.Y. 2006).  Moreover, the English law claim has no connection to this forum.  *See Ouro Preto*, 751 F. Supp. 3d at 366 (deference "moves on a sliding scale depending on the degree of convenience reflected by the choice").  Reckitt is an English company headquartered in England, several of the Individual Defendants reside in England, and the English law claim concerns securities traded on the London Stock Exchange and statements that were issued from Reckitt's headquarters in England.  *See* ¶¶ 16-17, 223-32.  "Courts routinely have little sympathy for plaintiffs—even American plaintiffs—who conduct business in foreign lands and later try to cry foul here."  *Aenergy, S.A. v. Republic of Angola*, 2021 WL 1998725, at *9 (S.D.N.Y. May 19, 2021), *aff'd*, 31 F.4th 119 (2d Cir. 2022); *see also In re Arbitration Between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 498-501 (2d Cir. 2002) (affirming *forum non conveniens* dismissal where plaintiff voluntarily conducted business with foreign company and "must have anticipated the possibility of litigation" abroad).

*Second*, English courts are an adequate alternative forum. *See Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003). Plaintiffs can litigate their dishonest delay claim in the Business and Property Courts of England and Wales. Davies Decl. ¶ 60.

*Finally*, the balance of private and public interest factors favors dismissal. The private interest factors, which include "relative ease of access to sources of proof" and "practical problems that make trial of a case easy, expeditious and inexpensive" favor dismissal because, as noted above, the relevant evidence and witnesses are located predominantly in England. *See Owens v. Turkiye Halk Bankasi A.S.*, 2023 WL 3184617, at \*5 (2d Cir. May 2, 2023). The public interest factors, which include "avoiding difficult problems in conflict of laws and the application of foreign law," "the interest in having localized controversies decided at home," and "the unfairness of imposing jury duty on a community with no relation to the litigation" strongly favor dismissal. *Ouro Preto*, 751 F. Supp. 3d at 380-81 (quotation omitted).[21]

This controversy is centered in England, where the shares are traded, the statements were made, and the issuer is located. *See Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*, 421 F. Supp. 2d 741, 770-75 (S.D.N.Y. 2006) (dismissing case under *forum non conveniens* where public interests were "largely centered in England"). The claim requires the application of English law on issues of first impression that are best decided by English courts. The legal standards governing a dishonest delay claim remain in flux because no such claim has ever progressed to trial in England. *See* Davies Decl. ¶¶ 56-58. As a result, there is significant uncertainty as to standards for liability, causation, and loss. *See id.* The novelty of the issues

---

[21] The remaining public interest factor, "administrative difficulties associated with court congestion" is neutral. *Ouro Preto*, 751 F. Supp. 3d at 380 (quotation omitted).

and the fact that they bear on policy considerations that are best navigated by English courts strongly favors dismissal. *Ouro Preto*, 751 F. Supp. 3d at 380-81.

Finally, the Court should also dismiss the Exchange Act claims under *forum non conveniens* because this forum is an inconvenient one in which to litigate the Exchange Act claims if the English law claim proceeds abroad. The Exchange Act claims are premised on the same challenged statements, concern witnesses and documents in England, and are not immune from *forum non conveniens* simply because they arise under U.S. law. *See Alfadda v. Fenn*, 966 F. Supp. 1317, 1332 (S.D.N.Y. 1997), *aff'd,* 159 F.3d 41 (2d Cir. 1998) (alleging securities fraud does not preclude court from dismissing under *forum non conveniens*); *Allstate Life Ins. v. Linter Group Ltd.*, 994 F.2d 996, 1002 (2d Cir. 1993) (fact that U.S. courts have interest in enforcing U.S. securities laws "alone does not prohibit them from dismissing a securities action" under *forum non conveniens*). Substantially similar claims against Reckitt for alleged misrepresentations or omissions could be brought in an English court under FSMA. *See* Davies Decl. ¶¶ 59-61.

### B.  The Complaint Fails to State a FSMA Claim

Alternatively, the dishonest delay claim may be dismissed for failure to state a claim. To succeed on a dishonest delay claim under paragraph 5, Schedule 10A of FSMA, a claimant (or group of claimants) must show that (i) the claimant(s) acquired, continued to hold or disposed of securities in an issuer admitted to trading on a securities market in the UK, (ii) the issuer delayed in publishing information via a recognized information service, (iii) a person discharging managerial responsibilities ("PDMR") within the issuer acted dishonestly in delaying the publication of the information, and (iv) the claimant(s) suffered loss in respect of the securities as a result of delay by the issuer in publishing the information. Davies Decl. ¶ 15. Plaintiffs fail to allege sufficiently requirements (ii) through (iv).

-25-

*First*, Plaintiffs have failed to plead any delay in publishing information via a recognized information service.  As a preliminary matter, Plaintiffs do not identify the source of any obligation on Reckitt to disclose information regarding NEC causation.  *Id*. ¶ 25.  The information relied upon was in the public domain and did not constitute inside information which Reckitt was required to disclose under any potentially applicable UK corporate disclosure legislation.  *Id*. ¶ 24.  Further, Plaintiffs do not identify any information which Defendants allegedly held back from the market <u>and</u> subsequently published via a recognized information service, which alone may be fatal to their claim.  *Id*. ¶ 29.  The *Watson* and *Gill* verdicts do not suffice as subsequent disclosures because they did not reveal new information and were not published by the issuer via a recognized information service.  *Id*. ¶¶ 33-34; *see supra* §I.C.  Given these glaring gaps in the pleading, Plaintiffs' use of a dishonest delay claim appears misplaced.  While Plaintiffs might have attempted to characterize their claim as an omission claim under paragraph 3, Schedule 10A of FSMA instead, that theory does not fit the allegations either.  Any claim under paragraph 3 would require the Plaintiffs to demonstrate reliance on the alleged dishonest omission, which Plaintiffs have not even attempted to allege here.  Davies Decl. ¶¶ 17, 49.

*Second*, Plaintiffs have failed to plead that a PDMR acted dishonestly in delaying the publication of information.  Plaintiffs must demonstrate two elements of dishonesty: a person's conduct is dishonest if, (i) it is regarded as dishonest by persons who regularly trade on the securities market in question, and (ii) the person was aware (or must be taken to have been aware) that it was so regarded.  *Id*. ¶ 40.  Plaintiffs fail to plead sufficiently that the conduct of any of the Individual Defendants met these criteria.  The statements the Individual Defendants made about NEC causation and the NEC Litigation would not be regarded as objectively

dishonest by persons who regularly trade on the London securities market because they were consistent with scientific studies and the allegedly conflicting material Plaintiffs cite was publicly available. *See supra* §I.A.1-2. These challenged statements were also not subjectively dishonest as the Individual Defendants reasonably believed their stated opinions. *Id.* As noted *supra*, the balance of the challenged statements were accurate or mere "puffery," neither of which are objectively dishonest. *See supra* §I.A.3. Moreover, Plaintiffs fail to allege adequately that any Individual Defendant knew their statements were false or acted recklessly. *See supra* §I.B. The bar for establishing dishonesty under English law is high, and the Plaintiffs fail to meet it. Davies Decl. ¶ 42.

*Third*, Plaintiffs have failed to plead a causal connection between the alleged dishonest delay in publishing information and their purported losses. Plaintiffs accordingly have no standing to bring a dishonest delay claim. *Id*. ¶ 46.

## CONCLUSION

The Court should dismiss the Complaint with prejudice.

Dated: December 19, 2025        Respectfully submitted,

_/s/ Michael G. Bongiorno_
Michael G. Bongiorno
Tamar Kaplan-Marans
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
7 World Trade Center
250 Greenwich Street
New York, New York 1007
212 230 8800 (t)
212 230 8888 (f)
michael.bongiorno@wilmerhale.com
tamar.kaplan-marans@wilmerhale.com

Timothy J. Perla
Erika M. Schutzman
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
60 State Street
Boston, MA 02109
617 526 6000 (t)
617 526 5000 (f)
timothy.perla@wilmerhale.com
erika.schutzman@wilmerhale.com (_pro hac vice pending_)

_Counsel for Defendants_

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum complies with the word-count limitation of Rule 2(B) of the Court's Individual Rules and Practices in Civil Cases.  According to the word-processing system used to prepare this memorandum, the total word count is 8,746 words.

*/s/ Michael G. Bongiorno*
Michael G. Bongiorno