**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re RECKITT BENCKISER GROUP PLC SECURITIES LITIGATION | No. 1:25-cv-04708-JPC-SDA<br><br>CLASS ACTION<br><br>**DECLARATION OF PROFESSOR PAUL DAVIES K.C. (HON.), FBA, IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

**DECLARATION OF PROFESSOR PAUL DAVIES K.C. (HON.), FBA**

I, PROFESSOR PAUL DAVIES K.C. (HON.), of Harris Manchester College, University of Oxford, Mansfield Road, Oxford, United Kingdom, state as follows:

1.      I am the Allen & Overy Emeritus Professor of Corporate Law in the Faculty of Law of the University of Oxford and a Senior Research Fellow of Harris Manchester College. Before holding this chair, I was the Cassel Professor of Commercial Law at the London School of Economics from 1998-2009. As recited below, I was asked in 2006 by the relevant governmental department to carry out a review of the existing UK law on misstatements to the markets (other than in prospectuses). Between 1998 and 2001, I was a member of the Steering Group of the Company Law Review, whose recommendations produced a revised version of the whole of the UK Companies Act in 2006.

2.      I have been asked by Wilmer Cutler Pickering Hale and Dorr LLP, attorneys acting on behalf of Reckitt Benckiser Group plc ("Reckitt"), to provide an opinion in the form of an affidavit for use in court proceedings in the United States addressing certain questions of English law. In particular:

1

a.      Specify and describe the legal elements, required proof, and damages for a "dishonest delay" claim brought under Section 90A and Schedule 10A, paragraph 5, of the Financial Services and Markets Act 2000 of the United Kingdom ("FSMA");

b.      Confirm whether the claims in the Amended Complaint for Violations of the Federal Securities Laws (Dkt. 44) (the "Complaint") may be brought before the English courts.

3.      My conclusions are that:

a.      In order to establish a dishonest delay claim under paragraph 5, it is necessary under English law to establish each of the legal elements described in paragraph 15 below.

b.      The interpretation and application of those legal elements under English law is unsettled and, as such, there is significant uncertainty as to what are the relevant legal standards to be met for a dishonest delay claim.

c.      Plaintiffs New York State Teamsters Conference Pension and Retirement Fund and New York State Teamsters Council Health and Hospital Fund ("Plaintiffs") could pursue the dishonest delay claim in Count III of the Complaint in the English courts, which would have jurisdiction to adjudicate that claim.

d.      Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund could pursue the claims for alleged misrepresentations or omissions asserted against Reckitt in Count I of the Complaint in the English courts, which would have jurisdiction under FSMA to adjudicate claims for alleged misrepresentations or omissions.

4.      I have approached this task on the basis that my duty is to provide to the Court such assistance as I am able on matters falling within my area of expertise, which is English law, and that this duty to the Court overrides any obligation I may owe to those instructing me. My compensation for providing this report is entirely independent of the outcome of the dispute.

2

5.      It is not my role to express views on the merits of the Plaintiffs' claims, which is a matter for the Court to resolve, and nothing that I say in this declaration should be taken as intended to express any such view.

**INTRODUCTION**

6.      The current UK law on misstatements by issuers to the market (other than in prospectuses) is contained in Section 90A and Schedule 10A of FSMA. These provisions were inserted into FSMA by the Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192, as from 1 October 2010. Before 2006, when a temporary, stop-gap provision was put in place, there was no statutory liability for misstatements to the market other than in prospectuses.

7.      Before 2006 there were potential liabilities at common law in respect of non-prospectus misstatements, most obviously through the tort of deceit (fraud) or, from the 1960s onwards, even in negligence. However, the common law provisions were difficult to use in the context of misstatements to the market outside prospectuses. In the UK the common law tort of fraud required that the defendant should have intended the claimant to rely on the false statement. This might well be possible in the case of a prospectus (a "selling document"), but it was more problematic in the case of the non-prospectus misstatements.

8.      Successive UK governments seem to have been content with the very limited availability of liability for market statements outside prospectuses, in the sense that, as far as I am aware, no governmental proposals before 2006 were put forward for a statutory, private-liability regime for the benefit of investors.

9.      The legal arrangements (or lack of them as far as statutory liability was concerned) that existed at the beginning of this century were called into question by the adoption in 2004 by the European Union (of which the UK was then a member) of the Transparency Directive.[1] Although this Directive was concerned principally with periodic reporting, which domestic UK law already required companies to make, the government perceived a problem for UK law from Article 7. This dealt with liability and required Member States to "ensure that their laws, regulations and administrative provisions on liability apply to the issuers, the bodies referred

---

[1] Directive 2004/109 of the European Parliament and of the Council of 15 December 2004 on the harmonisation of transparency requirements in relation to information about issuers whose securities are admitted to trading on a regulated market and amending Directive 2001/34/EC (Official Journal of the European Union, 31.12.2004, L390/38).

to in this Article or the persons responsible within the issuers." At first sight, this appears to be simply an obligation on Member States to apply their national systems of liability to the disclosures required by the Directive, that is, the common law provisions, which already applied. However, for the reasons given above, there was doubt whether the EU requirements were met by the existing common law of the UK. The EU doctrine of *effet utile* stipulated that the national liability rules must be effective to achieve the goals of the relevant EU instrument.

10.    I was appointed in October 2006 by the relevant government minister (the Economic Secretary to the Treasury) to carry out a review of the then operative provisions in UK law on misstatements to the market (other than in prospectuses) and, in particular, into the limitations of the stop-gap measure adopted earlier that year in the Companies Act 2006. I consulted interested parties and produced a discussion paper in March 2007, which contained a set of tentative proposals for reform (Davies Review of Issuer Liability, *Liability for misstatements to the market: A Discussion Paper*).[2] This is often referred to as "Davies I". This set of proposals was put out for public consultation and, on the basis of those responses, I produced a *Final Report* in June 2007 ("Davies II"). The Treasury, having accepted my proposals, carried out a further consultation itself in July 2008, with a set of draft regulations attached to give effect to its recommendations. With some minor amendments this draft set of regulations was adopted by Parliament in 2010, which inserted Section 90A and Schedule 10A into FSMA.

11.    The overall consensus of those who responded to this consultation process was that, while the stop-gap provision of 2006 was too narrowly drawn and the new rules should operate more broadly, it would be bad policy to introduce rights for investors, which could be triggered easily. There was considerable nervousness among the consultees that even a fraud basis of liability regime might generate "speculative" litigation. Those taking this view pointed out that class actions (usually via "group litigation orders") are generally available in the UK. So, increasingly, was litigation funding from third party funders. The risk of "speculative" litigation was thought by consultees to be substantial.

12.    This attitude was shared by the government of the day. Referring to the original version of Section 90A, the Explanatory Notes to the Companies Act 2006 stated that the government was "anxious not to extend unnecessarily the scope of any duties which might be owed to

---

[2] Available at:
www.treasurers.org/ACTmedia/daviesdiscussion260307.pdf#:~:text=The%20Review%20is%20examining%20t
he,equally%20to%20periodic%20and%20ad%2D

investors or wider classes of third parties, in order to protect the interests of company members, employees and creditors" (Explanatory note to the Companies Act 2006, paragraphs 1637 and 1643). In the Parliamentary Debates the responsible Minister referred to "the Government's desire to avoid radical change to the law in this area, to respect the preferences of stakeholders and, especially, to ensure that company resources are not inappropriately diverted from shareholders, employees and creditors to the benefit of a much wider group of actual and potential investors." (Margaret Hodge MP, Hansard, HC, Standing Committee D, Col, 482 (6 July 2006).[3] The same government was still in power when the 2010 reforms were adopted.

13.     The need to avoid "super-optimal" levels of litigation under the reform proposals was discussed at some length in Davies I, paragraphs 110-118 and 55. Among the features pointed to of the existing and proposed law which, it was argued, would keep litigation within proper bounds was the proposed requirement for reliance. This, it was argued, would exclude "fraud on the market" arguments because it would require the claimant to be aware of the misstatement and for that knowledge to have played a part in inducing the action which was taken.

14.     The importance of this legislative history and background to the interpretation and application of the legal standards in Section 90A, FSMA, has been emphasised in the English courts. In *ACL Netherlands BV v Lynch* [2022] EWHC 1178 (Ch), after considering the statements quoted in the previous paragraph, Hildyard J stated at [445]:

> "As emphasised by the Defendants, this history is not merely of antiquarian interest. It is relevant when considering the scope of the section, and in particular the matters left open by the draftsman such as the nature of the reliance that must be shown, and the measure of damages. I accept the Defendants' general admonition that the Court should not interpret and apply the section in a way which exposes public companies and their shareholders to unreasonably wide liability."

**SUMMARY OF RELEVANT LEGAL STANDARDS**

15.     In order to succeed on a dishonest delay claim under paragraph 5, a claimant (or group of claimants) must show that:

---

[3] Available at: publications.parliament.uk/pa/cm200506/cmstand/d/st060706/am/60706s02.htm

a.      the claimant(s) acquired, continued to hold or disposed of securities in an issuer admitted to trading on a securities market in the UK,

b.      the issuer delayed in publishing information via a recognized information service,

c.      a person discharging managerial responsibilities ("PDMR") within the issuer acted dishonestly in delaying the publication of the information, and

d.      the claimant(s) suffered loss in respect of the securities as a result of delay by the issuer in publishing the information.

16.    As addressed further below, a dishonest delay claim brought under paragraph 5 does not concern alleged misstatements and omissions in published information. A dishonest delay claim concerns the failure to publish information when required to do so.

17.    Claims concerning alleged misstatements or omissions in published information must instead be brought pursuant to paragraph 3, Schedule 10A of FSMA, which requires a claimant (or group of claimants) to plead and prove reliance. In order to succeed on a misstatements or omissions claim under paragraph 3, a claimant (or group of claimants) must show that:

a.      the claimant(s) acquired, continued to hold or disposed of securities in an issuer admitted to trading on a securities market in the UK,

b.      a person discharging managerial responsibilities within the issuer knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading; and/or a person discharging managerial responsibilities within the issuer knew the omission to be a dishonest concealment of a material fact,

c.      the claimant acquired, continued to hold or disposed of the relevant securities in reliance on the information in question, at a time when, and in circumstances in which, it was reasonable for them to rely on it, and

d.      the claimant(s) suffered loss in respect of the securities as a result of the misstatements and/or omissions in the published information.

**COUNT III: For Violations of Section 90A of the Financial Services and Markets Act of the United Kingdom Against Reckitt**

*GENERAL*

18.     Paragraph 225 of the Complaint puts the Plaintiffs' case solely in terms of paragraph 5 of Schedule 10A. This paragraph alleges, in relevant part, that "Reckitt, as an issuer of securities to which Schedule 10A applies, dishonestly delayed the publication of information (within the meaning of paragraph 5 of Schedule 10A) . . ."

19.     Count III is not particularised in detail. For support for Count III, the Complaint states in paragraph 223 that the "Plaintiffs … repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully stated in this Count." The foregoing paragraphs refer frequently to allegedly "false and misleading" statements and omissions and it is often not clear how these allegations map onto a complaint of delay in making statements to the market under paragraph 5 as opposed to a complaint of making inaccurate ones (which, as indicated above, are generally dealt with under paragraph 3 of Schedule 10A, which is not asserted here).

20.     The full wording of paragraph 5 imposes liability in the following terms:

> "5(1) An issuer of securities to which this Schedule applies is liable to pay compensation to a person who—
> (a) acquires, continues to hold or disposes of the securities, and
> (b) suffers loss in respect of the securities as a result of delay by the issuer in publishing information to which this Schedule applies.
> (2) The issuer is liable only if a person discharging managerial responsibilities within the issuer acted dishonestly in delaying the publication of the information."

21.     In relation to liability for delay and the legal elements of a delay claim, the following questions logically arise and below I seek to identify how the Schedule attempts to answer them.

> (a) Which delayed actions does the Schedule cover?
> (b) Who is potentially liable for delay?
> (c) What mental element has to be shown on the part of those potentially liable?

(d) How does the claimant demonstrate loss?

*WHICH DELAYS?*

22.    As quoted above, paragraph 5 refers to "delay by the issuer in publishing information to which this Schedule applies." The section below addresses the relevant requirements for establishing a "delay" under this provision.

*(a) Duty to disclose*

23.    It is clear that paragraph 5 does not contain the rules about what information the issuer should disclose to the market—this is done in other provisions—but rather it is concerned with compensation for losses caused to investors if the disclosures mandated elsewhere are not timely. However, it is hardly possible to know whether a disclosure is late unless there is a rule establishing when the disclosure should have been made.

24.    Necessarily, the information must therefore also be information which is not already in the public domain. In *Allianz Funds Multi-Strategy Trust v Barclays PLC* [2024] EWHC 2710 (Ch) ("*Barclays*"), Leech J commented (by reference to Davies II) at [144] that "[T]he paradigm example of liability under Paragraph 5 is insider trading and the dishonest delay by a PDMR in making an ad hoc disclosure to the market of price sensitive information or holding it back from information which the issuer was imminently about to publish." By its nature, a dishonest delay claim concerns information which was unknown to the market, which the issuer was under an obligation to disclose but delayed in doing so.

25.    The Complaint recognises the force of this point when it asserts in paragraph 226 that "Reckitt had an obligation under English law to publish . . . the truth" about its infant formula product." However, the Complaint does not identify what provisions of UK law give rise to the obligation alleged. In the absence of any identified legal obligation giving rise to a requirement to disclose information, an English court would not in my view allow any allegation of dishonest delay to proceed.

*(b) Subsequent Disclosure*

26.    As explained above, paragraph 5 does not concern the publication of misleading statements or omissions (which are addressed in paragraph 3). Rather, paragraph 5 concerns instances of delay by the issuer in publishing accurate information at all. The publication of information allegedly containing misleading statements or omissions may be relevant as

8

evidence to demonstrate that the issuer dishonestly held back information within a certain publication. However, it is not necessary, when establishing a paragraph 5 claim, to show that an issuer's published information contained misleading statements or omissions.

27.    It may be necessary, however, to show that an issuer subsequently disclosed the accurate information. This is the approach, which was taken by Leech J in *Barclays*, interpreting the phrase "delay [by the issuer] in publishing information to which this Schedule applies" as set out in paragraph 5(1)(b) (see [138] of the judgment). On that analysis, in order to establish a claim under paragraph 5, a claimant must identify a delayed disclosure containing the accurate information at issue.

28.    There is some division in the English courts on this point. In *The Persons Identified in Schedule 1 to the Re-Amended Particulars of Claim v Standard Chartered Plc* [2025] EWHC 698 (Ch), Green J did not think that any subsequent disclosure is required to establish dishonest delay under paragraph 5. However, it remains necessary under Green J's approach for a claimant to show that the defendant had an obligation to disclose the information in question – and dishonestly failed to do so in a timely manner. This ongoing debate in the English courts is addressed further in paragraphs 48-58 below.

### (c) Information Published by Recognised Means

29.    Importantly, following Leech J's approach, the delayed disclosure must be published by "recognised means," as required under paragraph 2 of Schedule 10A, which defines the nature of "information to which this Schedule applies" as described in paragraph 5. Leech J explained this conclusion in *Barclays* (see [138(3)] of his judgment):

"Paragraph 2 defines the information to which Schedule 10A applies. The schedule only applies to information "published by the issuer" either "(a) by recognised means" or "(b) by other means where the availability of the information has been announced by the issuer by recognised means". It follows that Paragraph 5 has no application to an issuer unless or until it has published the relevant information by recognised means or it has announced the availability of that information by recognised means. It also follows, in my judgment, that Schedule 10A does not apply – and that there can be no liability for delay in publishing information – unless or until it falls within paragraph 2 and has been published."

30.     Schedule 10A defines in its paragraph 2 the disclosures to which it applies by reference to the mechanism used to communicate the information to the market rather than by listing a set of substantive corporate announcements to which it applies. In relevant part, paragraph 2 provides as follows.

> 2(1) This Schedule applies to information published by the issuer of securities to which this Schedule applies—
> (a) by recognised means, or
> (b) by other means where the availability of the information has been announced by the issuer by recognised means.
>
> (2) It is immaterial whether the information is required to be published (by recognised means or otherwise).
>
> (3) The following are "recognised means"—
> (a) a recognised information service;
>
>     . . .
>
> (4) A "recognised information service" means—
> (a) in relation to a securities market situated or operating in the United Kingdom, a service used for the dissemination of information in accordance with transparency rules;

31.     The term "transparency rules" as used in paragraph 2, defined in Section 89A of FSMA as the Disclosure Guidance and Transparency Rules made by the Financial Conduct Authority, the UK securities markets regulator. These in turn create a category of "primary information providers". For an issuer on the Main Market of the London Stock Exchange, like Reckitt, the dominant provider is the Exchange's Regulatory News Service ("RNS").

32.     Paragraph 2(1)(b) brings within the coverage of the Schedule not only information published directly via a RNS but also information published indirectly, *i.e.* via a RNS statement that certain information is available (for example, on the issuer's website), even if the RNS announcement itself does not contain the relevant information.

33.     It follows from the above that any delayed disclosure made under paragraph 5— meaning the publication of accurate information that was allegedly delayed—must have been

made to the market via the RNS or a substitute service, either directly or indirectly. I have been unable to identify any such delayed disclosure alleged in the Complaint. The jury verdicts from the *Watson* v. *Mead Johnson Co.* and *Gill v. Abbott Laboratories, Inc.* cases, which the Plaintiffs indicate at paragraphs 157-167 and 196-197 of the Complaint provided the "truth" to the market, are not alleged to have been disclosed via an RNS or substitute service. For the disclosure of the *Watson* verdict on March 13, 2024, no source is provided.[4] For the disclosure of the *Gill* verdict on July 26, 2024, the Complaint cites to a news article in *Bloomberg* at paragraph 197 note 6.

34.     The Complaint also refers to statements made, or which allegedly should have been made, by or on behalf of Reckitt to doctors, salespeople and parents. Such statements would not fall within Schedule 10A, unless they constitute repetitions of RNS announcements. However, they appear to in any case be of limited relevance to a paragraph 5 claim, which concerns (delayed) publication of correct information, rather than the publication of alleged false information or omissions.

*WHOSE DELAY IS AT ISSUE?*

35.     As Count III rightly recognises, the only available defendant under Schedule 10A is the issuer itself and so *not* its directors or officers or others involved in the formulation of the allegedly delayed statement to the market. However, since the company is an artificial person, there is a further crucial question which needs to be answered once liability is confined to the issuer. This is the question of whose knowledge is to be attributed to the company in order to assess the issuer's liability, and it is answered in paragraph 5(2) of the Schedule. This states that "the issuer is liable only if a person discharging managerial responsibilities within the issuer acted dishonestly in delaying the publication of the information." The term those "persons discharging managerial responsibilities within the issuer" may be unfamiliar. However, it is defined precisely in paragraph 8(5)(a) of the Schedule for a company, such as Reckitt, which is governed by a board, as meaning "any director of the issuer (or person occupying the position of director, by whatever name called)." This statutory statement of attribution replaces ("liable only if") the broader rules that apply in a general company law

---

[4] The Complaint in paragraph 98 also references a statement by Reckitt from March 15, 2024 in which the Company disclosed the *Watson* verdict and provided a response.  However, even if this statement was made to the market via RNS or a substitute service (which is not alleged), it cannot be a delayed disclosure for a paragraph 5 claim because Plaintiffs allege the statement was false and misleading in paragraph 100.

context, where, subject to conditions, the knowledge of officers, agents and employees may also be attributed to the company.

36.      The definition of PDMR does not embrace those persons on whom the issuer has conferred the title "director", if that person has not been elected or appointed to the board of the company. A "director" of marketing, without board responsibilities, would thus not count under the definition. The FSMA is drafted on the basis that the word "director" means a person elected to the board of the company or in fact acting as such (as a *de facto* director) or a "shadow" director.[5] It is also worth noting that paragraph 8(5)(a) of the Schedule refers to directors of the issuer and does not include directors of its subsidiaries, such as Mead Johnson Nutrition Company, unless they are also main board directors.

37.      The only persons identified in the Complaint who could be directors, or might be *de facto* directors, of Reckitt are the Individual Defendants, as defined in paragraphs 18-23, however the Complaint does not specify which of these individuals is a "director" as that term is defined by paragraph 8 of Schedule 10A. Only the knowledge and actions of those in this group of persons who are directors under paragraph 8 may be attributed to Reckitt under paragraph 5 of the Schedule. The knowledge and actions of the many other persons referred to in the Complaint may not be attributed to Reckitt. For the purposes of attribution to the company, the question is what the Individual Defendants who are directors under paragraph 8 of the Schedule knew and did.

38.      For example, in paragraph 53 of the Complaint the knowledge of Dr Christina Valentine is attributed to Reckitt even though there is no allegation that she was at the relevant time (or at all) a director of Reckitt. Her activities and knowledge are then referred to on some 19 later occasions across multiple paragraphs, without it being asserted that she was a director of Reckitt. An English court would not attribute Dr Valentine's knowledge to Reckitt for the purpose of liability under paragraph 5, unless via the knowledge and understanding (if any) of a director of Reckitt.

*DISHONESTY*

39.      An issuer is liable under paragraph 5 of Schedule 10A only if the relevant PDMRs acted "dishonestly" in delaying the disclosures which it is alleged should have been made. The same

---

[5] A person in accordance with whose directions or instruction the directors are accustomed to act even if that person has not been elected to the board (FSMA § 417(1)).

requirement for dishonesty is made in relation to omissions in paragraph 3 (paragraph 3(3) of Schedule 10A). This is in contrast with the basis for liability in relation to untrue or misleading statements which arises where a PDMR "knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading" (paragraph 3(2) of Schedule 10A). It was therefore a deliberate decision of the legislature to impose a more demanding test for liability in respect of omissions and failures to disclose. In relation to delay, the requirement for dishonesty was thought to be a major safeguard against "speculative litigation". Whereas a statement known by a PDMR to be false will attract liability under the Schedule for the company in relation to untrue and misleading statements, even if made for entirely altruistic reasons or for the benefit of the company, in relation to omissions and delay dishonesty is required. The mere fact that the delay or omission was intentional is not enough to ground liability.

40.     It is important, therefore, to examine the statutory test for dishonesty. Dishonesty, as defined in paragraph 6 of Schedule 10A, contains two elements. A person's conduct is dishonest if, first, it is regarded as dishonest by persons who regularly trade on the securities market in question. The views of other persons, whether employees of the issuer, parents or medical professionals, are irrelevant for the purposes of the dishonesty test. The second is that the person alleged to have acted dishonestly was aware (or must be taken to have been aware) that the conduct was so regarded.

41.     As to the first part of this test, I can find no guidance in the Complaint about what views regular traders on the securities market took about the decisions of the Reckitt board beyond the simple assertion in paragraph 228 ("This delay in publishing information was regarded as dishonest by people who regularly trade on the securities market in question."). At least some of the evidence in support of and against Reckitt's position is alleged to have been in the public domain and so investors could have reacted to it. Still less does the Complaint point to facts which might indicate that the Individual Directors knew (or must be taken to have known) that regular traders regarded that issuer's conduct as dishonest (if this was indeed the case). This allegation appears to be limited to the conclusory statement in paragraph 229 of the Complaint. This is so despite the regular contacts Reckitt maintained with its principal investors as alleged in the Complaint's references to the "many other earnings calls, investor presentations" which Reckitt conducted, where such doubts could have been expressed.

42.    It is important to understand the high bar to liability under UK law created by the term "dishonesty". Its meaning was extensively considered in *ACL Netherlands BV v Lynch* [2022] EWHC 1178 (Ch), where the fraud alleged was the publication to the market of information known by the directors to be false (and so within paragraph 3). The defendants were in fact found by the judge (Hildyard J) to have acted dishonestly, but he defined dishonesty—and the evidence needed to support a finding of dishonesty—in stringent terms. As a starting point, the judge stated that "in a more typically run large company," as Reckitt is, "dishonest corporate strategy (as distinct from individual dishonesty) is unlikely because dishonesty is unusual and a board of directors unlikely to be unanimous in its pursuit." (at [103]). In the Complaint the assertion appears to be that Reckitt's continued marketing of and references to infant formula despite the ongoing litigation concerning infant formula was a corporate strategy adopted by all the Individual Defendants, not a frolic on the part of only one or some of them, and so this comment is apposite in relation to paragraph 5 of Schedule 10A.

43.    Later on, Hildyard J pointed out that the second limb of the statutory test was more demanding than the current common law and that the statutory embodiment in Schedule 10A of the former, stricter common law test was deliberate. He stated at [472] of the judgment:

> "As is apparent from the Government's July 2008 consultation paper on what would become Sch 10A, this was intended to be a statutory codification of the common law test for dishonesty laid down in R v Ghosh [1982] 1 QB 1053. . . [T]he revised and now applicable test . . . no longer requires that it be established that the defendant appreciated that his conduct was dishonest by the standards of ordinary decent people."

44.    The remarks of Hildyard J in *ACL Netherlands BV v Lynch* [2022] EWHC 1178 (Ch) were made in a judgment given after a trial, whereas this case is at a strike out stage. Nevertheless, in *The Persons Identified in Schedule 1 to the Re-Amended Particulars of Claim v Standard Chartered Plc* [2024] EWCA Civ 674 (a strike out case which reached the Court of Appeal), the Court said at [34]:

> "The Bar's Code of Conduct bars a barrister from drafting any statement of case containing an allegation of fraud unless he has both "clear instructions to allege fraud" and "reasonably credible

material which establishes an arguable case of fraud": see rule C9. In *Medcalf v Mardell* [2003] 1 AC 120, Lord Bingham commented on a previous version of the rule, then to be found in paragraph 606 of the Code of Conduct, which required "clear instructions to make such allegation" and "reasonably credible material which as it stands establishes a prima facie case of fraud". He said at paragraph 22: "at the preparatory stage the requirement is not that counsel should necessarily have before him evidence in admissible form but that he should have material of such a character as to lead responsible counsel to conclude that serious allegations could properly be based upon it. . ."

45.    In that case, the litigation was allowed to proceed, but there must be some doubt whether the Complaint in this case points to enough facts to get the case over the strike-out hurdle, were the case heard in England.

*DEMONSTRATION OF LOSSES*

46.    In order to succeed on a paragraph 5 claim, a claimant must demonstrate a causal connection between the alleged delay in publishing information and the alleged losses.  An English court will require plaintiffs to expressly plead causation, which is a requirement under Schedule 10A. In particular, a plaintiff does not have standing to bring a claim under Schedule 10A (including a paragraph 5 claim) unless they can show that they suffered losses arising from the alleged wrong.

47.    I have not been able to identify any alleged causal link of this kind in the Complaint. In paragraphs 230-31 of the Complaint the loss suffered by the claimant is put only in broad terms: "Had New York State Teamsters Funds and the other members of the Class known the truth, they would not have purchased or otherwise acquired those shares, or would not have purchased or otherwise acquired them at the inflated prices that were paid. New York State Teamsters Funds and the Class have suffered losses with regard to their purchase and retention of Reckitt ordinary shares as a result of the dishonest delay in publishing truthful information."

*THE INTER-RELATIONSHIP BETWEEN LIABILITY FOR DISHONEST OMISSIONS AND FOR DISHONEST DELAY*

48.    Currently, there is division in the English courts as to the interpretation and application of the criteria to be met to establish a dishonest delay claim. In particular, judges have taken different approaches in the High Court as regards inter-relationship between liability for dishonest omissions (under paragraph 3 of Schedule 10A) and dishonest delay (under paragraph 5 of Schedule 10A).

49.    As set out above, paragraph 3 imposes liability for dishonest omissions, while paragraph 5 imposes liability for dishonest delay. Clearly, the two overlap, in the sense that an omission of a piece of information from a market statement could also be said, in ordinary language, to entail a delay in releasing that information. However, paragraph 3(4) states liability arises under that paragraph only if the person acquiring the securities did so "(a) in reliance on the information in question, and (b) at a time when, and in circumstances in which, it was reasonable for him to rely on it." By contrast, there is no express reliance requirement in paragraph 5.

50.    As recited in paragraph 13 of this Declaration a reliance requirement was introduced into paragraph 3, in order to exclude the "fraud on the market" doctrine from this element of corporate misstatement law. The exclusion of "speculative litigation" (a euphemism for US-style class actions) was an important goal of the legislature in 2010. At one level, the reason for the omission of a reliance requirement from paragraph 5 of the Schedule is easy to understand. It is difficult to prove reliance on information which is not there. However, the same problem arises in relation to omissions covered by paragraph 3, where a reliance requirement is explicitly imposed.

51.    There are currently two conflicting decisions in the High Court on this point. In *Barclays*, Leech J decided to strike out a group of claims in a class action which alleged against the bank, inter alia, that it had failed to disclose the full details of a settlement the bank had reached with the Attorney General of New York State, in breach of the UK continuing disclosure obligations. The claims were based on both paragraphs 3 and 5 of Schedule 10A. The claims struck out were those of a group of investors who admitted that they had never read nor were aware of the statements by the bank which were alleged to be defective.

52.     In relation to paragraph 3 of the Schedule, Leech J made the reliance requirement for omissions effective by applying it to the incomplete statement put out by the issuer. In relation to the more difficult issue of delay under paragraph 5, where the Schedule does not mention reliance, the judge held that, in the interests of coherence, the circumstances in which liability for delay would arise should be narrowly formulated. Relying on paragraph 2 of the Schedule (addressed below) the judge held that liability for delay would arise only when an announcement to the market, falling within paragraph 2, was made which contained the delayed information. At that point, but not until then, a claim based on the delayed information would arise.

53.     Leech J put his conclusions as follows at [138(4)]:

> "If the PDMRs of an issuer deliberately and dishonestly delay the publication of information, e.g. to take advantage of it personally before the market becomes aware of it, but then later publish it accurately, there can be no liability under Paragraph 3 either for making a misleading statement or for omitting to publish the information. But there will be liability under Paragraph 5. This construction also addresses the need identified in Treasury 2, §6.3 to §6.8 for the liability to be precisely drawn."

54.     The essence of the argument was that the gap paragraph 5 was designed to fill was a narrow one and could be simply described. It was where information was held back from the market, no inaccurate information was released to the market during the period of delay, and the ultimate disclosure was accurate. In this hypothetical, no paragraph 3 liability would arise but liability under paragraph 5 could be asserted. The judge gave as the paradigm example of liability a PDMR who caused the issuer to hold back inside information in order to benefit personally from trading on it, but then secured its release, accurately, to the market to reap the gains from the previous trading (at [144]).

55.     The implications of the judgment of Leech J for delay claims is that the Plaintiffs cannot base their claim *under paragraph 5* on any of the announcements to the market which they allege were false and misleading, and must instead identify the point at which the allegedly delayed—but accurate—information was disclosed to the market.

56.    The contrasting High Court decision to the *Barclays* case is *Persons Identified in Schedule 1 v Standard Chartered plc* [2025] EWHC 698 (Ch) ("*Standard Chartered*"), a similar case on the facts, where Green J refused to strike out the claims of those who were unaware of the statements by the bank which were alleged to be defective. The judge thought that, in a developing area of law, it was better to allow the claim to go to trial (which, as is the standard practice in England and Wales with civil cases, including commercial disputes, would be before a judge rather than a jury) so that the law could be identified on actual, rather than assumed, facts. Currently, no paragraph 5 claim has yet made it to trial, which would provide for fuller analysis of the provision with the benefit of evidence.

57.    However, it was clear that Green J was uncertain about Leech J's interpretation of paragraph 5 of the Schedule. Dealing with the issue of how to show that the delay caused the claimants loss even if no accurate statement of the true position were ever put out, Green J stated, at [117]-[118]:

> "I have more doubts about whether Leech J was correct to conclude that dishonest delay claims are dependent on the issuer publishing corrective information at some stage. […] I understand the point that the introduction of Para. 5 was intended to cover a quite narrow lacuna in issuer liability and that, as such, it should probably be construed to be quite confined in its reach, so far as possible. But the requirement of later publication does not seem to me to cure that problem or necessarily lead to a tightening of the boundaries of issuer liability."

58.    The *Standard Chartered* case recently settled on 5 December 2025, denying the Court of Appeal the opportunity to offer guidance on the conflict between the positions presented by Leech J in *Barclays* and Green J in *Standard Chartered*. The position under English law is therefore in a state of flux, with two conflicting decisions in the High Court.

**ENGLISH COURTS AS AN ALTERNATIVE FORUM**

59.    There appears to be no bar to an English court taking jurisdiction over the dispute under paragraph 5 of Schedule 10A. Reckitt is an English-incorporated company and a dishonest delay claim concerns disclosures allegedly required to be published to the London market via a RNS or substitute service. The requirements of paragraph 1 of Schedule 10A are thus

satisfied: the securities subject to the dispute are admitted to trading on a securities market situated in the United Kingdom and the United Kingdom is the issuer's home state.

60.     In particular, the dishonest delay claim could be brought in the Business and Property Courts of England and Wales, which are specialist courts within the High Court of England and Wales that decide business and commercial disputes.

61.     For similar reasons, there also appears to be no bar to an English court taking jurisdiction over a claim against Reckitt for alleged misrepresentations or omissions which could be pursued under paragraph 3 of Schedule 10A.

[Remainder of page left intentionally blank.]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 18, 2025

_____
Professor Paul Davies K.C. (Hon.)