UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
          :  Civil Action No. 1:25-cv-04708-JPC-SDA

In re RECKITT BENCKISER GROUP PLC  :
SECURITIES LITIGATION          :  <u>CLASS ACTION</u>

———————————————————— x
          **ORAL ARGUMENT REQUESTED**

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ....................................................................................................1

II.    FACTUAL BACKGROUND....................................................................................3

    A.     Scientific Evidence Long-Established the Heightened NEC Risk Posed by
           Cow's-Milk-Based Formula ........................................................................4

    B.     Reckitt Internally Acknowledged the Increased NEC Risk Posed by
           Bovine Formula ...........................................................................................5

    C.     Reckitt Concealed NEC Risk from Doctors, Parents, and the Market ....................6

    D.     The Individual Defendants Knew Their Bovine Formula Posed a
           Significant NEC Risk...................................................................................7

    E.     The Truth Began to Emerge Through NEC Litigation ...........................................8

III.   ARGUMENT............................................................................................................8

    A.     The Complaint Adequately Alleges Material Misstatements and
           Omissions....................................................................................................9

          1.     Statements Touting Product Safety and Omitting Known Product-
               Specific NEC Risk ..........................................................................9

          2.     Defendants Made "Science-Led" Differentiation Central to
               Nutrition's Premium Pricing and Growth Narrative.................................12

          3.     Statements Representing Pediatrician, Hospital, and Healthcare-
               Provider Endorsements ...................................................................13

          4.     Statements Describing Adverse-Event Monitoring, Safety
               Vigilance, and Reporting Practices..............................................14

          5.     Statements Concerning Product Safety Risks...........................................16

          6.     Safe Harbor and Bespeaks Caution Doctrine Do Not Apply....................16

               a.     Defendants Did Not Provide Meaningful Cautionary
                    Language.................................................................................16

               b.     Defendants Had Actual Knowledge of Undisclosed Facts
                    that Seriously Undermined Their Reassurances ...........................17

**Page**

7.    Post-Verdict Misstatements Mischaracterizing the Trial Record, and Minimizing Product and Litigation Risk ............................................... 18

B.    Plaintiffs Adequately Allege Scienter ................................................................ 18

C.    Plaintiffs Adequately Allege Loss Causation ....................................................... 22

D.    Plaintiffs Adequately Allege a Dishonest-Delay Claim Under English Law ........ 25

1.    Defendants' *Forum Non Conveniens* Argument Should Be Rejected ...................................................................................................... 26

2.    Plaintiffs State a Claim for Dishonest Delay Under English Law ............. 29

IV.    CONCLUSION ....................................................................................................... 30

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)................................................................................................25

*Barron v. Helbiz, Inc.*,
2021 WL 4519887
(2d Cir. Oct. 4, 2021) ........................................................................................................30

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..............................................................................................................9

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
496 F.Supp.3d 952 (E.D. Va. 2020) ...................................................................................24

*City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*,
683 F.Supp.3d 120 (D. Mass. 2023) ...................................................................................24

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755
(S.D.N.Y. Mar. 25, 2013) ..................................................................................................16

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
587 F.Supp.3d 56 (S.D.N.Y. 2022) ........................................................................23, 25, 28

*DiRienzo v. Philip Servs. Corp.*,
294 F.3d 21 (2d Cir. 2002)........................................................................................26, 27, 28

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000).........................................................................................11, 12

*Guzman v. Bldg. Serv. 32BJ Pension Fund*,
2023 WL 2526093
(S.D.N.Y. Mar. 15, 2023) ....................................................................................................3

*Hall v. Johnson & Johnson*,
2019 WL 7207491
(D.N.J. Dec. 27, 2019) .......................................................................................................24

*Hemming v. Alfin Fragrances, Inc.*,
690 F.Supp. 239 (S.D.N.Y. 1988) .........................................................................................9

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F.Supp.3d 65 (S.D.N.Y. 2017) ...............................................................................13, 18

**Page**

*In re Carter-Wallace, Inc. Sec. Litig.*,
    150 F.3d 153 (2d Cir. 1998)...............................................................................................9, 12

*In re Dentsply Sirona, Inc. Sec. Litig.*,
    2026 WL 124581
    (S.D.N.Y. Jan. 16, 2026)...........................................................................................................21

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    986 F.Supp.2d 487 (S.D.N.Y. 2013)........................................................................................16

*In re Genworth Fin. Inc. Sec. Litig.*,
    103 F.Supp.3d 759 (E.D. Va. 2015) .........................................................................................21

*In re Henry Schein, Inc. Sec. Litig.*,
    2019 WL 8638851
    (E.D.N.Y. Sep. 27, 2019)..........................................................................................................11

*In re Omega Healthcare Invs., Inc. Sec. Litig.*,
    563 F.Supp.3d 259 (S.D.N.Y. 2021)........................................................................................23

*In re Petrobras Sec. Litig.*,
    116 F.Supp.3d 368 (S.D.N.Y. 2015).........................................................................................13

*In re Romeo Power Inc. Sec. Litig.*,
    2022 WL 3701095
    (S.D.N.Y. Aug. 25, 2022) .........................................................................................................17

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001).......................................................................................................20

*In re Teva Sec. Litig.*,
    512 F.Supp.3d 321 (D. Conn. 2021).........................................................................................27

*In re UiPath Inc. Securities Litigation*,
    2025 WL 2065093
    (S.D.N.Y. July 23, 2025) ..........................................................................................................21

*In re Vale S.A. Sec. Litig.*,
    2017 WL 1102666
    (S.D.N.Y. Mar. 23, 2017) .........................................................................................................23

*In re Virtu Fin., Inc. Sec. Litig.*,
    770 F.Supp.3d 482 (E.D.N.Y. 2025) ........................................................................................25

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)......................................................................................................16

**Page**

*Iragorri v. United Tech. Corp.*,
  274 F.3d 65 (2d Cir. 2001)........................................................................................26, 27

*Jackson Cnty. Emps.' Ret. Sys. v. Ghosn*,
  510 F.Supp.3d 583 (M.D. Tenn. 2020).........................................................................28

*Kleinman v. Elan Corp., plc*,
  706 F.3d 145 (2d Cir. 2013).........................................................................................10

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).............................................................................................1, 2, 15

*McMahan & Co. v. Wherehouse Ent., Inc.*,
  900 F.2d 576 (2d Cir. 1990)............................................................................................9

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014)..........................................................................................15

*Moshell v. Sasol Ltd.*,
  481 F.Supp.3d 280 (S.D.N.Y. 2020)..............................................................................17

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..............................................................................19, 21, 22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)................................................................................................10, 11

*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235 (1981)......................................................................................................27

*Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*,
  751 F.Supp.3d 330 (S.D.N.Y. 2024)....................................................................8, 9, 10, 19

*Sharette v. Credit Suisse Int'l*,
  127 F.Supp.3d 60 (S.D.N.Y. 2015) ...............................................................................17

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*,
  2021 WL 4864421
  (N.D. Cal. Oct. 19, 2021)......................................................................................23, 25

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019)............................................................................................14

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
  2023 WL 6314939
  (S.D.N.Y. Sep. 28, 2023).............................................................................................22

**Page**

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010)......................................................................................16, 17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)............................................................................................19, 20, 22

*Wash. State Inv. Bd. v. Odebrecht S.A.*,
    461 F.Supp.3d 46 (S.D.N.Y. 2020) .................................................................................13

## STATUTES, RULES, AND REGULATIONS

15 U.S.C.
    §78j(b)...............................................................................................................................25
    §78t(a)...............................................................................................................................25
    §78u-5(c)(1)(B)..................................................................................................................17

Federal Rules of Civil Procedure
    Rule 8................................................................................................................................23
    Rule 9(b) .............................................................................................................................8
    Rule 12(b)(6)....................................................................................................................1, 8

Private Securities Litigation Reform Act of 1995 .....................................................................8, 16

U.K. Financial Services and Markets Act 2000
    §5.......................................................................................................................................25

**TABLE OF DEFINED TERMS**

| | Terms |
|---|---|
| **Abbott** | Abbott Laboratories. |
| **ADS** | American Depositary Shares. |
| **CDC** | The United States Centers for Disease Control and Prevention. |
| **Carr** | Defendant Jeffrey Carr. |
| **Class Period** | The period from January 13, 2021 to July 26, 2024. |
| **Company** | Reckitt Benckiser Group plc. |
| **Complaint** | Amended Complaint for Violations of the Federal Securities Laws, filed in this matter on October 20, 2025 (ECF No. 44).  References to "¶" and "¶¶" refer to the Complaint. |
| **Consensus Statement** | FDA, CDC, NIH Consensus Statement on Recent Advisory Council Report on Premature Infants and Necrotizing Enterocolitis. |
| **Defendants** | Reckitt Benckiser Group plc., Laxman Narasimhan, Nicandro Durante, Kristoffer Loe Licht, Patrick Sly, and Jeffrey Carr. |
| **Durante** | Defendant Nicandro Durante. |
| **Ellman Declaration or Ellman Decl.** | Declaration of Alan I. Ellman in Support of Plaintiffs' Memoranda of Law in Opposition to Defendants' Motions to Dismiss the Amended Complaint, dated February 17, 2025, submitted herewith. |
| **Ex.** | Exhibits submitted in support of the Ellman Declaration. |
| **Exchange Act** | The Securities Exchange Act of 1934. |
| **FDA** | The United States Food and Drug Administration. |
| **FSMA** | U.K. Financial Services and Markets Act 2000. |
| ***Gill v. Abbott Laboratories, Inc.* or *Gill*** | *Gill v. Abbott Laboratories, Inc.*, Docket No. 2322-CC01251 (Mo. Cir. Ct.). |
| **HCP** | Healthcare Professional or Healthcare Provider. |
| **Individual Defendants** | Laxman Narasimhan, Nicandro Durante, Kristoffer Loe Licht, Patrick Sly, and Jeffrey Carr. |
| **LSE** | London Stock Exchange. |
| **Licht** | Defendant Kristoffer Loe Licht. |
| **MTD** | Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint, filed in this matter on December 19, 2025 (ECF No. 51). |
| **Narasimhan** | Defendant Laxman Narasimhan. |
| **New York Hotel Trades Council** | Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund. |

**Page**

| | |
|---|---|
| **New York State Teamsters Funds** | Plaintiffs New York State Teamsters Conference Pension and Retirement Fund and New York State Teamsters Council Health and Hospital Fund. |
| **NICU** | Neonatal Intensive Care Unit. |
| **NIH** | The United States National Institutes of Health. |
| **Plaintiffs** | Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund and Plaintiffs New York State Teamsters Conference Pension and Retirement Fund and New York State Teamsters Council Health and Hospital Fund. |
| **PSLRA** | The Private Securities Litigation Reform Act of 1995. |
| **Reckitt** | Reckitt Benckiser Group plc. |
| **Rule** | Federal Rule of Civil Procedure. |
| **Sly** | Defendant Patrick Sly. |
| ***Watson v. Mead Johnson Co.* or *Watson*** | *Watson v. Mead Johnson Co.*, Docket No. 21-L-1032-PF (Ill. Cir. Ct. St. Clair Cnty.). |
| **WHO Code** | World Health Organization's International Code of Marketing of Breast-Milk Substitutes of 1981. |

Plaintiffs[1] submit this memorandum of law in opposition to Defendants' Motion to Dismiss the Amended Complaint pursuant to Rule 12(b)(6).

## I.  INTRODUCTION

Premature and low-birth-weight babies are particularly vulnerable to disease, including necrotizing enterocolitis ("NEC"), a devastating and often-fatal gastrointestinal disease.  Reckitt marketed its cow's-milk-based (or "bovine") formulas as being safe for those babies, despite knowing internally that bovine formula posed a materially elevated risk of NEC to premature babies.  Defendants concealed that risk.

Defendants' motion rests on a false premise.  They claim that "Plaintiffs' central assertion is that Defendants' statements were materially misleading because they failed to disclose studies and other information that Plaintiffs believe demonstrate that preterm formula causes NEC."  MTD at 7-8 (emphasis omitted).  Not so.  Plaintiffs allege that Defendants repeatedly chose to speak about the safety of, and scientific support for, their preterm formulas, but omitted contemporaneous, Company-known facts showing that premature infants fed bovine-based formula experience an elevated risk of NEC than those fed human milk.  While the securities laws "do not create an affirmative duty to disclose any and all material information," once an issuer speaks, it must disclose the facts necessary to make its statements, "in light of the circumstances under which they were made," not misleading.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).

Defendants conflate risk with causation, arguing that because NEC has multifactorial pathways, they could deny any meaningful product-linked risk.  For investors, a known, elevated

---

[1]  Undefined capitalized terms are as defined in the accompanying Table of Defined Terms. Emphasis is added and internal citations and quotations are omitted unless otherwise noted.

risk is material even if the product is not the sole cause of a condition. The FDA/CDC/NIH Consensus Statement stating there is no conclusive evidence that formula causes NEC does not change that analysis. Defendants' position would invert *Matrixx*: it would allow a company to speak most confidently when the scientific questions are hardest, precisely when investors most need the omitted facts.

The evidence shows human milk is protective, and bovine formula is associated with higher NEC incidence. Yet, while assuring investors that their bovine preterm formulas were safe and science-based, Defendants internally acknowledged and tracked that elevated risk, softened physician-facing risk messaging, and failed to record, escalate, or report adverse-event information in accordance as required.

This case therefore does not turn on whether preterm formula *causes* NEC. The question is whether Defendants' statements, taken together, were materially misleading given what Defendants knew about the risk of NEC posed by their formula and chose not to disclose. The Complaint plausibly alleges they were.

The Complaint also pleads particularized facts showing Defendants knew, or recklessly disregarded, this undisclosed risk of NEC. Given their committee roles evaluating the safety of the Company's bovine formula, it is reasonable to infer that each Individual Defendant knew of or had access to the specific reports and information reflecting the elevated NEC risk from bovine formula. Even if they claim ignorance, that is recklessness because they failed to check information they had a Company-imposed duty to monitor.

The truth was revealed when two juries reached verdicts in favor of plaintiffs—preterm babies who developed NEC after being fed bovine formula—and awarded staggering amounts. These trials revealed a mountain of internal evidence showing Reckitt knew the risks posed by its

formulas, and the verdicts confirmed that the evidence was sufficiently credible for a jury to find liability.  In response, Reckitt's securities price declined materially.

In addition to Exchange Act claims on behalf of Reckitt ADS purchasers, Plaintiffs adequately allege a dishonest-delay claim under English law on behalf of Reckitt ordinary-share purchasers on the LSE.  As Plaintiffs' English-law expert confirms, Plaintiffs' allegations satisfy the pleading requirements of English law.  Accordingly, Defendants' motions should be denied.

## II.    FACTUAL BACKGROUND

Reckitt is a U.K.-based consumer goods and health conglomerate.  ¶2.  Reckitt built its Nutrition segment through its $19.7 billion acquisition of Mead Johnson Nutrition Company ("Mead") in 2017.  *Id.*  The Nutrition business is anchored by infant-formula products sold under the Mead brand, including multiple cow's-milk-based products for premature and low-birth-weight infants.  ¶25.  Reckitt generated hundreds of millions of pounds annually from its U.S. infant-formula business during the Class Period—approximately 8-10% of net revenue.  ¶26.

Premature infants often cannot be fed exclusively with their mothers' milk, requiring supplementation with donor milk, human-milk-based products, or bovine formula.[2]  ¶36.  Mead did not offer a human-milk-based product during the Class Period.  ¶30.  Reckitt's Nutrition business relies on hospital-based adoption, particularly within NICUs, where premature and

---

[2]    According to Reckitt's former CEO Rakesh Kapoor, a consultant report identified insurance coverage and hospital-budget constraints as the primary barriers to human-donor-milk adoption, and concluded that perceived donor-milk shortages were budget-driven rather than the result of actual supply limitations.  Ex. 22, 72:2-77:18.  The Complaint quotes and summarizes this transcript and others cited herein, and therefore incorporates them by reference.  *See Guzman v. Bldg. Serv. 32BJ Pension Fund*, 2023 WL 2526093, at *6 (S.D.N.Y. Mar. 15, 2023).  In fact, contrary to Defendants' "saving lives" narrative, MTD at 1, Mead's medical director testified that Mead treated publication of its 2016 trial as essential to counter a commercial human-donor-milk competitor that, if it secured third-party payor coverage, "will own the NICU, as cost will no longer be an issue for hospitals"—much to Reckitt's chagrin.  Ex. 20, 228:8-229:9.

medically vulnerable infants are treated.  ¶¶28-30.  Because NICU use dictates hospital contracting and downstream retail demand, Reckitt's success depends on persuading neonatologists to use its cow's-milk-based formulas.  *Id.*

      **A.**      **Scientific Evidence Long-Established the Heightened NEC Risk Posed by Cow's-Milk-Based Formula**

NEC affects premature infants and causes inflammation and destruction of the intestinal wall, frequently leading to life-threatening infection, surgery, and death.  ¶¶31-32.  Premature infants have underdeveloped gastrointestinal systems and are vulnerable to bovine proteins.  ¶37.  For decades, peer-reviewed medical literature has shown that feeding premature infants cow's-milk-based formula materially increases NEC risk compared with human milk.  ¶¶34-45.

Expert neonatologists testified in the *Watson v. Mead Johnson Co.* trial that, based on the totality of the scientific literature, bovine formula presents a three-to-ten-fold increased risk of NEC relative to human milk.  ¶¶46-47.  NICUs that adopted exclusive human-milk diets reported significant reductions in NEC incidence and severity.  ¶¶47, 50.  Dr. Jonathan Swanson, one of the experts, testified that uncertainty about NEC's precise pathogenesis does not undermine the feeding-type risk differential, because clinicians must choose between only two feeding options— human milk or formula—and the evidence shows that NEC risk decreases with the former and increases with the latter.  ¶¶80-81.  When asked whether mother's milk was protective or whether cow's-milk-based formula was harmful, Dr. Swanson testified, "It's both in that mother's own milk can be protective and at the same time formula can be harmful."  Ex. 21, 337:22-338:1; *see also id.*, 351:6-7 ("[C]ow's milk-based formula certainly increases the risk of NEC compared to human milk."); ¶46 (similar testimony of Dr. Brian Sims).

B.    **Reckitt Internally Acknowledged the Increased NEC Risk Posed by Bovine Formula**

Before and throughout the Class Period, Reckitt was aware that feeding premature infants cow's-milk-based formula carried a materially greater risk of NEC than human milk. As early as 2010, Dr. Christina Valentine, then a practicing neonatologist and later Mead's most-senior medical officer, co-authored a 2012 medical text stating that "[h]uman milk feeding is the only known practice to reduce the likelihood of necrotizing enterocolitis," citing peer-reviewed studies showing that exclusive human-milk diets dramatically reduced NEC and that donor-milk use could reduce NEC by up to 79%. ¶54. In a March 2021 internal presentation, Reckitt acknowledged that human milk "reduces NEC by 80 percent." ¶59. A 2012 Mead document acknowledged that premature infants "do not tolerate bovine protein well" and "are highly susceptible to infection." ¶56. In 2015, Dr. Valentine received an email from a doctor at the University of California who "virtually said it's not ethical to use bovine in the NICU." ¶188. Mead's own 2018 study concluded, "The risk of preterm infants developing necrotizing enterocolitis is higher when they are fed formula than when they are fed breast milk[.]" Ex. 19, 209:4-9.

In 2015, Mead identified ingredient-driven NEC risk associated with its preterm formulas. Medical Affairs and NICU-planning materials discussed replacing corn-syrup solids and maltodextrin in Enfamil Premature 24 with lactose, the primary carbohydrate in human milk, based on evidence that corn-syrup solids adversely affect gastrointestinal development and NEC risk. Those internal concerns culminated in Mead's funding of a controlled preterm piglet study led by Dr. Douglas Burrin, published in 2018, which concluded that corn-syrup solids can predispose or trigger NEC. *Id.*, 199:7-206:22. Following publication, Dr. Burrin inquired whether Mead had reformulated Enfamil in light of the findings, but Mead did not. *Id.*, 213:19-215:24. Mead's own

- 5 -

study found the sugar used in its formula more than tripled the risk of NEC compared to the sugar in human milk, but it made no changes to its formula. ¶62.

Mead's Medical Affairs and Quality teams also received hospital reports describing NEC cases in premature infants who had been fed Enfamil preterm products. ¶¶75-76. Those reports were reviewed and circulated internally among personnel responsible for medical oversight, product safety and vigilance functions. *Id.*, ¶¶127-129.

### C.    Reckitt Concealed NEC Risk from Doctors, Parents, and the Market

While Reckitt internally recognized that NEC incidence materially differed depending on feeding type, it trained personnel and crafted physician-directed messaging to downplay NEC risk. ¶¶52-64, 69-72. Materials initially drafted with stronger causal language describing the protective effects of human milk were edited for external use to soften those conclusions into references to mere "association," obscuring the clinical significance of the risk differential. ¶¶71-72. Reckitt further relied on a Mead-funded 2016 study that did not compare bovine formula to human milk— it compared groups who both received more than 80% of their own mothers' milk— to suggest no increased NEC risk, while conspicuously declining to conduct or fund any randomized clinical trial comparing its bovine-based formula to mother's milk. ¶¶71-74.

Reckitt also concealed adverse-event reports received from hospitals and complaints from parents concerning premature babies who became ill or died after being fed the Company's bovine formulas, none of which were reported to the FDA. ¶¶75-78, 127-129. As a result of Reckitt's selective disclosure and physician-facing messaging, many neonatologists during the Class Period were not informed of the magnitude of the NEC risk associated with bovine formula. ¶¶82-84.

**D.    The Individual Defendants Knew Their Bovine Formula Posed a Significant NEC Risk**

The Individual Defendants knew of elevated NEC risk through Reckitt's formal governance and oversight structures concerning both product safety and infant formula. Each Individual Defendant served on the Group Executive Committee and was responsible for product quality and safety during the Class Period. ¶175. Narasimhan, Durante, Licht, and Carr also served on Reckitt's Corporate Responsibility, Sustainability, Ethics and Compliance Committee ("CRSEC"), which addressed product-safety evaluation, product-integrity reviews, breast-milk substitutes ("BMS"), and infant-formula practices. ¶¶176-186. At each CRSEC meeting during the Class Period, the Committee was apprised of developments relating to the marketing of Reckitt's BMS substitute products and reviewed issues concerning product safety and quality, including matters implicating preterm formula. ¶¶181-185. Reckitt's BMS Marketing Policy, *see infra* at 19-20, further made the CEO "ultimately accountable" for compliance, with reporting submitted to the CEO for final review and approval. ¶174. These mechanisms placed NEC risk and the safety implications of bovine-preterm formula squarely within the CEO's remit. ¶¶52-64.

To provide the requisite information to these committees, Mead maintained a formal process in which nutrition scientists and Medical Affairs, Regulatory, and Legal personnel reviewed scientific materials concerning infant-formula safety. Quality teams routinely monitored complaint and adverse-event data that were reviewed by senior medical leadership, including Dr. Valentine, and escalated if event clusters exceeded historical baselines. Ex. 20, 48:23–49:4, 68:12–22.

Reckitt also maintained an ongoing internal process to reassess the safety of its infant-formula products. Robert Cleveland, who served as Reckitt's Global Category Director for Nutrition from 2020 to September 2021 and as Senior Vice President for North America Nutrition

thereafter, testified at the *Watson* trial that upper management periodically reviewed the current state of the science and reassessed whether Enfamil's benefits continued to outweigh its risks, and that this reassessment was continuous. Cleveland testified that he was only two reporting layers below Licht and reported directly to Sly. Ex. 22, 299:24-300:13.

### E.    The Truth Began to Emerge Through NEC Litigation

By late 2021, Reckitt was facing dozens of lawsuits alleging that its preterm formulas caused NEC. ¶64. On March 13, 2024, a jury in the *Watson* trial returned a $60 million verdict in the plaintiff's favor, finding that Mead's formula caused or contributed to a premature infant's death, and that the Company failed to warn of the risk. ¶157.

Following the verdict, Reckitt's share price declined sharply, and analysts began to reassess the Company's litigation exposure and the strength of the scientific evidence linking bovine formula to NEC. ¶¶157-160, 196. For the first time, the market confronted evidentiary records and judicial findings that Reckitt's public assurances had obscured. A subsequent $495 million verdict in an analogous case against Abbott underscored the clinical and financial significance of the NEC risk. ¶¶166-167, 197.

### III.    ARGUMENT

To survive a Rule 12(b)(6) motion, a plaintiff must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*, 751 F.Supp.3d 330, 344 (S.D.N.Y. 2024) (Cronan, J.). "A claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court must "draw[] all reasonable inferences in plaintiff's favor." *Id.* at 335 n.1. Securities-fraud actions are subject to the pleading requirements of the PSLRA and Rule 9(b). *Id.* at 345.

A.    **The Complaint Adequately Alleges Material Misstatements and Omissions**

A statement or omission is misleading where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). For this reason, "[t]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). Where an issuer speaks about risk, it must do so in a manner that is "clear and complete," and may not obscure the magnitude or nature of known risks through vague or generalized descriptors. *Amgen*, 751 F.Supp.3d at 347.

1.    **Statements Touting Product Safety and Omitting Known Product-Specific NEC Risk**

Defendants assured the market that their bovine-based preterm formulas were safe and suitable for premature infants while withholding contemporaneous, Company-known facts that materially altered the risk profile of those very products. Defendants represented that Enfamil preterm formulas were "designed to support [a premature infant's] special nutritional needs," "easy on the tummy," "easy to digest," and were "patterned after early breast milk." ¶¶88-89. Reckitt amplified these assurances through national advertising proclaiming that Enfamil has "everything premature babies need to get the best start in life."[3] ¶90. Narasimhan told investors that Enfamil

---

[3] Defendants cite *Hemming v. Alfin Fragrances, Inc.*, MTD at 16, which involved a consumer magazine advertisement for a skin cream found to bear "absolutely no connection" to a securities transaction. 690 F.Supp. 239, 244-45 (S.D.N.Y. 1988). The Second Circuit subsequently held that advertisements may satisfy the "in connection with" requirement when relevant to analysts evaluating a company's stock. *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156-57 (2d Cir. 1998).

- 9 -

A+ was the only bovine formula "aligned to global expert guidelines for macro and micronutrients to support growth, weight and neurodevelopment of preterm infants." ¶94.  These statements are actionable because they reassured investors about safety, but concealed Company-known information demonstrating that bovine formula carried a materially elevated NEC risk relative to human milk.  *See supra* at 4-8.  Indeed, Defendants' own expert, Dr. Elena Minakova, testified that a company should warn when reports in the published literature have raised a question regarding the possible association between their product and NEC, even based on a single study and even absent established causation.[4]  Ex. 22, 293:2-15; *see Amgen*, 751 F.Supp.3d at 346.

Defendants now attempt to recast these statements as either: (i) non-actionable scientific disagreement; (ii) non-actionable opinion; or (iii) harmless because studies were "publicly available."  MTD at 8-12.  Each fails.  Defendants invoke *Kleinman v. Elan Corp., plc*, 706 F.3d 145 (2d Cir. 2013), to suggest Plaintiffs allege nonactionable scientific disagreement.  MTD at 9.  Plaintiffs' case is not about scientific disagreement, but Defendants' failure to disclose a known risk omitted from Defendants' public statements—a theory of liability *Kleinman* supports.  *See* 706 F.3d at 154-55 ("Our job is not to evaluate" the propriety of post hoc analysis "generally in the scientific community…Instead, we look to see whether the statements made were misleading or rendered misleading due to an omission.").

Defendants' opinion argument is similarly unavailing.  Opinion statements are actionable if they omit material facts that make the statement misleading.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015).  Defendants were aware— as demonstrated by internal documents and senior-executive testimony—that feeding premature

---

[4]    Defendants' reliance on the Consensus Statement is therefore a red herring because it does not speak to the elevated risk of NEC posed by formula.  MTD at 1-2, 4, 12.

infants bovine formula carried a materially elevated risk of NEC compared to human milk. *See supra* at 4-8. These are not merely "some fact[s] cutting the other way," MTD at 10 (citing *Omnicare*, 575 U.S. at 189-90). Rather, they undermined Defendants' public assurances that their preterm products were functionally equivalent to human milk, rendering them misleading by omission.

Defendants argue that because relevant scientific studies were publicly available for decades, they had no duty to disclose them. MTD at 10-12. Their truth-on-the-market argument fails at this stage. This defense "is intensely fact-specific and…rarely an appropriate basis for dismissing" a complaint. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Defendants must show that any "corrective information" about NEC risk was "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Id*. And where, as here, Defendants continued touting the safety of bovine formula and issuing categorical denials that blunted any purported corrective effect, *see* ¶¶88-90, 94, 98-99, "the alleged 'truth' was not conveyed to the public in a manner to sufficiently undermine the allegedly misleading statements." *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *28 (E.D.N.Y. Sep. 27, 2019).

The Complaint plausibly alleges that the magnitude of NEC risk associated with bovine preterm formula was not known to the market. Dr. Swanson testified that "neonatologists are generally not fully aware of the magnitude of the risk and severity of NEC in premature infants," and that NEC risks are underestimated. ¶¶82-84. Reckitt's own medical-affairs personnel acknowledged that NICU physicians were "not consistently up to date about scientific research relevant to their practice." ¶83. If neonatologists did not appreciate the risk differential, it is implausible to suggest that investors possessed a more complete understanding of that risk.

- 11 -

The market reaction following the *Watson* verdict confirms that conclusion. After the verdict, a BNP analyst wrote: "it appears that there is a body of scientific evidence to support" a linkage between bovine formula and NEC—an understanding not previously incorporated into the investment thesis. ¶160. That real-time reaction from an analyst underscores that the alleged risk was not already absorbed by the market. At minimum, these allegations raise a fact question as to what information was known by investors.[5] *See Ganino*, 228 F.3d at 167.

### 2.    Defendants Made "Science-Led" Differentiation Central to Nutrition's Premium Pricing and Growth Narrative

Defendants repeatedly assured investors that the strength of Reckitt's Nutrition business rested on "science-led innovation," that the Company's infant formulas were grounded in "strong" and "credible" science across "cognition, digestion and immunity," and that Reckitt's product innovation leveraged its science to deliver benefits addressing the specific nutritional needs of infants—claims Defendants expressly tied to premium pricing, margin expansion, and a sustained runway for growth. ¶¶104-107, 109, 111, 133, 136-137. Defendants did not merely describe products, *see* MTD at 16, they explained why the market should value Nutrition at premium margins and trust the Company's preterm offerings. Those assurances were misleading because Defendants omitted Company-known facts undermining the claimed scientific validation and safety profile of bovine-preterm formula. *See supra* at 4-8.

---

[5]    Defendants mischaracterize Plaintiffs' position, claiming Plaintiffs want Reckitt "in any statement about the causes of NEC…to list out studies that Plaintiffs assert support a contrary conclusion[.]" MTD at 11. More than just the studies—which were not known to many neonatologists or analysts—Defendants concealed their *internal* understanding, as reflected in Company documents, that bovine formula posed an elevated risk of NEC. Defendants' cases (*see id*.) are therefore inapt.

Defendants' motion recasts these statements as puffery or non-actionable opinion. *See* MTD at 14-16. But when a statement is made to assuage investor concerns, it is not puffery. *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F.Supp.3d 65, 79 (S.D.N.Y. 2017) ("While certain statements, viewed in isolation, may be mere puffery," they "become material to investors" if "made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors."); *Wash. State Inv. Bd. v. Odebrecht S.A.*, 461 F.Supp.3d 46, 74 (S.D.N.Y. 2020) (same). By December 2021, Mead was a defendant in dozens of state and federal lawsuits brought by parents of infants who became seriously ill or died from NEC after being fed Mead's bovine formulas. ¶64. In that context, Defendants repeatedly invoked "science," "clinical support," and "scientifically proven" benefits to reassure the market amid mounting clinical and litigation scrutiny over NEC risk. ¶¶96, 102-111, 122-123, 133, 139.

### 3. Statements Representing Pediatrician, Hospital, and Healthcare-Provider Endorsements

Defendants repeatedly represented that Enfamil was "#1 pediatrician-recommended," "#1 most trusted brand, both by parents and [HCPs]," and relied upon in NICUs. ¶¶115-123. Defendants' pediatrician- and hospital-endorsement statements are actionable because they conveyed informed professional validation of product safety while omitting that Defendants deliberately manipulated and constrained the information available to those professionals. *See supra* at 6. Those statements are actionable because they created a misleading impression of the company's true state of affairs. *See, e.g.*, *In re Petrobras Sec. Litig.*, 116 F.Supp.3d 368, 381 (S.D.N.Y. 2015) (finding repeated statements on "general integrity and ethical soundness" actionable where they portrayed a misleading impression of the company's "true state of affairs"). Indeed, many neonatologists did not fully understand the risk of NEC associated with formula,

- 13 -

and Reckitt's misleading presentations to doctors contributed significantly to their insufficient understanding. *See supra* at 6, 11.

Defendants contend these statements are non-actionable puffery, accurate marketing, or irrelevant because they do not "say[] nor impl[y] anything about the cause of NEC." MTD at 16-17. Defendants are wrong. They emphasized pediatrician recommendation, hospital trust, and professional reliance as pillars of competitive strength and durability, particularly within the NICU channel that drives hospital contracting and downstream retail demand. In that context, representations that Enfamil was "#1 pediatrician-recommended" and "most trusted" by HCPs conveyed that: (1) healthcare professionals were adequately informed of material safety risks; (2) endorsements reflected informed clinical judgment; and (3) professional confidence validated the products' safety profile, and, therefore, are not puffery. Plaintiffs plausibly allege those statements were misleading by omission because they rested on an information environment Defendants manipulated. *See supra* at 6.

*Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019), cited by Defendants (MTD at 15), is inapposite. Unlike in *Singh*, Defendants did not offer abstract ethics rhetoric, *see id*. at 63-64, but repeated endorsement claims conveying informed clinical validation and business durability, while omitting facts showing Defendants constrained the information available to those professionals.

### 4. Statements Describing Adverse-Event Monitoring, Safety Vigilance, and Reporting Practices

Defendants' statements describing specific safety-vigilance functions, including that teams "monitor and report on adverse events," were materially false and misleading because Defendants failed to disclose that adverse-event information reflecting severe outcomes, including NEC, was not handled as described, and that Defendants' practices for preterm products involved non-

enforcement and non-reporting, creating a mismatch between the described controls and actual operations.  ¶¶75-78, 127-129.

Once an issuer elects to speak about safety monitoring and adverse-event handling, it must do so completely and accurately.  *Matrixx*, 563 U.S. at 44.  In *Matrixx*, the Supreme Court held that when a company affirmatively speaks about product safety or adverse-event information, the omission of known facts bearing on how safety risks were actually assessed or handled can render those statements misleading, even absent a duty to disclose every adverse event or absent statistically significant proof of causation.  *Id*. at 43-45.

Here, Plaintiffs allege that Defendants described a functioning vigilance and reporting regime as an existing operational reality, while adverse-event information reflecting severe outcomes was not meaningfully reviewed and never reported to the FDA.  *See supra* at 6.  The Second Circuit has held that when a company describes specific operational safeguards—such as teams that monitor risks or processes that ensure reporting—those statements are actionable when contemporaneous facts show the systems were not operating as represented.  *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (statements describing pollution-abatement equipment and 24-hour monitoring teams were misleading where issuer omitted that those measures were then-failing to prevent substantial violations).

Nor are these statements inactionable as vague compliance rhetoric.  *See* MTD at 15. Plaintiffs challenge concrete representations about how safety oversight functioned in practice. ¶¶127-129.  Cases addressing generalized statements of "disciplined" "risk management" or aspirational compliance language are therefore inapt, *see* MTD at 14-15, particularly where Plaintiffs plead a mismatch between the described controls and actual practice.

- 15 -

### 5.    Statements Concerning Product Safety Risks

"Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F.Supp.2d 487, 516 (S.D.N.Y. 2013).  Here, Defendants warned only that "product safety issues" *could* arise and *might* result in litigation or liability.  ¶¶144-146, 149, 151.  But by the time Defendants made the challenged disclosures, product-safety risk was known and manifesting itself in an identifiable product.  *See supra* at 4-8.

### 6.    Safe Harbor and Bespeaks Caution Doctrine Do Not Apply

The PSLRA safe harbor is inapplicable to material omissions of historical facts.  *See City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013). Defendants' risk disclosures concerning product safety omitted then-existing facts.  ¶¶143-147. At the time of the disclosures, Defendants already possessed internal presentations, adverse-event reports, and hospital-level data reflecting elevated NEC risk from their bovine preterm formulas. *See supra* at 5-6.

#### a.    Defendants Did Not Provide Meaningful Cautionary Language

Even if the safe harbor applied to Defendants' misrepresentations and omissions, it would not protect Defendants because they failed to provide meaningful cautionary language.  *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246-47 (2d Cir. 2016).  To avail themselves of that protection, Defendants were required to disclose the major contemporaneous factors driving the risk.  *See, e.g.*, *Slayton v. Am. Express Co.*, 604 F.3d 758, 771 (2d Cir. 2010).  Defendants offered only generalized warnings that product-safety or regulatory issues could result in recalls, reputational harm, or financial losses.  ¶¶144-146.  Those boilerplate warnings omitted the

- 16 -

principal facts Defendants knew. *See supra* at 4-8; *see Moshell v. Sasol Ltd.*, 481 F.Supp.3d 280, 288 (S.D.N.Y. 2020) ("Even assuming the [cautionary] language was not boilerplate,…it suffers from the more fundamental problem that it was misleading in light of historical fact and thus cannot be meaningful."). "[T]he disclosure of a mere possibility of a problem does not absolve defendants who failed to disclose that the problem was actually occurring." *Sharette v. Credit Suisse Int'l*, 127 F.Supp.3d 60, 88 (S.D.N.Y. 2015). Defendants' assertion that they "never said that formula was not associated with a greater incidence of NEC" is false. MTD at 10. Following the *Watson* verdict, Reckitt publicly denied "any failure to warn users of risk." ¶99.

### b. Defendants Had Actual Knowledge of Undisclosed Facts that Seriously Undermined Their Reassurances

Finally, the safe harbor does not apply because Defendants had actual knowledge of the material facts that rendered their statements misleading. 15 U.S.C. §78u-5(c)(1)(B). Actual knowledge precludes the safe harbor if "a reasonable person would…deem an inference that the defendants…were aware of undisclosed facts tending to seriously undermine the accuracy of the statement, cogent and at least as compelling as any opposing inference." *Slayton*, 604 F.3d at 775. Here, Defendants possessed information seriously undermining their risk warnings. *See supra* at 4-8. These allegations are sufficient to raise an inference of Defendants' actual knowledge and defeat application of the safe harbor. *See, e.g.*, *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 3701095, at *3 (S.D.N.Y. Aug. 25, 2022) (allegations that defendants were "aware of undisclosed facts tending to seriously undermine the accuracy" of projections satisfied actual knowledge requirement); *see also infra* at 18-22.

- 17 -

### 7.     Post-Verdict Misstatements Mischaracterizing the Trial Record, and Minimizing Product and Litigation Risk

Defendants' post-*Watson*-trial assurances were misleading because, in the immediate wake of an adverse bellwether verdict, Defendants chose to speak with market-reassuring—but false—claims about product safety and risk while invoking the trial proceedings as affirmative validation of those assurances. Specifically, Defendants "reiterate[d]" that "Enfamil premature products are safe," that they "provide life-saving nutrition for premature babies," that "Safety is and will remain [Reckitt's] #1 priority across [their] entire product portfolio," and there was no "failure to warn users of risk." ¶99. As Reckitt faced escalating safety scrutiny and litigation exposure, these statements were targeted reassurances directed at the investor concern that the verdict reflected a broader safety issue and future liability exposure.

Defendants' attempt to recast these post-verdict assurances as non-actionable opinion or puffery falls short. *See* MTD at 8-11. "While certain statements, viewed in isolation, may be mere puffery, when the statements are made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors." *BHP*, 276 F.Supp.3d at 79. That principle applies here, when Defendants spoke immediately after the first verdict in nationwide litigation and reiterated that their formulas were "safe" and "life-saving"—language directed at the concerns the verdict raised.[6]

### B.     Plaintiffs Adequately Allege Scienter

Scienter is adequately alleged when a complaint pleads facts showing either: (1) motive and opportunity to commit fraud; or (2) strong circumstantial evidence of conscious misbehavior

---

[6] Nor can Defendants salvage these statements by invoking truth-on-the-market. *See* MTD at 10-11; *see supra* at 11-12.

or recklessness. *Amgen*, 751 F.Supp.3d at 353. Recklessness may be shown by allegations that defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). The inference of scienter "need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,'" but "at least as compelling as any opposing inference[.]" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id*. at 326.

The Complaint sets forth particularized allegations raising a strong inference that Defendants had access to, and were presented with, scientific evidence showing bovine formula carried an elevated risk of NEC in preterm infants. ¶6. Each Individual Defendant served on Reckitt's Group Executive Committee and were personally responsible for product quality and product safety during the Class Period. ¶175. Narasimhan, Durante, Licht, and Carr also served on the CRSEC and regularly attended meetings at which product-safety evaluations, product-integrity reviews, breast-milk substitutes, and the Company's infant-formula practice were discussed. ¶¶176-186. Narasimhan, Durante, and Licht were personally responsible for "adherence to product quality standards" as CEO during their respective term. ¶173.

Reckitt's 2018 Breast-Milk Substitutes Marketing Policy, effective throughout the Class Period, is additional evidence of the CEO Defendants' scienter. ¶174. The BMS Marketing Policy pledged that the Company would comply with the WHO Code, which calls for exclusive breastfeeding during the first six months. *Id*. The policy made the CEO "ultimately accountable" for compliance, and "[a]ll reporting on compliance with the BMS Marketing Policy, is submitted

- 19 -

to the CEO for final approval." *Id.* Given those responsibilities, the CEO Defendants were required to understand the comparative safety of human milk and bovine formula. ¶¶173-187.

As members of committees charged with evaluating the safety of the Company's bovine formula, it is reasonable to infer that each Individual Defendant knew of or had access to the reports and information reflecting the elevated NEC risk from bovine formula, *i.e.*, scientific studies demonstrating that bovine formulas presented a greater risk of NEC than human milk, adverse event reports, and presentations to doctors. *See supra* at 4-8. Specifically, it is reasonable to infer that Defendants were aware of or recklessly disregarded Dr. Valentine's knowledge of the elevated risk of NEC from bovine formula. ¶¶53-54, 77, 188.[7] Dr. Valentine served as Mead's Medical Director of North America from before the start of the Class Period through August 2021 and as its Chief Medical Officer from May 2022 through October 2023.[8] Given her position, it is reasonable to infer that Dr. Valentine participated in the aforementioned committee meetings concerning the Company's bovine-formula safety and breast-milk substitutes.

The same inference applies to Robert Cleveland, who testified that he periodically reviewed the current state of the science and continuously reassessed whether Enfamil's benefits outweighed its risks. Cleveland was two reporting layers below CEO Licht, and reported directly to Sly. *See supra* at 7-8; Ex. 22, 299:24-300:13. Given Sly's and Licht's senior-leadership

---

[7] Defendants take issue with "the documents on which the Complaint relies to demonstrate Dr. Valentine's alleged knowledge…which predates Reckitt's acquisition of Mead [] and the Individual Defendants' tenure at Reckitt." MTD at 20. But pre-class period data is relevant to what a defendant should have known during the class period. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001).

[8] Defendants' contention that Plaintiffs "pile[] status allegations upon status allegations [and] assume[] Dr. Valentine knew that formula caused NEC" ignores the factual allegations in the Complaint. MTD at 19.

responsibilities and the reporting structure Cleveland described, it is reasonable to infer that they were presented with the results of Cleveland's Enfamil risk assessment and therefore knew of, or recklessly disregarded, the elevated risk of NEC associated with Enfamil.[9]

These allegations are sufficient to plead scienter. *See, e.g., In re Dentsply Sirona, Inc. Sec. Litig.*, 2026 WL 124581 at *19 (S.D.N.Y. Jan. 16, 2026) (scienter pled where "all defendants had access to information through Trackwise and/or Snowflake showing thousands of patient injuries that had not been reported to the FDA"); *In re Genworth Fin. Inc. Sec. Litig.*, 103 F.Supp.3d 759, 785 (E.D. Va. 2015) (scienter adequately alleged in part because defendants were members of steering committee overseeing business division at issue). Even if the Individual Defendants were somehow unaware of the facts contradicting their statements, they were reckless in failing to review information they had a Company-imposed duty to monitor. *Novak*, 216 F.3d at 311. Defendants' attempt to recast scienter allegations as impermissible status-based pleading is meritless. MTD at 18-20.

Furthermore, Defendants' assertion that there is "no allegation that Reckitt secretly conducted any causation study[,]" MTD at 18, misses the mark. Plaintiffs need not allege an unpublished causation study. Plaintiffs allege that Reckitt conspicuously failed to conduct or fund a randomized clinical trial comparing mother's or donor milk to formula, despite a Senior Medical Affairs executive suggesting otherwise, ¶74, permitting a reasonable inference that such a study

---

[9]    Defendants' reliance on *In re UiPath Inc. Securities Litigation,* 2025 WL 2065093 (S.D.N.Y. July 23, 2025) (Cronan, J.), is misplaced. MTD at 18. In *UiPath*, plaintiffs failed to allege that defendants were aware of "any specific report or communication…that directly contradicted" the challenged statements. 2025 WL 2065093, at *14. That is not the case here: Plaintiffs allege specific studies and data, conducted and/or possessed by the Company, demonstrating an elevated NEC risk posed by Enfamil—the omission of which made Defendants' statements materially misleading. Critically, the committees the Individual Defendants sat on were specifically responsible for evaluating the safety of the Company's bovine formula. *See supra* at 7, 19-20.

would have confirmed an increased NEC risk. *See supra* at 6. Indeed, "an egregious refusal to see the obvious, or to investigate the doubtful, may…give rise to an inference of recklessness." *Novak*, 216 F.3d at 308.

An inference of scienter is strengthened by the Company's longstanding interest, since at least 2010, in acquiring or developing human-milk-based products. ¶58. Cleveland confirmed the Company pursued these strategic opportunities because human-milk products have immunoprotective properties that formulas lack. ¶60. Despite this, Defendants contend that "one can infer that Reckitt employees concluded that the human-milk manufacturer was not a good investment and were aware that human milk was protective against NEC[.]" MTD at 19. Defendants' proffered competing inference, however, is not stronger than Plaintiffs', especially because Defendants believed that acquiring a human-milk manufacturer would "transform our ability to win in hospitals. Human milk is the gold standard for NICU feeding." ¶58; *see also* Ex. 22, 73:19-74:14 (NICUs were increasingly seeking human-milk-based fortifiers, and hospitals were willing to pay a premium for human-milk-based products); *id.*, 77:19-78:1 (projecting that a partnership with human-milk-based formula manufacturer could generate significant top-line impact for Mead under both base-case and high-case scenarios).

Accordingly, Plaintiffs adequately allege a strong inference of scienter.[10]

**C.    Plaintiffs Adequately Allege Loss Causation**

"Generally, plaintiffs sufficiently plead loss causation when they allege that their share's price fell significantly after the truth became known through an express, corrective disclosure or

---

[10] Despite Defendants' argument, MTD at 17, Plaintiffs are not required to plead insider stock sales. *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 2023 WL 6314939, at *11 (S.D.N.Y. Sep. 28, 2023). Indeed, pleading motive is not required. *See Tellabs*, 551 U.S. at 322.

through events constructively disclosing the fraud like the materialization of the risk concealed." *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F.Supp.3d 56, 100 (S.D.N.Y. 2022) ("*Reckitt*"). "[T]here is no requirement that the corrective disclosure take a particular form or be of a particular quality," such that it be a "mirror image tantamount to a confession of fraud." *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *29 (S.D.N.Y. Mar. 23, 2017). "The vast majority of courts in this [D]istrict have required that loss causation only meet the notice requirements of Rule 8." *In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F.Supp.3d 259, 266 n.7 (S.D.N.Y. 2021).

The Complaint identifies the required causal connection. The truth about Defendants' fraud was partially revealed through the disclosure of the *Watson* verdict on March 13, 2024. The jury found Mead's formula caused or contributed to cause NEC and the Company failed to warn the decedent's mother of the increased NEC risk posed by bovine-based formula. In response, the price of Reckitt's securities fell 15%. ¶¶157-158. Analysts began reassessing their prior acceptance of Reckitt's false assurances, acknowledging there is a body of scientific evidence contradicting Reckitt's claims. ¶160.

Defendants prevented the market from recognizing the verdict's full implications by falsely reassuring investors that their bovine formula was not linked to NEC and that it expected to prevail in the ongoing NEC litigation. ¶¶98, 161-165. The truth was further revealed on July 29, 2024, when the jury in *Gill v. Abbott Laboratories, Inc.*—which also involved NEC linked to bovine formula—found for the plaintiff. ¶¶166-167. In response, Reckitt's securities fell 9%. ¶197.

Courts have held that price declines following trial verdicts are sufficient to plead loss causation because verdicts reveal new information to the market by confirming that the evidence is sufficiently credible for a jury to find liability. *See, e.g., Sheet Metal Workers Nat'l Pension*

*Fund v. Bayer Aktiengesellschaft*, 2021 WL 4864421, at \*7 (N.D. Cal. Oct. 19, 2021) ("[A] verdict implies that a link between Roundup and cancer was sufficiently credible to find in favor of the plaintiff[.]"); *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F.Supp.3d 952, 968-70 (E.D. Va. 2020) (court's factual findings after jury verdict sufficient for loss causation); *City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*, 683 F.Supp.3d 120, 136 (D. Mass. 2023) (verdict constituted loss-causation event); *Hall v. Johnson & Johnson*, 2019 WL 7207491, at \*27 n.8 (D.N.J. Dec. 27, 2019) (same).

Defendants assert that Plaintiffs cherry-picked the *Watson* verdict, MTD at 21, but that verdict was the first trial verdict in the NEC cases.[11] ¶157. Defendants' "moving target" argument fails. MTD at 21. That contention is contradicted by the cases cited above holding that trial verdicts suffice to plead loss causation despite the possibility of appellate reversal. Defendants' assertion that the defendants in the NEC litigation have prevailed at summary judgment for lack of causation, *see* MTD at 5, 21, finds no support in the record.[12]

Defendants further argue that the *Watson* verdict cannot have supplied new information about NEC causation. *Id*. at 21. They contend that the Complaint is self-defeating because it asserts that the scientific community concluded that formula causes NEC long before *Watson*, such that the verdict could not constitute a corrective disclosure. *Id*. Like Defendants' truth-on-the-

---

[11] Notwithstanding Defendants' assertion, *see* MTD at 21, the Complaint does allege what the *Watson* jury found. ¶157.

[12] In *Brown v. Abbott Laboratories*, No. 1:22-cv-02001 (N.D. Ill. Oct. 23, 2025), the court granted defendants' summary judgment motion, but not on the basis of causation—rather, because plaintiffs' proposed design changes to the formula at issue were not economically or functionally practical, which is a necessary element of the pertinent statute. *See* Ex. 23 at 9-10. In *Diggs v. Abbott Laboratories*, No. 1:22-cv-05356 (N.D. Ill. Aug. 14, 2025), the court excluded plaintiff's expert because he relied exclusively on studies that excluded infants fitting the gestational age and birthweight of plaintiff's baby. *See* Ex. 24 at 5, 9.

- 24 -

market defense, this argument fails because the market lacked an informed understanding of the risk of NEC from bovine formula. *See supra* at 11-12. Further, courts have held that public but unproven allegations do not defeat loss causation. *See Bayer*, 2021 WL 4864421, at *7 ("Until a verdict in one of the cases, investors would have viewed the links between Roundup and cancer as unproven, untested allegations,…especially when Monsanto had denied any link between cancer and its product."). Minimally, this presents a question of fact that cannot be resolved at this stage. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

Defendants also argue the *Gill* verdict was at best a materialization of a disclosed risk of adverse litigation results. MTD at 22. That verdict, however, served as a corrective disclosure to Defendants' earlier statements that the *Watson* verdict was not supported by the science, and alerted investors that Reckitt faced even greater liability than *Watson* suggested. ¶166. Defendants' denials, which reassured the market (¶163), doom their argument. *See Reckitt*, 587 F.Supp.3d at 101 (rejecting loss causation argument because defendants "denied wrongdoing at the time, and the effect on Reckitt's share price is better considered on a more complete record").[13]

### D. Plaintiffs Adequately Allege a Dishonest-Delay Claim Under English Law

Plaintiffs adequately allege a dishonest-delay claim under Section 90A and Schedule 10A, §5 of FSMA. In support, Plaintiffs submit the Declaration of Robert Stuart Levy, KC ("Levy Decl."), a King's Counsel with more than 35 years of expertise in English law.

---

[13] Because the Complaint states a §10(b) claim, Plaintiffs have also stated a §20(a) control-person claim. *See In re Virtu Fin., Inc. Sec. Litig.*, 770 F.Supp.3d 482, 527-28 (E.D.N.Y. 2025).

### 1. Defendants' *Forum Non Conveniens* Argument Should Be Rejected

Defendants argue the Court should dismiss Plaintiffs' English-law claim on *forum non conveniens* grounds. MTD at 22-25. Defendants have failed to demonstrate—as is their burden, *see Iragorri v. United Tech. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001)—that they would be unduly inconvenienced by litigating the English-law claim in tandem with the Exchange Act claims in this District. The Second Circuit applies a three-step analysis for *forum non conveniens* motions: (1) determining the degree of deference to be afforded to the plaintiff's choice of forum; (2) examining whether an adequate alternative forum exists; and (3) balancing the private and public interests. *See id*. at 73-74. "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Id*. at 70.

Plaintiffs' forum choice warrants deference. One Plaintiff purchased Reckitt ADSs in the U.S. and two purchased ordinary shares on the LSE. ¶¶15-16. Each Plaintiff resides in this District or New York State.[14] Defendants argue Plaintiffs' choice merits minimal deference because they are representative plaintiffs, MTD at 23, but "[a]ffording less deference to representative plaintiffs does not mean they are deprived of all deference in their choice of forum." *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 28 (2d Cir. 2002). A plaintiff's forum choice warrants greater deference when "it was motivated by legitimate reasons, including the plaintiff's convenience…and diminishing deference…to the extent that it was motivated by tactical advantage." *Iragorri*, 274 F.3d at 73. Plaintiffs chose this District because: (1) they are all located in New York; (2) the Deposit Agreement *requires* litigation concerning the ADSs to be brought here (*see* Ex. 8 at PDF

---

[14] New York Hotel Trades Council is headquartered in Manhattan, and the New York State Teamsters Funds are headquartered in Syracuse. *See* Ellman Decl. ¶7.

pgs. 13-14); (3) three of the Defendants are located in the U.S. (*see* Ellman Decl. ¶10); (4) Reckitt's U.S. corporate offices are located nearby in New Jersey (¶17); and (5) the U.S. has an "interest in having [U.S.] courts enforce [U.S.] securities laws." *DiRienzo*, 294 F.3d at 28. Defendants assert the English-law claim has no connection to this forum, MTD at 23, but that ignores the myriad connections between the claim and the U.S.: the claim centers around Mead, which is headquartered in Chicago, *see* Ellman Decl. ¶10, and more than 400 NEC cases are pending in this country. MTD at 21. Accordingly, Plaintiffs' choice of forum should be accorded deference.

The balance of private and public interests also favors maintaining the English-law claim here. The private-interest factors, which include "relative ease of access to sources of proof" and "practical problems that make trial of a case easy, expeditious and inexpensive," *Iragorri*, 274 F.3d at 73-74, weigh strongly against dismissal. Defendants ignore the NEC cases pending in the U.S., abundant sources of proof here, virtually all of the *Watson* trial witnesses are U.S.-based (*see* Ellman Decl. ¶8), and three Defendants are located here.[15] Nor do Defendants identify any practical difficulties arising from prior trials. Although the alleged misstatements largely emanated from England, and certain Defendants are located there, MTD at 23, those facts do not tip the balance of the private and public interests in favor of dismissal.

The public-interest factors include "a local interest in having localized controversies decided at home," "the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law," and "the unfairness of burdening citizens in an unrelated forum with jury duty," *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6, 260 (1981), and they favor maintaining this

---

[15] *See In re Teva Sec. Litig.*, 512 F.Supp.3d 321, 359 (D. Conn. 2021) (denying *forum non conveniens* motion despite issuer's location overseas because "[t]he lion's share of evidence and witnesses are in the United States because the case regards Teva's U.S. generic drugs market.").

case here.  Contrary to Defendants' expert, the legal standards governing a dishonest-delay claim are well-established.  *See* Levy Decl. ¶¶45-46.  Thus, as in *Reckitt*, Defendants have not "identifie[d] a novel, unresolved issue raised by [Plaintiffs' English-law claim] that weighs significantly against the exercise of jurisdiction and dismissal on grounds of *forum non conveniens*."  587 F.Supp.3d at 107 ("Aside from the broad contention that section 90A has not been extensively applied in England's courts, defendants do not point to additional public or private considerations that weigh in favor of" dismissal).  And as explained above, this District and the U.S. have a local interest in the outcome of this litigation.

Finally, the Court should reject Defendants' bid to dismiss Plaintiffs' Exchange Act claims under *forum non conveniens*.  In addition to the strong interest of the U.S. in enforcing the federal-securities laws, *see DiRienzo*, 294 F.3d at 33, and the strong connections this action has with this District and the U.S., Reckitt's own forum-selection clause mandates that any lawsuit brought by ADS purchasers against the Company "may only be instituted in a state or federal court in New York, New York," and ADS holders "irrevocably submit[] to the *exclusive jurisdiction* of such courts in any such suit, action or proceeding."  Ex. 8 at PDF pgs. 13-14.  Thus, English courts would refuse to accept Plaintiffs' Exchange Act claims due to the clause.  *See* Levy Decl. ¶¶51-52.

Because the Exchange Act claims must proceed here, there is no efficiency or convenience to be gained by splitting the claims.  Pursuing the English-law claim abroad would be a waste of resources for all parties, including the Court's.  *See, e.g., Jackson Cnty. Emps.' Ret. Sys. v. Ghosn*, 510 F.Supp.3d 583, 600-01 (M.D. Tenn. 2020).  Indeed, according to the Levy Declaration, an English court would decline jurisdiction over the English-law claim, "given the obvious risk of conflicting decisions."  Levy Decl. ¶¶4(j), 53.

### 2. Plaintiffs State a Claim for Dishonest Delay Under English Law

Defendants contend that Plaintiffs do not identify the source of any obligation to disclose information regarding NEC causation. MTD at 26. As explained in the Levy Declaration, the obligation to disclose the elevated risk of NEC from bovine milk arose "under the Financial Conduct Authority's Disclosure and Transparency Rules ('DTR'), in particular: [a] DTR2, which imposes an obligation on issuers to announce as soon as possible any information that could affect the share price; and/or [b] DTR4, which imposes periodic financial reporting obligations (including reporting as to the principal risks and uncertainties facing the issuer)." Levy Decl. ¶19.

Defendants argue that Plaintiffs do not identify any information that Defendants withheld and subsequently published via a recognized information service such as the LSE's Regulatory News Service ("RNS"). MTD at 26. Yet the *Watson* verdict was announced by Reckitt itself via the RNS. *See* Ex. 25; *see also* Levy Decl. ¶25.[16] Although Plaintiffs satisfy this element,[17] Defendants claim the *Watson* and *Gill* verdicts do not suffice because they did not reveal new information. MTD at 26. But as explained above, these verdicts disclosed new information. *See supra* at 11-12, 23-25.

Defendants also contend that Plaintiffs fail to plead that a person discharging managerial responsibilities ("PDMR") acted dishonestly in delaying the publication of the allegedly concealed information. MTD at 26-27. Narasimhan, Durante, Licht, and Carr qualify as PDMRs. Levy

---

[16] Defendants wrongly assert the *Watson* verdict was not published by Reckitt via a recognized news service. MTD at 26.

[17] The issue of whether publication is a pre-requisite for liability under a dishonest-delay claim is in a state of flux under English law. *See* Levy Decl. ¶¶22-24. That issue, however, does not arise on the facts of this case. *Id*. ¶25.

Decl. ¶35. Levy further explained that, "if the primary allegations of fact set out in the Amended Complaint are held to be true, I would expect an English court…to have no difficulty in inferring that the Individual Defendants must be taken to have been aware that their conduct was dishonest to the requisite standard." *Id*. ¶42; *see also id*. ¶¶43-46.

Finally, Defendants argue Plaintiffs fail to plead a causal connection between the dishonest delay in publishing information and Plaintiffs' losses. MTD at 27. However, the effect of the announcement of the verdicts on the markets is alleged in the Complaint. *Supra* at 23; Levy Decl. ¶¶47-49. Accordingly, Plaintiffs adequately plead a dishonest-delay claim under English law.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.[18]

DATED:  February 17, 2026                    ROBBINS GELLER RUDMAN
                                               & DOWD LLP
                                             SAMUEL H. RUDMAN
                                             ALAN I. ELLMAN
                                             MARIO ALBA JR.
                                             JASON EDELMAN


                                                    */s/ Alan I. Ellman*
                                             ALAN I. ELLMAN

                                             58 South Service Road, Suite 200
                                             Melville, NY  11747
                                             Telephone:  631/367-7100
                                             631/367-1173 (fax)
                                             srudman@rgrdlaw.com
                                             aellman@rgrdlaw.com
                                             malba@rgrdlaw.com
                                             jedelman@rgrdlaw.com

---

[18]   Should the Court find the Complaint to be deficient in any respect, Plaintiffs respectfully request leave to amend. *See Barron v. Helbiz, Inc.*, 2021 WL 4519887, at *3 (2d Cir. Oct. 4, 2021).

- 30 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
CRISTELLE RABBAN
ALYSSA PLASCOFF
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100
crabban@rgrdlaw.com
aplascoff@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

PITTA LLP
VINCENT F. PITTA
120 Broadway, 28th Floor
New York, NY  10271
Telephone:  212/652-3890
vpitta@pittalaw.com


*Additional Counsel*

## **LOCAL RULE 7.1(C) CERTIFICATE**

Pursuant to Local Rule 7.1(c), the undersigned counsel certifies that the foregoing brief was prepared on a computer using Microsoft Word.  The total number of words in the brief, inclusive of point headings and footnotes and exclusive of the caption, table of contents, table of authorities, signature block, and this Certification, is 8737 words.  By operation of Microsoft Word's word count function, this number includes legal citations, numerical information, and certain forms of punctuation.



*/s/ Alan I. Ellman*
ALAN I. ELLMAN