**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re RECKITT BENCKISER GROUP PLC SECURITIES LITIGATION | No. 1:25-cv-04708-JPC-SDA <br><br> <u>CLASS ACTION</u> |

**DECLARATION OF ROBERT STUART LEVY KC IN OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS**

I, Robert Stuart Levy KC, LLB, LLM (Cantab) make this declaration pursuant to 28 U.S.C. §1746 and, under penalty of perjury, state as follows:

## I.  INTRODUCTION

1.  I am a barrister practising from 3 Stone Buildings, Lincoln's Inn, London WC2A 3X, United Kingdom. I was called to the Bar of England and Wales in 1988 and have been in continuous practice at the English Bar since 1990. I was appointed Queen's Counsel (now King's Counsel) in 2010. Throughout my career, I have regularly appeared before the courts of England and Wales at all levels. My principal areas of practice are company, insolvency, and commercial law.

2.  I have also been called to the Bar, and have regularly appeared in the courts, of a number of other common law jurisdictions including the British Virgin Islands, the Cayman Islands (on an *ad hoc* basis for tens of cases as general admission to the Bar there is not possible (in broad terms) for non-Cayman Islands residents), Anguilla, and St. Vincent and the Grenadines. Further, since May 2023, I have been appointed three times by the Judicial and Legal Services Commission of the Eastern Caribbean Supreme Court to sit as an acting Justice of Appeal of the Eastern Caribbean Court of Appeal, and have sat in that court hearing appeals (principally appeals from the Commercial Division of the High Court in the British Virgin Islands). I have written a number of judgments (in which the other Justices of Appeal concurred). I have been invited to sit on other occasions, but other commitments have prevented me from doing so.

3.  I have been asked by the Plaintiffs' attorneys, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), to comment on the declaration of Professor Paul Davies KC (Hon.), FBA dated 18 December 2025 in support of the Defendants' Motion to Dismiss (the "Davies Declaration") which considers certain questions of English law, namely:

    a.  the legal elements, required proof and damages for a "dishonest delay" claim under section 90A and Schedule 10A, §5 of the UK Financial Services and Markets Act 2000 ("FSMA"); and

1

b. whether the Plaintiffs' claims in the Amended Complaint for Violations of the Federal Securities Laws dated 20 October 2025 (the "Amended Complaint") may be brought before the English courts.

4. In summary, my conclusions are as follows:

a. While undoubtedly relevant, the reports relied upon by Professor Davies, and the official report of debates in Parliament, would not be treated by an English court as being capable of controlling the meaning of the relevant provisions of FSMA, nor would an English court in my view construe the wording of those provisions with a predisposition to limit their scope as much as possible.

b. While generally speaking I agree with Professor Davies' summary of the ingredients of liability under §5 of Schedule 10A, I do not agree that, by its very nature, a claim under §5 concerns information which the issuer was under an obligation to disclose.

c. Alternatively, if it is a prerequisite for liability under §5 of Schedule 10A that the issuer had an obligation to publish the relevant information, such an obligation would appear to have existed on the facts of this case under the Financial Conduct Authority's Disclosure and Transparency Rules.

d. I do not agree with Professor Davies' view that the claim under §5 of Schedule 10A is inadequately pleaded in the Amended Complaint.

e. There is a division in the authorities on whether it is necessary, in order to establish liability under §5, to show that publication of the relevant information has occurred, albeit belatedly. Insofar as this is a requirement, I consider it well-arguable that the announcement made by Reckitt via the London Stock Exchange's RNS on 15 March 2024 in relation to the *Watson* case satisfies that requirement.

f. I agree with Professor Davies that the term a *"person discharging managerial responsibilities"* covers *de jure, de facto* and shadow directors of the issuer, but not other senior executives. It would appear that all but one of the Individual Defendants were *de jure* directors of Reckitt for at least part of the Class Period.

2

g.  Insofar as Professor Davies considers that a higher than usual standard of proof applies to allegations of dishonesty under English law, I do not agree. Like any other allegation in civil proceedings before the English courts, an allegation of dishonesty is determined on the simple balance of probabilities.

h.  If the primary allegations of fact pleaded in the Amended Complaint are true, I would expect an English court to have no difficulty in inferring that the Individual Defendants must be taken to have been aware that their conduct was dishonest within the meaning of §6 of Schedule 10A.

i.  I agree with Professor Davies that, in order to succeed on their claim under §5 of Schedule 10A, the Plaintiffs need to demonstrate a causal connection between the alleged delay in publishing the relevant information and the alleged losses. I also agree that this causal connection has to be pleaded. I consider that such a connection is adequately pleaded in the Amended Complaint.

j.  I agree with Professor Davies that the English courts would have jurisdiction to entertain a claim by the Plaintiffs against Reckitt arising out of the facts set out in the Amended Complaint under §§3 and 5 of Schedule 10A. However, if, as appears to be the case, the Plaintiffs are contractually bound to litigate their claims relating to the American Depositary Shares ("ADSs") in the New York courts (being the court with exclusive jurisdiction pursuant to the terms governing the ADSs), I consider that the English court would decline jurisdiction over those claims and also over the claims relating to the ordinary shares, given the obvious risk of conflicting decisions.

5.  I understand that my role is to give my honest and independent opinion to the U.S. District Court, and I have done so. I confirm that my remuneration is not in any way contingent upon my findings, any testimony I may give, or the outcome of this matter.

6.  In preparing this Declaration, I have considered the following documents provided to me by Robbins Geller:

a.  The Amended Complaint dated 20 October 2025;

3

b. The Defendants' memorandum of law in support of their motion to dismiss the Amended Complaint dated 19 December 2025;

c. The Davies Declaration dated 18 December 2025;

d. Amendment No.1 to Amended and Restated Deposit Agreement among Reckitt Benckiser Group PLC, JP Morgan Chase Bank, N.A. as Depository and Holders of American Depositary Receipts; and

e. A copy of the announcement concerning the verdict in the *Watson* case made by Reckitt via the London Stock Exchange's RNS on 15 March 2024.

7. I reserve the right to amend or supplement this Declaration based on further information being made available to me, including as a result of subsequent discovery taken in this matter.

## II. RELEVANCE OF THE LEGISLATIVE HISTORY

8. In §§6-14 of the Davies Declaration, Professor Davies summarises the legislative history of the provisions relating to the liability of issuers for misstatements to the market contained in section 90A and Schedule 10A of FSMA. Such summaries may be found in §§432 – 445 of the judgment of Hildyard J in *ACL Netherlands BV & Ors v Lynch & Anr* [2022] EWHC 1178 (Ch) and §§43 – 60 of the judgment of Leech J in *Allianz Funds Multi-Strategy Trust v Barclays Bank plc* [2024] EWHC 2710 (Ch).

9. As to the relevance of the legislative history, it is important to note the following:

a. It is now generally accepted that, where legislation is introduced to give effect to official reports containing proposals for law reform (such as the reports produced by Professor Davies on misstatements to the market and the subsequent consultation carried out by the Treasury[1]), such reports may be relied upon before the English courts, at least for the purpose of determining the context or the mischief at which the legislation is aimed.[2]

---

[1] See §10 of the Davies Declaration.
[2] See *Bennion on Statutory Interpretation* (9th edition) at §24.9.

b.  What is more controversial is the extent to which official reports may be used as an aid to ascertaining the meaning of the words used in a statute. For example, in *Black-Cawson International Ltd v Papierwerke Waldhof-Aschaffenberg AG* [1975] AC 591 the House of Lords[3] unanimously held that a Parliamentary committee report could be relied upon as evidence of the mischief which a particular statutory provision was intended to cure, but was divided on whether the report could be relied upon to ascertain the meaning of the words used.[4] What seems clear is that a report should not be relied upon to alter the clear meaning of a provision of a statute because that would undermine the need for legal certainty.

c.  Under the so-called rule in *Pepper v Hart* [1993] AC 593 a court may have regard to the official report of debates in Parliament (known as Hansard) on a Bill for the purpose of ascertaining the meaning of a provision of the resulting Act only where (i) the provision is ambiguous or obscure, or leads to an absurdity, (ii) a statement as to the meaning of the provision is made by or on behalf of a minister or other promoter of the Bill, and (iii) the statement is clear.

d.  Even if these three conditions are satisfied, the weight to be attached to the statement is a matter for the court. Statements of ministers cannot control the meaning of an Act of Parliament; this is a matter for the court to determine.[5]

10.  Accordingly, while undoubtedly relevant, none of the materials cited by Professor Davies in §§6 – 13 of the Davies Declaration would be treated by an English court as being capable of controlling the meaning of the relevant provisions of FSMA, nor would an English court in my view construe the wording of those provisions with a predisposition to limit their scope as much as possible. The most that could be said (as Hildyard J did in *Lynch* (at §445)) is that the relevant provisions should not be construed in a way which exposes public companies and their shareholders to unreasonably wide

---

[3] The Judicial Committee of the House of Lords was the United Kingdom's apex court until the establishment of the Supreme Court of the United Kingdom in 2009.

[4] A majority of their Lordships held that, whilst regard could be had to the statement in the report identifying the mischief aimed at and the earlier state of the law, it was not possible to take into account the committee's recommendations or its comments on the draft Bill (see *Black -Cawson* at 592 F-G, 614 D-F, 629 C-D, and 638 F-H).

[5] See, e.g., *R v Secretary of State for the Environment, Transport and the Regions, ex p Spath Holme Ltd* [2001] 2 AC 349 per Lord Nicholls at 399; *Wilson v First County Trust Ltd* [2004] 1 AC 816 per Lord Nicholls at §58.

liability. That, however, seems to me to be of limited assistance in determining the precise scope of the provisions. It is difficult to see why Parliament would ever want to create a statutory liability which is unreasonably wide in its scope.

## III. SUMMARY OF THE RELEVANT LEGAL STANDARDS

11. I agree with Professor Davies' summary in §§15 – 17 of the Davies Declaration of the matters which a claimant needs to establish in order to succeed on a claim against an issuer pursuant to §§3 and 5 of Schedule 10A of FSMA, save that:

    a. §§3 and 5 apply not only to securities admitted to trading on a market in the United Kingdom, but also where the United Kingdom is the issuer's home state (regardless of the location of the market): see §1(2) of Schedule 10A.

    b. For the reasons set out below, I do not agree with the statement in §16 that a dishonest delay claim concerns the failure to publish information *when required to do so*.

## IV. COUNT III OF THE AMENDED COMPLAINT

12. As Professor Davies notes, Count III of the Amended Complaint[6] is based solely on §5 of Schedule 10A, which imposes liability on an issuer of securities to which Schedule 10A applies for dishonest delay in publishing information. It provides as follows:

    "5(1) An issuer of securities to which this Schedule applies is liable to pay compensation to a person who—

    (a) acquires, continues to hold or disposes of the securities, and

    (b) suffers loss in respect of the securities as a result of delay by the issuer in publishing information to which this Schedule applies.

    (2) The issuer is liable only if a person discharging managerial responsibilities within the issuer acted dishonestly in delaying the publication of the information."

---

[6] See §§223 – 232 of the Amended Complaint.

13. In §19 of the Davies Declaration, Professor Davies expresses the view that the Plaintiffs have not particularised their claim under §5 in detail, but simply refer back to the allegations in the preceding paragraphs, and that it is often "not clear how these allegations map onto a complaint of delay in making statements to the market under paragraph 5 as opposed to a complaint of making inaccurate ones."

14. I do not share that view. §223 of the Amended Complaint repeats the allegations contained in the preceding paragraphs by reference. The gravamen of those allegations is that Reckitt was aware that bovine-based pre-term formula carried a materially elevated NEC risk relative to human milk, and that it both misrepresented the existence of that risk to, and concealed it from, the market. If those allegations are true, I do not see why Reckitt's conduct could not properly be characterised as a delay by it in publishing information to the market, so as potentially to engage §5 of Schedule 10A. The key point is that Reckitt knew about the risk (it is said), but did not tell the market (at least not until it made an announcement following the *Watson* verdict).

*(a)    Duty to disclose*

15. In §§23 – 25 of the Davies Declaration, Professor Davies expresses the view that, by its very nature, a dishonest delay claim concerns information which the issuer was under an obligation to disclose but delayed in doing so. He argues that, unless there is a rule establishing when disclosure should have been made, it is not possible to know whether a disclosure is late.

16. This view, however, appears to be contradicted by §2 of Schedule 10A, which defines the information to which the provisions of Schedule 10A apply. §2(1) provides that Schedule 10A *"applies to information published by the issuer of securities to which this Schedule applies (a) by recognised means, or (b) by other means where the availability of the information has been announced by the issuer by recognised means"*. Importantly, §2(2) then goes on to say that *"it is immaterial whether the information is required to be published (by a recognised means or otherwise)."*

17. It seems to me that the effect of §2(2) of Schedule 10A is that liability under §5 can arise regardless of whether the information which the issuer delayed in publishing was information which it was required to publish. If the issuer could have published the

information earlier than it did, and the delay in publication causes loss to a person who acquires, continues to hold or disposes of the issuer's securities, then the issuer is liable to pay compensation to that person, provided that the dishonesty requirement in §5(2) is satisfied.

18. However, even if Professor Davies is right that it is an essential ingredient of liability under §5 that the information which the issuer delayed in disclosing was information which it was required to disclose, the Plaintiffs plead in §226 of the Amended Complaint that

> *"Reckitt had an obligation under English law to publish and not to dishonestly delay publication of the truth about the matters concerning its infant formula for premature infants, NEC, and the legal, financial, and reputational risks to the Company arising from the link between its formula and NEC that it misrepresented or concealed, as alleged in this Complaint."*

19. As Professor Davies observes, the Amended Complaint does not identify what provisions of English law give rise to the obligation to disclose. I consider, however, that, if it is right that Reckitt was aware of the existence of an elevated risk of NEC through use of its infant formula products, an obligation to disclose that information, and the associated legal, financial and reputational risks to Reckitt, would have arisen under the Financial Conduct Authority's Disclosure and Transparency Rules ("DTR"),[7] in particular:

   a. DTR2, which imposes an obligation on issuers to announce as soon as possible any information that could affect the share price; and/or

   b. DTR4, which imposes periodic financial reporting obligations (including reporting as to the principal risks and uncertainties facing the issuer).

20. Whilst it is beyond the remit of my expertise to reach any conclusions on such matters, it nonetheless occurs to me that, *prima facie*, the existence of an elevated risk of NEC through use of Reckitt's infant formula products was information that could affect

---

[7] The DTR were made pursuant to section 89A of FSMA which confers a power on the FCA (the UK equivalent of the SEC), inter alia, to make rules imposing requirements in relation to the disclosure of periodic or ongoing information about issuers whose securities are admitted to trading on a regulated market.

Reckitt's share price; absent any other explanation, this appears to be demonstrated by the movements in the share price following the handing down of the verdict in the *Watson* case (in which I understand the jury held that a causal link existed) on 13 March 2024. According to §158 of the Amended Complaint, Reckitt's ADS fell 14.7% and its ordinary shares fell 14.8% between 13 March and 15 March 2024. Further, I note that Reckitt itself issued an announcement about the verdict to the market via the London Stock Exchange's RNS on 15 March 2024,[8] which indicates that it considered that the disclosure obligation under DTR2 had been triggered.

  (b)  *The subsequent disclosure point*

21. I agree with Professor Davies[9] that it is not necessary, in order to establish liability under §5 of Schedule 10A, to show that the issuer published information which contained misleading statements or omissions, but that the publication of such information may assist in demonstrating that the issuer dishonestly held back information. That, in substance, is what I understand Reckitt is alleged to have done in the Amended Complaint.

22. As Professor Davies notes in §§28 and 48 – 58 of the Davies Declaration, there is a division in the authorities on the question whether it is necessary, in order to establish liability under §5, to show that publication of the relevant information has occurred, albeit belatedly. There are currently two decisions of the High Court which consider this question. In *Allianz Funds Multi-Strategy Trust v Barclays Bank plc*, supra, Leech J concluded that §5 of Schedule 10A only imposes liability on an issuer of securities where publication of the relevant information has occurred by recognised means. As the claimants in that case did not allege that this had occurred, their claims were struck out.[10] By contrast, in *Persons identified in Schedule 1 v Standard Chartered Plc* [2025] EWHC 698 (Ch) Green J expressed doubts about the correctness of Leech J's conclusion in *Allianz* that publication was a pre-requisite for liability under §5 and

---

[8] §98 of the Amended Complaint. This paragraph does not state, in terms, that the announcement was made via the London Stock Exchange's RNS, but I have been provided with a copy of the announcement which shows that it was an RNS announcement.
[9] See §26 of the Davies Declaration.
[10] See §§134 – 145 of his judgment.

9

declined to strike out the claims under that paragraph.[11] Professor Davies briefly summarises these conflicting decisions in §§48 – 58 of the Davies Declaration.

23. The decision of Green J in the *Standard Chartered* case reflects the English courts' reluctance to dispose summarily of claims that concern a developing area of law. In such cases, it may be desirable that the disputed legal issues should be resolved on the basis of the actual facts as found at trial, rather than hypothetical facts: *Crossley v Volkswagen AG* [2023] 1 All ER (Comm) 107 at §15, cited by Leech J in the *Allianz* case at §96.

24. Accordingly, insofar as the issue of whether publication is a pre-requisite for liability under §5 of Schedule 10A arises on the facts of the present case, an English court would in my view regard the fact that the authorities on the issue are in a state of flux as a reason for allowing the case to go to trial.

25. However, whichever of Leech J or Green J is correct, in my view the issue does not arise on the facts of this case. As noted above, on 15 March 2024 Reckitt announced to the market via the London Stock Exchange's RNS that the jury in the *Watson* case had found against Mead Johnson and awarded Ms Watson damages. It seems to me well-arguable that an announcement to the market via RNS that a court had found that there was a causal link between Mead Johnson's infant formula and NEC is sufficient to satisfy any publication requirement in §5 (if such a requirement exists). The existence of such a link is the information which Reckitt is alleged to have delayed publishing.

26. Professor Davies refers to the 15 March 2024 announcement only briefly in footnote 4 of the Davies Declaration. He comments, however, that it is not alleged in the Amended Complaint that the announcement was made to the market via RNS, and that it cannot in any event be a delayed disclosure for a §5 claim because the Plaintiffs allege the statement was false and misleading.

27. As to the first point, it is right to say that the Amended Complaint does not state, in terms, that the 15 March 2024 announcement was made via RNS. However, it seems clear from the copy of the announcement provided to me (which I assume Professor

---

[11] See §§91 – 120 of his judgment.

10

Davies has not seen, albeit that it is freely available by way of an internet search)[12] that the announcement was made via the London Stock Exchange's RNS.

28. As to the second point, I do not consider that it is relevant that Reckitt stated in its announcement that it disagreed with the jury's decision in the *Watson* case and that it continued to believe that the allegations in the case were not supported by the science, or that the Plaintiffs allege in the Amended Complaint (at §100) that these statements were false and misleading. In my view, what matters for the purposes of liability under §5 of Schedule 10A is that Reckitt announced to the market on 15 March 2024 via RNS the existence of the verdict in the *Watson* case which found that the science did support the existence of a causal link between bovine infant formula and NEC. The Plaintiffs do not allege that this statement was false and misleading (quite the opposite). It is not obvious to me why the fact that the announcement of the verdict was accompanied by commentary which the Plaintiffs allege was false and misleading should make a difference.

(c)  *The PDMR point*

29. An issuer is only liable for losses caused by the delayed publication of information under §5 of Schedule 10A if *"a person discharging managerial responsibilities within the issuer acted dishonestly in delaying the publication of the information"*: see §5(2).

30. §8(5) of Schedule 10A defines a *"person discharging managerial responsibilities"* within an issuer (a "PDMR") as

> "(a)    *any director of the issuer (or person occupying the position of director, by whatever name called);*
>
> (b)    *in the case of an issuer whose affairs are managed by its members, any member of the issuer;*
>
> (c)    *in the case of an issuer that has no persons within paragraph (a) or (b), any senior executive of the issuer having responsibilities in relation to the information in question or its publication."*

---

[12] https://www.londonstockexchange.com/news-article/RKT/statement-re-nec-litigation/16380777

31. As Reckitt is a public limited company with a board of directors, it is necessary for the Plaintiffs to establish that at least one of its directors (or a person occupying the position of a director by whatever name called) acted dishonestly in delaying the publication of the relevant information. This raises the question "who is a director"?

32. Section 417(1) of FSMA contains a definition of the word "director" for the purposes of the Act. It provides that

> *"a director, in relation to a body corporate, includes –*
>> *(a) a person occupying in relation to it the position of a director (by whatever name called); and*
>> *(b) a person in accordance with whose directions or instructions (not being advice given in a professional capacity) the directors of that body are accustomed to act."*

33. The first limb of the definition would include both *de jure* directors, i.e., persons formally appointed to the board of a company, and *de facto* directors, i.e., persons who are not formally appointed to the board of a company, but who undertake acts or functions such as to suggest that their remit to act in relation to the management of the company is the same as if they were formally appointed to the board.[13] The second limb of the definition describes what is known as a *"shadow"* director, i.e., an individual who is effectively pulling the strings behind the scenes.[14]

34. I agree with Professor Davies that the definition of a PDMR in §8(5) of Schedule 10A does not extend to senior executives of an issuer who are not *de jure*, *de facto* or shadow directors of the issuer, even if the word "director" appears in their job title. That was also the conclusion reached by Miles J (now Miles LJ) in *Allianz Global Investors GmbH & Ors v G4S Ltd* [2022] Bus LR 556, although it is worth noting that Miles J did express the view (in §180 of his judgment) that *"there is some potential for elasticity in the application of the concept of a de facto directorship in light of the*

---

[13] See *Secretary of State for Business, Innovation and Skills v Chohan* [2013] Lloyd's Rep FC 351 in which Hildyard J listed (at §41) ten characteristics relevant to the question of whether a person is a *de facto* director (which is an intensely fact-sensitive question).

[14] The language in section 417(1)(b) is similar to the language of section 251(1) of the English Companies Act 2006 which, in relation to a company, defines a "shadow director" as "a person in accordance with whose directions or instructions the directors of the company are accustomed to act."  Section 251(2) contains an exclusion for persons offering professional advice to the company.

*purposes of the statute."* He regarded this as a reason to consider the application of the concept of a *de facto* director on facts as found at trial, rather than striking out the claimants' claims. It would appear therefore that the test for treating someone as a *de facto* director may be somewhat lower in delayed publication claims under §5 than it is otherwise.

35. Turning to the facts of the present case, I am instructed that the UK register of companies shows that all of the Individual Defendants apart from Mr Sly were *de jure* directors of Reckitt for at least part of the Class Period:

    a.  Mr Laxman Narasimhan was appointed as a director on 16 July 2019 and resigned on 30 September 2022;

    b.  Mr Nicandro Durante was appointed as a director on 1 December 2013 and resigned on 31 December 2023;

    c.  Mr Kristoffer Licht was appointed as a director on 1 June 2023 and is still a director; and

    d.  Mr Jeffrey Carr was appointed as a director on 9 April 2020 and resigned on 31 March 2024.

36. If the Plaintiffs are able to establish that any of these Defendants acted dishonestly (in the relevant sense, as to which, see below) in delaying the publication of the relevant information (i.e., the existence of an elevated risk of NEC through use of bovine formula), the requirement in §5(2) of Schedule 10A would be satisfied.

37. I also agree with Professor Davies that, on the facts stated in the Amended Complaint, Dr Christina Valentine does not appear to have been a PDMR at the relevant times. Her knowledge would therefore not be directly attributable to Reckitt for the purposes of liability under §5. However, given her senior position within Reckitt as Medical Director of North America and later Chief Medical Officer, it does not seem unreasonable to suppose that she would have shared her knowledge about a link between bovine formula and NEC with members of Reckitt's board. That, however, will be a matter for evidence at trial.

13

(d)    *Dishonesty*

38.  The test for dishonesty to be applied in delay claims under §5 of Schedule 10A is set out in §6 of that Schedule. This provides that:

> *...a person's conduct is regarded as dishonest if (and only if) –*
>
> (a)    *it is regarded as dishonest by persons who regularly trade on the securities market in question, and*
>
> (b)    *the person was aware (or must be taken to have been aware) that it was so regarded."*

39. It will be readily apparent that there are two limbs to this test: an objective limb, i.e., is the conduct in question dishonest by the standards of people who regularly trade on the relevant market?; and a subjective limb, i.e., was the person in question aware of this (or must he/she be taken to have been aware)?

40. In §41 of the Davies Declaration, Professor Davies criticises the Plaintiffs' pleading on dishonesty in the Amended Complaint. He says that there is no guidance in the Amended Complaint *"about what views regular traders on the securities market took about the decisions of the Reckitt board."* He further criticises the Amended Complaint for not pointing to facts which might indicate that the Individual Defendants knew or must be taken to have known that regular traders regarded the conduct complained of as dishonest.

41. In my view, these criticisms are misplaced. As to the first point, the Amended Complaint pleads, in terms, in §228 that the delay in publishing the relevant information *"was regarded as dishonest by people who regularly trade on the securities market in question."* Whether that plea is correct or not will be a matter for evidence at trial. I assume that the Plaintiffs intend to adduce evidence from people who regularly trade on the relevant markets as to how Reckitt's alleged deliberate delay in announcing the existence of an elevated risk of NEC through use of its infant formula would be viewed. In England, a party is not required to plead evidence.

42. As to the second point, §229 of the Amended Complaint pleads that *"One or more of the Individual Defendants…were aware (or must be taken to have been aware) that such a delay was regarded as dishonest."* While it is true that no specific facts are

14

pleaded here that indicate such knowledge, §223 of the Amended Complaint repeats the allegations contained in the foregoing paragraphs (as previously noted). The nub of those allegations is that the Individual Defendants were aware that the weight of the scientific evidence supported the existence of an elevated risk of NEC through use of bovine formula, and that they deliberately set out to conceal this from the market. Such conduct seems to me to be plainly dishonest as that term is used in the Schedule; it would be surprising if people who regularly trade on the relevant securities market took a different view. Accordingly, if the primary allegations of fact set out in the Amended Complaint are held to be true, I would expect an English court (if this case were to be tried before it) to have no difficulty in inferring that the Individual Defendants must be taken to have been aware that their conduct was dishonest to the requisite standard.

43. It is worth noting that the Court of Appeal had to consider the requirements for pleading allegations of dishonesty in the context of claims under section 90A of FSMA in the *Standard Chartered Case*. In its decision[15] it held that there was no rule that a pleading had to disclose on its face a solid evidential foundation for any allegation of fraud or dishonesty made in it. The core requirement is that an allegation of fraud or dishonesty has been adequately particularised. Insofar as a claimant suggests that fraud or dishonesty is to be inferred, the onus is on him to plead primary facts such as to tilt the balance in favour of that inference, but even then the claimant does not need to detail the evidence with which he hoped to prove what he alleges. The Court of Appeal cautioned against imposing such onerous pleading requirements as to make it impractical to bring meritorious fraud claims, particularly given the limited information that might initially be available to a claimant.

44. In the present case, if the primary allegations of fact set out in the Amended Complaint are true, it seems to me that they would not merely tilt the balance in favour of inferring dishonesty on the part of the Individual Defendants; they would only be consistent with dishonesty.

45. In §42 of the Davies Declaration Professor Davies refers to the *"high bar to liability under UK law created by the term 'dishonesty.'"* It is not entirely clear to me what is meant by this. If it is intended to mean that a higher than usual standard of proof applies

---

[15] Reported at [2024] 1 WLR 4589.

to allegations of dishonesty under English law, I do not agree. Like any other allegation in civil proceedings before the English courts, an allegation of dishonesty is determined on the simple balance of probabilities. In *In Re B(Children) (Care Proceedings: Standard of Proof)* [2009] 1 AC 11 the House of Lords rejected the notion that the seriousness of the allegation or the seriousness of the consequences of a finding that the allegation is made out make any difference to the standard of proof to be applied in determining the facts. It held that there is no logical or necessary connection between seriousness and probability. The inherent probabilities are simply to be taken into account, where relevant, in deciding where the truth lies.

46. In my experience the decision of the House of Lords in *In Re B* is frequently cited and applied in commercial cases. English judges are by no means shy of making findings of dishonesty in such cases if such findings are, on the balance of probabilities, justified on the totality of the evidence. The *ACL v Lynch* case relied upon by Professor Davies is a good example of that. There are many others.

(e)   *Demonstration of losses*

47.  I agree with Professor Davies that, in order to succeed on their claim under §5 of Schedule 10A, the Plaintiffs need to demonstrate a causal connection between the alleged delay in publishing the relevant information and the alleged losses. I also agree that this causal connection has to be pleaded.

48. The issue of causation is addressed in §§230 – 231 of the Amended Complaint. What I understand those paragraphs to say is that, had Reckitt not delayed in publishing the relevant information (i.e., the existence of an elevated risk of NEC through use of its infant formula products) to the market, the Plaintiffs would either not have purchased their shares at all, or they would have purchased them at a lower price. While this is expressly in broad terms, it is nevertheless a plea of causation. Whether it is well-founded or not will be a matter for evidence at trial. As noted above, under English pleading rules it is not necessary to plead such evidence at this stage.

49. I would observe, however, that the effect of the announcement of the *Watson* and *Gill* verdicts on the markets pleaded in §§157 – 167 of the Amended Complaint appears to

provide some support for the allegation that the Plaintiffs would have paid less for their shares if the relevant information had been disclosed earlier.

## V. ENGLISH COURTS AS AN ALTERNATIVE FORUM

50. I agree with Professor Davies that the English courts would have jurisdiction to entertain a claim by the Plaintiffs against Reckitt arising out of the facts set out in the Amended Complaint under §§3 and 5 of Schedule 10A. §1(1) of Schedule 10A provides that the Schedule applies to securities that are traded on a securities market where the market is situated or operating in the United Kingdom, or the United Kingdom is the issuer's home state. Reckitt is incorporated in England and its ordinary shares are traded on the London Stock Exchange.

51. However, the fact that the English court has jurisdiction does not necessarily mean that it will take it. I am instructed that the ADSs acquired by the Plaintiffs on the OTC market in the United States are governed by terms and conditions which contain an exclusive jurisdiction clause in favour of the New York courts. I have been provided with a document entitled "Amendment No.1 to Amended and Restated Deposit Agreement among Reckitt Benckiser Group PLC, JP Morgan Chase Bank, N.A. as Depository and Holders of American Depositary Receipts." Attached to this (as Exhibit A) is the form of American Depository Receipt ("ADR") evidencing the ADSs. I am instructed that the terms set out in the form of ADR are binding as between the company and ADS holders. These terms include the following exclusive jurisdiction clause in paragraph 14:

> "By holding an ADS or an interest therein, Holders and owners of ADSs each irrevocably agree that any legal suit, action or proceeding against or involving the Company or the Depositary, arising out of or based upon the Deposit Agreement, the ADSs or the transactions contemplated herein, therein or hereby, may only be instituted in a state or federal court in New York, New York, and by holding an ADS or an interest therein each irrevocably waives any objection which it may now or hereafter have to the laying of venue of any such proceeding, and irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding."

17

52. Plainly, the proper construction of the above quoted provision is a matter of New York, rather than English law. However, on the basis of the information presently available to me, and on the assumption that paragraph 14 of the ADR creates a binding obligation on the holders of ADSs to bring any claims against Reckitt arising out of the matters set out in the Amended Complaint in the courts of New York, I cannot see any reason the English courts would not give effect to that obligation, and therefore they would decline to take jurisdiction over claims relating to the ADSs.

53. Further, if the claims relating to the ADSs are going to have to be litigated in New York in any event, I consider it likely that the English court would also decline to take jurisdiction over the claims relating to the ordinary shares (even though those claims are not, as far as I am aware, covered by an exclusive jurisdiction agreement in favour of another forum) to avoid the obvious risk of conflicting decisions.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Dated: 16 February 2026

_____
Robert Stuart Levy KC

18