**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re RECKITT BENCKISER GROUP PLC SECURITIES LITIGATION | No. 1:25-cv-04708-JPC-SDA<br><br>CLASS ACTION<br><br>**ORAL ARGUMENT REQUESTED** |

**REPLY IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

ARGUMENT ................................................................................................................................... 1

I.    The Opposition Confirms the Exchange Act Claims Fail (Counts I-II) ................................. 1

    A.    Plaintiffs Identify No False or Misleading Statement ................................................ 1

    B.    Plaintiffs Fail to Raise a "Strong Inference" of Scienter .......................................... 4

    C.    Plaintiffs Do Not Plausibly Allege Loss Causation ................................................... 6

II.   The Court Should Dismiss the FSMA Claim (Count III) ....................................................... 8

    A.    *Forum Non Conveniens* Dismissal is Warranted ...................................................... 8

    B.    The Complaint Fails to Plead the Required Elements of a FSMA Claim ................. 9

CONCLUSION ........................................................................................................................... 11

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*380544 Canada, Inc. v. Aspen Tech., Inc.*,
   544 F. Supp. 2d 199 (S.D.N.Y. 2008)...................................................................................5

*Aenergy, S.A. v. Republic of Angola*,
   2021 WL 1998725 (S.D.N.Y. May 19, 2021) .......................................................................9

*Bettis v. Aixtron SE*,
   2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016) .......................................................................2

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
   496 F. Supp. 3d 952 (E.D. Va. 2020) ...................................................................................7

*Castillo v. Dean Witter Discover & Co.*,
   1998 WL 342050 (S.D.N.Y. June 25, 1998) .........................................................................2

*City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*,
   683 F. Supp. 3d 120 (D. Mass. 2023) ...................................................................................7

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014).................................................................................................2

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
   587 F. Supp. 3d 56 (S.D.N.Y. 2022)....................................................................................8

*Fila v. Pingtan Marine Enter. Ltd.*,
   195 F. Supp. 3d 489 (S.D.N.Y. 2016)...................................................................................7

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)...................................................................................5

*Hall v. Johnson & Johnson*,
   2019 WL 7207491 (D.N.J. Dec. 27, 2019)...........................................................................7

*In re BHP Billiton Ltd. Sec. Litig.*,
   276 F. Supp. 3d (S.D.N.Y. 2017) .....................................................................................3, 4

*In re Dentsply Sirona, Inc. Sec. Litig.*,
   2026 WL 124581 (S.D.N.Y. Jan. 16, 2026) .........................................................................5

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
   2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ....................................................................11

*In re Genworth Fin. Inc. Sec. Litig.*,
   103 F. Supp. 3d 759 (E.D. Va. 2015) ....................................................................5

*In re GeoPharma, Inc. Sec. Litig.*,
   399 F. Supp. 2d 432 (S.D.N.Y. 2005)....................................................................2

*In Re Norfolk S. Corp. Bond/Note Sec. Litig.*,
   2026 WL 555420 (2d Cir. Feb. 27, 2026)..............................................................4

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)...................................................................................7

*In re PetroChina Co. Ltd. Sec. Litig.*,
   120 F. Supp. 3d 340 (S.D.N.Y. 2015)....................................................................6

*In re Teva Sec. Litig.*,
   512 F. Supp. 3d 321 (D. Conn. 2021).....................................................................9

*In re Uipath, Inc. Sec. Litig.*,
   2025 WL 2065093 (S.D.N.Y. Jul. 23, 2025) ..........................................................6

*Jackson Cnty. Emps.' Ret. Sys. v. Ghosn*,
   510 F. Supp. 3d 583 (M.D. Tenn. 2020).................................................................9

*Kleinman v. Elan Corp.*,
   706 F.3d 145 (2d Cir. 2013)...................................................................................2

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
   518 F. Supp. 3d 772 (S.D.N.Y. 2021).....................................................................4

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015).................................................................................................3

*Pitman v. Immunovant, Inc.*,
   2024 WL 964258 (E.D.N.Y. Feb. 15, 2024)............................................................5

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Can. Imperial Bank of Com.*,
   694 F. Supp. 2d 287 (S.D.N.Y. 2010)....................................................................6

*Resnik v. Swartz*,
   303 F.3d 147 (2d Cir. 2002)...................................................................................2

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*,
   2021 WL 4864421 (N.D. Cal. Oct. 19, 2021).........................................................7

**Statute**

15 U.S.C. § 78u-5 ...............................................................................................................3

## ARGUMENT

### I.    The Opposition Confirms the Exchange Act Claims Fail (Counts I-II)

#### A.    Plaintiffs Identify No False or Misleading Statement

The central thesis of the Complaint is that preterm formula causes NEC and that Defendants' statements were false and misleading because they did not confirm the purported causal relationship.  *E.g.*, ¶¶5-7, 100, 124, 150.  Defendants' opening brief showed that Plaintiffs' theory of causation is inconsistent with prevailing science.  *See* Mem. 1, 4 (FDA, CDC, NIH Consensus Statement stating "*[t]here is no conclusive evidence that preterm formula causes NEC*").  In response, Plaintiffs abandoned their causation theory.  Opp. 2 (arguing case "does not turn on whether preterm formula *causes* NEC").  Plaintiffs now argue that Defendants' statements were false and misleading for failing to disclose the *elevated risk* of NEC allegedly posed by preterm formula compared to human milk, which protects against NEC.  Opp. 10-16.  This fails to remedy the defects Defendants identified because it just repackages Plaintiffs' flawed causation theory and because Defendants had no duty to disclose that human milk is protective.  Plaintiffs' remaining arguments do not demonstrate that Defendants' statements were false or misleading.

*First*, Plaintiffs' theory that preterm formula "pose[s] a materially elevated risk of NEC" relies on the same faulty assumption as their abandoned causation theory.  *See, e.g.*, Opp. 1-2, 4-5, 10-12; Mem. 8-11.  Preterm formula cannot increase risk of NEC if it does not cause NEC.  It is thus not surprising that the Consensus Statement specifically rejects Plaintiffs' "elevated risk" theory.  *See* Ex. 15 at 1 ("Available evidence supports the hypothesis that *it is the absence of human milk – rather than exposure to formula – that is associated with an increase in the risk of NEC*."); *see also* Ex. 17 at iv, 15 (dedicated HHS NEC working group reached same conclusion).  At best, Plaintiffs allege a scientific disagreement about the cause of NEC, which

does not state a securities fraud claim. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 154 (2d Cir. 2013); Mem. 8.

*Second*, to the extent Plaintiffs argue in the absence of any viable causation theory that Defendants failed to disclose that human milk was protective against NEC, they identify no duty to disclose. *See Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) (omissions inactionable absent duty to disclose); Opp. 2, 10-11 (¶¶88-90, 94), 12 (¶¶104-07, 109, 111, 133, 136-37), 13-14 (¶¶115-20, 122-23), 14-15 (¶¶127-29), 16-17 (¶¶144-46). The law is clear: there is no duty to extol the virtues of a competing product if the issuer accurately represents its own. *See Castillo v. Dean Witter Discover & Co.*, 1998 WL 342050, at *8 (S.D.N.Y. June 25, 1998); *see also In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 448-49 (S.D.N.Y. 2005). The statements at issue were complete, accurate, and consistent with prevailing science. *See* Mem. 8-11. Moreover, the finding that human milk protects against NEC comes from public research that Defendants had no duty to disclose when discussing preterm formula. *See* Mem. 4-5, 11, 13, 16-17. Plaintiffs wrongly suggest that Defendants, by referencing public research, have presented a "truth-on-the-market" defense not ripe for adjudication. Opp. 11, 18 n.6. Defendants are instead relying on case law dismissing omissions claims premised on public information.[1] *See Bettis v. Aixtron SE*, 2016 WL 7468194, at *12-13 (S.D.N.Y. Dec. 20, 2016) ("a defendant may not be held liable for failing to disclose" information that is "readily accessible in the public domain"); Mem. 11.[2]

---

[1] Should the case proceed past the pleading stage, the same allegations regarding public NEC research support an affirmative defense of statute of limitations, which Defendants reserve the right to assert.

[2] Plaintiffs' other arguments concerning Defendants' alleged duty to disclose fail. First, Defendants had no duty to disclose alleged "manipulation" of data when marketing preterm formula to hospitals. *See* Opp. 13-14. Plaintiffs misconstrue NEC Litigation evidence, and there is no duty to accuse oneself of misconduct. *Compare* ¶¶71-72 (alleging Dr. Valentine revised presentation to doctors in effort to conceal NEC risk)*, with* Ex. 22 at 44:1-47:24 (testimony from Dr. Valentine that she revised presentation for accuracy); *see City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("companies do not have a duty to disclose uncharged, unadjudicated wrongdoing"). Second, Defendants likewise had no duty to supplement allegedly

*Finally*, Plaintiffs' remaining arguments concerning opinions, forward-looking statements, and puffery do not salvage their falsity allegations.

Plaintiffs have identified no actionable opinions.  Defendants demonstrated that the Complaint lacks plausible allegations that Defendants did not believe their opinions about preterm formula and NEC.  *See* Mem. 9-14 (¶¶ 98-99, 105, 130, 133, 139, 149, 152); *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183-86 (2015).  Plaintiffs' only response is that Defendants allegedly were aware of a "materially elevated risk of NEC" from formula.  Opp. 10-11.  This argument both fails because Defendants' opinions aligned with scientific consensus and because Plaintiffs only rely on publicly available sources.  *See supra* at 2.  And, to the extent Defendants were aware of research showing a higher incidence of NEC in formula-fed preterm infants, that research supports the view that human milk is protective and does not undermine Defendants' opinions.  *See* Mem. 9-11.

Plaintiffs fail to rebut that the bespeaks caution doctrine protects forward-looking statements in Reckitt's annual reports because the reports cautioned investors about the NEC Litigation.  Opp. 16-17; Mem. 13; ¶¶149, 151; Ex. 4 at 190.  Plaintiffs' arguments about the safe-harbor are inapposite because Reckitt is a foreign issuer.  15 U.S.C. § 78u-5; Opp. 16-17.

Plaintiffs have not shown that statements discussing "superior science," "#1 most trusted brand," and safety as a "#1 priority" are anything but puffery.  Opp. 13-14, 18 (¶¶96, 99, 102-111, 115-123, 133, 139).  Plaintiffs rely on *In re BHP Billiton Ltd. Securities Litigation* to argue that these statements are not puffery because Defendants repeated them to "assuage investor concerns," but there is no such blanket rule.  Opp. 13.  In fact, the court in *BHP*, which

---

"incomplete" statements about safety monitoring.  *See* Opp. 15.  Plaintiffs take issue with Reckitt's adverse event monitoring because it did not identify a causal relationship between NEC and preterm formula (¶¶75-76), but Reckitt's disclosure and process aligned with the prevailing view that there is no causal link.

concerned a securities fraud claim after a dam collapse, dismissed claims based on generic safety statements (*i.e.*, "safety is paramount") as "too general and/or aspirational to be actionable," regardless of repetition or purpose. *See* 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017). Plaintiffs challenge similarly inactionable statements. *See In Re Norfolk S. Corp. Bond/Note Sec. Litig.*, 2026 WL 555420, at *2 (2d Cir. Feb. 27, 2026) (statements concerning commitment to safety were puffery).

### B.    Plaintiffs Fail to Raise a "Strong Inference" of Scienter

Despite the Opposition's numerous pronouncements that Defendants acted recklessly, it does not identify any well-pleaded facts showing Defendants knew, had access to, or had a duty to monitor—but failed to check—contemporaneous information contradicting their public statements about preterm formula or NEC.[3]

Plaintiffs do not explain how information concerning the relative risk of NEC and preterm formula if known would have *contradicted* Defendants' statements or put them on notice that their public statements were inaccurate. *See* Opp. 19-21; *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 780-81 (S.D.N.Y. 2021) (dismissing complaint where allegations failed to specify how information in reports contradicted public statements). There was no contradiction here. While researchers have observed a higher incidence of NEC in formula-fed preterm infants, the medical consensus is that formula does not cause NEC and that human milk is protective. *See, e.g.*, ¶¶38-45; Ex. 15. And Reckitt never denied the protective effect of human milk. Plaintiffs' deliberate conflation of the concepts of preterm formula *causing* NEC or *increasing* the risk of NEC with the protective effect of human milk undermines

---

[3] Plaintiffs concede they have not pled motive. Opp. 18-22 & n.10. They offer no response to Defendants' arguments that "core operations" and "corporate scienter" are inapplicable, and they abandon the allegation that Defendants learned contradictory information through the NEC Litigation. *See* Mem. 18-20.

their position.  They are left to disagree with near consensus science and otherwise make no particularized scienter allegations.  *See Pitman v. Immunovant, Inc.*, 2024 WL 964258, at \*18-19 (E.D.N.Y. Feb. 15, 2024) ("disagreement as to the interpretation of scientific data is not a basis upon which scienter can be sufficient[ly] pled.")

Allegations that Reckitt considered acquiring human-milk-based formula companies or developing a human-milk-based product are similarly flawed.  Opp. 22.  To the extent this is relevant at all, at best, it supports the view that human milk is protective, not that preterm formula increases NEC risk.  *See* Mem. 18-19.  Moreover, that Reckitt did not ultimately pursue an acquisition undercuts any inference of scienter.  *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589 (S.D.N.Y. 2011) ("[C]onsistency between defendants' corporate activities and public statements will cut against the inference of scienter.").

Plaintiffs also impermissibly ask the Court to infer that the Individual Defendants had access to unspecified "scientific evidence" from "decades" of medical literature, undated adverse event reports, or internal presentations from attending committee meetings or by virtue of their role as CEO.  *See* Opp. 4, 7-8, 19-20.  Plaintiffs further urge the Court to infer that Dr. Valentine shared information about NEC risk with the Individual Defendants during committee meetings and that Robert Cleveland shared risk assessments of Enfamil with his supervisors Messrs. Sly and Licht.  Opp. 7-8, 20-21.  These allegations are merely varying attempts to plead scienter by status.  *See 380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 222 (S.D.N.Y. 2008) (allegations concerning defendant's "managerial status" insufficient to support strong inference).[4]

---

[4] *Dentsply Sirona* and *Genworth* concern defendants with access to specific information contradicting public statements.  *See* Opp. 21; *In re Dentsply Sirona, Inc. Sec. Litig.*, 2026 WL 124581, at \*19-20 (S.D.N.Y. Jan. 16, 2026) (scienter was adequately pled against executives with direct access to database showing patient injuries not reported to FDA); *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 785 (E.D. Va. 2015) (scienter was

Plaintiffs must allege specific documents containing information contradicting Defendants' public statements—they do not. *See In re UiPath, Inc. Sec. Litig*, 2025 WL 2065093, at *14 (S.D.N.Y. Jul. 23, 2025) (where "access to contrary facts" alleged, plaintiffs "must specifically identify the reports or statements containing this information"); *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 366-67 (S.D.N.Y. 2015) (plaintiffs must allege specific facts that defendants knew public statements were inaccurate).[5]  Plaintiffs' requested inference regarding Dr. Valentine is untethered to the Complaint, which nowhere alleges that she attended committee meetings, let alone interacted with the Individual Defendants.  *See, e.g.*, ¶¶53-54, 69-71, 76, 78; Mem. 19-20.  The argument concerning Mr. Cleveland is unavailing because the Complaint fails to allege that any risk assessments occurred and his testimony, if considered, does not suggest that any risk assessment contradicted Defendants' statements.  *See* ¶¶60, 79; Ex. 23 at 16:4-18:12.

### C.    Plaintiffs Do Not Plausibly Allege Loss Causation

Defendants' opening brief highlighted the illogic of Plaintiffs' loss causation allegations, which assert that the *Watson* and *Gill* verdicts revealed the "truth" about NEC risk to the market. Mem. 20-22.  In response, Plaintiffs assert that (1) price declines following trial verdicts sufficiently plead loss causation, (2) publicly available NEC research does not defeat loss causation, and (3) the *Gill* verdict corrected Defendants' statements about the *Watson* verdict. Opp. 22-25.  As to the first point, Plaintiffs' position relies on out-of-circuit cases that either are

---

adequately pled against defendants personally involved in reviewing allegedly misleading information).

[5] Plaintiffs attempt to distinguish *UiPath* by arguing that the Complaint alleges "specific studies and data, conducted and/or possessed by the Company" whereas the *UiPath* plaintiffs failed to allege any internal report contradicting public statements.  Opp. 21 n.9. Tellingly, Plaintiffs do not identify any contradictory "studies and data" with specificity.  *See Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 299-300 (S.D.N.Y. 2010) (rejecting "broad reference to raw data" as sufficient for scienter).

distinguishable because they concern verdicts that corrected statements about litigation risk[6] or support Defendants' arguments that to be corrective, disclosures must reveal "new" information.[7] *See* Opp. 23-24.  In this Circuit, a corrective disclosure must "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged," which the Complaint fails to do.  *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511-13 (2d Cir. 2010).  As to the second point, Plaintiffs do not contest that NEC research was public but assert that it cannot defeat loss causation because the market allegedly did not understand it.  Opp. 24-25.  This argument is at odds with the Complaint,[8] and Plaintiffs cite no law supporting it or the underlying assumption that Defendants had a duty to explain NEC research to the market (they did not).  *See Omnicom*, 597 F.3d at 511-13; *Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 496-97 (S.D.N.Y. 2016) (rejecting as outdated argument that corrective disclosures can be based on poorly disseminated public information).  As to the third point, the *Gill* verdict was not corrective of Defendants' statements concerning *Watson* for similar reasons—information about NEC risk was publicly known.  The *Gill* verdict was at best a materialization of a previously disclosed risk.  Mem. 22.[9]

---

[6] *See Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2021 WL 4864421, at *4-5, *7 (N.D. Cal. Oct. 19, 2021) (adverse products liability verdict corrected statements concerning due diligence and assessment of litigation risk); *City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*, 683 F. Supp. 3d 120, 136-37 (D. Mass. 2023) (adverse trade secret misappropriation verdict corrected statement that case was "without merit" and denials of misappropriation).

[7] *See Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 969-70 & n.18 (E.D. Va. 2020) (detailed factual order with new information was corrective disclosure rather than verdict with "minimal factual findings"); *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *27 n.8 (D.N.J. Dec. 27, 2019) (jury verdict "may have been a corrective disclosure" to the extent it "contained new information" that revealed the allegedly falsity of defendants' statements).

[8] Plaintiffs similarly argue that public NEC research is akin to "public but unproven allegations" that could not be credibly relied upon before a verdict.  Opp. 25.  The Complaint treats the same research as fact.  *See, e.g.*, ¶51 (alleging "weight of scientific evidence" supports conclusion that formula increases NEC risk).

[9] Plaintiffs take issue with Defendants' reference to MDL cases resolved on summary judgment but cannot refute that Abbott has won summary judgment on causation.  Opp. 24; *see* Ellman Decl. Ex. 24 at 12.

## II.    The Court Should Dismiss the FSMA Claim (Count III)

### A.    *Forum Non Conveniens* Dismissal Is Warranted

Plaintiffs do not dispute that England is a suitable alternative forum here, nor that this Court may disturb their selected forum if the balance of private and public interests strongly favors England.  *See* Opp. 26-28.  Here, they do because this case concerns unsettled questions of foreign law.  Plaintiffs have no basis to assert that the legal standards governing a dishonest delay claim are "well-established."  *See* Opp. 28.  No dishonest delay claim has been tried, and English judges evaluating these claims on the pleadings applied differing approaches.  *See* Davies ¶¶48, 51-58.  Plaintiffs' foreign law expert confirms that "authorities … are in a state of flux" and takes legal positions that underscore the presence of numerous "novel, unresolved issue[s] … that weigh[] significantly against the exercise of jurisdiction."  *See* Levy ¶24; *contra City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 107 (S.D.N.Y. 2022).[10]  These unresolved issues have broad policy implications and most prominently include whether a dishonest delay claim requires a subsequent publication.  *See* Davies ¶¶26-28 (observing "division in the English courts" on issue of subsequent publication); Levy ¶¶21-24 (concurring that "there is a division of authorities" on issue of subsequent publication); *see also* Davies ¶¶ 48-58 (describing competing English decisions).  Plaintiffs argue that a dispute over subsequent publication does not arise on these facts because any such requirement was allegedly met by the *Watson* verdict, but that is precisely the sort of legal determination an English court should make given the unsettled law.  *See* Opp. 28-29; Levy ¶25.

---

[10] *Reckitt*'s rejection of a *forum non conveniens* dismissal is limited to the facts of that case, which did not involve a dishonest delay claim and, in any event, pre-dates by several years the relevant decisions by English courts creating ambiguity on the scope of liability for dishonest delay.  *See* Opp. 28; 587 F. Supp. 3d at 107; Davies ¶ 24, 28, 48-58.

The presence of some Defendants and certain evidence in the U.S. does not change that this case is about a stock listing on an English exchange and primarily involves people and events in England.  *See* Mem. 23-24; Opp. 27.[11]  Nor is this a "local" controversy because Plaintiffs are in New York.  *See Aenergy, S.A. v. Republic of Angola*, 2021 WL 1998725, at *9 (S.D.N.Y. May 19, 2021) (courts are unsympathetic to Americans "who conduct business in foreign lands and later try to cry foul here").

Finally, the Deposit Agreement undermines Plaintiffs' speculation that an English court would decline jurisdiction to keep ADS claims here.  *See* Opp. 28; Mem. 25; Levy ¶¶51-53. While the Deposit Agreement requires ADS "owners," who could be located anywhere, to bring lawsuits concerning the ADSs in New York, it does not bargain away Reckitt's ability to transfer such suits under *forum non conveniens*.[12]

**B.      The Complaint Fails to Plead the Required Elements of a FSMA Claim**

The Opposition and Levy Declaration demonstrate that the Complaint fails to allege a viable dishonest delay claim under FSMA.

With regard to the delay element, the parties dispute through their experts whether a duty to disclose is a prerequisite to liability.  *See* Levy ¶17; Davies ¶¶23-25.  Levy's argument that no duty to disclose is required diverges from the Complaint, which alleges that "Reckitt had an obligation under English law to publish … the truth about" NEC.  ¶226.  Levy's alternative argument that certain statutory provisions triggered a duty to disclose is an improper attempt to

---

[11] *In re Teva Securities Litigation* (Opp. 15) is inapposite because the court rejected *forum non conveniens* where most of Teva's securities traded on U.S. exchanges, the U.S. and foreign law claims were substantively identical, and there was no "novel or complex" foreign law issue. 512 F. Supp. 3d 321, 357 (D. Conn. 2021). Similarly, in *Jackson Cnty. Emps.' Ret. Sys. v. Ghosn*, 510 F. Supp. 3d 583, 600-02 (M.D. Tenn. 2020), unlike here, the foreign law at issue was "straightforward."

[12] Ellman Decl. Ex. 8 at 14 (consent clause by which Reckitt agrees that suits by "any Holder" may be brought in New York and that New York courts have "non-exclusive jurisdiction" over such suits).

amend; as Levy concedes, the Complaint fails to allege the source of a duty to disclose. *See* Levy ¶19. Even if considered, the provisions Levy identifies cannot salvage Plaintiffs' claim because he gives no evidence that a duty to disclose attaches when information is public. *See supra* §I.A; Levy ¶19; Davies ¶24. As with the Exchange Act claims, Plaintiffs' dishonest delay claim rests on the flawed premise that Reckitt somehow concealed public research. *See* Davies ¶24; *supra* §I.A.

Plaintiffs also erroneously contend that Reckitt's March 15, 2024 statement about *Watson* serves as a subsequent publication. Opp. 29; Levy ¶25. Levy opines that "Reckitt knew about the [elevated NEC risk relative to human milk] (it is said), but did not tell the market (at least not until it made an announcement following the *Watson* verdict)." Levy ¶14. But the March 15 statement cannot be a subsequent publication correcting the "dishonest delay" because Plaintiffs allege it was inaccurate. *See* Davies ¶27 ("claimant must identify a delayed disclosure containing the *accurate* information at issue"), 33 n.4; ¶¶98, 100 (alleging March 15, 2024 statement *concealed* NEC risk and falsely denied causation link). The Complaint undermines Levy's position that discussion of the *Watson* verdict was nevertheless accurate because it alleges that "the *Watson* verdict did not reveal the entire truth" and "Defendants prevented the market from recognizing the verdict's full implications." ¶161; Levy ¶28.

Finally, Plaintiffs fail to rebut that the Complaint is insufficiently particularized to plead fraud and inadequately pleads dishonesty or causation. *See* Opp. 29-30; Mem. 26-27; Davies ¶19. Levy concedes that there are "no specific facts" indicating that the Individual Defendants knew their conduct was dishonest (Levy ¶42), and the Complaint provides no basis from which to infer this (*supra* §I.B). Similarly, the Complaint fails to plead causation based on the share

-10-

price drop following the *Watson* verdict because the Company's announcement did not disclose the "truth" regarding the alleged link between NEC and preterm formula.  *See* §I.C; Davies n.4.

## CONCLUSION

The Court should dismiss the Complaint and deny leave to amend.  *In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *20-21 (S.D.N.Y. Mar. 30, 2018).

Dated: March 19, 2026                    Respectfully submitted,

                                          */s/ Michael G. Bongiorno*
                                          Michael G. Bongiorno
Tamar Kaplan-Marans
**WILMER CUTLER PICKERING**
   **HALE AND DORR LLP**
7 World Trade Center
250 Greenwich Street
New York, New York 1007
212 230 8800 (t)
212 230 8888 (f)
michael.bongiorno@wilmerhale.com
tamar.kaplan-marans@wilmerhale.com

Timothy J. Perla
Erika M. Schutzman (*admitted pro hac vice*)
**WILMER CUTLER PICKERING**
   **HALE AND DORR LLP**
60 State Street
Boston, MA 02109
617 526 6000 (t)
617 526 5000 (f)
timothy.perla@wilmerhale.com
erika.schutzman@wilmerhale.com

*Counsel for Defendants*

-11-

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum complies with the word-count limitation of Rule

2(B) of the Court's Individual Rules and Practices in Civil Cases.  According to the word-

processing system used to prepare this memorandum, the total word count is 3,497 words.

/s/ Michael G. Bongiorno
Michael G. Bongiorno