UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re RECKITT BENCKISER GROUP PLC SECURITIES LITIGATION | Civil Action No. 1:25-cv-04708-JPC-SDA<br><br>CLASS ACTION |

**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**


NATURE OF THE ACTION AND OVERVIEW ....................1

JURISDICTION AND VENUE ....................7

PARTIES ....................8

SUBSTANTIVE ALLEGATIONS ....................11

I. The Devastating Disease of Necrotizing Enterocolitis ....................11

II. Scientific Evidence Showed Materially Higher NEC Rates Among Premature Infants Fed Bovine-Based Formula Than Those Fed Human Milk ....................13

III. Reckitt Understood that There Is a Higher Incidence of NEC From Consuming Bovine-Based Formula ....................19

IV. Internally, Reckitt Believed that Bovine-Based Formula Increased the Risk of NEC in Premature Babies ....................22

V. Reckitt's Preterm Formula Served as a Critical Customer-Acquisition Mechanism for its Broader Baby Formula Portfolio ....................31

VI. Defendants' Efforts to Acquire a Human-Milk-Based Product Company Reflects Their Understanding of the Elevated Risk of NEC from Preterm Bovine-Based Formula ....................35

VII. Defendants Understood the Commercial Consequences of NEC-Related Product Labeling ....................39

VIII. Reckitt Knew that Many Doctors Were Not Fully Informed of the NEC Risk from Bovine-Based Formula, and Concealed and Exploited that Information Environment ....................40

IX. Reckitt Concealed NEC Risk from Parents, Sales Employees, and the FDA ....................44

X. Reckitt Understood that NEC Warnings Were Feasible and Would Affect Physician and Parental Decision Making ....................48

XI. Reckitt Manipulated Scientific Messaging Concerning NEC and Human-Milk Feeding ....................51

**Page**

XII. Abbott and Reckitt Influenced the FDA, CDC, and NIH's Issuance of a Joint Consensus Statement that Downplayed the Elevated Risk of NEC from Consuming Preterm Formula ....56

XIII. Reckitt Influenced the American Association of Pediatrics and Its Agreement with the Joint Consensus Statement ....57

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ....59

I. Defendants Misrepresented and Concealed the Severe Risks of Reckitt's Formulas for Preterm Infants ....59

II. Defendants Misrepresented the Scientific Basis and Safety of Reckitt's Infant Formulas While Omitting Known NEC Risk ....64

III. Defendants Misrepresented Pediatrician and Hospital Endorsements ....67

IV. Reckitt Falsely Represented to Investors that It Monitored Adverse Event Reports ....70

V. Defendants Characterized Product-Safety Risks as Merely Hypothetical When They Knew that Reckitt's Infant Formula Posed an Unreasonable Risk of Serious Illness or Death for Premature Babies ....71

VI. Defendants Misrepresented the Drivers and Sustainability of the Nutrition Segment's Growth ....72

THE TRUTH EMERGES ....73

ADDITIONAL ALLEGATIONS OF SCIENTER ....77

I. The Understanding by Senior Mead Johnson Medical Personnel that Bovine-Based Preterm Formula Elevates NEC Risk Supports a Strong Inference of Scienter ....77

II. Defendants' Access to Product Quality and Safety Information, by Virtue of Their Risk Management and Committee Roles, Supports a Strong Inference of Scienter ....81

III. Reckitt's Consistent Exclusion of Preterm Formula from Their Oversight Duties Supports a Strong Inference of Scienter ....86

IV. Defendants' Efforts to Acquire Human-Milk-Product Manufacturers Raise a Strong Inference of Scienter ....88

**Page**

V. The Volume of NEC Lawsuits Against Mead Johnson Raises a Strong Inference of Scienter ....... 88

VI. Defendants Were Motivated to Conceal the Elevated Risk of NEC from Bovine-Based Formula in Order to Preserve Their Ability to Win Hospital Contracts and Protect a Vital Stream of Revenue ....... 88

POST CLASS PERIOD EVENTS ....... 89

CLASS ACTION ALLEGATIONS ....... 91

LOSS CAUSATION ....... 93

APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ....... 93

NO SAFE HARBOR ....... 95

COUNT I ....... 95

Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ....... 95

COUNT II ....... 98

Violation of Section 20(a) of the Exchange Act Against the Individual Defendants ....... 98

COUNT III ....... 100

Violations of Section 90A of the Financial Services and Markets Act of the United Kingdom Against Reckitt ....... 100

PRAYER FOR RELIEF ....... 102

JURY TRIAL DEMANDED ....... 102

Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund and plaintiffs New York State Teamsters Conference Pension and Retirement Fund and New York State Teamsters Council Health and Hospital Fund (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, among other things, the investigation of their counsel, which includes, without limitation: (a) review and analysis of regulatory filings made by Reckitt Benckiser Group plc ("Reckitt" or the "Company") with Companies House, the official registrar of United Kingdom ("U.K.") companies, and the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by or concerning Reckitt; (c) review of pleadings, trial transcripts, and exhibits in the actions styled *Watson v. Mead Johnson & Co., LLC*, Case No. 21-L-1032-PF (Ill. Cir. Ct. St. Clair Cnty. Oct. 28, 2021) ("*Watson*"), *K.W. ex rel. Whitfield v. Mead Johnson & Company, LLC, et al.*, Case No. 2222-CC06214 (Mo. Cir. Ct., City of St. Louis July 6, 2022) ("*Whitfield*"), and *Inman v. Mead Johnson & Company, LLC*, Case No. 1:22-cv-03737 (N.D. Ill. July 25, 2022) ("*Inman*"), among others; and (d) review of other publicly available information concerning Reckitt.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a securities class action on behalf of a class consisting of all persons, other than the defendants ("Defendants," as defined in ¶34) and those affiliated with Defendants who (i) purchased or otherwise acquired Reckitt American Depositary Shares ("ADSs") on the Over-the-Counter ("OTC") market in the United States, or incurred irrevocable liability for the ADSs in the United States, or to whom title to the ADSs passed in the United States, from January 13, 2021 to July 26, 2024, inclusive (the "Class Period"), and were damaged thereby, against Reckitt and certain

of its officers and directors, seeking remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (collectively, the "Exchange Act claims"); and (ii) purchased or otherwise acquired Reckitt ordinary shares on the London Stock Exchange during the same period, and were damaged thereby, against Reckitt and certain of its officers and directors, seeking remedies under Section 90A and Schedule 10A of the U.K. Financial Services and Markets Act 2000 ("FSMA") (the "English Law claims") (the "Class," as defined further in ¶309).[1]

2. Reckitt is a U.K.-based consumer-goods and health conglomerate that operates three segments: Nutrition, Health, and Hygiene. Its Nutrition segment, built through Reckitt's $19.7 billion acquisition of Mead Johnson Nutrition Company ("Mead Johnson") in 2017, markets the Enfamil brand of infant formulas under the Mead Johnson name. Included among its Enfamil line of formulas are formulas made for premature and low-birth-weight infants (generally those born after less than 37 weeks of pregnancy).

3. Mead Johnson and Abbott Laboratories ("Abbott") constitute the entirety of the baby formula industry. They fiercely compete with each other for hospital contracts, and produce similar cow's-milk-based (or "bovine-based") infant formulas.

4. Premature and low-birth-weight infants are uniquely vulnerable to necrotizing enterocolitis ("NEC"), a devastating intestinal disease that can rapidly destroy portions of an infant's bowel, require emergency surgery, cause systemic infection, and result in death.

5. For years before and during the Class Period, Mead Johnson's own physicians, scientists, executives, training materials, commissioned research, and strategic analyses recognized that premature infants fed bovine-based formula—whose primary carbohydrates are corn syrup

---

[1] Reckitt ADSs and ordinary shares are collectively referred to in this Complaint as "Reckitt Securities."

solids ("CSS") and maltodextrin, which are both glucose polymers—experienced materially higher rates of NEC than infants fed human milk—whose primary carbohydrate is lactose—and that bovine-based formula increases the risk of NEC.

6. The Company's knowledge was not limited to published literature comparing bovine-based formula with human milk. Mead Johnson investigated whether the composition of its own preterm formulas affected NEC outcomes. Dr. Randal Buddington, a scientist who for years studied NEC using preterm piglet models, advised Mead Johnson that maltodextrin was "a very real risk factor" for NEC in premature infants. And a study that Mead Johnson commissioned in 2018 found that NEC developed in 14% of premature piglets fed lactose-based formula, compared with 44% of those fed formula containing CSS, which constituted more than half of the carbohydrate content in commercial bovine-based preterm infant formulas. The study determined that CSS "***may predispose or even trigger onset of NEC pathology***." Mead Johnson personnel understood the significance of those results: scientist Dr. Rosaline Waworuntu proposed making lactose the principal carbohydrate source in Enfamil Premature to "protect against NEC," and defendant Susan Sholtis acknowledged that the research provided "another reason to shift away from corn syrup solids."

7. Indeed, numerous senior Mead Johnson medical personnel and scientists testified in the various NEC litigations concerning Reckitt's preterm formula that bovine-based formula increases the risk of NEC and is a risk factor for the deadly disease.

8. These facts suggest a significant risk to the commercial viability of Reckitt's preterm formula. Doctors and parents likely would have viewed the risk associated with preterm formula (NEC, potentially resulting in death or serious injury) as substantially outweighing the benefit of using the product (feeding), particularly in light of the existence of human donor milk.

9. Nevertheless, Defendants repeatedly assured investors that Reckitt's preterm formulas were safe and effective for premature and low-birth-weight infants. For example, Reckitt discussed the blend of CSS and lactose in certain Enfamil preterm products in Mead Johnson's Pediatric Product Guide, available on its website since January 2021, noting a "[c]arbohydrate blend of 60% corn syrup solids (glucose polymers) and 40% lactose that is easily digested and helps avoid overloading the premature infant's capacity to digest lactose," despite knowing from its own study the elevated risk of NEC to preterm infants from consuming CSS-based formula.

10. Relatedly, in its 2023 Annual Report, Reckitt described Enfamil as "building brains, easing tummies," and explained that Enfamil was designed to address infants' "[d]igestion issues[.]" Reckitt's website for its Enfamil infant formulas similarly stated during the Class Period that "Our options support the distinct nutritional needs of premature and low-birth-weight infants. . . . And because your little one's belly is still developing, our preemie baby formula is easy on the tummy." These statements were false and misleading because Defendants knew their preterm formula increased the risk of NEC.

11. During earnings calls, Defendants similarly emphasized the immunoprotective nature of its Enfamil products, for example stating that its NeuroPro preterm formula "now contains a blend of human milk oligosaccharides that provide additional immune support" and that the formula "contains critical ingredients to drive . . . immunity," but failed to disclose that the CSS in their formula increased the risk of NEC.

12. Investors learned the truth about the elevated risk of NEC from bovine-based formula through the trials and verdicts in *Watson* and *Gill v. Abbott Laboratories, Inc.*, Case No. 2322-CC01251 (Mo. Cir. Ct. June 23, 2023) ("*Gill*")—two cases involving substantially similar factual and legal issues in which plaintiffs alleged that Mead Johnson's and Abbott's bovine-based formulas

caused NEC that killed their babies. It was through the *Watson* trial that the market learned of significant evidence demonstrating that Defendants themselves believed that their formula increased the risk of NEC.

13. Following those developments, Reckitt Securities' prices fell sharply, erasing billions in market capitalization. Defendants' misrepresentations and omissions artificially inflated and/or maintained the prices of Reckitt Securities, deprived investors of material information necessary to evaluate the Company's business operations, results, and risks, and directly caused Plaintiffs' and the Class's losses when the truth emerged.

14. Defendants' defense to the torrent of NEC-related litigation is to (1) deny that its formula increases the risk of NEC and (2) maintain that human milk is protective. Defendants simply blind themselves to the facts—according to the plaintiff's experts in the *Watson* case, both are true: formula increases the risk of NEC and human milk is protective. And Defendants' defense rests on shaky ground, at best: one of Reckitt's own scientists testified he did not "know that we had substantial data at the time to say" that NEC rates are higher among preterm babies receiving exclusively formula as a result of something missing from the formula that is present in human milk; that "all the evidence isn't in"; that "there simply wasn't enough evidence"; and that he would call such an assertion "a hypothesis that had some data points to support it." Moreover, multiple scientists testified that Mead Johnson never even funded a randomized clinical trial comparing formula to human milk.

15. An integral part of the defense of the formula industry to the NEC litigation was to exert influence over the U.S. Food & Drug Administration ("FDA") and the American Academy of Pediatrics ("AAP"). Reckitt's and Abbott's efforts to engineer statements by the FDA and AAP downplaying the risks of bovine-based preterm formula, particularly in light of Reckitt's

understanding that bovine-based preterm formula increases the risk of NEC, highlight the formula industry's influence on and regulatory capture of these agencies and organizations, which not only undermines the credibility of their statements, but also constitutes active efforts to further mislead the public regarding the safety of preterm bovine-based formula.

16. As alleged herein, Defendants engaged in a multifaceted scheme to conceal the fact that their preterm formula increased the risk of NEC. They: (1) conducted animal studies showing that CSS in bovine formula may predispose or even trigger onset of NEC pathology; (2) claimed that the absence of human milk causes NEC even though they failed to conduct clinical studies in support of that hypothesis; (3) concealed the NEC risk posed by their formula from doctors and parents while knowing that many physicians were not fully informed of it; (4) manipulated scientific studies and messaging concerning NEC; (5) influenced the FDA and AAP to issue public statements that they intended to use, and did use, to sway potential jurors; and (6) failed to report to the FDA, at any time in the last 25 years, of the reasonable possibility of a causal relationship between consumption of Enfamil preterm formula and an infant's death, especially in light of quickly dismissing adverse event reports it has received.

17. Defendants' motive to do so was straightforward: had they warned that their preterm formula increased the risk of NEC, their formula business would have evaporated overnight.

18. The Individual Defendants (defined below) had access to, and were presented with, scientific evidence showing bovine formula carried an elevated risk of NEC in preterm infants. They each were members of the Group Executive Committee ("GEC"), which takes "[o]wnership and accountability of principal risks" such as "product quality" and "product safety." They also, with the exception of defendants Patrick Sly ("Sly") and Susan Sholtis ("Sholtis"), were either on the Corporate Responsibility, Sustainability, Ethics, and Compliance Committee (the "CRSEC

Committee"), or attended meetings held by the CRSEC Committee, which specifically addressed product-safety evaluation, product-integrity reviews, breast-milk substitutes, and infant-formula practices. The Individual Defendants therefore were responsible for reviewing—and had access to information regarding—the quality and safety of Reckitt's preterm formula, including information demonstrating that Reckitt's preterm bovine-based formula increased the risk of NEC. Importantly, Sly and Sholtis, through their leadership of the Nutrition segment, were fully informed of the findings of Mead Johnson's piglet study and were present along with the rest of the Individual Defendants when the aforementioned issues were discussed with the GEC.

## JURISDICTION AND VENUE

19. This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated under the Exchange Act by the SEC (17 C.F.R. §240.10b-5).

20. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

21. With respect to the English Law claims, this Court has diversity jurisdiction under 28 U.S.C. §1332. Plaintiffs are each citizens of the United States. Defendants Reckitt and Jeffrey Carr ("Carr") are citizens of the United Kingdom; defendant Nicandro Durante ("Durante") is a citizen of Brazil; and defendants Laxman Narasimhan ("Narasimhan"), Kristoffer Loe Licht ("Licht"), Sly and Sholtis are citizens of the United States. The amount in controversy under the English Law claims exceeds $5 million. On information and belief, Reckitt Securities are not "covered securities" within the meaning of 28 U.S.C. §1332(d)(9)(A).

22. The English Law claims are so related to the Exchange Act claims that they form part of the same case or controversy. Jurisdiction over the English Law claims is therefore also conferred by 28 U.S.C. §1367.

23. Venue is proper in this Judicial District under 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts alleged in this Complaint, including the dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. In addition, the Deposit Agreement that governs Reckitt's sponsored ADSs contains a binding forum-selection clause, mandating that a lawsuit brought by ADS purchasers "may only be instituted in a state or federal court in New York, New York," and that ADS holders "irrevocably submit[] to the exclusive jurisdiction of such courts in any such suit, action, or proceeding." Moreover, by sponsoring its ADSs, and promoting them in its annual reports, Reckitt took affirmative steps directed towards investors in the United States by actively marketing its equity interests to them.

24. In connection with the acts, transactions, and conduct alleged in this Complaint, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail and interstate telephone and wire communications.

**PARTIES**

25. Lead Plaintiff New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund, as set forth in the certification accompanying its motion for appointment as Lead Plaintiff (ECF No. 22-2), incorporated by reference in this paragraph, purchased or otherwise acquired Reckitt ADSs during the Class Period and suffered damages as a result of the federal securities law violations and false and misleading statements and material omissions alleged in this Complaint. It is headquartered in New York, New York.

26. Plaintiffs New York State Teamsters Conference Pension and Retirement Fund and New York State Teamsters Council Health and Hospital Fund (together, "New York State Teamsters Funds") purchased or otherwise acquired Reckitt ordinary shares on the London Stock Exchange

during the Class Period and suffered damages as a result of the English law violations and false and misleading statements and material omissions alleged in this Complaint, as set forth in their certifications accompanying Plaintiffs' Amended Complaint (ECF No. 44-1), which are incorporated herein by reference. The New York State Teamsters Funds are headquartered in Syracuse, New York.

27. Defendant Reckitt is a U.K.-based consumer-goods and health conglomerate. The Company maintains substantial operations in the United States, including its principal U.S. corporate offices, which are located in Parsippany, New Jersey. Reckitt's subsidiary Mead Johnson is headquartered in Evansville, Indiana. Reckitt's ordinary shares trade on the London Stock Exchange under the ticker symbol "RKT," while its sponsored ADSs, which Reckitt has registered with the SEC, trade on the U.S. OTC market under the ticker symbol "RBGLY." Five ADSs represent one ordinary share.

28. Defendant Narasimhan served as the Company's Chief Executive Officer ("CEO") from September 2019 until September 30, 2022. He was a member of the GEC in 2021, and attended CRSEC Committee meetings during his time as CEO.

29. Defendant Durante joined Reckitt's Board as a Non-Executive Director in 2013, became the Senior Independent Director in 2019, became the Company's CEO on October 1, 2022, and served as CEO until September 30, 2023. In his role as non-executive director, Durante signed multiple Form F-6 Registration Statements registering Reckitt ADSs with the SEC, filed on February 15, 2018, May 21, 2018, and September 25, 2020. In this role as director, Durante also signed the Annual Reports' Statement of Directors' Responsibilities, which verifies the accuracy of information in Reckitt's Annual Reports. Durante was a member of the GEC in 2022, was a member

of the CRSEC Committee in 2021 and 2022, and attended CRSEC Committee meetings during his time as CEO.

30. Defendant Licht has served as the Company's CEO from October 1, 2023 through the present, and Executive Director of the Company's Board of Directors (the "Board") from June 1, 2023 through the present. Before his appointment as CEO, Licht served as the Company's CEO Designate from May 1, 2023, and President of the Company's Health segment and Chief Customer Officer from July 2020 until his appointment as CEO Designate on May 1, 2023. Licht was a member of the GEC from 2021 to 2023, and has been a member of the CRSEC Committee since 2023.

31. Defendant Sly originally joined the Company as part of its acquisition of Mead Johnson in 2017 and served as the President of the Nutrition segment from July 2021 to July 1, 2023. Sly was on the Executive Team from 2022 to 2024. As President of Nutrition, Sly oversaw the Company's Nutrition business, including Mead Johnson's preterm nutrition products. He then served as President of the Company's Health segment from July 1, 2023 to 2025, after which he departed the Company. During his time as President of Nutrition and President of Health, he was on the Executive Team, was a member of the GEC, and reported to the Company's CEO.

32. Defendant Carr served as the Company's CFO and Executive Director of the Board from 2020 until his retirement on March 31, 2024. Carr was a member of the GEC from 2021 to 2023, and attended CRSEC Committee meetings during his time as CFO.

33. Defendant Sholtis has served as President of Reckitt's Nutrition business from July 1, 2023 through the present, and is on Reckitt's Executive Team. Sholtis previously worked for Mead Johnson from 2006 to 2015 in various leadership positions involving general management, marketing, sales, and medical marketing strategy, and again from 2017 to 2018 as Vice President of

Global Marketing, Healthcare. Sholtis rejoined Reckitt effective July 1, 2023. As President of Nutrition, Sholtis oversees the Company's Nutrition business, including Mead Johnson's preterm nutrition products. Since becoming President of Nutrition in 2023, Sholtis has been on the Executive Team, is a member of the GEC, and reported to Reckitt's CEO. Sholtis resides in the United States.

34. Defendants Narasimhan, Durante, Licht, Sly, Carr, and Sholtis (together, the "Individual Defendants" and together with the Company, "Defendants"), because of their positions with Reckitt, possessed the power and authority to control the contents of Reckitt's annual reports, press releases, websites, and presentations to securities analysts, money and portfolio managers, and institutional and retail investors, *i.e.*, the market. The Individual Defendants were provided with copies of Reckitt's reports, press releases, websites, and presentations alleged in this Complaint to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material nonpublic information available to them but not to the public, the Individual Defendants knew that the adverse facts specified in this Complaint had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded in this Complaint.

## SUBSTANTIVE ALLEGATIONS

### I. The Devastating Disease of Necrotizing Enterocolitis

35. NEC is one of the most frequent causes of serious illness and death in premature babies.

36. In a Mead Johnson document presented at the *Watson* trial, the Company described NEC as "a devastating disease that affects the intestine of premature infants and can destroy the wall

of the bowel, causing life-threatening infection." Approximately 13% of very low birth weight infants (less than 1,500 grams) suffer from NEC; about 35% of those infants require surgery; and about 35% of the infants who suffer from NEC die each year.

37. Dr. Jonathan Swanson, a neonatologist and NEC expert who testified at the *Watson* trial on behalf of the plaintiff, explained that "the only ways to treat [NEC] are to treat the infection, if there is one," and hope the bowel will heal itself; if it doesn't, as it often can't, then surgery is necessary to remove the dead portion of the intestine, which can cause further complications for the baby, and the baby often requires intubation, a ventilator, and pain control. He agreed that NEC is "one of the most horrible diseases that infects some of our most fragile patients."

38. Long before and throughout the Class Period, published medical literature consistently demonstrated that premature infants fed bovine-based formula experienced materially higher rates of NEC than premature infants fed mother's own milk, donor human milk, or human-milk-based products. Those findings were replicated across randomized clinical trials, observational studies, and decades of clinical experience, establishing a consistent comparative risk associated with bovine feeding in premature infants.

39. Babies are considered carried to term if they are born after 37 weeks' pregnancy. Babies born earlier than that are considered premature and are often much smaller than term babies, including having low birth weight, and are more vulnerable to serious illnesses. Therefore, premature babies are commonly cared for in NICUs.

40. Mothers cannot always produce enough of their own breast milk to feed their babies, and this is particularly the case for mothers of premature babies. As a result, it is often necessary to feed these babies a substitute or supplement for their mother's milk. There are three primary substitutes or supplements for the mother's own milk: pasteurized donor milk, which is available to

hospitals from a nationwide network of donor milk banks; commercial human-milk-based formulas; and commercial bovine-based formulas. There is a medical consensus that mother's own milk is the most advantageous nourishment for premature babies, when it is available, followed by pasteurized donor milk or human-milk-based formula, with bovine formula the least-preferred option.

## II. Scientific Evidence Showed Materially Higher NEC Rates Among Premature Infants Fed Bovine-Based Formula Than Those Fed Human Milk

41. Premature infants have less developed gastrointestinal systems than babies carried to term, and therefore are less able to digest the complex carbohydrates, proteins, and fats contained in bovine-based formulas. Although researchers have continued to study the precise biological mechanisms underlying NEC, the observed clinical association was consistent and well established: scientific studies dating back to at least 1990 repeatedly demonstrated that premature infants fed bovine-based formula experienced materially higher rates of NEC than premature infants fed human milk.

42. Beginning at least as early as 1990, published studies repeatedly quantified that comparative risk. A 1990 study by A. Lucas, et al., in the medical journal *The Lancet*, titled "Breast milk and neonatal necrotising enterocolitis," found that in one group, only 1% of the babies who received human donors' milk developed NEC, while 5% of the babies who received bovine-based formula developed the disease (*i.e.*, the incidence of NEC was five times greater with formulas like Mead Johnson's than with donor milk). In a second group, 1.2% of the babies who received donors' milk developed NEC, while 3.6% of babies who received bovine-based formula developed the disease (*i.e.*, the incidence of NEC was three times greater with formulas like Mead Johnson's than with donor milk).

43. A 2005 study by Richard Schanler, et al., in *Pediatrics*, titled "Randomized Trial of Donor Human Milk Versus Preterm Formula as Substitutes for Mother's Own Milk," found that

babies who were fed donor milk had a 6% incidence of NEC compared to a 11% incidence for babies fed formula—almost double the difference.

44. A 2006 study by Lin and Stoll found that babies who were fed human milk had a three-fold to ten-fold reduction in NEC incidence compared to babies fed formula.

45. A 2009 study by J. Meinzen-Derr, et al., titled "Role of Human Milk in Extremely Low Birth Weight Infants' Risk of NEC or Death," published in the *Journal of Perinatology*, found that the percentage of human milk in the total nourishment fed to a baby correlated with the risk of NEC, demonstrating that human milk reduces the incidence of NEC compared to bovine formula.

46. A 2010 study by Sullivan found that babies who were fed human milk experienced a 50% reduction in NEC incidence compared to babies fed formula.

47. In a 2013 study by Elizabeth A. Cristofalo, et al., titled "Randomized Trial of Exclusive Human Milk versus Preterm Formula Diets in Extremely Premature Infants," published in the *Journal of Pediatrics*, the incidence of NEC in babies receiving human donor milk or human-milk-based formula was 3%, compared with 21% in babies receiving bovine formula—a seven-times greater incidence.

48. In a 2014 study in *Breastfeeding Medicine* by Steven A. Abrams, et al., titled "Greater Mortality and Morbidity in Extremely Preterm Infants Fed a Diet Containing Cow Milk Protein Products," an exclusively human milk diet was found to reduce both NEC and mortality. The rate of NEC for human milk was 5%, including 1% surgical NEC, and for bovine-based formula was 17%, including 12% surgical NEC.

49. In a 2016 study by M. Assad, et al., titled "Decreased Cost and Improved Feeding Tolerance in VLBW [Very Low Birth Weight] Infants Fed an Exclusive Human Milk Diet," published in the *Journal of Perinatology*, babies fed only human milk had an approximately 1%

NEC rate, while babies fed bovine formula or a mix of formula and human milk had a 10% NEC rate.

50. In a 2016 study by Deborah L. O'Connor, et al., titled "Effect of Supplemental Donor Human Milk Compared With Preterm Formula on Neurodevelopment of Very Low-Birth-Weight Infants at 18 Months," published in the *Journal of the American Medical Association*, the incidence of all stages of NEC was 3.9% for babies receiving donor milk and 11% for babies receiving bovine formula—2.8 times greater. For more serious, advanced stages of NEC, the incidence was 1.7% in the donor milk group and 6.6% in the bovine formula group—3.9 times greater.

51. A 2019 study by Maria Quigley found that babies who were fed human milk had a 3.6% incidence of NEC, compared to a 6.7% incidence of NEC in babies fed formula—almost double the difference.

52. A 2021 study by Miriam Tyebally Fang found that babies who were fed human milk had a 2.7% incidence of NEC, compared to a 7.7% incidence of NEC in babies fed formula—almost triple the difference.

53. A 2022 study by Amy B. Hair found that babies who were fed human milk had a 2% incidence of NEC, compared to a 10.4% incidence of NEC in babies fed formula—over five times greater.

54. A 2023 paper by Dhirendra K. Singh, et al., titled, "Necrotizing enterocolitis: Bench to bedside approaches and advancing our understanding of disease pathogenesis" explains that undigested nutrients from bovine formula may provide a substrate for pathogenic bacteria, including gram-negative bacteria such as E. coli, contributing to the inflammation and intestinal tissue injury characteristic of NEC.

55. In a January 2024 article by Tarah T. Colaizy, et al., titled "Neurodevelopmental Outcomes of Extremely Preterm Infants Fed Donor Milk or Preterm Infant Formula," published in the *Journal of the American Medical Association*, the incidence of NEC in a double-blind, randomized clinical trial was found to be 4.2% for the donor milk group and 9.0% for the bovine formula group—a 2.1 times greater incidence.

56. Dr. Brian Sims, a practicing neonatologist and medical professor at the University of Alabama, Birmingham, testified for the plaintiff at the *Watson* trial as an expert in neonatology, including NEC. Dr. Sims testified within a reasonable degree of medical certainty, based on his experience and knowledge of the scientific literature, that bovine-based formula presents a three-to-ten times greater risk of NEC than donor milk or human-milk-based formula. Dr. Sims also studied the medical records of the baby who died in the *Watson* case and testified that he could eliminate all risk factors for NEC other than prematurity and bovine-based formula, and therefore opined that Reckitt's formula caused or contributed to the infant's illness and death. He further explained that it is true both that mother's milk is more protective against NEC than formula (as the Company claims), and that Mead Johnson's formula has harmful risks (as the Company denies): "It's both. The answer is it's protective effects of breast milk, and there's also data that supports there are things that causes stress to the baby that's in . . . premature formula."

57. Dr. Jonathan Swanson testified in the *Watson* trial that, within a reasonable degree of medical certainty, based on his experience and knowledge of the scientific literature, "cow's milk-based formula causes or contributes to cause NEC" in premature infants, particularly those born at less than 34 weeks, and that the risk of NEC is two to five times greater with bovine formula than donor milk. Dr. Swanson's professional "passion" is NEC and nutrition for newborns, which is the biggest part of his research, and he has written many scientific articles about NEC. Based on his

professional experience and knowledge of the scientific literature, he and his colleagues at the University of Virginia NICU introduced an exclusive human milk diet for very low birth weight infants. They also adopted a diet of either mother's milk or donor milk for all babies under 34 weeks; they use bovine-based formula only for babies born at 34 weeks or more. As a result, "there's definitely been a decrease in NEC" and "a significant decrease in NEC that requires surgery, . . . the most severe form of NEC."

58. Dr. Swanson further testified in *Watson* that the risk of NEC is highest for babies born at 34 weeks or less, and that "the risk of using formula at that age far outweighs any benefit," whereas "the risk of utilizing pasteurized donor milk is far less than the benefit. . . ."

59. An article coauthored by Dr. Swanson in *Pathophysiology* in 2014, titled "Necrotizing enterocolitis is one disease with many origins and potential means of prevention," states that "cow's milk intolerance" is one of the "risk factors" for NEC. Similarly, a 2022 article coauthored by Dr. Swanson in *Practical Gastroenterology*, titled "Nutritional Management of Infants with Necrotizing Enterocolitis," stated that "[c]ow's milk protein exposure in very low birth weight infants, or cow's milk allergy" was a risk factor for NEC.

60. An article coauthored by Dr. Swanson in *BMC Pediatrics* in 2023, titled "Implementing an exclusive human milk diet for preterm infants: real-world experience in diverse NICUs," reported that seven NICUs that implemented exclusive human milk diets for preterm infants all demonstrated a significant decrease in the most severe cases of NEC—those that require surgery—and the vast majority of the NICUs also demonstrated a decrease in total NEC cases.

61. During the trial in *Whitfield*, an NEC case in which Mead Johnson and Abbott were defendants, Dr. Buddington testified regarding a study and related paper he co-authored in 2006, titled, "Diet- and Colonization-Dependent Intestinal Dysfunction Predisposes to Necrotizing

Enterocolitis in Preterm Pigs." The study involved feeding different groups of preterm piglets colostrum, an early form of human breast milk, and CSS. Dr. Buddington testified that animals fed glucose polymers, a carbohydrate molecule that includes CSS and maltodextrin, "begin to develop NEC[,]" while those fed colostrum "did not get NEC."

62. Dr. Susanne Hay, a neonatologist and defense expert in the *Watson* trial, affirmed that "formula is a risk factor for NEC[.]"

63. Abbott, Reckitt's primary competition in the baby formula space, similarly acknowledged internally that consumption of bovine formula elevates the risk of NEC among premature babies. In 2010, Abbott wrote a research proposal stating that NEC "is the most severe GI complication of prematurity and the use of bovine milk-based fortifiers and formulas are believed to be the primary risk factor."

64. Abbott also commissioned a study in 2017 comparing the effect of different types of fat-ingredients on NEC. An early abstract of the draft stated that "the development of NEC has been *directly linked with the administration of infant formula* . . . suggesting that specific components of infant formula plays (sic) a critical role in NEC development."

65. Moreover, internal Abbott documents state that formula feeding "is thought to be a contributing factor to the development of NEC."

66. Relatedly, Dr. Buddington, when retained by Abbott to study a possible correlation between preterm formula and NEC, hypothesized that using glucose polymers resulted in an increased risk of NEC. Dr. Buddington wrote to Abbott to insist they remove corn syrup from formula, and internally referred to bovine formula with colleagues as "death formula." Abbott, however, dismissed these findings as "bad for business."

67. Taken together, the published scientific literature consistently demonstrated, before and throughout the Class Period, that premature infants fed bovine-based formula experienced materially higher rates of NEC than premature infants fed mother's milk, donor milk, or human-milk-based products. That comparative risk was repeatedly confirmed across randomized clinical trials, observational studies, by practicing neonatologists and, as discussed below, even by Reckitt's own senior medical personnel.

## III. Reckitt Understood that There Is a Higher Incidence of NEC From Consuming Bovine-Based Formula

68. Defendants and Mead Johnson personnel clearly understood that there is a higher incidence of NEC from consuming bovine-based formula. Dr. Christina Valentine was Mead Johnson's Medical Director of North America from 2014 to August 2021, and returned in May 2022 as Chief Medical Officer until October 2023. She engaged in frequent cross-talk with defendant Sly, according to an internal organizational chart, and her duties included tracking current scientific literature regarding feeding preterm infants. Dr. Valentine testified during her deposition in *Inman*—a federal bellwether product-liability case alleging that Mead Johnson's bovine-based preterm formula caused the plaintiff's infant to develop NEC—that she was familiar with studies, including the Lucas, Cristofalo, O'Connor, Fang, Hair, and Colaizy studies described above, which demonstrate an increased incidence of NEC from consuming formula. Internal documents from *Inman* also demonstrate that certain NEC studies, for example the Lucas study, were included in a Mead Johnson continuing medical education presentation.

69. Likewise, during the *Watson* trial, Dr. Valentine testified that there is an increased incidence of NEC from consuming preterm formula when compared to human milk.

70. In 2010, before joining Mead Johnson, Dr. Valentine delivered a presentation regarding donor human milk in neonatal intensive care units ("NICUs"). There, she explained that

the goal of human-milk feeding was to "attenuate inflammation and reduce NEC," cited studies reporting lower NEC rates with donor milk than formula, and presented research showing that enteral feeding (*i.e.*, tube feeding) consisting of more than 50% human milk during the first 14 days of life was associated with a six-fold decrease in the odds of NEC. Her presentation also stated, "When direct breastfeeding is not possible, expressed breast milk should be provided. Pasteurized donor milk is a reasonable alternative." Dr. Valentine further stated that, "[b]ecause of the known risk reduction in NEC and infection," physicians "must have informed choice (informed consent)" from mothers and should offer donor milk when a mother's own milk was unavailable. The presentation also concluded that "[h]uman milk immune biology is vital for protection against NEC."

71. Mead Johnson promptly incorporated those concepts into its internal strategic planning. On May 6, 2010, Susan Vaughn, Mead Johnson's Director of Open Innovation, circulated Dr. Valentine's webinar presentation to numerous Mead Johnson employees, including senior Mead Johnson executive Dr. Carol Lynn Berseth, Mead Johnson's longtime Director of Medical Affairs and a former practicing neonatologist, under the subject line "Human milk: the future of the NICU." Vaughn specifically highlighted the presentation's finding that enteral feeding containing at least 50% human milk during the first fourteen days of life was associated with a six-fold reduction in NEC and observed that "[i]f the consumption of human milk and the incidence of NEC are inversely proportional, then it is clear why NICUs are seeking human milk alternatives." Vaughn also highlighted Dr. Valentine's report regarding Nationwide Children's Hospital's rapid shift away from bovine formula. These contemporaneous communications demonstrate that Mead Johnson recognized not only the comparative scientific evidence regarding NEC and feeding type, but also that the evidence was already influencing physician practice and hospital purchasing decisions.

72. Dr. Valentine's published work before joining Mead Johnson likewise recognized the relationship between human-milk feeding and reduced NEC risk. Dr. Valentine co-wrote a chapter in a book in 2012 before joining Mead Johnson in 2014, stating: "Human milk feeding is the only known practice to reduce the likelihood of necrotizing enterocolitis." The chapter cited multiple studies, including the Sullivan study reporting that an exclusively human-milk-based diet dramatically reduced both medical and surgical NEC, and concluded that donor human milk could reduce NEC by approximately 79%. It further recognized that commercially available human-milk-based products had demonstrated reductions in NEC when used in place of bovine-based fortifiers and described Dr. Valentine's own clinical experience reducing NEC rates from 12% to 4% after implementing a donor-milk program in a large NICU. Thus, before ever joining Mead Johnson, the physician who would later become Mead Johnson's Chief Medical Officer had publicly recognized that replacing bovine products with human-milk-based nutrition materially reduced the incidence of NEC.

73. Reckitt's internal awareness that premature infants fed bovine-based formula experienced higher rates of NEC than infants fed human donor milk was reinforced by scientific studies that Company personnel actively reviewed, discussed, and evaluated internally. Following publication of the 2016 O'Connor study in the Journal of the American Medical Association, Dr. Valentine circulated an email mischaracterizing the study as showing "poor growth, no [difference] in [NEC] and poorer [development] scores." Dr. Steven Wu, Mead Johnson's Associate Director of Global Clinical Innovation, responded that this characterization was incorrect and urged that the group be "on the same page" regarding the study's actual findings, explaining that "there IS a difference in NEC incidence—it's lower in the donor milk-supplemented babies" and that the study showed a "significant decrease in NEC incidence in favor of donor milk." (emphasis in original).

Dr. Berseth thanked Dr. Wu for the "clarification," and noted that she had previously attended a presentation by one of the study investigators and the data had been presented as showing that "because of the lower NEC, ***it would be unethical to not use donor milk***." Dr. Berseth further cautioned that Mead Johnson should "be ready to have a response" because the study had been published in a "very highly visible journal."

74. Internal Company materials likewise reflected Mead Johnson's understanding that premature infants fed bovine-based formula experienced materially higher rates of NEC than infants maintained on an exclusive human-milk diet. A July 7, 2010 internal Mead Johnson presentation prepared for the Company's Management Committee identified a "proven decrease" in NEC when "only human milk is given," recognized reduced rates of NEC as a "hard clinical outcome" of exclusive human milk feeding, and identified the absence of human-milk products as a significant gap in Mead Johnson's NICU portfolio. Rather than questioning whether exclusive human milk reduced NEC, the presentation treated that proposition as established and focused on the Company's competitive response. Similarly, another Mead Johnson PowerPoint stated, "Formula use can drive deadly disease (NEC) up."

75. Rakesh Kapoor, Reckitt's CEO from 2011 to 2019, testified during the *Watson* trial that he received a presentation dated October 2017 from his staff regarding a potential partnership with Medolac, a supplier of donor human milk products. The presentation informed Kapoor that human milk-based products help babies avoid NEC, and that human milk-based products are a medical need because they reduce the likelihood of NEC.

## IV. Internally, Reckitt Believed that Bovine-Based Formula Increased the Risk of NEC in Premature Babies

76. More than recognizing that there is a higher incidence of NEC when preterm infants are fed bovine formula—which Reckitt publicly claims results from the absence of certain

unidentified protective ingredients in human milk—Reckitt's own medical personnel, scientists, and executives understood that bovine-based preterm formula increases the risk of NEC in infants and is a risk factor for NEC. Internal documents repeatedly treated the increased risk of NEC posed by the Company's formula as established and directly contradicted Defendants' later public portrayal of their preterm products as unqualifiedly safe, science-backed, and clinically supported.

77. Numerous members of Mead Johnson's senior medical and scientific leadership shared this understanding. Dr. Timothy Cooper, Associate Director of Clinical Innovation at Mead Johnson, testified in the *Inman* trial that the use of infant formula increases the risk of NEC over the use of human milk. He similarly testified in *Whitfield* that "Mead Johnson was aware of the fact that . . . [preterm infant] formula increases the risk of NEC, and [it has] been aware of that for decades."

78. Dr. Berseth testified during the *Watson* trial that NEC occurs in approximately 3% of premature infants receiving human milk, compared with approximately 5% to 6% of premature infants receiving formula. She agreed that, "if you compare one to the other," formula feeding results in approximately double the incidence of NEC, that formula "increases the risk" of NEC compared with human milk, and that formula is a risk factor for NEC. She further acknowledged that this comparative risk was important information for physicians caring for premature infants and for parents making feeding decisions.

79. Dr. Waworuntu, a Senior Scientist on Mead Johnson's Global Discovery team, testified in her *Inman* deposition that she was aware that risk of NEC is "many times greater if a premature infant is fed formula versus mother's own milk[.]"

80. Dr. Brian Berg, Mead Johnson's former Associate Director of Global Discovery, testified in his deposition that Mead Johnson was aware that CSS and maltodextrin increased NEC risk.

81. Dr. Amy Gates, who joined Mead Johnson as Medical Scientific Liaison in September 2020, became Associate Medical Director in January 2023, and is currently Head of Nutrition, R&D Operations, admitted during the *Inman* trial that "[f]ormula increases the risk of NEC," and that she has known this for "quite some time."

82. Steven Braun joined Mead Johnson in 2007 as Vice President of Global R&D, and served as Reckitt's Senior Vice President of Research and Development and Quality from 2017-2018, and Senior Vice President of Research and Development from 2018 until leaving the Company in 2019. He likewise testified that, during his employment, he understood that infants receiving "100 percent formula have a higher NEC rate than the NEC rate in babies receiving bovine fortified donor milk."

83. Jodee Le Vin, Reckitt's Associate Medical Director of North America since November 2022, who reported to Dr. Valentine, testified in the *Watson* trial that she "very general[ly]" agrees with the statement, "Formula increases the risk [of NEC] over human milk."

84. Dr. Valentine testified in *Watson* that the incidence of NEC in preterm infants fed formula "increased when compared to human milk and pasteurized donor milk." She similarly testified during her *Inman* deposition that "[f]ormula feeding compared to breast milk has an increased [NEC] risk." Valentine agreed that "[r]eports and studies in the literature suggest a higher risk of NEC with formula than human milk," and there is no downside to putting that information on the product label or on a product insert.

85. Mead Johnson also participated in the 2016 Pediatric Academic Societies annual meeting, using a poster presentation with Dr. Waworuntu's name that stated that a major risk factor of NEC was "formula feeding."

86. Mead Johnson's understanding of the risk of NEC from formula feeding is further demonstrated in its own training materials. For example, in Mead Johnson University training materials from 2017, a section discussing NEC states, "Feeding is almost always necessary for NEC to develop. Formula fed babies are more at risk than those who are breastfed." These materials also included a recommendation from the AAP Guidelines that "all preterm infants should receive human milk."

87. Internal Mead Johnson planning materials prepared in connection with Mead Johnson's review of human-milk-based products reflected the same understanding. A January 13, 2012 presentation titled *Human Milk Review & Planning* stated that human milk was important because it "addresses the key risks of tolerance and infection when treating preterms," while acknowledging that "***infants this small do not tolerate bovine protein well, making feeding a challenge.***" The presentation further explained that breast milk was better tolerated, possessed proven immunoprotective properties, and remained the "#1 choice for neonatologists." The presentation reflects Mead Johnson's internal recognition that premature infants fed bovine formula face materially greater feeding challenges and higher comparative risks than infants fed human milk, and that those differences made human milk the preferred nutritional choice in the NICU.

88. Moreover, the Company itself evaluated whether the composition of Mead Johnson's own preterm formulas contributed to NEC risk. Mead Johnson scientists identified the glucose polymers maltodextrin and CSS, the principal carbohydrate sources in Mead Johnson's preterm formulas, as risk factors for NEC.

89. In March 2017, Dr. Buddington—who has not conduced any NEC studies with Mead Johnson—emailed Dr. Waworuntu and Dr. Berg, advising them that maltodextrin was "a very real risk factor," explaining that there was "no reason to not consider it a risk factor for preterm infants,"

and writing, "For years, I had concerns about the preterm NEC with the very high incidence and severity caused by feeding maltodextrin." Dr. Berg likewise testified that Mead Johnson was aware that CSS and maltodextrin increased NEC risk. Internal NICU strategic-planning materials circulated by Mead Johnson medical marketing employee Natalie Reinglass in October 2014 identified "NICU products with lactose only" as a potential product innovation and stated that "corn solid syrup adversely affects gastrointestinal development, fermentation and bacterial colonization." The materials further noted that a study of preterm piglets showed differences between lactose and CSS in NEC incidence and described a lactose-based formulation as "closer to breast milk." Dr. Valentine was one of the recipients of these materials.

90. Consistent with those concerns about glucose polymers in its preterm formula, in 2018 Mead Johnson commissioned its own study conducted by Dr. Doug Burrin, and co-authored by, among others, Mead Johnson's Dr. Berg, Dr. Waworuntu, and Dr. Anja Wittke, comparing NEC incidence in premature piglets fed lactose with NEC incidence in premature piglets fed CSS and maltodextrin.

91. Such use of piglets in researching NEC is widely accepted, as they are generally recognized as the best animal model for pediatric nutrition research. Piglets have "emerged as a relevant species . . . especially for NEC research," according to Dr. Buddington in a 2026 study titled, "Preterm infant formulas with glucose polymers and reduced lactose content increase the risk of necrotizing enterocolitis." This is because of similar body size, organ anatomy, physiology, compatibility with NICU infrastructure and protocols, and NEC onset without the need to induce non-physiological interventions.

92. Reckitt recognized the benefits of the piglet model. Dr. Waworuntu likewise noted in a presentation that many aspects of a piglet's "anatomy, physiology, and metabolism are similar to

those of the human neonate," and that piglet research has been used to study NEC susceptibility in premature infant research. She also noted in a presentation that the preterm piglet model is the best model for performing studies on or with regard to premature infants, and testified in her *Inman* deposition that the preterm piglet model is the best animal model to use with infant nutrition in general.

93. Dr. Burrin's resulting publication, published in June 2018, acknowledged that one of the major risk factors for NEC is "formula feeding," and that formula feeding is one of the "dominant factors . . . thought to be causally associated with NEC." The study observed that CSS-based formula increased the incidence and severity of NEC, and concluded that CSS, which constituted more than half of the carbohydrate content in commercial bovine-based preterm infant formulas, "***may predispose or even trigger onset of NEC pathology***."

94. An internal document from Dr. Waworuntu indicates that she wrote, "Mead Johnson Nutrition was looking to replace corn syrup solid with lactose, or at least increase the lactose levels compared to corn syrup solids. I don't think there were any actions taken by the company based on the study findings."

95. Dr. Waworuntu testified during her *Inman* deposition that the authors of this study's manuscript believed at the time of the study that "formula feeding is causally associated with necrotizing enterocolitis," acknowledging that "causally associated" is a medical way of saying that "something causes something." She also testified that maldigestion of carbohydrates can increase the risk of NEC.

96. Dr. Waworuntu suggested reformulating Enfamil Premature by "mak[ing] lactose the main carbohydrate source [in Enfamil Premature] to promote growth and protect against NEC." She gave the proposal a perfect score for ease of innovation because component parts for this formula

already existed, and Mead Johnson would not need to "make anything or discover anything." Dr. Waworuntu testified during her *Inman* deposition that she suggested this because Dr. Burrin's piglet study demonstrated that piglets that consumed lactose got NEC less frequently than piglets consuming CSS.

97. In July 2018, Dr. Zihua Ao, a Mead Johnson Senior Principal Scientist of Global Product Development, emailed the study's findings to Drs. Cooper and Colin Rudolph, Mead Johnson's Vice President for Global Medical Affairs and Chief Medical Officer, among other employees, and summarized the results as showing that "***[t]he risk of preterm infants developing necrotizing enterocolitis is higher when they are fed formula than when they feed on breast milk***." Specifically, the study found NEC occurring in 14% of piglets receiving formula containing lactose, compared with 44% of piglets receiving formula containing CSS.

98. Dr. Rudolph forwarded the email to defendant Sholtis and Dr. Valentine (and included Dr. Cooper), writing, "Lactose is good." Sholtis forwarded the email to business directors and wrote, "***[A]nother reason to shift away from corn syrup solids***." She separately sent another email in which she acknowledged that the change could be desirable but questioned whether it could be justified commercially because "it will be difficult to say we are going to sell THAT MUCH MORE." (emphasis in original). Dr. Rudolph responded to defendant Sholtis's last email, writing, "I agree." Sholtis's contemporaneous acknowledgment of the findings demonstrates that she was personally aware of internal and published research linking Mead Johnson's formula composition to elevated NEC risk and recognized the financial implications of those findings for the Company's preterm nutrition products. Notably, Dr. Waworuntu noted that Mead Johnson's products have the lowest lactose ratio in preterm products.

99. Similarly, Dr. Cooper sent an email in November 2018 to Robert Elliott, Global Brand Director for Infant Nutrition, and Dr. Teresa Murguia, Associate Medical Director of Global Clinical Research, and copied Drs. Rudolph and Valentine. Dr. Cooper wrote, "Colin, Carol Lynn, and I think that increasing the lactose in our product line and minimizing [carbohydrate] polymers is a good thing to do."

100. In June 2019, approximately one year after Mead Johnson personnel reviewed and circulated the piglet study's findings, Dr. Burrin contacted the Company to determine whether it had removed CSS from Enfamil Premature 24 Cal/fl oz ("EPF 24") in light of the research. Dr. Valentine forwarded the inquiry internally and was informed by Kelly Walsh, Mead Johnson's Director of Nutrition Science, that the formulation had not changed. Dr. Valentine subsequently confirmed that EPF 24 continued to contain CSS. Thus, despite internally recognizing that CSS may trigger NEC, evaluating lactose as an alternative, and revisiting the issue after Dr. Burrin followed up, Mead Johnson left EPF 24 unchanged. The contemporaneous communications demonstrate that the principal objection discussed internally was not whether a potentially safer formulation was scientifically feasible, but whether, as Sholtis noted, the change would generate sufficient additional sales.

101. In 2026, Dr. Buddington, consistent with his concern that formula was a risk factor for NEC (which he shared with Dr. Waworuntu), published a study titled "Preterm infant formulas with glucose polymers and reduced lactose content increase the risk of necrotizing enterocolitis." In his paper, he challenged the notion espoused by Reckitt that the elevated NEC incidence from preterm bovine-based formula is merely the byproduct of the protective nature of human milk. He did so by pointing out that findings demonstrate that there is a direct relationship between the percentage of glucose polymers in preterm formula and the risk of NEC. He continued: "The

absence of protective elements in breast milk does not explain the increased risk of NEC for preterm pigs fed preterm formula with increasing proportions of glucose polymers. If glucose polymers were safe, the incidence and severity of NEC would be similar for preterm formula with different proportions of the carbohydrate represented by glucose polymers." He also pointed out that findings demonstrate that preterm pigs fed both breast milk and glucose polymers experience NEC at the same rate as when solely fed preterm formula with comparable percentages of glucose polymers.

102. Dr. Buddington went on to state, "The direct relationship between the amount of glucose polymers in formula fed to . . . NEC incidence corroborates the findings for preterm pigs and neonatal mice and collectively reveal that glucose polymers are a more important risk factor for NEC than the absence of potentially protective elements in breast milk. ***Indeed, one of the protective elements in breast milk appears to be the presence of lactose, and corresponding absence of glucose polymers***. This makes the substitution of lactose with glucose polymers risky and unnecessary." He concluded that the "[e]vidence presented here that glucose polymers directly and indirectly damage the immature gastrointestinal tract and trigger NEC via multiple mechanisms justifies additional animal research and independently funded randomized clinical trials . . . to determine whether any amount of glucose polymers can be safely included in preterm formula[.]" Thus, the unidentified protective ingredient in human milk that Reckitt claims protects against NEC appears to be the same ingredient it knew its formula lacked and yet adamantly refused to add.

103. These facts not only demonstrate that Defendants understood the elevated risk of NEC from consuming Reckitt's preterm bovine-based formula, but also suggest a significant risk to its commercial viability. Doctors and parents likely would have viewed the potentially deadly risk associated with Reckitt's preterm formula as substantially outweighing the benefit of using the product, particularly in light of the existence of human donor milk.

## V. Reckitt's Preterm Formula Served as a Critical Customer-Acquisition Mechanism for its Broader Baby Formula Portfolio

104. Infant formulas marketed specifically for premature babies are a key part of Reckitt's business.

105. The Company's infant-formula revenue in the United States comes primarily from "retail" sales to parents buying formula after bringing their babies home from the hospital. However, the critical way that Mead Johnson and its competitors (primarily Abbott, which is its only formula competitor in hospitals) gain retail sales is by having hospitals provide their formulas to parents of newborn babies. Once doctors, nurses, and nutritionists in the hospital recommend a particular formula, the parents will typically continue to buy that particular formula after taking the baby home.

106. Mead Johnson generally provides its infant formulas to hospitals at little or no cost and does not earn substantial revenue from hospital sales themselves. Rather, hospital use serves as a mechanism for generating downstream retail sales. Internal Mead Johnson documents confirm that Mead Johnson's business model depends heavily on securing hospital adoption of its products because parents frequently continue purchasing the same formula brand after discharge—they recognized that the "[h]ospital is critical for US customer acquisition" and that a "hospital's potential market value is related more to its effect on eventual purchases of formula than to its projected direct purchases for Mead Johnson."

107. Company personnel understood the importance of the NICU to Mead Johnson's success. During the *Watson* trial, for example, then-Reckitt CEO Rakesh Kapoor testified that he was informed no later than October 2017 that "feeding newborn babies in the hospital is the life blood of the U.S. infant formula and children nutrition business."

108. Mead Johnson's internal strategy was straightforward: "If you own the NICU, you can own the hospital." Other internal planning materials likewise recognized, as did Glen Kawlewski—who worked in marketing and medical sales for Mead Johnson from 1985 to 2023—during the *Inman* trial, that the NICU was the critical driver of hospital contracting, reflecting the Company's understanding that control of feeding decisions for premature infants was essential to securing broader hospital adoption of its infant formula portfolio.

109. Mead Johnson's marketing strategy was critical to "win[ning] the NICU." Robert Cleveland was Reckitt's Global Category Director of Nutrition from 2020 to September 2021 and its Senior Vice President for North America Nutrition from September 2021 to the present. He was two reporting layers below Licht, and reported directly to Sly. Cleveland testified during the *Watson* trial that Mead Johnson spent about $340 million in 2023 on marketing. When asked during the *Inman* trial what it meant to "own the NICU," Kawlewski explained that if "the physicians within the NICU believe in your products for formula-fed babies, it's very possible to win the rest of the hospital."

110. New York University Professor Jennifer Pomeranz, who during the *Watson* trial served as the Plaintiff's expert in marketing and public health, including the marketing of preterm infant formulas and the public health implications of that marketing, reviewed internal Mead Johnson documents and testified that Mead Johnson's preterm-formula business was "the most important" component of the Company's marketing strategy because, according to Mead Johnson, it sought to "win the NICU." According to Professor Pomeranz, Mead Johnson internally described its marketing strategy as "acquisition, retention, extension." That strategy contemplated, in Mead Johnson's words, "acquiring" infants onto its products during their hospital stay, retaining those infants on Mead Johnson products following discharge, and extending those customer relationships through additional Mead Johnson-branded nutritional products during infancy and childhood.

111. Internal Mead Johnson documents reflected this. Its internal marketing materials described hospitals as a "key driver of early acquisition" and referred to infants as being "acquired," "branded," and "flipped" from competitors. Cindy Hasseberg, Vice President of Medical Sales, emailed Cleveland, to whom she reported, stating, "We still follow the old fun saying of FEED 'em, Bag 'em and Club 'em!" She wrote that this meant feeding formula to infants while in the hospital, giving them a bag of formula as they left the hospital, and enrolling the mothers in Mead Johnson's rewards program. She concluded the email by writing, "#Acquisition."

112. Cleveland testified in the *Watson* trial that it is approximately 70% likely that a parent whose infant received Mead Johnson products in the hospital continued purchasing those products after discharge, making NICU placement one of the Company's principal customer acquisition mechanisms rather than a profit center in itself.

113. Cleveland also testified that hospitals receiving Mead Johnson products often committed to use its products for 80% to 90% of defined hospital use.

114. Susan Neuhoff, a Mead Johnson sales representative, similarly testified during her *Inman* deposition that Mead Johnson commonly provided its NICU products to hospitals at nominal prices solely to secure long-term product usage commitments.

115. Within hospitals, the neonatologists working in the NICUs are critical to determining which companies' formulas the hospital will use. Since many mothers of premature babies cannot produce enough milk for their babies, the NICU doctors need to be able to provide donor milk, human-milk-based formula, or bovine-based formula to many of the premature babies who are treated in the NICU during the first weeks of their lives. The NICU doctors' decision about which supplier's products are appropriate for feeding premature babies in the NICU is the primary driver of the hospital's choice of supplier for an entire portfolio of formulas for all infants.

116. Recognizing the importance of clinical decision makers in the NICU, Mead Johnson developed marketing strategies specifically directed toward neonatologists. Internal Company training materials identified the neonatologist as "often the key decision maker for product choices for the NICU" and identified "Formula Hospital Feeding" and "Formula Discharge Protocol" as commercial opportunities associated with those physicians. The same materials identified neonatologists who were "Advocates of breast feeding" as a commercial risk. Mead Johnson also sought to influence neonatal feeding decisions through physicians whom the Company described as "key opinion leaders." Internal documents stated that such key opinion leaders possessed a "[d]isproportionate influence over what [their] peers use/recommended/do."

117. Internal Mead Johnson documents stated that "75% of contract decisions are influenced by the nutritional offering in the NICU." Cleveland likewise testified in *Watson* that Mead Johnson generally could not secure a hospital's nursery business without first obtaining the NICU business and could not obtain the downstream retail revenue generated after discharge without first securing the nursery business.

118. Accordingly, Mead Johnson's premature-infant formulas served as a critical customer-acquisition mechanism for its broader infant-formula portfolio. By securing use of its premature formulas in the NICU, Mead Johnson increased the likelihood that hospitals would adopt its products throughout the nursery and that parents would continue purchasing those products after discharge. Because Mead Johnson did not have a human-milk-based formula during the Class Period and still does not have one, it aggressively marketed its bovine-based formulas to NICUs, even though, it internally recognized that premature infants fed bovine-based formula faced a materially greater risk of NEC than those fed human milk or human-milk-based nutrition.

## VI. Defendants' Efforts to Acquire a Human-Milk-Based Product Company Reflects Their Understanding of the Elevated Risk of NEC from Preterm Bovine-Based Formula

119. Defendants' efforts to acquire a producer of human-milk-based demonstrates that they understood that bovine-based preterm formula increases the risk of NEC. This posed a significant threat to Mead Johnson's U.S. revenues generated from formulas and fortifiers, which during the Class Period amounted annually to approximately $1 billion. Defendants' understanding of this is reflected by their recognition that human-milk-based preterm products increasingly threatened the role of Reckitt's bovine-based preterm formula in the NICU. Defendants were keenly aware of this—a Mead Johnson-commissioned report from the consulting firm Advancy determined: "[donor human milk] expected to fully replace [infant formula] by 2021." During the *Watson* trial, Cleveland testified that the availability of donor milk has grown since 2010.

120. For more than a decade, Reckitt evaluated acquisitions, partnerships, and strategic opportunities involving human-milk-based nutrition products, including Prolacta in 2008, Neolac in 2009-2010, Medolac in 2017, and Lactalogics in 2021. The Company's internal strategic materials consistently evaluated those opportunities against the backdrop of published evidence that exclusive human-milk feeding reduced NEC and increasingly influenced hospital purchasing decisions, physician practice, and competition in the NICU. These strategic considerations demonstrate that Reckitt evaluated the comparative NEC evidence not merely as a scientific development, but as one with direct implications for its hospital business.

121. Reckitt's evaluation of a potential acquisition of Neolac reflected that understanding as early as 2010. An internal presentation prepared for the Mead Johnson's Management Committee identified as a principal clinical benefit of human milk "hard clinical outcomes reducing the incidence of Sepsis and NEC" and further stated: "Market need. NEC, proven decrease if only human milk is given." When the presentation was revised for external distribution, however, those

statements were replaced with materially softer language stating only that "[h]uman milk is being studied to understand the benefit that might be derived during sepsis and NEC."

122. The Company confronted the same competitive dynamic when it evaluated a potential partnership with Medolac. In November 2017, Mead Johnson retained Advancy to evaluate Medolac, a supplier of donor human milk products. Advancy's final report, which was received by Reckitt's then-CEO Kapoor, defendants Sly and Sholtis, and Dr. Valentine, stated that "clinical studies showed the superiority of DHM [donor human milk] vs formula in decreasing the risk of NEC" and warned that "it will become harder for NICU's to justify not using DHM" for very low birth weight infants. The report further stated that approximately 30% of Level III NICUs continued to use preterm formula despite increasing donor human milk adoption, and that "[l]ack of DHM insurance coverage in hospitals is the #1 reason for incomplete adoption of donor milk," and reported that hospitals rationed donor milk because of budget constraints rather than supply shortages.

123. Defendant Sly, in an October 2017 email to Mead Johnson management, highlighted his view of the importance of partnering with Medolac:

> A small number of organizations (Prolacta, Medolac, Ni-Q), have begun to produce nutritional products based on human milk from specifically designed donor milk banks. . . . ***The future of feeding preterm infants is likely to no longer be predominately a bovine-based world – there is going to be more and more human milk used in the NICU.*** The landscape is shifting sufficiently enough to start thinking about the MJ/RB product offering in this new landscape. A partnership with Medolac potentially provides opportunity for RB to extend its value proposition in the hospital; a potential to differentiate and grow as . . . the best choice for every doctor, every baby."

124. Internal materials stated that the Medolac portfolio would "transform our ability to win in hospitals," described human milk as the "gold standard for NICU feeding," and cited mounting evidence of "improved clinical outcomes (fewer complications including NEC and reduced mortality rates)." The same materials thus connected the clinical advantages associated with

human milk—including reduced NEC—to Mead Johnson's ability to compete for hospital contracts and generate additional revenue.

125. That strategy was presented directly to Reckitt's most senior executives. In June 2018, Reckitt executives, including Kapoor, received a U.S. Health Brand Plan presentation stating that "Human milk has become the 'gold standard' in the NICU" and that adding donor human milk would allow Mead Johnson to "meet every feeding need for preterm and supplemented postpartum babies." The same presentation described a Medolac partnership as providing "a hospital contract lever" and "a new contracting lever for [Reckitt Benckiser/Mead Johnson Nutrition] vs. Abbott," and projected increased revenue through both hospital sales and new hospital contracts.

126. Defendant Sly subsequently connected the proposed Medolac relationship to Reckitt's hospital competitiveness. On October 18, 2018, Sly emailed Kapoor regarding a proposed strategic partnership with Medolac, reminding him that Kapoor had previously directed management to pursue a broader strategic relationship with Medolac. Sly explained that the proposed arrangement would give Reckitt an exclusive right to offer discounted Medolac products to hospitals and described that right as "key to our ability to leverage Medolac to enhance our Hospital contracting competitiveness." The proposed transaction also contemplated collaboration on the development of a human-milk-based infant formula and milestone payments tied to the development of a human milk fortifier product. These communications demonstrate that Sly and Kapoor personally understood that access to human-milk products could materially improve Reckitt's ability to obtain and retain hospital contracts.

127. Kapoor's own testimony confirmed his understanding of the clinical developments driving that strategy. Kapoor testified at the *Watson* trial that, by 2017, he had been informed that

NICUs increasingly preferred human-milk fortifier (*i.e.*, a substance added to human milk or formula to provide additional nutrients) rather than bovine fortifier; that demand for human-milk-based products was driven by the fact that they provided protective gut health, including the avoidance of NEC; and that there was a medical need for donor milk because it reduced the likelihood of NEC. Kapoor was therefore informed that neonatal feeding practices were changing as a result of the evidence regarding NEC, and of increasing demand for products that Mead Johnson did not offer.

128. Reckitt continued to incorporate the comparative NEC evidence into its hospital strategy during the Class Period. In March 2021, Mead Johnson prepared an internal strategic presentation evaluating a "'Leapfrog' Human Milk Opportunity" involving Lactalogics and other human-milk-based nutrition strategies. The presentation described human-milk-based products as a way to "[l]eapfrog the competition" and strengthen Reckitt's hospital portfolio, and identified one principal clinical benefit in stark terms: human milk "[r]educes NEC by 80 percent." The presentation thus connected the reduction in NEC associated with human milk to a strategic opportunity to expand Reckitt's hospital business.

129. Mead Johnson recognized that human-milk-based products conferred a competitive advantage in the NICU because of their association with reduced NEC risk years earlier. In a May 2013 email concerning proposed Kentucky legislation that would require insurance coverage for human-milk-based products for preterm infants, Cleveland wrote to, among others, Sholtis that "[i]f I interpret the below correctly in commercial terms, we will now be at a substantial disadvantage versus Abbott … in Kentucky for the NICU business." Cleveland testified that he was referring to Abbott's partnership with Prolacta, which provided Abbott access to a human-milk-based product offering that Mead Johnson lacked.

130. Other internal communications reflected the same concern regarding Prolacta's efforts to obtain third-party insurance reimbursement. Communications from January 2015 by Dr. Berseth to Nitida Pastor, then Reckitt's Medical Affairs Director Europe, IFCN, and Dirk Hondmann, Senior Vice President of Research and Discovery, discussed the importance of publishing data that would "contradict" studies conducted by Prolacta Bioscience, whose research was being used to obtain third-party reimbursement support for human-milk-based products. The communication warned that "[i]f they are successful in this bid, they will own the NICU, as cost will no longer be an issue for hospitals." Mead Johnson thus recognized that cost and reimbursement were principal barriers to broader hospital adoption of human-milk-based products and that eliminating those barriers could cause hospitals to shift away from bovine preterm products.

## VII. Defendants Understood the Commercial Consequences of NEC-Related Product Labeling

131. Defendants knew from firsthand experience that information appearing on the label of a neonatal nutrition product could be used to alter physician behavior, cause hospitals to remove Mead Johnson products, and shift market share to a competitor. Professor Pomeranz testified at the *Watson* trial that Mead Johnson's acidified fortifier product suffered years of commercial difficulties after Abbott negatively highlighted the product's "acidified" labeling language in its own marketing efforts (unrelated to NEC). According to Professor Pomeranz, Abbott's campaign was successful and resulted in Mead Johnson products being removed from hospitals.

132. Professor Pomeranz also testified that if Mead Johnson added a warning to its label, "Abbott would latch on in a second and drive that as one of its main marketing features" by highlighting that "Mead Johnson's product causes necrotizing enterocolitis." She further testified that "the goal would be to get people to use Abbott's [formula] instead." Reckitt therefore knew from experience that negative language appearing on a neonatal product label could be leveraged by

a competitor to influence hospital purchasing decisions and cause Mead Johnson products to lose hospital placement.

133. Cleveland acknowledged as much, having testified during his *Whitfield* deposition that he previously testified that it would be "really bad" for Mead Johnson if a warning associated with its preterm infant products discouraged neonatologists from selecting Mead Johnson products over competitors' products. Cleveland's testimony therefore confirmed that Reckitt understood an NEC warning could discourage neonatologists from selecting Mead Johnson's products, weaken its hospital contracting position, and threaten the downstream commercial benefits that depended on NICU adoption.

## VIII. Reckitt Knew that Many Doctors Were Not Fully Informed of the NEC Risk from Bovine-Based Formula, and Concealed and Exploited that Information Environment

134. Treating physicians did not fully appreciate the magnitude of the NEC risk associated with bovine formula, which Defendants understood and exploited.

135. Dr. Amy Gates stated at a conference in 2018 that NICU doctors are not consistently up to date about scientific research relevant to their practice: "One of Mead Johnson's weaker points is that you're making a lot of assumptions about the knowledge base of the NICUs and their ability, not just their nutrition knowledge, but their ability and their willingness, and their time to critically review journal articles." She further observed that hospital personnel were "being heavily swayed by marketing" and were relying on "glossy conclusions" rather than critically analyzing the scientific literature.

136. Dr. Swanson testified at the *Watson* trial that he agreed that "neonatologists are generally not fully aware of the magnitude of the risk and severity of NEC in premature infants. . . ." In an article he published based on a survey, Dr. Swanson reported that only about half of neonatologists recognized that human milk had a major impact in reducing NEC. Testifying at the

*Watson* trial, Dr. Swanson agreed that "there's an underestimation of NEC risks with regard to cow's milk-based formula[.]"

137. Reckitt also maintains a sales force of representatives who visit doctors and hospitals to give or sell Reckitt products to them. Dr. Valentine testified in the *Watson* case that "sales reps are often [neonatologists'] avenue for education. And so [the reps] give [the neonatologists] educational handouts, papers, statistics[.] And [the doctors] get it from all the companies and then they make an educated decision is what usually happens."

138. Nevertheless, Hasseberg testified during her *Inman* deposition that she never attended a meeting in which it was suggested for Mead Johnson's sales operation to take efforts to systematically warn doctors and hospitals that babies consuming formula develop NEC as higher rates than those not consuming formula.

139. Dr. Valentine testified during her *Inman* deposition that she was never involved in trying to create any such warning providing information regarding the risk of formula consumption. She also testified that to her knowledge, no one at Mead Johnson brought that up, or considered creating an information card or warning for doctors or parents regarding the increased risk.

140. Moreover, Reckitt, like other manufacturers of products that are provided to doctors and hospitals to be given to patients, routinely sends Dear Doctor letters to doctors and hospitals to advise them of scientific studies that identify risks associated with the products. Despite being aware of the significantly greater risk of NEC associated with its infant formulas for premature babies, Reckitt never advised doctors and hospitals of this risk during the Class Period.

141. The information Reckitt withheld was precisely the type of information treating neonatologists expected manufacturers to disclose. Dr. Elena Minakova, a practicing neonatologist who, among others, treated the plaintiff's infant in the *Watson* case, testified that physicians should

be informed of potential NEC risks even based on a single study, and even where causation has not been established. She agreed that it is important for companies to warn about potential NEC risks, to disclose possible associations reflected in the scientific literature, and to ensure that treating physicians are aware of such information. Dr. Minakova further testified that, if similar information existed regarding EPF 24 or other Mead Johnson products, she would want to know it as a treating physician because physicians need "as much information about the products that we're using and any sort of potential risk for . . . adverse events."

142. Reckitt's internal editing of presentations to be shown to doctors during the Class Period also demonstrates that Reckitt downplayed the risk of NEC resulting from consumption of bovine formula in premature babies but deliberately obscured that evidence by removing language reflecting a causal relationship. For example, in a presentation by Dr. Valentine titled "Nutrition to Support Adequate Growth in Preterm Infant," an internal draft stated that "human milk significantly reduces risk of Necrotizing Enterocolitis or Death in Extremely Low Birth Weight Infants in a Dose-dependent Manner." However, the final version that was presented to doctors instead stated that "Human milk Is Associated With Lower Risk of Necrotizing Enterocolitis or Death in Extremely Low Birth Weight Infants in a Dose-dependent Manner," obscuring the causal relationship. In the *Watson* trial, Hasseberg stated that it appeared that "Mead Johnson is downplaying the risk of NEC" and that "the changes themselves . . . understate[d] the risk of NEC as compared to the original language."

143. Similarly, the internal draft stated, "Human milk has a dose-dependent beneficial effect on risk of NEC or death in extremely low birth weight infants." The final version that was presented to doctors, however, stated instead that "human milk intake is associated with a dose-related reduction." The initial draft also stated, "Human milk consumed by preterm infants within

the first 14 days offers a great degree of protection in reducing NEC-associated mortality in a dose-dependent manner"; the final version instead stated that "the study suggests that human milk consumed by preterm infants within the first 14 days is associated with a dose-related reduction in NEC incidence." The study cited in the slide deck's speaker notes was from 2009, indicating that these edits were not a good-faith "update" based on new information but rather an effort to conceal the scientific literature reflecting that bovine-based feeding was associated with materially higher rates of NEC by removing language describing a causal protective effect of human milk.

144. In creating this information vacuum, Reckitt employees continued to ignore the science and insist that they needed data demonstrating that human milk is not categorically superior to formula. For instance, in 2015, Dr. Rudolph discussed piglet studies suggesting that formula using lactose, rather than CSS and maltodextrin, resulted in lower NEC incidence. He wrote in an email to, among others, defendant Sholtis, Dr. Berseth, Dr. Cooper, and Braun, saying, "Wouldn't it be amusing if the primary factor differentiating [human milk] feeding from formula feeding per NEC morbidity turns out to be lactose?" Braun responded that he "long felt we need to address the issue of Human Milk in the NICU vs. pre-term formula. We face a perception by many that [human milk] is the only choice and that it is categorically better. I don't believe this is the case, but we need data." Dr. Cooper responded that "[i]t seems every manuscript begins with a sentence acknowledging the bias: 'of course human milk is obviously superior . . . blah blah.' . . . Despite that, the trend now is to use donor human milk whenever possible . . . It will be a real challenge (cost a lot of money) for an *INDUSTRY* sponsored trial to convince neonatologists of the equivalency." Dr. Valentine responded, "I believe we have a real opportunity to compete with donor milk and call out its deficiencies[.]"

145. Thus, Defendants affirmatively shaped the information environment in which doctors made feeding decisions by selectively presenting favorable science, omitting statistically significant NEC findings, avoiding warnings, and targeting NICU decision-makers whose choices were critical to Mead Johnson's hospital contracting and downstream retail-sales strategy.

## IX. Reckitt Concealed NEC Risk from Parents, Sales Employees, and the FDA

146. Along with doctors, Defendants also actively concealed the elevated risk of NEC from bovine-based preterm formula from parents, sales employees and the FDA.

147. The labels for the versions of Reckitt's formula that are marketed for premature babies and on the Company's website did not include any warning during the Class Period that these formulas are associated with a greater risk of NEC. Nor did they include any studies on any product inserts indicating that infants consuming preterm formula are more likely to get NEC than from human milk.

148. During the *Watson* trial, Professor Pomeranz testified that the way Mead Johnson marketed its preterm formula was not backed by science, stating:

> ***It's contrary to the science. It's not a science-led marketing campaign. It's contrary to public health. It also is leading to people not being able to make informed decisions. There is no way to make an informed decision when the science is being hidden and covered up by not only Mead Johnson to the sales reps, to the hospitals, to the patients.*** There's really no way to have made an appropriate decision the way the information environment is today.

149. Similarly, a Mead Johnson pamphlet that was distributed to parents in NICUs during the Class Period noted that NEC was "a severe problem with the intestines" but said, "the cause is not very well understood," without informing parents that Mead Johnson believed bovine formula led to an increased risk of NEC or that numerous scientific studies—including its own—showed an increased risk of NEC for babies who were fed bovine formula versus donor milk or human-milk-based formula.

150. Professor Pomeranz testified that based on the documents she saw in that case, Mead Johnson sales representatives on the medical sales force did not know much about NEC, and were not even trained about NEC.

151. Despite being aware of the greater risk of NEC associated with its infant formulas for premature babies, the Company trained its sales representatives during the Class Period not to mention this risk to the doctors and hospitals with whom they spoke. In case doctors brought up the question, the Company trained its sales representatives with talking points about purported flaws in scientific studies that said there was an increased risk of NEC for babies who were fed bovine formula. For example, shortly after publication of the 2016 O'Connor study, which showed NEC incidences of 1.7% of infants on donor milk and 6.6% of infants on formula, Dr. Valentine wrote in an internal email about how to respond to the study that there was "no diff [difference] in NEC," which was untrue. In an early 2020 training video for nutritionists who would speak about Mead Johnson products outside the Company, Dr. Valentine said that the O'Connor study "found that there was no difference" with respect to cognitive development "in those two groups" that received either donor milk or Mead Johnson formula, without mentioning that there was a difference in NEC cases.

152. The information vacuum Mead Johnson facilitated similarly encompassed senior Mead Johnson executives. For example, Gary Rizzo, Mead Johnson's marketing director for Enfamil, testified during his *Inman* deposition that when he was hired as Enfamil's marketing director, he received training on safety issues regarding preterm formula products—including on ingredients, their effects, and safety checks—but did not learn specifically about the safety of using bovine-based formula with preterm infants.

153. Reckitt also never reported the existence of a reasonably possible causal relationship between its formula and NEC from the FDA, despite having received "adverse event reports" from

hospitals and complaints from parents concerning premature babies who became ill or died after being fed the Company's bovine formulas during the Class Period. Mead Johnson is required by the FDA to "conduct an investigation and notify the Agency" when "there is a reasonable possibility of a causal relationship between consumption of an infant formula and an infant's death[.]"

154. One adverse event report, for instance, listed an email from a parent insisting that Mead Johnson remove her from a mailing list, claiming that "[i]t is because of your animal-based preterm artificial baby food crap that you peddle to hospital NICU's that my son is dead from NEC." Despite receiving concerning adverse event reports such as this, there is no record over the last 25 years, according to KFF Health News, that Mead Johnson has reported to the FDA that a causal relationship between its formulas and NEC death was reasonably possible.

155. Rather than treating those reports as information warranting evaluation of the growing scientific literature associating bovine formula with materially higher rates of NEC, Reckitt instead maintained internally, and communicated externally, that no causal relationship existed between its formulas and NEC. The Company further treated adverse event reports as potential manufacturing issues involving particular product lots and limited its investigations to determining whether batch-specific manufacturing defects existed, rather than evaluating whether the reported NEC cases were consistent with the comparative clinical evidence known to the Company.

156. Dr. Valentine, who was responsible for the Company's decisions about how to handle adverse event reports, adhered throughout the Class Period to the Company line that no causal relationship between its formulas and NEC had been proved, despite the scientific literature demonstrating higher rates of NEC for babies fed bovine formula than those fed human milk. Consistent with that Company line, Dr. Valentine determined in every instance—often within a few

minutes of receiving an adverse event report or complaint—that there was no need to report it to the FDA, amounting to a situation of the fox guarding the henhouse.

157. On October 12, 2018, Mead Johnson received an adverse event report stating that two infants receiving Mead Johnson's EHMFAL fortifier had developed NEC and that one of the infants had died. At 11:34 a.m., the report was circulated internally. Three minutes later, at 11:37 a.m., Dr. Valentine responded, "No other reports and in Randomized trials no increased risk for this so most likely unfortunate underlying reason." The certainty with which Dr. Valentine responded to the report is contradicted by Dr. Valentine's testimony during her *Inman* deposition, in which she stated that there is not a consensus in the studies she has reviewed regarding the risk differential of NEC between formula and donor milk consumption, and that it is an area in which the science is evolving. It is also contrary to Braun's testimony in *Inman*, described below, that Mead Johnson never funded a randomized clinical trial comparing formula to human milk concerning NEC.

158. When asked at the *Watson* trial whether, within approximately three minutes of receiving the report, she was expressing the view that the event was "most likely not a causal relationship," Dr. Valentine answered, "Yes." These internal causation assessments occurred against the backdrop of Mead Johnson's knowledge that its bovine-based preterm formulas were associated with materially higher rates of NEC than donor milk and human-milk-based feeding, and that NEC was a central clinical concern in the NICU setting.

159. Mead Johnson likewise actively managed the classification of NEC-related adverse events within Company-sponsored studies. Dr. Berseth testified regarding an adverse event review in which a premature infant's medical records identified "suspected necrotizing enterocolitis." Despite the presence of NEC in the medical records, a notation was later added directing personnel to "please correct SAE CRF"—that is, to revise the Serious Adverse Event Case Report Form.

Dr. Berseth acknowledged that the supervising physician did not sign the form authorizing the change. Dr. Berseth admitted that Mead Johnson changed the adverse event data reported in the final study report, including information submitted to the FDA, and that the revised data, rather than the original information reflected in the infant's medical records, was reported in the resulting publication.

160. In 2017, Dr. Valentine also edited a script for Company employees receiving calls about adverse events to remove the implication that the Company's bovine formula caused NEC. A prior version of the script instructed call recipients to ask, "Are there other medical problems or potential causes of NEC that are being considered?" Dr. Valentine left a comment to this stating, "Implies you can cause NEC," and edited it to read, "What other medical problems is the infant diagnosed to have?" Similarly, the prior version of the script instructed call recipients to ask: "Does the infant have a history of feeding intolerance?" Dr. Valentine left a comment to this stating, "Omit- implies a cause and effect," and edited it to read, "Do you have a standard feeding protocol?" At the *Watson* trial, Dr. Valentine admitted that she made these changes to avoid having the script imply causation of NEC. In her 2017 edits, she also deleted the statement that "Human milk and careful advancement of feedings are known to be effective in prevention."

161. These facts demonstrate that Defendants' concealment of NEC risk affirmatively shaped the information environment of parents, sales employees, and the FDA by selectively presenting favorable science, omitting statistically significant NEC findings, and avoiding warnings.

## X. Reckitt Understood that NEC Warnings Were Feasible and Would Affect Physician and Parental Decision Making

162. Reckitt's own labeling practices demonstrate that the Company knew NEC-related warnings could be provided to physicians even without definitive proof of causation. Reckitt's labeling for Cafcit, a neonatal pharmaceutical product containing caffeine and administered to

premature infants, warned that in a double-blind, placebo-controlled study, six cases of NEC developed among 85 infants studied (or 7%), including three deaths, and advised that patients treated with Cafcit should be carefully monitored for NEC. Though the FDA required this warning, as it was for a pharmaceutical product, Reckitt expressly stated that it was provided "although a causal relationship has not been established."

163. During the *Watson* trial, Dr. Valentine acknowledged that such a label "goes out to doctors and then doctors will know that there's a study out there that they can go look at to determine whether the risks associated with this product are sufficient to justify using it[.]"

164. Reckitt provided that NEC-related disclosure for Cafcit based on far fewer reported cases—7% of study participants—and without established causation, but included no comparable warning, disclosure, or discussion of NEC risk on EPF 24 or other bovine-based preterm formula labels, despite decades of published literature and internal Company materials associating bovine-based feeding with higher NEC rates in premature infants—ranging from 6.7% to 21%.

165. The Company did speak to NEC risk in connection to another product in its Pediatric Product Guide—its Enfamil Human Milk Fortifier Acidified Liquid. Specifically, it stated that there were "[n]o statistical differences in confirmed NEC (3%), sepsis (12%) or serious adverse events than Enfamil HMF Powder."

166. The Cafcit label, and Reckitt's NEC disclosure regarding Enfamil Human Milk Fortifier Acidified Liquid, thus demonstrate that Reckitt understood the importance of disclosing information concerning a potential association with NEC, even if causation had not been established.

167. Professor Pomeranz testified at the *Watson* trial that, when shown the EPF 24 label, there was "no warning at all" regarding NEC. She further testified that the label contained "no mention" of NEC and did not even disclose an association between EPF 24 and NEC risk. Professor

Pomeranz testified that Mead Johnson could have added an NEC warning to the EPF 24 label and that there were no FDA restrictions preventing the Company from doing so. She further testified that responsibility for ensuring that the label contained appropriate warnings rested with Mead Johnson itself. Thus, the absence of an NEC disclosure on the Enfamil label was not compelled by federal labeling requirements or by any regulatory prohibition; Mead Johnson retained both the authority and the responsibility to provide the warning.

168. Defendants also understood that warnings concerning serious risks to infants would affect both physicians and parents. Dr. Susanne Hay, Mead Johnson's expert in *Watson*, acknowledged that prominent warnings regarding serious infant risks would be noticed and communicated. She agreed that if a product label contained a significant warning concerning a dangerous risk to infants, the warning would be brought to physicians' and parents' attention. Dr. Hay further acknowledged that both healthcare providers and parents read product labeling. Collectively, these facts demonstrate that Reckitt understood it was able to disclose comparative NEC risk information without asserting that its products caused NEC, knew that physicians and parents would consider that information important in making feeding decisions for premature infants, and recognized that such disclosures could influence physician recommendations, parental choices, and hospital adoption of its products. Nevertheless, Reckitt omitted any warning or discussion of comparative NEC risk from its preterm formula labels, did not communicate that information through Dear Doctor letters or other physician-facing channels, and continued to represent publicly that its premature infant nutrition products were safe, science-backed, and lifesaving. Reckitt's own use of an NEC warning for Cafcit, despite expressly stating that "a causal relationship has not been established," further demonstrates that the Company's asserted uncertainty

regarding causation of NEC by its formula did not prevent it from warning parents of this deadly disease.

## XI. Reckitt Manipulated Scientific Messaging Concerning NEC and Human-Milk Feeding

169. Reckitt did not merely fail to disclose comparative NEC evidence. The Company actively managed how that evidence was communicated to physicians, hospitals, and healthcare providers. Internal documents and witness testimony show that Reckitt selectively emphasized favorable findings, minimized or omitted unfavorable NEC data, edited scientific presentations, attempted to influence publications and clinical guidance, and developed strategies to counter messaging concerning the benefits of donor milk and human-milk-based feeding.

170. Reckitt's internal recognition that exclusive human-milk feeding reduced NEC is particularly significant because the Company later altered the manner in which that same information was presented externally. Evidence presented at the *Watson* trial showed that, in September 2010, Mead Johnson used an external presentation containing the same discussion of NEC, including that it was the most common gastrointestinal emergency in premature infants and carried a mortality rate exceeding 50%. However, whereas the July 2010 internal presentation stated that there was a "proven decrease" in NEC when "only human milk is given," the corresponding statement in the September 2010 external presentation was changed to state only that "[h]uman milk is being studied to understand the benefit that might be derived during sepsis and NEC." The contrast between the two presentations demonstrates that Reckitt internally characterized exclusive human-milk feeding as producing a "proven decrease" in NEC while deliberately softening that same message in materials presented externally.

171. Dr. Valentine's attempt to minimize the conclusion of the O'Connor study illustrates the gap between Mead Johnson's internal understanding and its external scientific messaging. As

discussed above, Dr. Valentine initially characterized the O'Connor study as showing "no [difference] in [NEC]." Dr. Wu corrected that characterization, explaining that "there IS a difference in NEC incidence" in favor of donor milk. Senior Mead Johnson personnel therefore recognized the study's statistically significant NEC findings before training speakers and other personnel on how to present the study externally.

172. Despite that internal understanding, Mead Johnson selectively characterized the O'Connor study within its physician education materials. Following publication of the O'Connor randomized controlled trial in the Journal of the American Medical Association, Mead Johnson Medical Affairs circulated an internal summary stating that the study demonstrated a statistically significant decrease in NEC incidence among donor-milk-fed infants compared to formula-fed infants. The summary reported NEC rates of 3.9% versus 11.0%, respectively for all NEC and 1.7% versus 6.6%, respectively, for Stage II or greater NEC. At trial, Dr. Valentine acknowledged that both differences were statistically significant, that the rate of all-stage NEC was nearly three times higher in the formula group, and that the rate of Stage II or greater NEC was more than three times higher in the formula group. Nevertheless, in a 2020 speaker training presentation for healthcare providers and Company sponsored speakers, Dr. Valentine emphasized a purported cognitive concern with donor milk that was favorable to Mead Johnson's formula products while omitting the study's statistically significant NEC findings.

173. Mead Johnson also funded and publicized unreliable results from a 2016 study by Willemijn E. Corpeleijn, et al., to obfuscate its formulas' greater risk of NEC, which Reckitt continued to rely publicly on after acquiring Mead Johnson.

174. The study was marred by significant issues. First, it compared two groups—one with infants consuming both mothers' milk and donor milk, and one with infants consuming both

mothers' milk and bovine-based formula. Each group's intake, however, consisted of over 80% of their own mothers' milk, meaning both groups were primarily consuming human milk. Second, the infants in this study were only fed these mixes for ten days, yet NEC for this age group typically occurs after ten days.

175. The Corpeleijn study was one of the studies Mead Johnson used to train employees to tout that there was no difference in NEC incidence between human and cow's milk.

176. In addition, Mead Johnson willfully blinded itself from developing its understanding that its formula increased the risk of NEC. For instance, it never performed a single clinical study for NEC using humans. This was despite Dr. Waworuntu stating in a memo to the director of Discovery that "Although Mead Johnson Nutrition will not specifically target NEC issue due to difficulties in clinical studies, it seems that there is a need in understanding and addressing infection and inflammatory mediated diseases."

177. Moreover, Braun testified in *Inman* that, at least during his time at Mead Johnson and Reckitt, that Mead Johnson never funded a randomized clinical trial comparing formula to human milk. He also testified during the *Watson* trial that he could not tell if Mead Johnson had conducted a randomized, controlled, double-blind study of its preterm formula since 2002, when it conducted a study measuring the effects of supplemented preterm formulas on growth and development.

178. Dr. Waworuntu similarly testified in *Inman* that to her knowledge, Mead Johnson has never done a study to determine whether its preterm infant formulas present a safety risk for NEC, and has never tested any of the ingredients in its infant formula to determine if they increase the risk of NEC. She also testified that she was not aware of plans by Mead Johnson to improve preterm formula for the purpose of reducing NEC.

179. Mead Johnson also used key opinion leaders and physician education programs to encourage healthcare providers to move premature infants from donor milk to formula before hospital discharge. In doing so, the Company relied upon the Corpeleijn study to communicate purported equivalence between donor milk and formula while simultaneously emphasizing the risks associated with prolonged donor-milk feeding. These efforts are significant because Mead Johnson internally understood: that physicians frequently relied upon Company educational materials and speakers; that healthcare providers were often influenced by how scientific information was presented to them; and that NICU feeding decisions directly affected hospital contracting, customer acquisition, and downstream retail sales. Thus, rather than merely failing to disclose comparative NEC risk information, Mead Johnson affirmatively promoted scientific messages that favored its bovine products.

180. Dr. Valentine taught healthcare providers that preterm infants should be transitioned off donor milk "sooner" because prolonged use of donor milk carried developmental risks, including the baseless possibility that infants would become "special needs." Dr. Valentine thus discouraged the continued use of donor milk by invoking an unfounded risk of permanent developmental impairment. She also led a training seminar that taught that donor milk is "extremely limiting" like a "starving Sudanese woman" "not standardized," and "not nutritionally adequate for [a] preterm baby," and urged to "get [] babies off donor milk sooner," including after the "first month of life." At the same time, however, Dr. Valentine advocated transitioning premature infants to formula by representing that donor milk and formula were equivalent with respect to NEC risk and did not inform clinicians that premature infants fed formula experienced materially higher rates of NEC than those fed donor milk. Rather than presenting clinicians with the known comparative risks and benefits of the available feeding options, Dr. Valentine warned them about the purported dangers of

remaining on donor milk while concealing the materially greater comparative NEC risk associated with transitioning premature infants to formula.

181. The *Inman* court, in denying Mead Johnson's motion for summary judgment, highlighted the existence of evidence demonstrating that Mead Johnson misinformed the public about the elevated NEC risk associated with Enfamil, and specifically addressed Dr. Valentine's claim that prolonged use of donor milk carries developmental risks. The court stated:

> Inman claims the evidence shows that Mead "deliberately created" an "informational vacuum" that concealed the risks of its Enfamil premature product. . . . Rhetoric aside, there is indeed evidence that Mead Johnson's representatives downplayed Enfamil Premature's risks relative to mother's milk. As noted earlier, in one instance, a Mead employee told providers that breast milk would lead to "special needs" among preemies. Mead Johnson has not suggested there is evidence to support this warning, and a fact finder could infer that Mead Johnson was negligent in making statements that generated misconceptions about the safety of formula vis-à-vis mother's milk.

182. Even after the *Watson* verdict, Reckitt continued to try to mislead parents, doctors, and investors by insisting that its bovine-based formula does not increase the risk of NEC; rather, insists Reckitt, human milk reduces the risk. Reckitt's public framing—that human milk is protective but bovine formula does not increase NEC risk—was itself misleading in light of the knowledge possessed by senior Mead Johnson medical personnel. Braun's testimony during his *Inman* deposition, for example, underscores that Reckitt's understanding of the science belied the unequivocal nature of such statements. Specifically, Braun was asked about a conclusion Mead Johnson reached that increased NEC rates from formula consumption was not the result of formula elevating the risk of NEC, but rather that it lacked something in human milk lowering the risk. In response, Braun testified that: he did not "know that we had substantial data at the time to say that"; that "all the evidence isn't in"; that "there simply wasn't enough evidence"; and that he would call such an assertion "a hypothesis that had some data points to support it."

## XII. Abbott and Reckitt Influenced the FDA, CDC, and NIH's Issuance of a Joint Consensus Statement that Downplayed the Elevated Risk of NEC from Consuming Preterm Formula

183. In order to manipulate public opinion and potential jurors, Abbott and Reckitt secretly influenced the FDA, CDC, and NIH's decision to issue a joint consensus statement (the "Consensus Statement") stating that "1) there is no conclusive evidence that preterm infant formula causes NEC; and 2) there is strong evidence that human milk is protective against NEC[.]" Their undisclosed influence undermines the purported independence and credibility of the Consensus Statement.

184. The baby formula industry consists of two companies—Mead Johnson and Abbott—and their interests in combatting NEC litigation are completely aligned.

185. On July 29, 2024, just three days after the jury in *Gill* returned a verdict against Abbott, Robert B. Ford, Abbott's CEO, met with Dr. Robert Califf, the then-FDA commissioner, and others in the food division. The following day, defendant Licht also met with Dr. Califf and others in the food division. Both meetings had the subject, "Infant Formula." According to the New York Times, an individual familiar with the process indicated that formula companies had asked government officials to draft a consensus statement.

186. Shortly after, in August 2024, an advisory committee of scientists and organizational representatives were convened to study the relationship between enteral feeding and NEC. One of the individuals on this committee, Dr. Steven Abrams, had been on Abbott Nutrition Health Institute's Speaker Bureau until 2022. Another individual on the committee, Dr. Mark Corkins, is the spouse of Kelly Corkins, who was also on Abbott's Speaker Bureau. Their connections with Abbott were not disclosed in the Consensus Statement.

187. The Consensus Statement echoes Abbott's position in the *Gill* litigation. According to the New York Times, the Consensus Statement was "expected to help formula makers in upcoming cases."

188. Reckitt and Abbott's efforts to extract a joint consensus statement from the FDA downplaying the risks of bovine-based preterm formula, particularly in light of their understanding that it increases the risk of NEC, highlight the formula industry's influence on and regulatory capture of the FDA. This not only undermines the credibility of the Consensus Statement, but also constitutes active efforts to further mislead the public regarding the safety of consuming preterm bovine-based formula.

189. Further demonstrating the influence the formula industry exerts over the FDA and its ability to engineer the industry-favorable Consensus Statement, in February 2025, Kyle Diamantas, who represented Abbott in *Gill* and two other formula-related cases while in private practice, was appointed to lead the food division of the FDA, which oversees infant formula. The FDA has since maintained its position downplaying the elevated risk of NEC from consuming bovine-based preterm formula. Diamantas became acting head of the FDA on May 15, 2026.

## XIII. Reckitt Influenced the American Association of Pediatrics and Its Agreement with the Joint Consensus Statement

190. Reckitt also engaged in a campaign to influence the AAP to issue a statement downplaying the elevated risk of NEC from preterm formula. In July 2024, in response to NEC litigation, AAP President Dr. Benjamin D. Hoffman released a statement that "[c]ourtrooms are not the best place to determine clinical recommendations for the care of infants. Feeding decisions should be made by clinicians and families. These need to be individualized in the context of human milk availability, specific patient needs, and individual family preferences[.]" Dr. Hoffman also stated, "Part of what is so challenging about NEC is that the causes are multifaceted and not completely understood. Our science does not tell us exactly how to prevent it."

191. In August 2026, the AAP filed an amicus brief in *Mead Johnson v. Clarissa Greear*, Case No. 26-29 (Ill. App. Ct. 2026), in which it cited the joint consensus statement in writing that "conclusive evidence that formula causes NEC is lacking."

192. Colloquy during the *Inman* trial between the court and the parties reveals that there were efforts at the highest level of Mead Johnson, including by Eric Santoro, Mead Johnson's Senior Vice President of Legal, North America, Litigation and Investigations, to persuade the AAP to issue a statement and draft an amicus brief in response to the verdict against Abbott in *Gill*. Specifically, an internal email with the subject line, "Project Rocket" stated, "[m]any urged the AAP speak up sooner, provide the courts with an amicus brief." The email also stated that the AAP's "current statement[] needs to be updated with more definitive language." Project Rocket was a working group put together by Mead Johnson focused on responding to the *Watson* verdict. According to an email discussed during the colloquy, the purpose of the project was to impact public opinion and future jurors.

193. Following the AAP's publication of its statement regarding NEC, Mead Johnson continued making efforts to obtain a stronger statement from the AAP, believing it was too weak and did not go far enough. Emails from *Inman* indicate that Mead Johnson engaged Dr. Camila Martin, who was on the AAP's Fetus and Newborn Committee, and who received research support from Mead Johnson at least in 2023 and 2024 and was one of Abbott's expert witnesses in NEC litigation. Dr. Martin and Dr. Brenda Poindexter, who was also on the Fetus and Newborn Committee, then urged the AAP to convene an emergency meeting to publish the Consensus Statement.

194. The colloquy concerned the admissibility of certain emails and/or testimony introduced at the deposition of Brian Robertson, Reckitt's Senior Vice President of Strategy and Corporate Development in a different NEC-related case. The *Inman* court did not allow the emails

in evidence because they were not related to what happened to the plaintiff's baby, and would improperly open the door to informing the jury about other NEC litigation. However, the court stated on the record as follows:

> ***This really is very ugly stuff***, and you're saying ***'They're waving around the AAP so we have a right to cast a shadow on the bona fides of the AAP.' That could be true in some case***. . . . ***The idea that they're trying to get word out to the general public and influence jurors repels me just as it does you. I think that's wrong.***
>
> But the reality is, I don't think -- I don't think this information about what went on in 2024 and the panic that Mead Johnson or Abbott or anybody else felt about a $495 million [verdict] is something the jurors ought to know about.

195. Reckitt's efforts to influence the AAP to issue a statement downplaying the risks of bovine-based preterm formula and signal agreement with the Consensus Statement, particularly in light of Reckitt's understanding that bovine-based preterm formula increases the risk of NEC, highlight the formula industry's influence on and regulatory capture of the AAP, which not only undermines the credibility of its statements, but also constitutes active efforts to further mislead the public regarding the safety of preterm bovine-based formula.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### I. Defendants Misrepresented and Concealed the Severe Risks of Reckitt's Formulas for Preterm Infants

196. Throughout the Class Period, Reckitt told parents, investors, and the general public that the Company's formulas that were marketed for premature infants were safe and nutritious, while concealing that those formulas actually posed a serious risk of severe illness and even death from NEC, relative to human milk and human-milk-based products.

197. In Mead Johnson's Pediatric Product Guide, posted on its website since at least January 2021 through the present, the Company described numerous Enfamil preterm formulas as having a "***[c]arbohydrate blend of 60% corn syrup solids (glucose polymers)*** and 40% lactose ***that is easily digested*** and helps avoid overloading the premature infant's capacity to digest lactose."

198. Reckitt's website for its Enfamil infant formulas said throughout the Class Period that its preemie formulas were "easy on the tummy":

> Enfamil preemie formulas are designed to support your baby's special nutritional needs. . . . Enfamil preemie formula is specially designed to promote their continued catch-up growth and development throughout their first nine months. ***Our options support the distinct nutritional needs of premature and low-birth-weight infants***. . . . ***And because your little one's belly is still developing, our preemie baby formula is easy on the tummy***. . . . The newest love of your life is ready to hit their next milestone. Nurture their growth and development with Enfamil preemie formulas. From Enfamil NeuroPro® EnfaCare®, clinically shown to promote catch-up growth similar to full-term breastfed infants, to our other premature formula options, Enfamil has formulas to support the special nutritional needs of your perfect baby.

This statement appeared on the Company's website at least as early as September 28, 2021, and remained on the website throughout the Class Period.

199. On November 18, 2021, and continuing through the present, Mead Johnson posted a video advertisement for "Enfamil NeuroPro EnfaCare for preterm infants transitioning to home" on its YouTube channel, in which it touted Reckitt's formula for preterm infants as "patterned after early breast milk":

> Today we are going to talk about Enfamil NeuroPro EnfaCare, enriched nutrition, specially tailored to support growth during premature babies' first year of life. . . . ***Enfamil NeuroPro EnfaCare is patterned after early breast milk***, with an 80-20 whey-to-casein ratio ***that is easy to digest***. Enfamil NeuroPro EnfaCare has demonstrated to help promote catch-up growth similar to full-term, breast fed infants when offered in a program of Enfamil formulas fed through 12 months corrected age.

200. The statements quoted in ¶¶197-199 were materially false and misleading because Reckitt's preterm formula was not "easy on the tummy" nor easily digested. Rather, it increased the risk that preterm infants consuming it would develop NEC and potentially die—a risk that Defendants knew, but did not disclose.

201. The statement quoted in ¶197 was also materially false and misleading because it discussed the blend of CSS and lactose in certain Enfamil preterm formulas while omitting that the

presence of CSS increases the risk of NEC, which Defendants knew based on the studies conducted by Dr. Buddington, Dr. Burrin, and its own scientists.

202. The statement quoted in ¶199 was also materially false and misleading because preterm formula is not patterned after early breast milk—its principal carbohydrate is CSS, which is not found in human milk and which Defendants knew, and omitted, elevates the risk of NEC.

203. On July 27, 2022, during the Company's second-quarter 2022 earnings call, defendant Narasimhan told investors: "On our core Enfa range, we launched . . . our latest NeuroPro product, which ***now contains a blend of human milk oligosaccharides that provide additional immune support.***"

204. The statement quoted in ¶203 was materially false and misleading because it invoked human-milk-related health benefits of consuming NeuroPro while omitting a crucial health detriment—that consuming it elevates the risk of developing NEC. Additionally, the statement extolled the health benefits of one of the ingredients of Reckitt's preterm formulas, while omitting that the presence of CSS, another ingredient, increases the risk of NEC, which Defendants knew based on the studies conducted by Dr. Buddington, Dr. Burrin, and its own scientists.

205. In its 2023 Annual Report, Reckitt described Enfamil as "building brains, easing tummies," and explained that Enfamil was designed to address infants' "[d]igestion issues[.]"

206. The statement quoted in ¶205 was materially false and misleading because Reckitt's preterm formula did not "eas[e] tummies," nor was it designed to address infants' "[d]igestion issues[.]" Rather, it increased the risk that preterm infants consuming it would develop NEC and potentially die—a risk that Defendants knew, but did not disclose.

207. On February 22, 2024, defendant Licht addressed investors at the Consumer Analyst Group of New York conference. In discussing the Company's U.S. supply expansion in response to

a baby-formula shortage caused by problems at one of competitor Abbott's factories, Licht stated, "Now I want to give you an example of how we're premiumizing nutrition with superior science. ***Enfamil NeuroPro" – a formula variety marketed specifically for preterm babies – "contains critical ingredients to drive brain superiority and immunity including MFGM***. This superior proposition is enabling us to both premiumize . . . while driving better health and cognitive outcomes for consumers."

208. The statement quoted in ¶207 was materially false and misleading for the reasons discussed in ¶204.

209. On March 15, 2024, following the $60 million verdict in *Watson* two days earlier, Reckitt issued a "Statement re NEC Litigation" via the London Stock Exchange's Regulatory News Service, in which it flatly denied that its infant formula caused NEC:

> **Statement is in response to a verdict received in Illinois state court on 13 March in one case concerning Necrotising enterocolotis (NEC)**
>
> ***Reckitt/Mead Johnson stands by the safety of our products. We strongly reject any assertion that any of our products cause NEC***, a serious gastrointestinal problem that mostly affects premature infants.
>
> While we continue to offer our deepest condolences to Ms. Watson, we strongly disagree with the jury's decision to fault Mead Johnson and award damages. We continue to believe that the allegations from the plaintiff's lawyers in this case were not supported by the science or experts in the medical community. This was underscored during the trial by a dozen neonatologists.
>
> It is important to note that this is a single verdict in a single case and should not be extrapolated.
>
> This case, and others like it, exclusively involve products used under the strict supervision of neonatologists in neonatal intensive care units and ***provide lifesaving nutrition options for vulnerable premature infants***.
>
> We are of course, surprised and deeply disappointed with the verdict and will pursue all options to have it overturned.

210. In its 2024 Annual Report, in speaking about the *Watson* verdict, Reckitt again denied the existence of a causal link between its preterm formula and NEC, stating that it "believe[s] the allegations from the plaintiff's lawyers in this case were not supported by the science of the experts in the medical community."

211. On March 18, 2024, Reckitt hosted an emergency conference call following the *Watson* verdict, on which defendant Sholtis was also present. The Company stated, according to a report by Bank of America, that it saw Enfamil as safe, critical, and essential to care, and that there was no causal link between its preterm formula and NEC, repeating the company line that it is the absence of human milk, rather than the consumption of formula, that results in a higher incidence of NEC.

212. During the call, Licht repeated the Company's denial that its infant formulas cause NEC, stating that EPF 24 "is safe and critical and we have no plans to stop providing the product."

213. On April 24, 2024, Reckitt held an earnings call during which Licht reiterated this message:

> To reiterate what we have previously said. ***Enfamil premature products are safe and provide life-saving nutrition for premature babies*** under the guidance of medical professionals who administer and specify our products. ***We strongly reject any assertion that any of our products cause necrotizing enterocolitis and that there was any failure to warn users of risk. The science does not support a causal connection between any Mead Johnson product and NEC***. We have no plans to stop providing the product, as that would be detrimental to the care of preterm babies and their families. ***Safety is and will remain our #1 priority across our entire product portfolio***.

214. The statements quoted in ¶¶ 209-213 were materially false and misleading because they spoke in unequivocal terms regarding the safety and life-saving nature of Reckitt's preterm bovine-based formulas, while omitting that Defendants understood—and Mead Johnson medical personnel personally believed—that Reckitt's preterm formulas increased the risk of NEC, that

preterm formula was a risk factor for NEC, and that Reckitt's own studies showed that CSS may trigger NEC.

## II. Defendants Misrepresented the Scientific Basis and Safety of Reckitt's Infant Formulas While Omitting Known NEC Risk

215. Throughout the Class Period, Defendants touted the Company's infant formulas as grounded in "science" and "safe," while internally acknowledging mounting evidence that bovine-based formulas significantly increased the risk of NEC in premature infants. Rather than disclosing these risks, Defendants repeatedly reaffirmed that Reckitt's infant formulas were based on "science" to preserve market share and pricing power in the Nutrition segment.

216. In Reckitt's 2020 Annual Report, issued on June 13, 2021, the Company again emphasized the scientific basis of its infant formulas:

> The Nutrition business includes our leading infant and child nutrition, adult nutrition and our range of vitamins, minerals and supplements. Brands include Airborne, Mead Johnson, Move Free and Schiff. ***The strength of this business is its focus on science-led innovations which underpin products catering to consumers from infant through to the elderly***.

217. On September 23, 2021, during an investor seminar, defendant Narasimhan further stated about Reckitt's infant-formula business: "Our specialty infant business is currently largely a North American business. . . . ***Our core Enfa business growth relies on science and differentiated claims to support premiumization***, offsetting the declines in birth rates. ***Our science is very strong across cognition, digestion and immunity***."

218. On June 8, 2022, Reckitt issued its 2021 Annual Report, in which it emphasized the scientific basis of its infant formulas:

> ***The Nutrition business includes our leading infant and child nutrition***, our adult nutrition and our range of vitamins, minerals and supplements (VMS). Brands include Enfa, Nutramigen, Airborne, Move Free and Neuriva. ***The strength of this business is its focus on science-led innovations which underpin products catering to consumers from infants through to the elderly***.

* * *

HOW DO WE PROVIDE ENHANCED NUTRITION FOR INFANTS AND FOR THE INCREASING NUMBER OF SENIORS IN SOCIETY?

* * *

Our response: ***Through the strength of our brands, consumer insight and science understanding, we are well placed to be a winner in the nutrition market. With our infant brands such as the Enfa range and Nutramigen***, and adult brands such as Provital, Move Free, Airborne and Neuriva, ***we seek to address the most important needs in nutrition***. Our product innovation teams leverage the capabilities within our science platforms of digestive health and allergy and immunity to deliver natural solutions that ***address the specific nutritional needs of these groups, whether infants or adults***.

219. On the February 22, 2024 call—when the *Watson* trial was underway and the witnesses who were neonatologists had already testified—an analyst asked about the Company's infant-nutrition business, specifically referencing Reckitt's description of an "attractive earnings model, enduring competitive advantage, [and] long-term runway for growth." Defendant Licht responded:

> [E]ven in very developed markets like here in the U.S., we can grow fast. And we have conviction that we can do that. In nutrition . . . we are still in a situation of normalizing after our business became much larger . . . due to the supply crisis. . . . [T]here's also no question that the real way to grow this business . . . is the runway for significant premiumization. ***And that's why I anchored on the science that underpins our innovation and our formula in the benefits that we can deliver when we bring new propositions to market that are clinically supported, where we have strong science to back that and claims that we can make that are very relevant for consumers. So in terms of health outcomes for babies . . . there's a long runway for growth to actually improve formula, deliver new benefits that are scientifically proven and premiumize the business as a result***. . . . There's no question that there are fewer babies being born . . . but there's also no question that the real way to grow this business . . . is actually the runway for significant premiumization.

220. The statements quoted in ¶¶216-219 were materially false and misleading because Defendants' preterm bovine-based formula was *not* grounded in rigorous science or science-led innovation—Defendants understood that the science indicated that there is an elevated risk of NEC from preterm bovine-based formula.

221. On May 16, 2024, two months after the *Watson* verdict, Reckitt issued its 2023 Annual Report, in which it doubled down on prior Annual Reports' statements about the scientific basis for its infant formula and the trust pediatricians and consumers accordingly placed in it:

> ***With its strong science-backed reputation for supporting brain health, the Enfamil family of brands offers a range of routine and specialty infant formulas***, as well as toddler nutritional drinks. It is the leading premium infant nutrition brand across markets and ***the number one paediatrician recommended product*** in core markets such as the US.
>
> * * *
>
> ***"Our products are differentiated by our clinical, science-based approach to innovation and an expanding focus on specialised nutrition." [Quoting Susan Sholtis, President of Nutrition.]***
>
> * * *
>
> ***Our infant formula and toddler products lead their categories and earn trust through an immutable commitment to quality that is deeply rooted in our Purpose***. We bring that Purpose to life through a strong innovation and clinical research pipeline that delivers the latest in scientific advances to our consumers.
>
> Our Nutrition business comprises some of the world's leading brands in infant and toddler formula alongside a growing brand presence in adult nutrition. ***Our products are differentiated by our clinical, science-based approach to innovation and an expanding focus on specialised nutrition***.
>
> ***Our leading scientists and Key Opinion Leader partnerships enable us to deliver solutions that are trusted and respected by parents and healthcare professionals (HCPs) alike***. This is reflected in ***Enfa's position as the leading premium infant nutrition brand*** across markets and the number one paediatrician recommended product in core markets such as the US and Malaysia, ***where infants are able to benefit from the cognitive and digestive benefits of our science-backed formula***.
>
> * * *
>
> ***Our credible science has meant we have established high levels of consumer trust and paediatric recommendation***. This is a position we never take for granted. We recognise trust needs to be earned every day and we work relentlessly to meet changing nutritional needs through a no-compromise commitment to product quality and food safety.
>
> * * *

> Within Nutrition, HCPs play an integral role in educating parents on child nutrition and recommending the solutions for their needs. ***As channel mediators, HCPs are therefore critical to our market success, which means building their awareness and trust alongside that of consumers. We review the latest clinical research continually to help improve understanding of how our products may be used to meet the specialised nutritional needs of infants and toddlers. We provide a variety of resources to HCPs, including medical education, roundtables and the workshops we facilitate with world-renowned experts.***

222. Defendants' statements quoted in ¶221 were materially false and misleading because Defendants portrayed Enfamil's market position, physician recommendations, consumer trust, healthcare-professional support, Key Opinion Leader relationships, clinical research pipeline, educational initiatives, and purportedly "science-backed" reputation as evidence that Reckitt's infant-formula products were supported by credible science and trusted by informed healthcare professionals, while omitting that Defendants understood that there was an elevated risk of NEC from preterm bovine-based formula. Defendants' repeated references to physician trust, pediatrician recommendations, healthcare-professional education, scientific credibility, and Key Opinion Leader support were particularly misleading because Reckitt knew that those endorsements existed within an information environment that Reckitt itself substantially influenced. At the same time, Reckitt internally recognized that many NICU physicians lacked the time, resources, or specialized knowledge necessary to independently evaluate the underlying scientific literature and that neonatologists often underestimated the magnitude of NEC risk associated with bovine formula feeding.

## III. Defendants Misrepresented Pediatrician and Hospital Endorsements

223. Throughout the Class Period, Defendants repeatedly assured investors that Reckitt's infant-formula business was underpinned by strong professional endorsements from pediatricians and hospitals. In addition to the statements quoted above in which Defendants linked Enfamil's purported strong scientific basis to pediatricians' trust in it, there were numerous other earnings

calls, investor presentations, and marketing materials in which Defendants highlighted that "Enfamil is the #1 pediatrician-recommended brand." In reality, Defendants manipulated scientific studies to deceive doctors.

224. The 2021 Annual Report, issued on June 8, 2022, boasted about how the **Company's scientifically based infant formulas had the trust of doctors and consumers:**

> Reckitt is home to some of the best loved, most recognisable and most trusted consumer brands in the US, including Airborne, Air Wick, Enfamil, Finish, KY, Lysol and Mucinex. . . . ***Our infant follow-on nutrition, Enfamil, is the number one brand recommended by paediatricians***.

225. During the March 1, 2023 earnings call, defendant Sly told investors that:

> In North America, ***we are now the #1 infant formula manufacturer in both the United States as well as Canada. Enfamil is now the #1 most trusted brand, both by parents and health care professionals***. . . . In the United States, our market share of non-WIC, i.e., the formula which parents choose and pay for themselves, is just under 50%, up from around 38% at the beginning of 2022. . . . ***Having the trust of HCPs [i.e., health care providers – doctors, nurses, and nutritionists in hospitals] is critical***. . . . It is difficult to know exactly how much of this increased share we will retain. I think it will be relatively sticky in the short term . . . with our leading brands and ***stronger reputation with health care professionals, including being the #1 recommended brand by pediatricians in the U.S.***, we will be fighting hard for every new parent. . . .

226. Likewise, on an April 26, 2023 investor call, defendant Durante said that "Enfamil is, as I said several times, is the preferred brand recommended by pediatricians."

227. On May 15, 2023, the Company issued its 2022 Annual Report, in which it again touted the trust doctors and consumers placed in Enfamil:

> Our Nutrition Global Business Unit (GBU) provides the highest-quality nutrition through various stages of life. The strength of this business is the leading position we occupy in infant nutrition across our key markets and the immense trust placed in us, especially by healthcare professionals and parents.
>
> * * *
>
> ***Our Enfamil brand is currently the Number One Recommended Infant Formula by Paediatricians and the Number One Trusted by Consumers in the US***.

228. On July 26, 2023, during Reckitt's earnings call, defendant Licht stated:

> In the U.S., we've maintained an absolute non-WIC market share just below 50%. ***Enfamil remains the #1 recommended infant formula by pediatricians and the #1 trusted brand by consumers in the U.S. . . . We also have a circa 40% share of hospital contracts, which we've managed to increase over the last 18 months***.

229. On February 28, 2024, on Reckitt's earnings call held during the *Watson* trial, defendant Licht told investors:

> Turning to Nutrition. While our North America business continues to rebase, we exited the year as market leader. And ***Enfamil remains the #1 brand recommended by pediatricians.*** We also have a circa 45% share of hospital contracts. ***We drive growth in this business through both premiumization, from science-led innovation*** and focus on the faster-growing and higher gross margin segment of specialty formula. . . . Families and health care providers rely on our products, and we take that responsibility very seriously.

230. In its 2023 Annual Report, after the Watson verdict, Reckitt further represented: "***Enfamil is the #1 infant formula brand recommended by pediatricians and trusted by consumers in the US. In 2023, our share in the Core Enfa family of products increased by c.60bps, supported by innovation and healthcare professional activation.***" The same report reiterated: "***Our products are differentiated by our clinical, science-based approach . . . solutions that are trusted and respected by parents and healthcare professionals . . . reflected in Enfa's position as the . . . number one pediatrician recommended product. . . .***"

231. Defendants' statements quoted in ¶¶224-230 were materially false and misleading because, by repeatedly citing pediatrician recommendations, healthcare professional trust, and hospital adoption, Defendants implied that Enfamil is unquestionably safe, while omitting that Defendants understood that there was an elevated risk of NEC from preterm bovine-based formula. Defendants' repeated reliance on pediatrician recommendations, healthcare professional trust, and hospital adoption was particularly misleading because Reckitt knew that those endorsements did not

arise from a fully informed assessment of the scientific evidence, but rather from an information environment that they manipulated.

## IV. Reckitt Falsely Represented to Investors that It Monitored Adverse Event Reports

232. Reckitt's 2021 Annual Report assured investors that the Company monitored the quality of its products and reported adverse events:

> Product safety policy
>
> ***The purpose of this policy is to assure our stakeholders of the safety of our products by describing our approach to Safety Assurance for products of Reckitt***. We have a responsibility to develop products that are as safe and nourishing as they can be; to monitor their in-use safety and listen to feedback from users, and if things change, to react quickly and effectively to mitigate harm.
>
> *   *   *
>
> A robust quality management system is underpinned by clear policies and supporting systems, which are subjected to comprehensive and independent regular audit review. ***Consumer safety and vigilance teams within the GSA [Global Safety Assurance] function conduct pre- and post-market safety reviews and monitor and report on adverse events***.

233. Similarly, the Company's 2022 Annual Report stated that the Company managed "product safety" risk in part by "Adverse and critical events procedure and dedicated vigilance group to monitor and report adverse events."

234. The statements quoted in ¶¶232-233 were materially false and misleading because Reckitt did not maintain or operate the robust adverse event monitoring, vigilance, and reporting system it described to investors with respect to NEC related events involving its preterm infant formulas. Because Defendants knew of the elevated risk of NEC from bovine-based preterm formula, a meaningful review of adverse event reports they received would have resulted in a determination that a causal relationship between consumption of its preterm formula and the death of an infant was reasonably possible. This is particularly true in light of Dr. Valentine determining in

every instance of receiving an adverse event report—often within a few minutes of receiving it—that there was no need to report a reasonably possible causal relationship.

## V. Defendants Characterized Product-Safety Risks as Merely Hypothetical When They Knew that Reckitt's Infant Formula Posed an Unreasonable Risk of Serious Illness or Death for Premature Babies

235. In Reckitt's annual reports, the Company falsely and misleadingly described the admittedly serious harms the Company could suffer from product safety problems as merely hypothetical when, as alleged above, Defendants were aware of the serious NEC risk that Mead Johnson's infant formulas posed to premature babies.

236. The Company's 2020 and 2021 Annual Reports both discussed its "Principal risks," including "Product safety." The "Risk Management" sections of the annual reports elaborated on this risk's "Potential impact":

> Product safety issues lead to reputational damage with consumers, customers or regulators. Significant financial losses could arise from supply disruption, product recalls, delayed launches, penalties and a loss of consumer trust, as well as possible criminal liability for senior management. Any gaps in the completion of our safety assessments or a lack of anticipation of new safety concerns could exacerbate any potential impact.

237. The Company's 2020 and 2021 Annual Reports also discussed "adherence to product quality standards" as one of the Company's "Principal risks" and described this risk's "Potential impact": "Impacts are wide-ranging and may include a consumer safety incident, regulatory failures, loss of sales (including product recall) and adverse reputational impact, a supply disruption or factory closure, or potential civil/criminal actions against individuals."

238. The statements quoted in ¶¶236-237 were materially false and misleading because they described the risk of harm to the Company from product safety defects, product quality defects, and violations of external or internal regulations or standards concerning product safety and product quality as merely hypothetical possibilities that could arise in the future, when in reality, such risks

had already materialized, as Defendants already knew of the elevated risk of NEC from Reckitt's bovine-based preterm formula.

## VI. Defendants Misrepresented the Drivers and Sustainability of the Nutrition Segment's Growth

239. On July 27, 2021, Reckitt held an earnings call to discuss its second-quarter results. During prepared remarks, defendant Narasimhan emphasized Reckitt's share growth in the U.S. infant-formula market, highlighting that it was driven by NeuroPro, a preterm formula: "***On market share, U.S. IFCN [i.e., infant and children nutrition] grew share by 100 basis points on the non-WIC*** . . . segment of the market. ***This continues to be driven by the strength in NeuroPro, where we have built marketing campaigns around its Omega 3-DHA claims.***"

240. On June 8, 2022, Reckitt issued its 2021 Annual Report stating: "We have approximately a one-third share of the IFCN market in the US, excluding sales related to the WIC. . . . ***[S]hare here grew c.50bps in 2021 as a result of strong innovation, with the new Enfamil NeuroPro launched in June***. . . ."

241. On July 27, 2022, Reckitt again reported quarterly results, stating that "Nutrition delivered mid-single-digit growth, ***led by the success of our preterm and specialty products, particularly . . . NeuroPro.***"

242. On an April 26, 2023 earnings call, defendant Carr told analysts: "In the U.S., we maintained our market-leading share position in the non-WIC markets, showing that ***mothers . . . are sticking with Enfamil.*** . . . [W]e remain confident in our ability to maintain a sustainable upside in market share. . . ."

243. The statements quoted in ¶¶239-242 were materially false and misleading because they discussed Enfamil NeuroPro as a driving force of its success in capturing IFCN market share,

while omitting that Reckitt's growth in that market was a result of a scheme to mislead investors and the public regarding the health and safety risks of its Enfamil preterm formulas.

**THE TRUTH EMERGES**

244. On March 13, 2024, in the *Watson* action, a jury in St. Clair County, Illinois, returned a $60 million verdict for the plaintiff in the first NEC lawsuit to be tried to a verdict.

245. The *Watson* jury was asked to determine Mead Johnson's liability on three grounds: (1) defective condition, based on whether Mead Johnson's bovine-based preterm formula was in an unreasonably dangerous condition that was a proximate cause of the decedent's injuries; (2) failure to warn, based on Mead Johnson's failure to adequately warn of the dangers and risks of its preterm infant formula, which rendered the product unreasonably dangerous and was a proximate cause of the decedent's injuries and/or death; and (3) negligence, based on whether Mead Johnson failed to act with the care of a reasonably careful manufacturer under similar circumstances and that failure was a proximate cause of the decedent's injuries and/or death.

246. After examining internal Company documents and hearing testimony from numerous witnesses, including senior Company executives, the jury found for plaintiff on the failure to warn and negligence claims. In doing so, the jury found that Mead Johnson's formula was a proximate cause of the infant's NEC.

247. On this news, the price of the Company's ADSs fell $1.97, or 14.7%, from a closing price of $13.41 per share on March 13, 2024, to a closing price of $11.44 on March 15, 2024. Similarly, the price of the Company's ordinary shares fell £7.80, or 14.8%, from a closing price of £52.66 on March 13, 2024, to a closing price of £44.86 per share on March 15, 2024.

248. Securities analysts expressed concern over the financial impact of the verdict, and others like it, or Reckitt's share price. For example, J.P. Morgan wrote in a March 15, 2024 analyst report that "[w]e see the share price movement reflecting market concerns on the potential financial

liability (for which the company has not provisioned) . . . ." On March 17, 2024, Jefferies wrote in an analyst report that the "liability risk is zero to £8bn+. Our base case assumes a £5.5bn, taking our PT [price target] from £46 to £40. . . ."

249. On March 18, 2024, BNP Paribas acknowledged for the first time in an analyst report that "[t]here appears to be a body of scientific evidence linking dairy based formula with NEC. Having reviewed the bellwether cases it appears that there is a body of scientific evidence to support the case that use of cows' milk-based preterm formula is linked to an increased incidence of necrotising enterocolitis (NEC)."

250. On March 18, 2024, UBS wrote that "[t]he verdict essentially concludes that some cow's milk-based infant formula products sold under the Enfamil brand cause necrotizing enterocolitis (NEC)[.]"

251. Bernstein Research, in its March 18, 2024 report, highlighted Reckitt's decision to not disclose the elevated risk of NEC from Enfamil. The report noted that it "would have preferred if: Reckitt would have made the case that the risks were known and sufficiently communicated. That does not seem to be the case and clearly its consumer communication does not highlight much risks in general[.]" It also noted that Mead Johnson's assertion of the learned intermediary defense in *Watson* was curious, because "***[o]n the one hand they claim that their products do not cause NEC, and on the other hand they claim that the physicians knew the risk rates. . . . '[I]f you say the physicians knew about the risk, then surely those risks were about higher NEC probability . . . therefore the product is involved in causing NEC?'***"

252. The Bernstein report went into further detail regarding how Reckitt described Enfamil on its website, stating that it focuses only "on benefits of the product and about expert recommendations . . . but no reference to experts recommending breastfeeding if possible."

253. Although Reckitt's March 15, 2024 statement about the *Watson* verdict itself was accurate, and the jury did find that the evidence adduced at trial supported the existence of proximate causation between bovine preterm formula and NEC, the *Watson* verdict did not reveal the entire truth, and Defendants prevented the market from recognizing the verdict's full implications by falsely reassuring investors that Reckitt's bovine formula did not cause NEC and that it expected to prevail in the ongoing NEC litigation.

254. The market accepted Defendants' false reassurances that the *Watson* verdict did not undermine Reckitt's position regarding NEC.

255. For example, J.P. Morgan wrote in a March 18, 2024 report:

> At this stage the company still believes that no liability should rise (no provision taken in FY23 accounts) as ***no causal link have been established between NEC and its pre-term feeding product***, but rather that formula fed babies are at higher risk of developing NEC (vs breast fed). All in all, we found that that context was helpful and reassuring even though the timeline (at the earliest H125) means the question of liability will linger for now. Near term, the shares could some see some relief on the positive outcome of an appeal against the verdict in the trial court (over the next months).

256. Similarly, RBC wrote in a March 18, 2024 analyst report, "we are reassured by management's confidence. . . ."

257. On April 24, 2024, the Company reported the *Watson* verdict in its 2023 Annual Report and stated that it had unquantified "contingent liabilities" related to the case purely as an accounting matter, but Reckitt did not book any reserve and continued to insist that it did not expect to ultimately pay any money to Ms. Watson or any of the other NEC plaintiffs:

> Necrotizing Enterocolitis (NEC) Product liability actions relating to NEC have been filed against certain Group subsidiary companies, or against certain Group subsidiary companies and Abbott Laboratories, in state and federal courts in the United States. The actions allege injuries relating to NEC in preterm infants. Plaintiffs contend that human milk fortifiers (HMF) and preterm formulas containing bovine-derived ingredients cause NEC, and that preterm infants should receive a diet of exclusive breast milk. ***The Company has denied the material allegations of the claims. It contends that its products provide critical tools to expert neonatologists for the***

> ***nutritional management of preterm infants for whom human milk, by itself, is not available or nutritionally sufficient. The products are used under the supervision of medical doctors. Any potential costs relating to the product liability actions are not considered probable*[.]** Given the uncertainty on the number of cases and range of possible results and/or outcomes on each case, the possible economic outflow cannot be reliably estimated, but may be significant. . . .
>
> * * *
>
> On 13 March 2024, a state court jury in Belleville, Illinois awarded $60 million to a mother of a child who was born prematurely and died 25 days later from Necrotizing Enterocolitis (NEC). ***Reckitt believe the allegations from the plaintiff's lawyers in this case were not supported by the science or the experts in the medical community***. Reckitt are appealing the verdict, and at this time, an economic outflow is not considered probable. There is a possible outcome that may be unfavourable. . . .

258. The Company's reassurances following the *Watson* verdict proved false. On July 29, 2024, the jury in *Gill v. Abbott Laboratories, Inc.* concluded that Abbott's specialized formula for premature babies led a baby to develop NEC and awarded the plaintiff $495 million. The scientific issues concerning causation of NEC by Abbott's bovine formula for premature babies were substantially identical to the issues concerning causation of NEC by Reckitt's formula. The *Gill* verdict therefore directly contradicted Defendants' prior statements that the NEC litigation was baseless, and it alerted investors that Reckitt faced even greater liability exposure than the *Watson* verdict had suggested, as demonstrated by the approximately 9% decline in the Company's ADSs and ordinary shares following reporting of the *Gill* verdict.

259. Accordingly, the market reasonably understood the *Gill* verdict as additional material news contradicting Reckitt's false reassurances about what the science supposedly said about bovine formula and NEC. For example, HSBC wrote in a July 25, 2024 report about Reckitt that "all eyes will be on the Abbott trial (Gill), already under way for two weeks, in St Louis, Missouri," and that "the result of the Abbott trial remains likely to be important for sentiment surrounding the litigation," although HSBC also noted that "[m]anagement still does not see either of these trials

[*Watson* or *Gill*] as critical in the bigger scheme of things . . . ." After the *Gill* verdict, J.P. Morgan wrote in a July 29, 2024 analyst report: "***Although this case did not involve Mead Johnson, the verdict is a second verdict on NEC*** (after the $60m *Watson* case) and, with the scale of the damages awarded, a negative read on potential liability is weighing on Reckitt shares today."

## ADDITIONAL ALLEGATIONS OF SCIENTER

### I. The Understanding by Senior Mead Johnson Medical Personnel that Bovine-Based Preterm Formula Elevates NEC Risk Supports a Strong Inference of Scienter

260. Defendants' scienter is also demonstrated by the understanding of senior Mead Johnson medical personnel and scientists, who reported to defendants Sly and Sholtis, that bovine-based preterm formula elevates NEC risk.

261. Dr. Valentine, as alleged in detail above, was Mead Johnson's Medical Director of North America from before the start of the Class Period until August 2021, and its Chief Medical Officer from May 2022 to October 2023. She acknowledged before joining the Company that human milk posed a significantly lower risk of NEC than bovine formula, but after joining Mead Johnson, she: (1) edited presentations to be shown to doctors to conceal the causal link between bovine formula and NEC; (2) failed to notify the FDA of adverse event reports concerning NEC cases among premature babies who were fed Mead Johnson's bovine formulas; and (3) edited a script for Company employees receiving calls about NEC cases among premature babies who were fed Mead Johnson's bovine formulas to conceal the causal link between bovine formula and NEC. Dr. Valentine also received an internal email in October 2015 reporting that Dr. Jae Kim, who at that time worked at the University of California, San Diego, had "virtually said it's not ethical to use bovine in the NICU." In light of her senior positions at Mead Johnson, and her frequent cross-talk with defendant Sly, there is a strong inference that the Individual Defendants were either aware, or

reckless in not being aware, of Dr. Valentine's knowledge and concealment of the undisclosed or misrepresented facts concerning the increased risk of NEC associated with bovine formula.

262. Dr. Waworuntu, as alleged in detail above, was a Senior Scientist on Mead Johnson's Global Discovery team. She: (1) participated in the 2016 Pediatric Academic Societies annual meeting, using a poster presentation with her name that stated that a major risk factor of NEC was "formula feeding"; (2) co-authored Dr. Burrin's study, which acknowledged that formula feeding is one of the "dominant factors . . . thought to be causally associated with NEC" and concluded that CSS "may predispose or even trigger onset of NEC pathology"; and (3) suggested reformulating Enfamil Premature by "mak[ing] lactose the main carbohydrate source [in Enfamil Premature] to promote growth and protect against NEC," giving the proposal a perfect score for ease of innovation because component parts for this formula already existed.

263. Braun, as alleged in detail above, joined Mead Johnson in 2007 as Vice President of Global R&D, was Senior Vice President of Research and Development and Quality from 2017-2018, and Senior Vice President Research and Development from 2018 until leaving the Company in 2019. He knew: (1) that infants receiving "100 percent formula have a higher NEC rate than the NEC rate in babies receiving bovine fortified donor milk"; (2) that "there simply wasn't enough evidence" to unequivocally state that elevated NEC rates from formula consumption was merely the result of lacking protective properties found in human milk; and (3) about piglet studies suggesting that formula using lactose, rather than CSS and maltodextrin, resulted in lower NEC incidence. In light of his senior positions at Reckitt, there is a strong inference that the Individual Defendants were either aware, or reckless in not being aware, of his knowledge and concealment of the undisclosed or misrepresented facts concerning the link between bovine formula and NEC.

264. Dr. Cooper, as alleged in detail above, was Associate Director of Clinical Innovation at Mead Johnson. He: (1) knew that the use of infant formula increases the risk of NEC over the use of human milk; (2) affirmed that "Mead Johnson was aware of the fact that . . . [preterm infant] formula increases the risk of NEC, and [it has] been aware of that for decades"; (3) received an email that contained the results of Dr. Burrin's study and summarized the results as showing that "[t]he risk of preterm infants developing necrotizing enterocolitis is higher when they are fed formula than when they are fed breast milk"; (4) was included on a subsequent email chain regarding the results with defendant Sholtis and Dr. Valentine, in which Dr. Rudolph wrote, regarding the study, that "[l]actose is good"; (5) believed that "increasing the lactose in our product line and minimizing [carbohydrate] polymers is a good thing to do"; (6) had "slight concern over the perception that could be generated if [Dr. Burrin's] ultimate results were spun to imply that our preemie product is unsafe and causes NEC in pigs"; and (7) acknowledged internally that the Company would be "more likely to have control over final language if we provide the small support[.]"

265. Dr. Berseth, as alleged in detail above, was Director of Medical Affairs, as well as a former practicing neonatologist. She (1) acknowledged that data demonstrated that "because of the lower NEC, ***it would be unethical to not use donor milk***"; (2) testified during the *Watson* trial that formula "increases the risk" of NEC compared with human milk, and that formula is a risk factor for NEC; (3) discussed the importance of publishing data that would "contradict" studies conducted by Prolacta Bioscience; and (4) admitted that Mead Johnson changed adverse event data reported in a final study report, including information submitted to the FDA.

266. Dr. Rudolph, as alleged in detail above, was Mead Johnson's Vice President for Global Medical Affairs and Chief Medical Officer. He (1) received an email that contained the results of Dr. Burrin's study and summarized the results as showing that "[t]he risk of preterm

infants developing necrotizing enterocolitis is higher when they are fed formula than when they are fed breast milk"; (2) forwarded the email to defendant Sholtis and Dr. Valentine, writing, "Lactose is good"; and (3) sent an email discussing piglet studies suggesting that formula using lactose, rather than CSS and maltodextrin, resulted in lower NEC incidence, writing, "Wouldn't it be amusing if the primary factor differentiating [human milk] feeding from formula feeding per NEC morbidity turns out to be lactose?"

267. Cleveland, as alleged in detail above, was Reckitt's Global Category Director of Nutrition from 2020 to September 2021 and its Senior Vice President for North America Nutrition from September 2021 to the present. He understood the importance of Reckitt's strategy to "win the NICU," and that a significant component of that was to attempt to acquire a company that produces human-milk-based nutrition products. He therefore understood that the reason for wanting to make such an acquisition was grounded in acknowledged clinical differences between human milk and Mead's products. Cleveland also periodically reviewed the current state of the science and continuously reassessed whether Enfamil's benefits continued to outweigh its risks.

268. Mead Johnson's senior personnel reported to defendants Sholtis and Sly, who each served as the Nutrition segment's President at various times during the Class Period, and who in turn both were on the Executive Team, sat on the GEC alongside defendants Licht, Durante, Carr, and Narasimhan, and reported to the CEO, who, at various points of the Class Period, were defendants Licht, Durante, and Narasimhan. It is therefore reasonable to infer that the actions and knowledge of Mead Johnson's senior medical personnel and scientists were shared with the Individual Defendants.

## II. Defendants' Access to Product Quality and Safety Information, by Virtue of Their Risk Management and Committee Roles, Supports a Strong Inference of Scienter

269. The Individual Defendants' scienter is further demonstrated by their access to information regarding product safety, product quality, and compliance with internal and external standards.

270. The "Risk Management" section of Reckitt's 2021 Annual Report states, with respect to "Oversight accountability" for "adherence to product quality standards," that "Executive ownership resides directly with the CEO, Global Business Unit Presidents and Chief Supply Officer, who drive activity through each of the Global Business Unit executive leadership teams." Thus, defendants Narasimhan, Durante, Licht, Sly, and Sholtis, at various times throughout the Class Period, were personally responsible for "adherence to product quality standards" during their respective terms as CEO, President of Health, and President of Nutrition, and either knew or were reckless in disregarding the undisclosed facts about the serious NEC danger posed by the Company's infant formula to premature babies and the resulting legal, financial, and reputational harms to which the Company was exposed.

271. According to the Company's 2023 Annual Report, "Ownership and accountability of principal risks resides with the GEC." The "principal risks" included "product quality" and "product safety," which were combined in 2023 as "product safety." The GEC included defendants Narasimhan, Carr, Licht, and Sly in 2021; Durante, Carr, Licht, and Sly in 2022; Licht, Carr, Sly, and Sholtis in 2023; and Sholtis in 2024. Thus, all of the Individual Defendants were personally responsible for product quality and product safety during the Class Period and either knew or were reckless in not knowing the undisclosed facts about the serious NEC dangers posed by the Company's infant formula to premature babies and the resulting legal, financial, and reputational risks to which the Company was exposed.

272. Moreover, because defendant Sholtis had personal knowledge of Dr. Burrin's piglet study demonstrating an elevated risk of NEC from formula, she either raised these facts at GEC meetings, or was reckless in failing to do so.

273. Further, because the Mead Johnson doctors and scientists reported to Sly when he was President of Nutrition, it is reasonable to infer that he knew of Dr. Burrin's piglet study demonstrating an elevated risk of NEC from formula.

274. Reckitt's CRSEC Committee is another forum in which defendants Narasimhan, Durante, Licht, and Carr either learned or were reckless in not learning about the bovine formula-NEC linkage and the resulting legal, financial, and reputational risks to the Company.

275. Reckitt's 2019 Annual Report states that "[t]here was continued focus on the management and safety of ingredients in products. The Committee continued to monitor emerging concerns on any ingredients, and RB's [Reckitt's] approach to both developing new ingredients to address these and collaboration with relevant regulators where appropriate."

276. Dr. Burrin's study—commissioned by Mead Johnson—concerned the safety of the ingredients in Mead Johnson's preterm formula, and found that the glucose polymers in that product may trigger the onset of NEC. The study came out in 2018.

277. Reckitt's 2021 Annual Report states that "Board oversight [of adherence to product quality standards] is provided by the CRSEC Committee." The 2021 Annual Report further states:

> Our Board is responsible for overseeing, considering and reviewing the Group's environmental, social and governance (ESG) strategy, as outlined in its Schedule of Matters Reserved for the Board. The Board delegates regular oversight of sustainability to the Corporate Responsibility, Sustainability, Ethics and Compliance (CRSEC) Committee.

278. The 2021 Annual Report also states that "[p]roduct quality & safety and Ethical business conduct" were among the "Non-negotiable ESG issues" that "continue to be among our

most material issues." Thus, the Board and CRSEC Committee's responsibility for ESG included responsibility for product quality and safety, as well as compliance.

279. The 2021 Annual Report's "Risk Management" section states with respect to "Oversight accountability" for "product safety" that "Executive ownership resides with the Chief R&D Officer, who drives activity through each of the Global Business Unit executive leadership teams. Board oversight is provided by the CRSEC Committee." The 2021 Annual Report makes substantially the same statement with respect to the Chief R&D Officer and CRSEC Committee's "Oversight accountability" for compliance with external and internal "product regulations" and standards. Specific matters considered by the CRSEC Committee during 2021 included "Product safety evaluation," "product integrity review," and "IFCN update - breast-milk substitute call to action."

280. In performing product integrity reviews, the CRSEC Committee was highly attuned to, and actively discussed, product safety incidents that result in serious illnesses and deaths. For instance, it performed a 4.5-year "product integrity" review in response to a catastrophic safety violation in South Korea that resulted in numerous illnesses and deaths. The review, at its peak, consisted of 90 cross-function scientists who reviewed over 21,000 stock-keeping units across 173 markets.

281. The CRSEC Committee included defendant Durante in 2021 and 2022 until he became CEO, and defendant Licht since 2023. The CEO and CFO also "regularly attend[ed] meetings," according to the 2021 Annual Report. Thus, defendants Narasimhan, Durante, and Licht attended the Committee's meetings during their respective tenures as CEO, and defendant Carr attended the Committee's meetings throughout the Class Period until his retirement as CFO in March 2024.

282. The CRSEC Committee also specifically addressed the Company's infant formula marketing practices in 2021:

> As part of our governance mandate and ensuring that we monitor the proper implementation of Reckitt's policy and procedures on the marketing of breast-milk substitutes (BMS), we are apprised on progress and developments in the marketing of our BMS products. We employ a number of monitoring activities, and have summarised below the key items from 2021:

- We completed our reporting on the responsible marketing of BMS: summarising alleged non-compliances of our BMS marketing practices versus the BMS Marketing Policy and/or local legislation for 2020.

283. Reckitt's 2022 Annual Report stated that the CRSEC Committee continued to monitor the Company's infant formula marketing practices in 2022: "As part of our governance mandate and ensuring that we monitor the proper implementation of Reckitt's policy and procedures on the marketing of breast-milk substitutes (BMS Policy), at each Committee meeting, we are apprised on progress and developments in the marketing of our BMS products." The Committee also that year considered "product safety evaluation," "regulatory matters," and "quality performance and risks."

284. The 2022 Annual Report further stated that that year, Reckitt "continued to implement new Safety Standards in our Nutrition business unit, which enabled us to demonstrate the safety of imported infant formula mixes to the US authorities. Overall, product safety evaluations within the Nutrition business have been upgraded and made more robust."

285. The 2022 Annual Report also stated that the CRSEC Committee's priorities in 2023 would include monitoring "product safety" and "compliance matters (including regulatory and quality risk assurance . . .)."

286. The CRSEC Committee reviewed "Product Safety and Quality" at all of its meetings during 2023, according to the 2023 annual report.

287. Moreover, Reckitt's 2021 and 2022 Annual Reports stated that one of the matters the CRSEC Committee discussed was "[Infant and Children Nutrition] progress, including position on sugars." These discussions culminated in a publication (the "Sugar Commitment") that stated its commitment to "[l]actose as the only carbohydrate source in infants' formulas from birth to 6 months of age[.]" Although Reckitt conveniently excluded preterm formula from the Sugar Commitment, it is reasonable to infer that Defendants were also discussing sugars used in preterm formula—in order to exclude it, Defendants must have discussed why to exclude it, which was a time when they would have discussed preterm formula and its attendant risks. Further, Dr. Burrin's 2018 piglet study specifically tested the sugars used in Mead Johnson's preterm formula (CSS) and concluded that it may trigger an onset of NEC. As a result, senior Mead Johnson doctors and scientists recommended substituting CSS with lactose in preterm formula. The Company, however, refused to make that change.

288. In order to provide the requisite information to the GEC and CRSEC Committee, Mead Johnson maintained a formal process whereby nutrition scientists and Medical Affairs, Regulatory, and Legal personnel reviewed scientific materials regarding the safety of infant formula. Teams routinely monitored complaint and adverse event data, which were reviewed by senior medical leadership, including Dr. Valentine, and escalated if event clusters exceeded historical baselines.

289. Reckitt also maintained an ongoing internal process to reassess the safety of its infant formulas. Cleveland testified at the *Watson* trial that, as part of upper management at Mead Johnson, he periodically reviewed the current state of the science and continuously reassessed whether Enfamil's benefits continued to outweigh its risks.

290. Thus, all of the Individual Defendants were responsible for, had access to, and/or were informed of the Company's product safety issues through their participation in the CRSEC Committee and either knew or were reckless in not knowing the undisclosed facts concerning the serious NEC dangers posed by Reckitt's infant formulas to premature babies and the resulting legal, financial, and reputational harms to which Reckitt was exposed.

291. In addition to the allegations concerning defendant Durante's scienter, he was thoroughly familiar with Reckitt's business, including the issues of product safety, product quality, and compliance with internal and external guidelines, from before the start of the Class Period until his departure from the Company. He served on Reckitt's Board for nine years before serving as the Company's CEO from October 1, 2022 to September 30, 2023. The Company's 2022 Annual Report described him as "deeply familiar with the business and its leadership function and . . . well positioned to lead the execution of the company's strategy and transformation."

## III. Reckitt's Consistent Exclusion of Preterm Formula from Their Oversight Duties Supports a Strong Inference of Scienter

292. Reckitt carved out preterm formulas from the Company's labeling procedures in Reckitt's Policy and Procedures on the Marketing of Breast-Milk Substitutes ("BMS Marketing Policy"), which was adopted in 2018, revised in 2020, and remained in effect throughout the Class Period. The BMS Marketing Policy pledged that the Company would comply with the World Health Organization's International Code of Marketing of Breast-Milk Substitutes of 1981 ("WHO Code"), "as implemented by local governments worldwide."

293. Although Reckitt was not obligated to follow the WHO Code in the United States, the Company nevertheless voluntarily took it upon itself to follow the WHO Code in the United States.

294. Article 9.1 of the WHO Code states, "Labels of Covered Products are designed to provide all necessary information regarding their safe and appropriate use and should not discourage

breastfeeding[.]" Reckitt, however, defines what constitutes a "covered product," and because it explicitly excluded preterm formula from this category, the Company did not create a self-imposed policy that its preterm formula labels must "provide all necessary information regarding safe and appropriate use." When asked during the *Watson* trial why, from a marketing perspective, it would be important to Reckitt to create this carve-out, Professor Pomeranz stated:

> There are two reasons in my mind . . . The first is the NICU is the most important place so they need to be able to market without any type of restriction in the NICU. And the second is they are well aware of the association between NEC and formula. So this allows them to not, according to their own policy, put that warning on their label.

295. According to the BMS Marketing Policy, "The Chief Executive Officer (CEO) of RB [Reckitt] is ultimately accountable for the BMS Marketing Policy and ensuring compliance herewith. All reporting on compliance with the BMS Marketing Policy, is submitted to the CEO for final review and approval." Reckitt's decision to exclude preterm formula from the labeling requirement of "provid[ing] all necessary information regarding safe and appropriate use," in conjunction with Defendants' understanding of the elevated risk of NEC from preterm formula, supports a strong inference that Reckitt was deliberately reckless in its oversight of preterm formula, intending to effectively blind itself and create the carve-out specifically to avoid overseeing the marketing of preterm formula or having to abide by a self-imposed policy of disclosing the elevated risk.

296. Moreover, as described above, Reckitt's decision to carve out preterm formula from CRSEC Committee discussions regarding its position on sugars, at precisely the time that preterm formula was alleged to cause NEC, supports the strong inference that Reckitt was deliberately reckless in its oversight of preterm formula, creating this carve-out specifically to avoid obligating itself to make an accurate statement regarding the elevated risk of NEC from consuming preterm formula.

## IV. Defendants' Efforts to Acquire Human-Milk-Product Manufacturers Raise a Strong Inference of Scienter

297. Because of its awareness of the greater risk of NEC for premature babies who were fed bovine formula instead of human milk, Reckitt tried to acquire a human-milk-product manufacturer several times from 2008 to 2021. Thus, there is a strong inference that the Individual Defendants were all informed of that greater NEC risk, and of the legal, financial, and reputational harms the Company was exposed to as a result, when the Company's senior executives and Board were considering the proposed acquisition of a human-milk-product manufacturer in 2021.

298. Indeed, Reckitt's then-CEO Rakesh Kapoor was personally involved with the attempt to acquire Medolac in 2017.

## V. The Volume of NEC Lawsuits Against Mead Johnson Raises a Strong Inference of Scienter

299. By about December 2021, Reckitt was aware that it was a defendant in ten federal lawsuits and 43 state lawsuits brought by parents of babies who became seriously ill or died from NEC after being fed Mead Johnson's bovine formulas. Mead Johnson sought a federal MDL consolidation of its federal NEC cases in February 2022. The number of NEC cases against Mead Johnson increased throughout the Class Period. Thus, there is a strong inference that the Individual Defendants were all informed of the greater risk of NEC for babies who are fed bovine formula instead of human milk, and the resulting legal, financial, and reputational harms to which the Company was exposed, when the Company's senior executives and Board were considering the Company's defenses in those cases.

## VI. Defendants Were Motivated to Conceal the Elevated Risk of NEC from Bovine-Based Formula in Order to Preserve Their Ability to Win Hospital Contracts and Protect a Vital Stream of Revenue

300. Reckitt and the Individual Defendants were motivated to misrepresent and conceal the truth about the science demonstrating that Mead Johnson's bovine formulas increase the risk of NEC

in premature infants because the Company's ability to provide formulas to NICUs to feed premature infants was critical to its ability to win hospital contracts to supply them with its entire portfolio of formulas, and the ability to supply the entire portfolio to hospitals was critical to gaining customers among parents—not only of premature babies but also of term babies—who would buy Mead Johnson formulas at retail after bringing their babies home from the hospital. Thus, Reckitt's entire infant formula business in the United States depended on its success in persuading neonatologists to use its formulas with premature babies in NICUs, which the neonatologists would not have done if they had been fully informed about the NEC risks that Reckitt misrepresented and concealed.

301. Reckitt's U.S. infant formula business was one of its critical sources of revenue. During the Class Period, Reckitt generated annual U.S. formula revenues of approximately $1 billion. Thus, Defendants were motivated to misrepresent and conceal the linkage between Mead Johnson's bovine formulas and NEC in premature infants in order to protect this vital revenue stream.

**POST CLASS PERIOD EVENTS**

302. The NEC litigation against Mead Johnson has continued since the end of the Class Period. Mead Johnson and Abbott initially won a jury verdict in October 2024 in *Whitfield*. But the judge in that case granted a new trial in March 2025, which was upheld upon appeal, finding that defendants' lawyers had engaged in misconduct at trial that made the verdict "against the weight of the evidence." The judge held that defendants' lawyers intentionally and repeatedly violated court rulings when presenting evidence to the jury; "flooded the zone" with improper objections; presented evidence the judge had previously excluded; falsely argued that the FDA had approved the relevant formulas' ingredients; confused the jury by attacking "straw man" arguments; and improperly argued that if plaintiff prevailed, babies would "starve to death" because the companies' bovine infant formulas would have to be pulled from the market, contrary to evidence that the formulas

would not have to be removed from the market and that there are alternative feeding options for premature babies. During the trial, the court sanctioned one defense lawyer—a lawyer for Abbott—for his misconduct, and the court held in its subsequent order granting a new trial that "Mead exacerbated Abbott's errors and misconduct by mirroring the same language throughout their presentation of evidence and arguments."[2]

303. In *Gill*, Missouri's Court of Appeals upheld the verdict against Abbott on appeal in May 2026. Abbott then appealed to Missouri's Supreme Court, after which Abbott reached a settlement to resolve the appeal in August 2026, agreeing to pay approximately $670 million to settle *Gill* and hundreds of other cases against Abbott.

304. In *Watson*, the Appellate Court of Illinois remanded for a new trial and reversed the denial of certain of Mead Johnson's post-trial motions on June 12, 2026. The Appellate Court largely rested the decision on its conclusion that the lower court should have, but did not, apply the learned intermediary doctrine to the plaintiff's claim, meaning that Mead Johnson's duty of care was owed to the physicians, rather than the plaintiff. The Appellate Court also concluded that the prejudicial effect of evidence introduced regarding Mead Johnson's financial details such as revenue, profitability, and executive compensation outweighed its probative value.

305. Critically, the Appellate Court's decision did not change that investors learned about the risks associated with preterm formula through the *Watson* trial and when the jury returned its verdict, nor did it speak to the propriety of plaintiff's experts or the scientific evidence introduced at trial.

306. In *Inman*, the jury returned a verdict in favor of Mead Johnson. During opening and closing statements, however, Mead Johnson's counsel largely focused on the unique medical

---

[2] Counsel who represented Mead Johnson (and counsel who represented Abbott) in *Whitfield* are not the same counsel who represent Reckitt in this action.

circumstances and complications of the plaintiff's baby, and argued those conditions caused his NEC and death.

307. In July 2026, a jury in St. Louis, Missouri,[3] found that Mead Johnson was not liable for causing NEC in the plaintiff's baby.

308. In April 2026, a jury in Cook County, Illinois, found Abbott liable for negligence, failure to warn, and product defect claims brought by four mothers whose children were diagnosed with NEC shortly after being fed Abbott's formula.[4] The jury awarded plaintiffs $70 million in damages.

## CLASS ACTION ALLEGATIONS

309. Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, as defined in ¶1. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

310. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. During the Class Period, Reckitt had approximately 700 million ordinary shares outstanding. Record owners and other members of the Class may be identified from records maintained by Reckitt or its transfer agent, and may be notified

---

3 *Collins v. Mead Johnson*, Case No. 2422-CC01642-01.

4 The jury's verdict was the result of four actions that were consolidated for trial. Those actions are: *Mendez v. Abbott Laboratories*, Case No. 2022-L-005377; *Williams v. Abbott Laboratories*, Case No. 2022-L-005401; *Thompson v. Abbott Laboratories*, Case No. 2022-L-005393; and *Sharpe v. Abbott Laboratories*, Case No. 2022-L-005381.

of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

311. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws or U.K. law that is alleged in this Complaint.

312. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

313. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws and U.K. law were violated by Defendants' actions as alleged in this Complaint;

(b) whether statements made by Defendants to the investing public during the Class Period omitted or misrepresented material facts about the business, operations, and prospects of Reckitt; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

314. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

315. The *Watson* verdict revealed new and corrective information, and in response the price of the Company's ADSs fell $1.97, or 14.7%, from a closing price of $13.41 per share on March 13, 2024, to a closing price of $11.44 per share on March 15, 2024. Similarly, the price of the Company's ordinary shares fell £7.80, or 14.8%, from a closing price of £52.66 on March 13, 2024, to a closing price of £44.86 per share on March 15, 2024.

316. The *Gill* verdict, which was reported after the market closed on Friday, July 26, 2024,[5] revealed new and corrective information. In response, the price of the Company's ADSs fell $1.02, or nearly 9%, from a closing price of $11.66 per share on July 26, 2024, to a closing price of $10.64 per share on Monday, July 29, 2024. Similarly, the price of the Company's ordinary shares fell £3.93, or 8.8%, from a closing price of £44.86 per share on July 26, 2024, to a closing price of £40.93 per share on July 29, 2024.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

317. At all relevant times, the market for Reckitt's ADSs and ordinary shares was efficient for the following reasons, among others:

318. Reckitt's ordinary shares met the requirements for listing and were listed and actively traded during the Class Period on the London Stock Exchange, a highly efficient market;

319. Reckitt's ADSs traded in large volumes on the OTC market, were exchangeable for ordinary shares, and were closely linked with the prices of the ordinary shares on the London Stock Exchange through trading by arbitrageurs;

---

[5] Robert Burnson and Jef Feeley, *Abbott Loses $500 Million Infant Formula Verdict, Lawyers Say*, BLOOMBERG (July 26, 2024), https://www.bloomberg.com/news/articles/2024-07-27/abbott-loses-500-million-infant-formula-verdict-lawyers-say.

320. Reckitt communicated with public investors via established market communication mechanisms, including dissemination of press releases through major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

321. Reckitt was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and customers of their respective brokerage firms during the Class Period and were publicly available and entered the public marketplace; and

322. Unexpected material news about Reckitt was reflected in and incorporated into the Company's ordinary share and ADS prices during the Class Period.

323. As a result of the foregoing, the market for Reckitt's ordinary shares and ADSs promptly digested current information regarding the Company from all publicly available sources and reflected that information in Reckitt Securities' prices. Under these circumstances, all purchasers of Reckitt Securities during the Class Period suffered similar injury through their purchases of Reckitt Securities at artificially inflated and maintained prices, and a presumption of reliance applies.

324. Alternatively, reliance need not be proven in this action because the action involves omissions. Positive proof of reliance is not a prerequisite to recovery for securities-fraud claims based on omissions under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that, as is the case here, the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## NO SAFE HARBOR

325. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading in this Complaint all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized by Defendants as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is alleged by Defendants to apply to any forward-looking statements pleaded in this Complaint, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false and misleading, or the forward-looking statement was authorized or approved by an executive officer of Reckitt who knew that the statement was materially false and misleading when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

326. Lead Plaintiff repeats and realleges every allegation contained above as if fully stated in this Count.

327. Lead Plaintiff asserts this Count against all Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated under the Exchange Act by the SEC.

328. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they intentionally or recklessly engaged in acts, transactions,

practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. This scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members; (ii) artificially inflate and maintain the market prices of Reckitt Securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Reckitt Securities at artificially inflated and maintained prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions alleged in this Complaint.

329. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and issuance of the annual reports, filings, websites, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Reckitt Securities. These reports, filings, websites, press releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

330. By virtue of their positions at the Company, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged in this Complaint and intended to deceive Lead Plaintiff and other members of the Class, or, in the alternative, these Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose facts that would reveal the materially false and misleading nature of the statements made, although those facts were readily available to these Defendants. These acts and

omissions of these Defendants were committed willfully or with reckless disregard for the truth. In addition, each Individual Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

331. Information showing that the Individual Defendants acted intentionally or with reckless disregard for the truth is peculiarly within these Defendants' knowledge and control. As the senior managers or directors of the Company, the Individual Defendants had knowledge of the details of Reckitt's internal affairs.

332. The Individual Defendants are liable both directly and indirectly for the wrongs complained of in this Complaint. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the Company's statements. As officers or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information about Reckitt's business, operations, and financial results. As a result of the dissemination of the false and misleading reports, filings, website, releases, and public statements alleged above, the market price of Reckitt Securities was artificially inflated and maintained throughout the Class Period. In ignorance of the adverse facts concerning the Company that were concealed by Defendants, Lead Plaintiff and other members of the Class purchased or otherwise acquired Reckitt Securities at artificially inflated and maintained prices and relied upon the price of the securities, the integrity of the market for the securities, or the false and misleading statements and omissions by Defendants, and were damaged thereby.

333. During the Class Period, Reckitt Securities were traded on an active and efficient market. Lead Plaintiff and other members of the Class, relying on the materially false and misleading statements and omissions described in this Complaint, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise

acquired shares of Reckitt Securities at prices artificially inflated and maintained by Defendants' wrongful conduct. Had Lead Plaintiff and other members of the Class known the truth, they would not have purchased or otherwise acquired Reckitt Securities, or would not have purchased or otherwise acquired the securities at the inflated prices that they paid. At the time of the purchases and other acquisitions by Lead Plaintiff and other Class members, the true value of Reckitt Securities was substantially lower than the prices paid by Lead Plaintiff and other members of the Class. The market prices of Reckitt Securities declined sharply upon public disclosure of the facts alleged in this Complaint, to the injury of Lead Plaintiff and other Class members.

334. By reason of the conduct alleged in this Complaint, Defendants intentionally or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated under the Exchange Act.

335. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases and acquisitions of Reckitt Securities during the Class Period, upon the disclosure of the previously materially misrepresented or omitted facts alleged in this Complaint.

**COUNT II**

**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

336. Lead Plaintiff repeats and realleges every allegation contained in the foregoing paragraphs as if fully stated in this Count.

337. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse

nonpublic information about Mead Johnson bovine products' link to NEC and the related legal, financial, and reputational risks to the Company.

338. As officers or directors of a publicly traded company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct or update promptly any public statements issued by Reckitt that had become materially false or misleading.

339. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the reports, press releases, website, and public filings which Reckitt disseminated in the marketplace during the Class Period containing the misrepresentations and omissions. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Reckitt to engage in the wrongful acts complained of in this Complaint. The Individual Defendants therefore were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged, which artificially inflated and maintained the market prices of Reckitt Securities.

340. Each Individual Defendant, therefore, acted as a controlling person of the Company. By reason of their senior management positions or being directors of the Company, each of the Individual Defendants had the power to direct Reckitt's actions and exercised that power to cause Reckitt to engage in the unlawful acts and conduct complained of in this Complaint. Each Individual Defendant exercised control over the general operations of the Company and possessed the power to control the specific activities constituting the primary violations set out in this Complaint.

341. By reason of the above conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act for the violations committed by the Company.

## COUNT III

### Violations of Section 90A of the Financial Services and Markets Act of the United Kingdom Against Reckitt

342. Plaintiffs New York State Teamsters Funds repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully stated in this Count.

343. This Count is brought under Section 90A of the FSMA, as amended by the Companies Act of 2006 and the FSMA 2000 (Liability of Issuers) Regulations 2010 (2010/1192), and Schedule 10A of the FSMA against Reckitt seeking damages in relation to New York State Teamsters Funds' and the Class's acquisition and/or retention of Reckitt ordinary shares during the Class Period.

344. Reckitt, as an issuer of securities to which Schedule 10A applies, dishonestly delayed the publication of information (within the meaning of paragraph 5 of Schedule 10A), including in reports and statements published in response to provisions implementing Articles 4, 5, and 6 of Directive 2004/109/EC of the Transparency Obligations Directive of December 31, 2004, in its preliminary statements pertaining thereto, and as further alleged in this Complaint.

345. Defendants Narasimhan, Durante, Licht, and Carr qualify as persons discharging managerial responsibilities.

346. Reckitt had an obligation under the Financial Conduct Authority's Disclosure and Transparency Rules ("DTR") to publish and not to dishonestly delay publication of the truth about the matters concerning its infant formula for premature infants, NEC, and the legal, financial, and reputational risks to the Company arising from the link between its formula and NEC that it misrepresented or concealed, as alleged in this Complaint. Specifically, Reckitt was obligated to disclose information regarding the elevated risk of NEC from bovine-based formula under DTR2, which requires issuers to announce information affecting share price as soon as possible, and/or

DTR4, which imposes periodic financial reporting obligations regarding, among other things, principal risks and uncertainties.

347. Reckitt, after delaying publication of the truth regarding elevated NEC risk from bovine-based formula, finally did so in announcing the *Watson* verdict via the London Stock Exchange's Regulatory News Service, which revealed new information to investors regarding Defendants' internal knowledge and prior concealment of evidence supporting elevated NEC risk.

348. One or more of the Individual Defendants, in discharging their managerial responsibilities on behalf of Reckitt, acted dishonestly in delaying the publication of information regarding the substantially increased risk of NEC and death to preterm infants taking Reckitt's bovine-based formulas and the attendant legal, financial, and reputational risks facing Reckitt.

349. This delay in publishing information was regarded as dishonest by people who regularly trade on the securities market in question.

350. One or more of the Individual Defendants, as alleged in this Complaint, were aware (or must be taken to have been aware) that such a delay was regarded as dishonest.

351. New York State Teamsters Funds and the Class made a decision to acquire shares in the market at the inflated price at which they were in fact acquired. Had New York State Teamsters Funds and the other members of the Class known the truth, they would not have purchased or otherwise acquired those shares, or would not have purchased or otherwise acquired them at the inflated prices that were paid.

352. New York State Teamsters Funds and the Class have suffered losses with regard to their purchase and retention of Reckitt ordinary shares as a result of the dishonest delay in publishing truthful information.

353. By reason of the foregoing, Reckitt is liable to New York State Teamsters Funds and the Class for compensation as provided by Section 90A of the FSMA 2000, as amended.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September 18, 2026

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
ALAN I. ELLMAN
MARIO ALBA, JR.
JASON EDELMAN

*/s/ Alan I. Ellman*
ALAN I. ELLMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
srudman@rgrdlaw.com
aellman@rgrdlaw.com
malba@rgrdlaw.com
jedelman@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
CRISTELLE RABBAN
ALYSSA PLASCOFF
420 Lexington Avenue, Suite 1832
New York, NY 10170
Telephone: 212/432-5100
crabban@rgrdlaw.com
aplascoff@rgrdlaw.com

*Lead Counsel for Plaintiffs*

PITTA LLP
VINCENT F. PITTA
120 Broadway, 28th Floor
New York, NY 10271
Telephone: 212/652-3890
vpitta@pittalaw.com

*Additional Counsel for Plaintiffs*